| ANDERSON & KARRENBERG, P.C. | LEWIS KAHN (Pro Hac Vice Pending) |
|---|---|
| Heather M. Sneddon (UT #9520) | **KAHN SWICK & FOTI, LLC** |
| Jared D. Scott (UT #15066) | 1100 Poydras Street – Suite 3200 |
| Jason E. Greene (UT #13990) | New Orleans, Louisiana 70163 |
| 50 West Broadway, Suite 700 | Telephone: (504) 455-1400 |
| Salt Lake City, UT 84101-2035 | Facsimile: (504) 455-1498 |
| Telephone:  (801) 534-1700 | Email: lewis.kahn@ksfcounsel.com |
| Facsimile:  (801) 364-7697 | |
| hsneddon@aklawfirm.com | |
| jscott@aklawfirm.com | |
| jgreene@aklawfirm.com | |

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| BENJAMIN HA, Individually And On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> OVERSTOCK.COM INC., GREGORY J. IVERSON and PATRIC BYRNE, <br> Defendants. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** <br><br> Civil No. _____ <br><br> Judge _____ |

## INTRODUCTION

This is a federal class action on behalf of purchasers of the securities of Overstock.com

Inc. ("Overstock" or the "Company") between May 9, 2019, and September 23, 2019, inclusive

(the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the

"Exchange Act").  As alleged herein, defendants published a series of materially false and misleading statements which defendants knew and/or deliberately disregarded were false and materially misleading at the time of such publication, and which omitted to reveal material information necessary to make defendants' statements, in light of such material omissions, not materially false and misleading.

## OVERVIEW

1.      Throughout the Class Period, Overstock operated an internet website selling household furniture and accessories, such as bed and bath and kitchen products.  The Company had been on a long streak of losing money, and had not reported a net quarterly profit sine 4Q:16.  In part, the Company was locked in a hopeless struggle for market share against a competitor, Wayfair.com, that had committed to losing billions of dollars to gain control over the market.  Realizing the market dynamics made it nearly impossible for Overstock to return to profitability, Overstock embarked on a blockchain strategy several years ago that was designed to profit on new markets for crypto currency.  In fact, it was recently reported that, for the last several years, defendant Byrne spent no fewer than 220 days a year on the road, "spreading his blockchain gospel, despite the fact that Overstock was hemorrhaging cash."

2.      By the inception of the Class Period, however, the Company's fortunes suddenly seemed to change.  First, Overstock had suddenly returned to profitability on an EBITDA basis and not only was the Company EBITDA positive for the first time in recent times, but profitability was suddenly increasing at such a torrid pace that Overstock had ***raised year-end guidance by 50% at the inception of the Class Period***.[1]  Moreover, not only had the Company

---

[1] All emphasis added unless otherwise noted.

2

purported to return to producing positive cash flow, but it had done so at the most critical time – at the launch of Overstock's crypto currency project tZERO, which theretofore had reportedly cost shareholders over $100 million to get to launch. Throughout the Class Period, defendants represented to investors that improvements in Overstock's Retail division would fund the launch of tZERO and that the Company could expect to earn at least ***$17.5 million of EBITDA by year end 2019***.

3.       During the Class Period, defendants issued a series of press releases and made statements in SEC filings and during Conference Calls for analysts and investors that promoted the Company's transition to crypto currency exchange service provider, and extolled the benefits that this would purport to provide to investors.  What defendants did not disclose, however, were the extreme risks and foreseeable volatility that was likely to result if and when defendants' true intentions behind the tZERO Dividend Offering were ever discovered.

4.       In fact, as investors belatedly discovered beginning on September 16, 2019, defendants had engineered the tZERO offering as revenge upon short sellers and tried to create a short squeeze by offering a digital token dividend that would not be registered and could not be resold for at least 6 months.  The lock-up period created by the issuance of an unregistered security effectively resulted in the inability of short sellers to deliver the security upon the surrender of their shares.   Because a short seller is responsible for any dividends issued during the time when that seller has borrowed shares, the inability to obtain the locked-up digital token dividend made it impossible for short sellers to maintain their short positions.  This was a significant issue, in part, because during the Class Period, Overstock was a heavily shorted stock.

5.      During the period when defendants were executing this short squeeze, and as shares of Overstock spiked in advance of the expected crypto Dividend date, however, investment banks began to make it known that they would accept cash in lieu of the crypto dividend.  This alone had the effect of ending this short squeeze, but not before shares of the Company spiked up from $16 to almost $27.00 per share.  Soon thereafter, on September 18, 2019, Overstock too relented and announced that it would modify the terms of its tZERO Dividend, and register such shares so as to avoid any lock-up.  This too had the effect of ending the embargo against short sellers.

6.      The end of the short squeeze caused shares of the Company to immediately deflate.  While shares traded to a Class Period high of $26.89 each on September 13, 2019, they traded to as low as $15.50 by September 18, 2019, three trading days later, after investors learned that the tZERO dividend was designed to be a short squeeze, and after the squeeze was first disrupted by investment banks and then abandoned by the Company.  Investors also ultimately learned that it was the SEC that quietly put a stop to Overstock's attempted market manipulation scheme.

7.      Thus, while failing to disclose the true risks inherent in defendants' plan, or the true plan itself, and the real motive for the tZERO Dividend, which was to punish short sellers for a decade long campaign against them for shorting Overstock and for being a market-check, or thorn in the side of defendant Byrne.  While defendant Byrne had previously, at different times, launched into public tirades over short selling and naked short selling, the tZERO Dividend was his secret plot to finally obtain hegemony over them – and it almost worked.

4

8.      Market participants and the SEC, however, thwarted Overstock's plan but not before defendant Byrne liquidated over $102 million of his privately held Overstock shares, including over $91.98 million of stock that he sold between September 16 and 18, 2019, the same time the SEC was: (i) telling the Company that it would not allow it to issue locked-up crypto dividends; (ii) defendant Byrne knew or deliberately disregarded that Overstock's sky high Directors & Officers insurance and other problems were causing the Company to miss earnings projections for the year (including the entire $17.5 million in EBITDA that defendants had conditioned the market to expect and which was critical to supporting the tZERO launch); and (iii) during the time that Overstock's new CFO had abandoned the Company (something that would not be disclosed until a full week later, on September 23, 2019).

9.      It was only on September 23, 2019, the final day of the Class Period, that investors learned the truth about the Company, including that defendant Iverson, who had only become CFO of the Company in May 2018, had abandoned his position at Overstock effective September 17, 2019 – a full week earlier and prior to and during the time when defendant Byrne was liquidating millions of shares of his personally held stock.

10.     At that time, the market also learned that the Company could not reach guidance sponsored and endorsed by defendants.  One of the chief reasons given for this miss was the rising cost of Directors & Offers liability insurance, which defendant Byrne had attributed as his reason for leaving the Company on August 22, 2019.  At that time, investors learned that defendant Byrne had liquidated his shares knowing that the sky-high insurance rates – caused primarily as a result of his unstable and erratic behavior – would cause the Company to miss guidance for 3Q and FY:19.

11.    By the time shareholders realized the scope of the misrepresentations that had been made to them during the short 5 months of the Class Period, shares of Overstock collapsed, falling from just below $15.00 per share on September 20, 2019, the trading day prior to September 23, 2019, to as low as $11.05 per share, before closing at $11.19 per share – a one day decline of almost 50%

12.    As investors also ultimately learned, the statements made by defendants during the Class Period concerning Overstock's operations and foreseeable results were patently untrue and were known or deliberately disregarded as such thereby. Unbeknownst to investors, throughout the Class Period, the Company was suffering from a host of undisclosed adverse factors which were negatively impacting its business and which would cause it to report declining financial results, materially less than the market expectations defendants had caused and cultivated.  In addition, as investors ultimately learned, Overstock did not maintain an adequate system of internal Controls and Procedures to assure the accuracy and completeness of the Company's statements and disclosures, nor did it maintain an adequate system of internal Controls necessary to prevent defendant Byrne from liquidating 100% of his $102 million worth of Overstock shares during the Class Period, while in possession of material adverse, non-public information about the Company.

13.    Defendants were motivated to and did conceal the true operational and financial condition of Overstock, and materially misrepresented and failed to disclose the conditions that were adversely affecting the Company throughout the Class Period, because it (i) enabled them to deceive the investing public regarding Overstock's business, operations, management and the intrinsic value of Overstock common stock; (ii) enabled defendants to artificially inflate the price

of Overstock common stock; (iii) enabled defendant Byrne to sell over $100 million of his privately held Overstock shares while in possession of material adverse non-public information about the Company; (iv) enabled defendants to sell additional shares of Overstock in the market to create a cash fund necessary to support its crypto projects (in the face of them being abandoned by investment partners); and (v) caused Plaintiff and other members of the Class to purchase Overstock common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).   Overstock maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

17.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

18.     Plaintiff BENJAMIN HA, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Overstock at artificially inflated prices during the Class Period and has been damaged thereby.

19.     Defendant **OVERSTOCK.COM INC.** is a Delaware corporation with its principal place of business located at 799 West Coliseum Way, UT  84047.  According to the Company's profile, on *https://finance.yahoo.com,* Overstock is as an online retailer in the U.S. and internationally, operating through Retail and tZERO segments. Through its on-line Retail division, the Company offers furniture, home décor and other related products.  Recently, the Company has also shifted its focus to include the development and commercialization of financial applications of blockchain technologies, through tZERO.

20.     Defendant **PATRIC BYRNE** ("BYRNE") was during the relevant period, Chief Executive Officer and a member of the Board of Directors of the Company, until his sudden and unscheduled departure announced on August 22, 2019.  During the Class Period, defendant Byrne made a series of materially false and misleading statements which he knew or deliberately disregarded were materially false and misleading at that time.   During the Class Period, defendant Byrne sold over $100 million of his personally held Overstock shares while in possession of material adverse information that had not been disclosed to shareholders.

21.     Defendant **GREGORY J. IVERSON** ("IVERSON") was during the Class Period, Chief Financial Officer and Principle Accounting Officer of the Company, until his sudden and unscheduled departure on September 17, 2019, that was not disclosed until September 23, 2019.  During the Class Period, defendant Iverson made a series of materially

false and misleading statements which he knew or deliberately disregarded were materially false and misleading at that time.  Defendant Iverson Joined the Company in April 2018, having previously served as the long-term CFO and/or held other senior accounting positions at Apollo Education Group, Inc. (2007 to 2018).   Apollo Education was sued for securities fraud that purported to occur between November 2013 and October 2015, by the Government of Guam Retirement Fund, and ultimately settled that action for a cash payment of $7.4 million, approved by the Court in late June 2019.  Defendant Iverson signed Apollo Education's SEC reports filed pursuant to Form 10-Q on 6/29/15, 3/25/15 and 1/08/15.

22.    The individual defendants referenced above are referred to herein as the "Individual Defendants."

23.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Overstock's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

24.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Overstock common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Overstock's business, operations, management and the intrinsic value of Overstock common stock; (ii) enabled defendants to artificially inflate the price of Overstock common stock; (iii) enabled defendant Byrne to sell over ***$100 million*** of his privately held Overstock shares while in possession of material adverse non-public information about the Company; and (iv) caused Plaintiff and other members of the Class to purchase Overstock common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Overstock between **May 9, 2019 and September 23, 2019,** inclusive (the "Class") and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Overstock common stock was actively traded on the Nasdaq.  As evidence of this, as of August 2, 2019, the Company had over 35.289 million shares of common stock issued and outstanding, as well as options and/or debt instruments. While the exact number of Class members is unknown to Plaintiff at this time and can only be

ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Overstock or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Overstock; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS
### Defendants' Materially False and Misleading Statements Made During the Class Period

31.     **1Q:19 Results: Guidance Increased 50%**.   On May 9, 2019, defendants published a release announcing purported results for the first quarter of 2019, the period ended March 31, 2019.  This release announced that, after spending $100 million of shareholder funds over the last 4 years, that the Company's tZERO product was ready to launch, and critically, that *Overstock Retail department was performing so well that EBITDA guidance could be increased by 50%*.   As defendants explained in the May 9 release, the return of Overstock Retail to positive cash flow was imperative in supporting the launch of tZERO.

32.     As evidence of this, the Company's May 9, 2019 release stated, in relevant part, the following:

Dear Shareholders,

Both the Retail and Medici (blockchain) sides of our business are progressing ahead of schedule, and below *I raise guidance for Retail by 50%.* I look forward to discussing these further in our earnings call.

Blockchain: Jonathan Johnson's organization and management of Medici has been superb.

tZERO:

As described on the last earnings call, I calculate the security token opportunity could be in the range of tens or hundreds of billions of dollars ("as with all estimates, this rests on the validity of assumptions and extrapolations described in

that call," interject the lawyers). As a result, ***over four years ago we began building, buying, and assembling the components of a blockchain-based capital market. We have deployed well over $100 million of your capital over four years in that quest. Maximizing our lead in the field is an organizational imperative***.

* * *

***Our security token capital market that we dreamed of four years ago is now ready (this month) for the public to use***. Starting in a few weeks and running into September, we are rolling out our full kit of technology and apps for security token trading: a great crypto trading app, a migration of OSTKP to a token, an integration with issuance platform Securitize allowing us to bring live on tZERO tokens issued by Securitize, and DLR 2.0 (in August). In sum, starting this quarter (even this month), you will see on tZERO's platform live security tokens which (we are working with regulators to ensure) the public will be able to trade legally.

33.     Regarding the purported performance of the Company's Retail division – Overstock's only source of revenue at that time – Byrne's Letter to Shareholders contained in the May 9, 2019 release also stated, in part, that:

***Retail is returning to be a source of positive cash flow rather than a consumer of it.***

* * *

Last quarter, I gave guidance that our 2019 contribution would be $160 million. I am now raising that to $165 million.

G&A Expenses: Our expense management has been aggressive. We have taken a tremendous (>25%) amount of cost out of our expense structure in the last 5 months. We are lean and fit as an organization.

***Taking the previous two points together, I am raising my Retail Adjusted EBITDA guidance for 2019 from $10 million to $15 million.*** I believe that by 2020, Retail positive Operating Cash Flows will be comparable with the past.

34.     The May 9, 2019 release stressed the critical importance of Overstock Retail returning to profitability relative to its overall plans, in part, as follows:

My ambition is to structure things so that for 2020, ***the cash thrown off by Retail largely covers the cash burn required to fuel our Medici blockchain keiretsu, without assuming that those firms find their own capitalization***, and without

assuming that any of them become oil gushers (though with tZERO, anything is possible).

35.     **1Q:19 Form 10-Q.** The same day, May 9, 2019, defendants filed with the SEC the Company's 1Q:19 Form 10-Q, for the quarter ended March 32, 2019, signed and Certified by defendants Iverson (as Chief Financial Officer), and Byrne (as Chief Financial Officer).  The Company's 1Q:19 Form 10-Q contained representations which attested to the purported effectiveness and sufficiency of Overstock's Controls and Procedures, as follows:

**ITEM 4. CONTROLS AND PROCEDURES**

We maintain disclosure controls and procedures, as such term is defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). ***The term disclosure controls and procedures means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms***.

Disclosure controls and procedures include, without limitation, ***controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure***.

36.     Regarding the purported Evaluation of Disclosure Controls and Procedures, the 1Q:19 Form 10-Q stated, in part, the following:

We carried out an evaluation required by the Exchange Act under the supervision and with the participation of our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) of the Exchange Act, as of the end of the period covered by this report. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective*** to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within

the time periods specified in the SEC's rules and forms and to provide reasonable assurance that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

\* \* \*

*[T]here has not occurred any change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting*.

37.    **Certifications**.  In addition to the foregoing, the Company's 1Q:19 Form 10-Q also contained nearly identical Certifications signed by defendants Byrne (as Chief Executive Officer) and Iverson (as Chief Financial Officer), that purported to attested to the accuracy and completeness of the Company's financial and operational reports, as follows:

## CERTIFICATION

I, Patrick M. Byrne, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Overstock.com, Inc.;

2. Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;

3. Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant* as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d15(f)) for the registrant and have:

      a. *designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision*, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others

15

within those entities, particularly during the period in which this report is being prepared;

b. *designed such internal control over financial reporting*, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. *evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. *disclosed in this report any change in the registrant's internal control over financial reporting* that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

b. *any fraud, whether or not material, that involves management or other employees* who have a significant role in the registrant's internal control over financial reporting.

Date: May 9, 2019

/s/ PATRICK M. BYRNE
Patrick M. Byrne
Chief Executive Officer
(principal executive officer)

38.     **1Q:19 Conference Call**.  In connection with the presentation of results for 1Q:19,

defendants also hosted a conference call for analysts and investors during which defendants

Byrne and Iverson presented.  During this call defendants reiterated many of the same or similar statements concerning the Company's foreseeable guidance and operations as were published by defendants previously, as reported herein, *supra*.  This release also quoted defendant Iverson, in part, as follows:

> Now on a personal note, while I only joined the Overstock team a few weeks ago, I couldn't be more excited about being part of this amazing organization. We have an incredibly talented team and I am confident we are well positioned to capitalize on the great opportunities ahead, both in our retail and blockchain businesses. With that, let me turn the call over to Patrick.

39.     The statements contained in Overstock's May 9, 2019 release and those statements contained in the Company's 1Q:19 Form 10-Q, and those made during the 1Q:19 Conference Call for analysts and investors referenced above, were each materially false and misleading when made, and were known by defendants to be false or were deliberately disregarded as such thereby, for the following reasons, among others:

(a)     At all times during the Class Period, it was not true that Overstock would be able to support the launch of its tZERO crypto currency with earnings or cash flow from its Retail operations and that whatever marginal improvements defendants had made by cutting costs and engineering earnings, could not be sustained so as to generate positive EBITDA or cash from operations necessary to support its crypto currency operations;

(b)     At all times during the Class Period, unbeknownst to investors, defendants had failed to disclose the extreme additional risks and the substantial volatility in the price of Company shares that was foreseeable, given defendants' undisclosed plan to offer its tZERO Preferred Share Dividend as a means to squeeze short sellers out of Overstock, and to prevent them from holding legitimate positions in the Company;

(c)     At all times during the Class Period, defendants had failed to disclose the foreseeable likelihood that the Company's ability to accomplish its intended short squeeze would embolden the SEC or even market participants, such as major brokerage houses, to act to prevent this market manipulation;

(d)     Throughout the Class Period, it was also not true that Overstock contained adequate systems of internal operational or financial controls, such that Overstock's quarterly reports filed with the SEC were true, accurate or reliable;

(e)     As a result of the foregoing, throughout the Class Period it also was not true that the Company's quarterly reports filed with the SEC were prepared in accordance with GAAP ad SEC rules; and

(f)     As a result of the aforementioned adverse conditions which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Overstock was operating according to plan, or that Overstock could achieve guidance sponsored and/or endorsed by defendants.

40.     Following the 1Q:19 Conference Call, Coindesk.com was quick to report that the $5 million that GSR Capital was reported on that call to have finally been paid Overstock for an investment in tZERO was significantly lower than the $400 million defendants had previously announced GSR would invest (on August 9, 2018), after reported "months of delays and revisions to the deal."  The finalized transaction valued tZERO at $1 billion, 50% less than the $1.5 billion in the initial agreement, and based only on an investment 1.25% of its original

announced size.[2]  Despite the sharp reduction in proceeds and paltry size of the investment, tZERO CEO, Saum Noursalehi, told CoinDesk that the $5 million investment was "a decent offer," and that the investment consisted of $1 million in U.S. dollars, $1 million worth of Chinese Renminbi, and $3 million worth of "certain securities."  **Only $2 million in cash.**

41.     At that time, CoinDesk also reported that, as tZERO had not obtained as much external investment as it hoped, it would for the time being rely on cash from Overstock.  In this regard, CoinDesk quoted tZERO CEO Saum Noursalehi, who stated that, **"[t]he retail business have quite a bit of capital, they are starting to be cash flow-positive."** CoinDesk also reported that Noursalehi told it that, to raise additional capital, Overstock sold some of its stock recently, and that those funds would be used, in part, to support tZERO.  Noursalehi described the stock sales as a "kind of hedge" against the uncertainty in the GSR-Macara deal.

42.     The publication of defendants' materially false and misleading statements had their intended effect and shares of Overstock immediately traded higher on these purported results and the Company's huge guidance increase.  As evidence of this, on May 9, 2019, shares of Overstock traded up over $2.00 per share in intra-day trading, almost 17% higher than the prior day's close.  It is obvious that defendants' positive statements regarding foreseeable growth and profitability overshadowed the fact that reported losses for 1Q:19 amounted to $1.18 per share, significantly higher than the $0.93 per consensus share loss expected by analysts.

---

[2] The original deal with GSR, announced in August 2018, was expected to bring $404 million to tZERO, but was postponed several times and downsized to $100 million in March 2019, and then to $30 million in April.  In March, when the deal was postponed for the second time, GSR brought in Makara. The two firms were supposed to co-lead the $100 million investment in tZERO.

43.     Taking advantage of the artificial inflation in the price of Overstock shares caused as a result of defendants' publication of materially false and misleading information, between May 13, 2019 and May 17, 2019, defendant Byrne sold over 900,000 of his personally held Overstock shares, while in possession of material adverse undisclosed facts about Overstock.  As evidence of this, on May 15 and on May 17, defendant Byrne filed reports with the SEC pursuant to Form 4, that showed he sold 250,000 shares on 5/13 at $13.33 per share; another 250,000 shares on 5/14 at $12.84 per share; and another 407,055 shares on 5/16 at $10.29 per share, for total gross proceeds of $10.731 million.  Considering no other material news about the Company was issued during that time, it appears that it was defendant Byrne's large sales that unbalanced the market and then caused the decline in the price of Overstock shares.

44.     Not only did the volume of defendant Byrne's sales depress the price of Overstock shares at that time, but questions immediately were raised as to why defendant Byrne would choose such an unusual time to sell so much of his position – approximately 20% of his holdings.  Considering how heavily Overstock had bet on Byrne's tZERO project that was finally coming to fruition, these sales naturally raised questions by investors.  Byrne was under no obligation to explain these sales, but once he did speak, he had an obligation to tell the complete truth.

45.     Rather than fulfill this obligation, on May 17, 2019, defendant Byrne took the opportunity to author a Letter to Shareholders that he then published in a corporate release that defended his stock sales, in part, feigning indignation and, in part, cloaking himself in purported corporate governance compliance, as follows:

Overstock.com CEO Patrick Byrne Issues Statement on Recent Sale of Personal
Shares of Overstock.com Stock

20

Dear Owners,

An unanticipated stir has been created this week among shareholders by my sale of approximately 900,000 shares of "founder's shares" of Overstock.com, Inc. (NASDAQ:OSTK), referenced in Form 4 filings on May 15, 2019, and today on May 17, 2019. Oddly, people of whom I have never heard are writing me demanding answers regarding my timing, reasoning, and purpose in such sales. Apparently, some find it unsettling and demand answers from me about why, after 20 years of working (generally without salary or compensation), I might sell several tens of millions of dollars' worth of stock. Frankly, I had no idea that shareholders would demand explanations of why and how I might want to use *my* cash derived from *my* labor and *my* property to pursue *my* ends in life. Not once have I ever asked a shareholder for his reasons in any decision he made. Yet, given the consternation this has caused, I will give answer, to preclude further recurrence of mass vapors.

A year ago, I told shareholders that I would be making significant sales to fund a variety of projects. Since then I have invested $12.5 million in blockchain projects, approximately 2/3 of that directly alongside your company's investments (thus, I am not only *not* running from eating my own cooking, I have been asking for a double helping of it)…

As to the timing: since I informed the public of my plans a year ago, there has barely been a day where my selling of stock would have been appropriate and legal. On nearly every one of those days I have been in possession of information that would have made such a sale inappropriate (or at least, arguably inappropriate). Nor could I sign a 10b5 plan, when such signature can only be made when one is not in a position of having asymmetric information with the marketplace. Only briefly, last fall, for about a week, did I feel I was not in possession of material non-public information. Recently I made a tremendous effort to disclose all possibly relevant information in our earnings release and our shareholder meeting (the latter of which has been overlooked), so that after the meeting, come what may, I could conduct such sales. While I hate to sell at this share price while the business continues to rebound quickly, but, as you may know, for many years I did not draw a salary in my role as CEO of Overstock, and even today it's a matter of public record that my annual salary is $100,000. As we recently discussed in our Q1 2019 earnings call and shareholders meeting that occurred the same day, the quicker-than-expected rebound towards profitability of our top-of-class e-commerce machine coupled with our Medici Ventures keiretsu companies bringing world-changing products to market has me as optimistic as ever about the future. I simply had to supplement my nominal salary with stock sales in order to fulfill personal commitments to invest

personally in blockchain projects such as Medici Land Governance, along with a need to meet charitable pledges such as those outlined above.

I do not intend to ever give such an explanation again. I owe shareholders staying within the law and not making decisions based on inside information, not explanations of my life and projects outside Overstock.

46.     On June 27, 2019, Overstock published a release announcing the "launch" of the tZERO "Crypto Wallet Mobile App."  According to defendant Byrne, the "tZERO Crypto is bringing a superb wallet into production, one with distinct advantages over other wallets currently in use."  In addition to certain security enhancements, defendant Byrne highlighted that tZERO is  "more true to the cypherpunk ethos of decentralization through cryptography."  If that is the distinct advantage, it is not clear what, if anything, that is.

47.     On July 15, 2019, defendant Byrne authored an unscheduled Letter to Shareholders that exceeded 14 pages in a corporate release.  After analyzing what Byrne concludes is a multi-billion- or trillion-dollar market opportunity for Overstock, he then outlined what he presented as his purported "Plan of Action," in part, as follows:

a.      Our first step (two weeks ago) was converting OSTKP digital preferred shares to OSTKO, a Digital Preferred Series A-1 stock, trading on the PRO Securities ATS.

b.      In order to trade OSTKO digital securities on the PRO Securities ATS, investors need a brokerage account with Dinosaur Financial Group.

c.      Currently and for the time being, the tZERO preferred equity tokens that we issued in 2018 in a private placement may only be resold among accredited investors with Dinosaur Financial brokerage accounts on the PRO Securities ATS pursuant to Section 4(a)(7).  Come August 2019, however, they will be eligible for resales under Rule 144. At that point investors who are not accredited investors will be able to start trading tZERO tokens on the PRO Securities ATS (also subject to the Dinosaur Financial Group account opening process described above).

48.     Defendant Byrne again used this release to condition the market to believe that

Overstock's Retail operations were performing at or even above revised guidance, as follows:

Retail

The core earning power of our retail business has snapped back more quickly than
I expected. It is time to take honest stock of how we got here and where we are. I
will address this by explaining where we were, what happened, how we corrected,
and where we go from here.                          * * *

How we corrected: At the start of 2019 I told you that Retail EBITDA for 2019
would be ≈ $115 million improvement from 2018, through a combination of a $33
million reduction in expenses and an $82 million improvement in Contribution. It
looks to me now as though that our improvement will be ≈$120 million.

    i.      In the first half of 2019 we took an axe to expenses, trimming
payroll in Utah by about 30%. The reduction in force was heavily skewed away
from technologists and scientists and towards business staff, so that we are
approaching a 50-50 split. Though any such reduction is painful, everything
seems to be running smoothly.

    ii.     In the first half of 2019 our contribution soared, so that I now
move my estimated projection for its improvement this year from $82 million to
>$90 million. As a result of our belt-tightening and return to optimization of
Contribution, we have already reached the point that our monthly Contribution
covers our Retail cash expense structure:



Where we go from here -

> i.   *Retail's recovery in 2019 has been exceeding expectations. I have raised our 2019 Retail Adjusted EBITDA estimate from $10 million to $15 million to (now) $17.5 million to reflect this growing strength.*

49.   In concluding, defendant Byrne stated that, "[w]e will sell the Retail business if it makes sense and we get a good offer for a good home for it. Otherwise we will operate the retail business as though we are going to hold it forever.  We will run it with a goal to maximize profit, which will fund our world-changing blockchain innovations, while we leverage its significant traffic to introduce our consumer-facing blockchain products to the world."

50.   Byrne's final comment about retaining the Retail division forever was in stark contrast to his prior statements regarding the existence of real suitors interested in purchasing these assets and Overstock's desire to liquidate them to focus entirely on crypto.  In a report titled, "**Overstock.com CEO Patrick Byrne Can't Keep His Story Straight**," published on the website Gurufocus.com, the authors stated that "despite recently claiming to have two eager suitors waiting in the wings, CEO Patrick Byrne has done a rather shocking about-face. He now says that Overstock plans to hold on to its retail business, possibly forever."

51.   Gurufocus reported on this "sudden change of tune," in part, as follows:

Fast forward to [July] 15 and suddenly Byrne is singing an entirely different tune. In a letter to shareholders, the mercurial CEO declared that, because the retail business has recovered substantially, and will likely tip back into profitability this year, the imperative to sell is now gone:

> "Retail's recovery in 2019 has been exceeding expectations. I have raised our 2019 Retail Adjusted EBITDA estimate from $10 million to $15 million to (now) $17.5 million to reflect this growing strength...That means that for 2020, Retail should generate enough cash to substantially cover Blockchain's operating cash burn. Thus, an important strategic consideration to note is that we are not in a place that we have to sell."Indeed, Byrne now claims that profits from the online retail platform will now be used to offset the cash burn from its expanding blockchain business."

24

An adjusted Ebitda of $17.5 million is hardly peanuts, but it is also nothing like the hundreds of millions of dollars that most Overstock bulls expected to arise from an outright sale. Yet, according to Byrne, Overstock now intends to act as if it plans to run the retail business forever…

52.     The GuruFocus Report concluded the following:

Verdict

Mere days before the latest shareholder letter was published, [renowned trader Mark] Cohodes was calling for Byrne's ouster:

> "Patrick has lost the confidence of the Holders...He is a Fisherman not a Chef of a Seafood Restaurant. He can catch fish but can't cook."

This latest episode in the Overstock saga will probably sour shareholders on their CEO even further, and will not likely change the tune of the likes of Cohodes.

**Why Byrne would want to keep it forever, rather than sell it for significantly more upfront cash, is beyond us. Fundamentally, the decision to hold onto the retail business makes no sense**. It just is not a good business, even if it is no longer burning cash. If there was even a remote hope of selling, one would think Overstock would pursue it. **Giving up suggests that there are probably few businesses out there with an interest in acquiring an expensive, low-margin e-commerce and logistics platform.**

**Ultimately, Byrne has proven that he cannot execute to plan. As a result, the company will continue to operate its barely profitable retail business alongside its blockchain efforts. That does not sound like a coherent strategy**.

53.     The statements made by defendants contained in the Company's May 17, 2019, June 27, 2019 and July 15, 2019 press releases were materially false and misleading and were know by defendants to be false at that time, or were deliberately disregarded as such, for the reasons stated herein in ¶ 39, *supra*.

54.     On July 30, 2019, Overstock published a release that purported to announce that it had declared a dividend of 1 digital Series A-1 Preferred Share for every 10 common shares held.  According to this release, the new shares of Series A-1 to be issued in connection with the

Dividend have not been, and are not required to be, registered under the Securities Act of 1933 or applicable state securities laws. Consequently, no secondary resales of such shares will occur until they become eligible for resales under Rule 144 under the Securities Act, or if another exemption from registration is available. The time period after which the Dividend shares will become eligible for Rule 144 varies depending on individual circumstances. In general, it is <u>six months</u> from the payment date for non-affiliate investors, subject to the applicable requirements and limitations of Rule 144. Once secondary resales are permitted, investors are expected to be able to trade shares of the Series A-1 on the PRO Securities ATS, operated by PRO Securities, through a brokerage account established with Dinosaur Financial Group, LLC.

55.     This release again quoted defendant Byrne, in part, as follows:

"***Five years ago, we set out to create a parallel universe: a legal, blockchain-based capital market. We've succeeded***," said [defendant] Byrne. "The approximately 40,000 holders of the currently outstanding ≈37 million shares of Overstock will be issued a dividend of ≈3.7 million of these new digital shares to trade in that new capital market. Because the bundle of legal rights represented by each of these new A-1 shares is similar to the bundle of legal rights embodied in shares of our common stock (OSTK) that trades on NASDAQ, I might normally expect these blockchain-based A-1 shares to trade in rough approximation with OSTK…"

56.     On August 8, 2019, defendants published a release purporting to announce results for the 2Q:19, the period ended June 30, 2019.  This release again contained a Letter to Shareholders by defendant Byrne that stated, in part, the following:

Fellow Shareholders,

Our second quarter brought strong results for both our blockchain and retail businesses as we continue to innovate in both areas with our disruptive technologies.

* * *

**Our retail business has returned to positive adjusted EBITDA for the first time since the second quarter of 2017 and shows no signs of stopping.**

Finally, the recently announced shareholder dividend to be issued in shares of our Digital Voting Series A-1 Preferred Stock, OSTKO, has opened a wormhole that will further connect our retail, blockchain, and crypto universes.

57.     The same day, August 8, 2019, defendants also caused to be filed with the SEC the Company's 2Q:19 Form 10-Q, for the quarter ended June 30, 2019, signed and Certified by defendants Iverson (as Chief Financial Officer) and Byrne (as Chief Executive Officer).  The 2Q:19 Form 10-Q contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as well as the completeness and veracity of Overstock's disclosures and reports, that were substantially similar or the same as those statements contained in the Company's 1Q:19 Form 10-Q, reproduced herein in ¶¶ 35- 37, *supra*.

58.     While the 2Q:19 Form 10-Q did contain several pages of purported Risk Disclosures related to tZERO and the A-1 Preferred Dividend, these statements did nothing to alert investors to the true risks inherent in defendant Byrne's plan to punish short sellers of Overstock shares by attempting to engineer a short squeeze using the tZERO Offering. Assuming these purported Risk Factors are placed in order of importance, the top 5 purported Risk Disclosures related to tZERO included:

*Our ownership in tZERO is below the threshold required to permit us to use its losses to of set taxable income generated by the rest of our U.S. business and is below the threshold required to effect a tax-free spin-off.*

*tZERO Crypto's business may be limited in certain jurisdictions if it is unable to timely receive certain licenses it is in process of obtaining or due to the regulations applicable to it.*

*ZERO Crypto operates a digital wallet and exchange services application which subjects it to a variety of risks.*

**tZERO Markets may not receive the regulatory approval it requires to operate its anticipated business.**

**tZERO Markets intends to be registered as a broker-dealer and would be subject to extensive regulation**.

59.     Assuming these purported Risk Factors are placed in order of importance, the top 5 purported Risk Disclosures related to A-1 Preferred Offering included:

**Our Series A-1 Preferred shares are substantially different from other securities traded in the U.S. public markets and are subject to a variety of unusual restrictions and material risks.**

**PRO Securities, and the Series A-1 Preferred depends on both tZERO and PRO Securities, neither of which has substantial resources**.

**Transactions involving the Series A-1 Preferred could result in errors, which may be impossible to correct.**

**The Series A-1 Preferred depends on Computershare as the transfer agent for the Series A-1 Preferred.**

**The potential application of U.S. laws regarding traditional investment securities to the Series A-1 Preferred is unclear.**

60.     The following day, August 9, 2019, in connection with the presentation of results for 2Q:19, defendants also hosted a conference call for analysis and investors in which defendants Byrne and Iverson presented.  During this call defendants reiterated many of the same or similar statements concerning the Company's foreseeable guidance and operations as were published by defendants previously, as reported herein, *supra*.  While the transcript of this call, including Q&A, was 20 pages, Chief Financial Officer, defendant Iverson's comments were limited to explaining that certain statements were forward looking.  After that, Iverson's contribution to this call consisted of stating, "I'll turn the call over to Patrick."  Having participated in (at least to that extent) and monitored this entire call, defendant Iverson did

nothing to dispute defendants' prior statements or to disclose the true financial or operational condition of Overstock at that time.

61.     The statements made by defendants contained in the Company's July 30, 2019 and August 8, 2019 press releases, and those statements contained in the Company's 2Q:19 Form 10-Q, filed with the SEC on August 8, 2019, and those statements made by defendants during the Company's  August 9, 2019 Conference Call with analysts and investors were materially false and misleading when made and were know by defendants to be false at that time, or were deliberately disregarded as such, for the reasons stated herein in ¶ 39, *supra*.

62.     On August 12, 2019, defendant Byrne caused Overstock to publish a release that can only be described as bizarre in the annals of corporate history in America.  That day, defendant Byrne published a release titled, "**Overstock.com CEO Comments on Deep State, Withholds Further Comment**."  This strange release stated, in substantial part, the following:

SALT LAKE CITY, Aug. 12, 2019 (GLOBE NEWSWIRE) -- Overstock.com, Inc. CEO Patrick M. Byrne has released the following statement:

"Sara Carter has published two articles relating the following claims of mine:

Starting in 2015 I (operating under the belief that I was helping legitimate law enforcement efforts) assisted in what are now known as the 'Clinton Investigation' and the 'Russian Investigation' (in fact, I am the notorious 'missing Chapter 1' of the Russian investigation). It was the third time in my life I helped the Men in Black: the first was when my friend Brian Williams was murdered, and the second was when I helped the M.I.B. shake up Wall Street a decade ago. Unfortunately, this third time turned out to be less about law enforcement and more about political espionage conducted against Hillary Clinton and Donald Trump (and to a lesser degree, Marco Rubio and Ted Cruz).

In July 2018 I put the pieces together. I immediately (last July) came forward to a Congressman and a senior military officer, to the Department of Justice this April, and (upon my Omaha Rabbi reminding me of my duty as a citizen late this June) to a small set of journalists this summer. Ms. Carter was among them. Her two stories are accurate.

Having confirmed Ms. Carter's two articles, I have fulfilled those citizenship obligations of which my Rabbi reminded me. I will speak no more on the subject. Instead, having lived in places lacking Rule of Law and having witnessed the consequences of its absence, I plan on sitting back and watching the United States Department of Justice re-establish Rule of Law in our country."

63.     Needless to say, these statements did not inspire investor confidence and shares of the Company immediately traded lower on August 14, 2019, to a low of just above $20.00 per share, compared to the prior day close of $24.92 – a one-day decline of almost 20%.  As investors digested the significance of this release, and the apparent instability of its author, shares of Overstock continued to trade lower falling to an intra-day low of $15.46 per share on August 14, before closing the trading day only slightly higher at $15.97 – a two day decline of over 36%.

64.     On August 13, 2019, MarketWatch published a report titled, "**Overstock CEO spins an insane Russian-spy drama, with himself as the star**."  This report characterized Byrne's statements as "bizarre" and "ridiculous," in part, as follows:

Overstock.com Inc. Chief Executive Patrick Byrne has gone in some wacky directions over the past two decades: internet entrepreneur, acid-tongued enemy of short sellers, self-proclaimed blockchain guru.

None of that prepared the world for Byrne's latest ridiculous role, though: Lothario secret agent at the center of the biggest political scandal in the country.

Byrne issued one of his most bizarre statements yet after the market closed Monday, which is really saying something when it comes to the Overstock CEO. In confirming a story from an independent Fox News contributor and a random interview on Fox Business early Monday, Byrne claimed that in 2015 he "assisted in what are now known as the Clinton investigation and the Russian investigation."

"In fact," Byrne said. "I am the notorious 'missing Chapter 1' of the Russian investigation."

\* \* \*

30

"I think we are about to see the biggest scandal in American history," Byrne said in an interview with Stuart Varney on Fox Business. "Everything you think you know about the Russia and Clinton investigations was a lie, it was all political espionage. I think [U.S. Attorney General William Barr] has gotten to the bottom of it."

While Byrne was spinning about international espionage and conspiracy, his company's stock took a beating. Overstock share plunged 17.6% Tuesday, wiping away temporary gains that it had won after an earnings report last week, despite disclosing a net loss for the 10th consecutive quarter.

65.    The August 13 MarketWatch report speculated that there may be a method to Byrne's seeming madness, speculating that "Byrne's behavior may serve a purpose: deflecting from the disintegrating business he runs. As an e-commerce company, Overstock has been a money-losing venture and Byrne had been trying to find a buyer for it so he can focus on his cryptocurrency gambit, called tZERO, which, MarketWatch stated, was the original intent of that Fox Business interview Monday."

66.    Within ten days, the aftermath of defendant Byrne's ill-fated "Deep-State" release resulted in his resignation as CEO and as a director of the Company.  On August 22, 2019, the Company issued a release that again contained a Letter to Shareholders by defendant Byrne that stated, in part, the following:

Dear Shareholders,

In July I came forward to a small set of journalists regarding my involvement in certain government matters. Doing so was not my first choice, but I was reminded of the damage done to our nation for three years and felt my duty as a citizen precluded me from staying silent any longer. So, I came forward in as carefully and well-managed fashion as I could. The news that I shared is bubbling (however haphazardly) into the public. Though patriotic Americans are writing me in support, my presence may affect and complicate all manner of business relationships, from insurability to strategic discussions regarding our retail business. Thus, while I believe that I did what was necessary for the good of the country, for the good of the firm, I am in the sad position of having to sever ties with Overstock, both as CEO and board member, effective Thursday August 22.

31

67.    In this release, defendant Byrne also revealed that he had anticipated his departure since as early as July 2018 and that, on July 15, 2019, "in the expectation that I might be gone before our recent (August 8) earnings call, I wrote my most detailed letter to shareholders in a long time ("Overstock.com Releases Letter to Shareholders from CEO Patrick M. Byrne")." Defendant Byrne used this release to reiterate the "key points" of the July 15 Letter, in part, as follows:

Retail

We face a competitor who (by the end of this year) will have lost close to $3 billion, and who announced recently it will seek to raise another $750 million...

After my ill-fated experiment last year in copying our competition's strategy, our retail business has recovered to a state of positive adjusted EBITDA.

* * *

Strategically:

We have removed the pistol from our temple. I believe in the near future the cash generated by Retail going forward should be adequate for funding both Retail's ongoing innovation (we caught the Machine Learning wave just right here, and have a first-rate team that is reinventing the company from an ML perspective), and nurturing to maturity our keiretsu of blockchain firms, especially tZERO, Medici Land Governance, and Bitt (well, and Voatz, too) – particularly with the possibility of their becoming less of a cash burn, either through outside investments, or from the fact that their products (e.g., tZERO's) are reaching the market.

68.    Not surprisingly, the market reacted positively to the news of defendant Byrne's departure as well as his wildly inflated guidance that lacked any reasonable basis at that time, and shares of Overstock rallied to just below $23.00 per share from a close the prior day of $19.50 per share, on trading volume of over 12.48 million shares, many times average daily trading volume.  At the time of his exit, it was reported that defendant Byrne continued to own just over 4.9 million shares of the Company equal to 13.9% of the shares outstanding.

32



69.    The statements made in the August 22, 2019 release, especially those statements that reiterated or endorsed the statements previously made on July 15, 2019, were materially false and misleading when made and were know by defendants to be false at that time, or were deliberately disregarded as such, for the reasons stated herein in ¶ 39, *supra*.

70.    As defendant Byrne was exiting his investor conference where he had just announced his departure, he appears to have called reporters who, thereafter, reported that he told them he was running away to a South America, and leaving a mess behind him. MarketWatch stated that, **"[t]he sudden resignation of Overstock.com Inc. founder and Chief Executive Patrick Byrne takes away a major distraction, but doesn't solve any issues for the questionable company**."

71.    That day, August 23, 2019, MarketWatch also reported, in part, the following:

"***I will be sitting on a beach in South America shortly***, and that is all I want to think about," [defendant Byrne] told Forbes in a call from his car, after delivering a farewell speech to his surprised employees. Byrne told the reporter he had his bags packed. "I want to focus on getting back into good shape, doing yoga and becoming a vegetarian."

***An escape to South America and a focus on getting in shape sounds like the plans of a future fugitive from justice, not a chief executive. So this is a good time to mention that Overstock is in the middle of an apparently expanding Securities and Exchange Commission investigation***. And that is just one of the

issues that should temper any optimism Overstock investors should feel as Byrne takes his leave. But the latest chapter in the saga of Overstock led to its shares soaring 8% on Thursday after the news of Byrne's resignation, after they plummeted last week.

In a lengthy 16-minute interview on Fox Business's "Bulls and Bears," **_Byrne said he is leaving Overstock in a "perfect place" and said that he is "not getting chased out" of his company_**. He said he came forward with information about political espionage against Hillary Clinton, Marco Rubio, Ted Cruz and Donald Trump because he felt it was his duty as an American, and that it had nothing to do with Overstock. "I have been warned that the apparatus of Washington is going to grind me into dust and that's going to happen, and I have to get that away from the company."

* * *

So whether Byrne is escaping Washington because of a political spy plot or an expanded SEC investigation, it's not completely clear. **_But investors can be sure that Overstock's remaining executives are now left to determine whether Byrne's vision is genius and worth their continued pursuit, or a bunch of impossible ideas that will blow up in the wake of his abrupt departure._**

72.     The August 23 MarketWatch report noted that Byrne did not mention any plans to go to South America to Fox. However, they noted that, "if indeed he is sitting on a beach, forgetting about Overstock's problems, **the remaining Company executives and investors are left holding the shopping bag**, so to speak. Regarding the SEC investigation, Overstock disclosed this month that it had received a follow-up request from the SEC in its investigation into its tZero blockchain business and its crypto token offering."

73.     The statements made in defendant Byrne and reported by MarketWatch on August 23, 2019, were materially false and misleading when made and were know by defendants to be false at that time, or were deliberately disregarded as such, for the reasons stated herein in ¶ 39, *supra*.

74.     While it had been widely reported earlier, the MarketWatch report again noted that defendant Byrne had been motivated to focus on Overstock's "fledgling, but still money-

34

losing, blockchain efforts," which "appear in part to stem from Byrne's… **obsession with revenge on Wall Street,** for which he has no love, after a lengthy legal battle with some of the biggest firms on the street over allegations that they enabled **short selling**." According to MarketWatch, tZERO is a digital trading platform that would circumvent traditional trading mechanisms.[3]

75.     Following defendant Byrne's departure, InvestorPlace also published a report, on August 26, 2019, titled "**The Long Strange Trip of Patrick Byrne Spells the End for OSTK Stock**." This report stated, in part, the following:

> *So long as the Byrne's various bitcoin ideas appeared viable, however, investors ignored the operating problems. The shares were outperforming the market despite missing earnings estimates by the proverbial mile*.
>
> Byrne successor Jonathan Johnson insists Overstock will continue moving forward in both retail and blockchain. A conference call was scheduled for Aug. 26 to discuss how to proceed.
>
> **The Bottom Line on Overstock Stock**
>
> While publicly traded, OSTK stock always ran as a one-man band, and Patrick Byrne was that one man.

---

[3] In 2005, Byrne held a conference call where claimed that there was a vast conspiracy to drive down Overstock's shares orchestrated by someone he called the "Sith Lord." He wouldn't name the Sith Lord, but described him as "one of the master criminals of the 1980s." He titled the conspiracy "the Miscreants Ball." At the same time, Overstock filed a lawsuit against Gradient Analytics, a research firm, and Rocker Partners, a hedge fund run by David Rocker and Marc Cohodes, that specialized in short-selling. Byrne claimed in the lawsuit "that they were acting in concert to hurt the company and manipulate its stock price." Later, Byrne included certain financial journalists in the conspiracy, including Herb Greenberg, the former MarketWatch reporter, of "helping others front-run" Company's stock, by working with Rocker. Next, Byrne became convinced that an illegal practice called "naked short-selling," and he devoted himself to rooting it out and exposing it. Barron's once described naked short-selling, rather aptly, as "the grassy knoll of the equity markets, denounced by crackpots, devotees of penny stocks, and troubled companies eager to divert attention from their failings."

> ***It's hard for me to see any future in the company or much future in Overstock stock. <u>The retailing operation is nearly worthless, the bitcoin projects look like nonsense and there's no one bringing capital in the door that might change things.</u>***
>
> ***As logistics consultant Brittain Ladd told The New York Post recently, Byrne should have been fired years ago. But that would have just brought us to where we are now.***
>
> **Where we are now is the end.**

76.     On August 26, 2019, shares of Overstock fell as much as 10.7% after the Company held a conference call before the market-open to discuss the ramifications of defendant Byrne's unscheduled departure and, according to MotleyFool reporters, "**<u>investors generally didn't like what they were hearing</u>**."   At that time, MotleyFool reported, in part, the following:

> [Interim CEO Jonathan] Johnson held a conference call early Monday morning to update Overstock's investors on what the new leadership situation will mean. **<u>In short, not much is changing, and that message wasn't popular with the company's shareholders today</u>**.
>
> Now what
>
> Johnson confirmed that Overstock will continue along roughly the same course that his predecessor had set the company on. The retail operation is still looking for a buyer, allowing Overstock's core operations to shift into the tZERO crypto token exchange and other blockchain-based business ideas. At the same time, Singapore-based investment company Makara Capital said that it won't invest in tZERO at the moment. The fund had been looking into a large tZERO investment since the spring of 2019. The interim management team framed Makara's decision as a potential for larger investments later on, but the optics of losing an expected round of tZERO funding are still unquestionably bad.

The MotleyFool report quoted one analyst who stated that, "Overstock has become an ultra-volatile gambling chip, prone to wild swings on both good and bad news. I'm quite content with **<u>watching Overstock from the sidelines until the blockchain strategy starts to make sense</u>**."

77.     The statements made by defendants during the August 26, 2019 Conference Call with analysts and investors were materially false and misleading and were know by defendants to

be false at that time, or were deliberately disregarded as such, for the reasons stated herein in ¶39, *supra*.

## THE TRUE FINANCIAL AND OPERATIONAL
## CONDITION OF OVERSTOCK IS BELATED DISCLOSED

78.    Unfortunately for investors, the "sense" that the tZERO offering made was belatedly reported on September 16, 2019, at which time Bloomberg reported that the tZERO offering was really **an engineered and well-planned short squeeze primarily designed to hurt short sellers**.   Contrary to defendants' prior statements regarding the benefit of this Offering, the Bloomberg report uncovered its true purpose and reported, in substantial part, the following:

> How Patrick Byrne's Final Act at Overstock Crushed Short Sellers
>
> Shares of the online merchant are on a tear, up about 60% in two weeks. The rally coincides with a flurry of short covering that comes a week before the record date for an exotic dividend the company unveiled to much fanfare and confusion last month.
>
> * * *
>
> Data from S3 Partners, a financial analytics firm, show that about 6% of the 13.2 million shares borrowed by people betting against Overstock have been bought back in the past three business days. Shares fell for the first time in eight days Friday in volume that was three times the recent average.
>
> "There's been a serious acceleration of short covering just recently," said Ihor Dusaniwsky, managing director of S3. "To have that much short covering in that amount of time is responding to an event that's changing people's trading strategies."
>
> In a short sale, a bearish trader sells borrowed stock, hoping to buy it back at a lower price, return it and pocket the difference. Frantic buying to close such positions is termed a "squeeze" and can boost shares rapidly.
>
> While other reasons may exist for the rally, one explanation centers on a blockchain-based "digital security" that Overstock said on July 30 it would grant to shareholders of record on Sept. 23 as a dividend. Because the security could prove hard for others to lay hands on, the potential exists for it to snarl the process by which shorts maintain positions.

* * *

The theory behind the squeeze is technical but comes down to the obligation a short seller faces to pass dividends back to whomever lent him shares. That may prove difficult in Overstock's case because the so-called "Digital Voting Series A-1 Preferred Stock" it promised in July is unregistered, will trade only on a blockchain exchange owned by a subsidiary, and may face restrictions on transfer.

"You can expect a lot of buy-to-covers before the record day," said Dusaniwsky. The 764,000 shares bought back since Sept. 10 are "the tip of the iceberg if people are wary of how the dividend settles out," he said.

Pressure on shorts would conceivably ease if the firms that lent shares were to accept something else in lieu of Overstock's digital security -- cash, for instance. Dusaniwsky said brokerages he's spoken to "are trying to figure out" how to handle it.

A spokeswoman for Nasdaq, the exchange where Overstock shares trade, declined to comment. Overstock didn't respond to an email seeking comment.

"It's a complex situation and we're trying to help our clients figure out the best course of action," said JJ Kinahan, chief market strategist at TD Ameritrade. As for the rally, he said: "If you're short the stock, how are you going to deliver crypto? You have no way of delivering it, so you're like, 'OK, well I have to cover this stock because I can't deliver the dividend.'"

Whatever's causing it, a rally this extreme puts anyone betting against a stock in difficult straits. That's unlikely to bother Byrne, the 56-year-old founder who over the years espoused conspiracy theories about Wall Street and the evil "Sith Lord" hedge fund manager who conspired to take him down.

79.    The following day, August 17, 2019, the New York Post also reported that defendant Byrne, "**Ex-Overstock CEO planned crypto dividend to thwart short sellers**," and stated, in part, the following:

**<u>When Patrick Byrne vacated the helm of Overstock last month, he left a nasty surprise for short sellers.</u>**

Brokers at JPMorgan and Morgan Stanley in recent days have been helping short sellers roll back a bizarre plan by Overstock's controversial ex-CEO to pay shareholders their next dividend in the form of an obscure cryptocurrency, sources told The Post.

* * *

**"Byrne figured out how to stick it to Wall Street," a source said. "He designed the dividend to create short covering."**

80.     Following this belated revelation shares of Overstock declined precipitously, falling from a close of just below $25.00 per share on September 13, 2019, to a close of $19.75 the following trading day, September 16 – another one-day decline of over 20%.

81.     Shares continued to trade lower the following day, September 17, 2019, after the NY Post also reported that defendant Byrne "Ex-Overstock CEO planned crypto dividend to thwart short sellers," and after the realization of certain theretofore undisclosed risks had suddenly sprung into existence and were also pressuring Overstock shares.  Specifically, the NY Post reported that Byrne's short squeeze had deflated in recent days because brokerage firms JPMorgan and Morgan Stanley agreed to take cash of an equivalent value to the digital dividend when short sellers return their borrowed shares.  According to the Post, Overstock shares "buckled as word of the brokerage concession began to spread early Friday because it meant short sellers could maintain their short positions."

82.     As the theretofore undisclosed risk, that brokerages would thwart the Company's short squeeze attempt by accepting a like-kind dividend exchange, manifested and as investors woke up to these additional risks that the short squeezed necessarily entailed, shares of the Company fell more than 40% form their peak, two trading days prior.

83.     Worse still, on September 18, 2019, as the short squeeze scheme collapsed under the weight of brokerages accepting cash equivalent dividends, the Company itself announced that it would loosen the restrictions on its bizarre crypto dividend.  That day, defendants also published a release that stated, in part, the following:

In view of the feedback we received from industry participants, investors, and regulators with respect to the Series A-1 stock dividend, and in order to provide greater liquidity, we are working with the appropriate regulatory authorities to structure the issuance of the dividend shares so they would be freely tradable by non-affiliates immediately upon distribution. We believe this will be a major benefit to investors. Thus, we will seek to register the shares with the appropriate regulatory authorities. We expect the result will be that, immediately upon distribution, such dividend shares will be freely tradable without the six-month holding period requirement under Rule 144. We are already working closely with regulators to register the shares and achieve that result.

In light of this, we are postponing the previously-announced September 23, 2019 record date. We expect to announce a new record date for the dividend shares in as soon as approximately three to six weeks, as we work to conclude the registration process.  Once we announce the new record date, we will also announce a new distribution date, which may be sooner or later than the previously announced November 15, 2019 distribution date.

84.    By restructuring the Offering to register the dividend shares and to end the lock-up period, the Company had effectively abandoned the short-squeeze.  As investors would soon learn, the SEC would not have allowed the Offering to occur subject to this condition, so the Company's announcement that it voluntarily made these changes is also suspect.

85.    Accordingly, on September 18, 2019, shares of the Company continued to trade lower, closing the day at just under $16.20 per share, after trading another 12.32 million shares. Shares might have fallen further had defendant Byrne not published another long 3-page single-spaced Letter to Shareholders, that he published on a site called DeepCapture.com, a site he has owned and controlled since the "Sith Lord" days.[4]

86.    Byrne's September 18, 2019 Letter stated, in part, the following:

---

[4] According to reports, Overstock's director of communications, Judd Bagley, would "friend" Byrne's critics on Facebook, then publish the names of their friends on a website, especially those friends who could serve as "evidence" of a conspiracy, called DeepCapture, the purpose of which was to smear his critics.  The journalist Bethany McLean once told an interviewer that in effect, Byrne had won, because his tactics had caused his critics to stop writing about him.

A Message to My Former Colleagues at Overstock

Dear Erstwhile Teammates,

As you will learn from an SEC filing today, over this past week all my shares in OSTK were sold. Before I left for Australia I put it all in the hands of Mr. Pettway (whom some of you know), for it had already become clear to me that this was the right thing to do (and I decided to come SCUBA-diving in Asia so as to be as far removed from it as possible). The riff-raff will tell you that my departure and sale were from a lack of confidence in what I left behind in Peace Coliseum: they are wrong, and I would like to tell you all the actual reasons before the yuck-yucks spin the truth.

- **Insurance** – ***The proximate cause for my departure was, in fact, the impossibility of our getting corporate insurance with me still at the helm. Your CFO Greg Iverson reported to the board in writing on Saturday August 17 that it was "impossible" to get insurance with me there***, and on Monday August 19 in a politely worded letter our insurance brokers at Marsh said much the same thing….

- **Controversy** – ***You think me controversial now, but you ain't seen nothing yet.*** I know enough to fry the Deep State to ashes. The Deep State and the oligarchy are entwined, and they won't die quietly…

- **Hedge** – ***In both July and in August I wrote lengthy letters to shareholders, but in truth they were to you as well, so that you would know the full lay of the land after I left***.

According to Byrne's Letter, he had planned August 19, 2019, to liquidate all his Overstock shares "in the week or two before the dividend, but as late as possible…"

87.     Remarkably, defendant Byrne reported in this Letter that he had made his decision to sell all his Company shares **after** he leaned that the SEC was not going to allow Overstock to continue its short squeeze dividend.  As evidence of this, his Letter stated, in part, the following:

I knew we had had made the right decision, however, came when we heard over the weekend that starting last Friday, the Deep State's pets at the SEC began leaking something to their clients JPMorgan, Morgan Stanley, and Goldman (and here as citizens I bet you thought *we* were their clients, right? lol)

That is to say, the SEC leaked that they were going to Bazoomba our digital dividend. Once that started getting back to me, I realized this: Whenever I have had any question about whether the SEC would or would not do something totally outrageous in order to hurt our company to benefit their clients on Wall Street, they never let me down: they *always* did the evil thing. So Pettway, whose finger was poised over the button of the ejection seat anyway, hit it, especially because he knows I need the ammo to go to war against the Deep State.

88.    Defendant Byrne also used this Letter to explain to former shareholders who he had left behind, that his liquidation at super-inflated prices actually benefited Overstock shareholders.  As evidence of this, Byrnes Letter continued, as follows:

For these reasons it may give you some comfort to know what I am doing with the capital generated by the sale of my stock. After paying tens of millions in taxes (after all, "We didn't build that," right?) by Friday the rest will be in investments that are counter-cyclical to the economy: Gold, silver, and two flavors of crypto. The gold and silver are stored outside of the United States, in Switzerland, and within two weeks, will be scattered in other locations that are even more outside of the reach of the Deep State, but are places that are safe for me. The crypto is stored in the place where all crypto is stored: in mathematical mist, behind long keys held only in the memory of someone who is quite good at storing such things in memory (with paper backups in the hands of a priest I met 35 years ago who never sits foot in the West).

These acts accomplish two objectives:

- ***It provides a hedge for Overstock***. If the economy craters and thus Overstock runs into tough times, those investments will soar (that's what "hedging" a bet means) and you will have access to capital if needed. In fact, you will have not just access to capital, you will have access to the friendliest capital imaginable: *my own*. I have to wait six months for it to be legal, but anytime after March 17, 2020 I can provide a capital injection (if needed) by buying back into Overstock. Please remember that as you watch the global chaos. If you see the US economy cratering please do not lose the sleep you otherwise might: you will have a friend who has sunk (almost) his entire fortune into investments that will soar if a crisis occurs, and who knows your business well, and who appreciates you.

- The other thing accomplished by the investment moves I described above is that my ammunition gets moved outside acts of retaliation from the Deep State. That is important because, in fact, I am now going to shellac them.

> Actually, "shellac" is too weak a word for what I intend to do to the Deep State. Sit back and enjoy the show.

89.     The same day, September 18, 2019, defendant Byrne filed with the SEC, pursuant to Form 4, a report of his sales of over $91.8 million in Company stock between Sept. 16 -18, 2019, as follows:

| Date | # Shares | Price | Total | Shares Remaining |
|------|----------|-------|-------|------------------|
| 9/16/19 | 1,505,123 | $21.84 | 32,871,866 | |
| 9/16/19 | 87,000 | Gift Price Equivalent to $21.84 | 1,900,080 | |
| 9/17/19 | 2,141,646 | $18.66 | 39,963,114 | 0 Indirect |
| 9/18/19 | 1,056,690 | $16.32 | 17,245,180 | 0 Direct |
| | | **TOTAL Liquidation** | **$91,980,240** | |

90.     It did not take long for the financial press to begin to characterize defendant Byrne's well-timed stock sales as a short squeeze turned pump and dump.  On September 22, 2019, MarketWatch published a report titled, "**Overstock founder tried to squeeze short sellers, then sold out when the SEC cracked down.**"  This report stated, in part, the following:

> In unexpected afterword to his bizarre final chapter at Overstock, Patrick Byrne sells his shares after his 'digital dividend' is changed and delayed

> One of Patrick Byrne's last acts at Overstock.com Inc. appears to have forced a short squeeze that warranted the attention of the Securities and Exchange Commission, and the sell-off of his entire stake over the last three days is now raising questions about whether he tried to manipulate the market.

> Byrne, the controversial founding chief executive of Overstock who has long been at open war with short sellers and Wall Street at large, left the company last month amid some of the strangest circumstances and stories from a tech executive

since John McAfee fled Belize. Before he left, though, he installed plans for a "digital dividend" for Overstock shareholders that appears designed to be a shot of pure poison for the people Byrne appears to hate only as much as "the Deep State," short sellers.

As in all things associated with Overstock, the dividend is not normal. As designed by Byrne, shareholders would receive one share of Series A-1 Preferred Stock for every 10 shares of Overstock common shares, but they would have to set up an account with Dinosaur Financial Group to access an alternative trading system called PRO Securities that is operated by Overstock's blockchain subsidiary, tZero.

* * *

De Vocht said at the time he was covering part of his short position. "There is very little transparency from most brokers, the SEC, the OCC how they are going to deal with the dividend," he said, referring to the Securities and Exchange Commission and the Options Clearing Corporation.

The SEC appeared to eventually step in, however. On Wednesday, Overstock announced a big change: that investors would not have to hold the dividend for 6 months, as was initially required, but could immediately begin trading the instrument. Overstock also postponed the record date for the dividend, and said it will announce a new distribution date, while suggesting that questions from unnamed "regulators" helped lead to the decision.

Overstock officials did not respond to an email for further comment.

91.     The September 22, 2019 MarketWatch report further quoted Willem de Vocht,

founder of Netherlands hedge fund Mayflower Capital Partners, who stated that, **"[t]he entire**

**dividend is a gimmick conceived by the company's board to engineer a short squeeze by**

**designing an operational impossibility by short sellers to deliver the digital dividend**."

Evidence of this included the following:

Byrne explained the genius behind his digital dividend in another blog post on his DeepCapture website, at the same time writing a post to Overstock employees about his sudden departure from the company last month and his controversial stock sell-off.

"By issuing OSTK shareholders a digital token, they would have a reason to open digital wallets with tZERO," Byrne wrote Wednesday from Asia, where he said he is scuba diving. "There is a wonderful business reason, a way to create an

incentive for 40,000 people to open accounts with tZERO: if each customer is worth $10,000 (which is about where some brokerages are valued, I am told), that would bring $400 million of economic value into the tZERO firm."

What Byrne is saying is that the digital dividend is a way to force investors to open a digital wallet and help his blockchain-exchange experiment. What he is not saying is that the scheme would also force investors to recall their shares that were loaned out to short sellers, forcing some to buy to cover their position.

None of this is going over well with investors, especially hedge funds who typically short stocks that they borrow, hoping to repay the borrows after a price decline and make money on the difference. In the last two weeks, Overstock's shares have been on a roller-coaster ride, as investors started to realize that the digital dividend presented a problem for short sellers.

92.     The September 22, 2019 MarketWatch report also noted the implications of the

unusual timing and amount of defendant Byrne's stock sales, in part, as follows:

Just hours later, Byrne disclosed that he had sold his entire stake in Overstock for $90 million over the prior three days. Amazingly, he admitted that he did so because he caught wind that the SEC was looking to smack down his convoluted but brilliant scheme.

"They leaked that they were going to Bazoomba our digital dividend," Byrne wrote in a post directed to his former colleagues at Overstock. "Once that started getting back to me, I realized this: Whenever I have had any question about whether the SEC would or would not do something totally outrageous in order to hurt our company to benefit their clients on Wall Street, they never let me down: they always did the evil thing."

Evil is in the eye of the beholder, though, and many investors — especially short sellers — are pointing that accusation at Byrne, along with a couple of other loaded words: Market manipulation.

"If Byrne had intent to engineer a short squeeze then profited from selling into the price spike, that seems to be clear-cut market manipulation," Nathan Anderson, founder of Hindenberg Research…, said Wednesday afternoon…

"For years, Patrick Byrne has complained about short sellers and has insinuated that they are criminals or nearly so," said one hedge-fund manager who asked not to be named. "Today we learned that he tried to engineer a short squeeze and when it appeared to be failing, he sold every share of stock he owned. And it's the shorts who are criminals? Hogwash."

45

93.     The September 22, 2019 MarketWatch report concluded the following, "[e]ven if Byrne escapes charges of market manipulation or insider trading, this is still a horrible look: Amid an ongoing investigation by the SEC's enforcement division into Overstock's tZERO platform and its token offering, the chief executive quit and sold his entire stake while seemingly hiding out in an unidentified Asian country, with plans to invest the money in ways that it may not be recoverable by U.S. authorities. Anyone who was still supporting Byrne as an eccentric, misunderstood genius before this final episode in his bizarre soap opera needs to change their tune: **We understand what he is doing, and it is shockingly brazen.**"

94.     September 22, 2019 was a Sunday, so the MarketWatch report did not have an immediate effect until the stock opened for trading the following day, September 23, 2019, and when it did it opened more than $1.20 lower than the prior day closing price of $14.97. However, shares of Overstock would collapse more than 25% that day after the Company belatedly reported that its **CFO, defendant Iverson had left Overstock in an unscheduled departure a week before, on September 17, 2019**, and that the Company would **lower guidance to break even EBITDA for the year, eliminating the projected $17.5 million that Overstock had only recently guided to expect**.  Among other things, Overstock blamed rising insurance premiums to insure the directors and officers of the Company as the reasons for lowering guidance –  which defendant Byrne had previously stated was, "[t]he proximate cause for my departure… the impossibility of our getting corporate insurance with me still at the helm" which defendant Iverson reported to the board in writing on Saturday August 17.

95.     MarketWatch also reported on the steep and immediate decline in the price of Overstock shares following the latest belated disclosure, as follows:

Overstock stock suffers worst day in more than a decade as Byrne fallout continues

Shares dive more than 25% after company loses chief financial officer, admits retail business is struggling worse than expected

Overstock.com Inc. shares lost more than a quarter of their value Monday, the worst single-day performance for the stock in more than a decade.

Overstock shares declined 25.3% to $11.19 Monday, the second worst performance for the e-commerce company since it went public in 2002, trailing only a 41.1% decline on July 18, 2008. The drop continued a horrid stretch for Overstock shares, which have fallen in seven consecutive trading sessions that add up to a decline of 58.1%, the worst seven-day stretch in Overstock history, according to information from Dow Jones Market Data.

Monday's decline followed an announcement ahead of trading that Overstock's chief financial officer had resigned and that the company's retail business would not live up to financial expectations in the back-to-school quarter. Overstock said CFO Greg Iverson will be replaced on an interim basis by Robert Hughes, who worked in Overstock's finance department for many years and will also remain president of Medici Land Governance, one of Overstock's blockchain-based ventures.

Iverson resigned as of last Tuesday, Sept. 17, Overstock said Monday; the company did not provide a reason for the departure nor why the company waited nearly a week to announce the change. The date provides some clues, however: Overstock announced the next morning that a "digital dividend" that was expected to be dispersed this week had instead been changed and delayed after "feedback ... from industry participants, investors and regulators."

96.    The September 24, 2019 MarketWatch report further questioned the timing of

defendant Byrne's well-timed stock sales, as follows:

The dividend was designed by Chief Executive Patrick Byrne before he dramatically resigned from the company last month amid claims of deep involvement in international political conspiracies. Byrne sold all his stock — more than 13% of the company — in a three-day sales binge at the beginning of last week, as the record seven-day decline was early in the making

Byrne originally said in a blog post that he and an adviser decided to sell his shares after hearing "leaks" from the Securities and Exchange Commission to bankers on Friday, Sept. 13, concerning the SEC's plans to combat the digital dividend. As

trading began on that Friday, Overstock's shares had gained 74% in the previous seven sessions as investors awaited the dividend, which was widely expected to squeeze short sellers as investors attempted to reclaim borrowed shares to secure the dividend.

Byrne changed that timeline after being asked if he had sold the shares while in possession of material nonpublic trading information from his time at Overstock. He then said on Twitter, and updated his blog post to reflect, that he had actually decided to sell the shares on Aug. 19, though he interchangeably used the date Aug. 22 — his departure date from Overstock — at times in various statements.

97.     The market for Overstock's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Overstock common stock traded at artificially inflated prices during the Class Period.   Plaintiff and other members of the Class purchased or otherwise acquired Overstock common stock based upon the integrity of the market price of Overstock common stock and market information relating to Overstock and have been damaged thereby.

98.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Overstock common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

99.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Overstock's business, prospects and operations.  These material misstatements

and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Overstock and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.   Defendants artificial inflation in the price of Overstock shares also allowed defendant Byrne to sell over $100 million of his personally held common shares, while in possession of material adverse non-public information about the Company.

## CAUSATION AND ECONOMIC LOSS

100.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated the price of Overstock's common stock and operated as a fraud or deceit on Class Period purchasers of Overstock's common stock by misrepresenting the Company's financial results and by overstating guidance. Over a period of approximately five months, defendants made a series of materially false and misleading statement regarding the Company's financial condition and foreseeable financial results.   Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, Overstock's common stock declined precipitously - - evidence that the prior artificial inflation in the price of Overstock's security prices was eradicated.   As a result of their purchases of Overstock common stock during the Class Period, Plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

101.   By improperly characterizing the Company's financial results and misrepresenting its prospects, the defendants presented a misleading image of Overstock's business and future growth prospects.  During the Class Period, defendants repeatedly emphasized the ability of the Company to monitor and control its operations and expenses, and consistently reported results within the range of guidance sponsored or endorsed by the Company.  These claims caused and maintained the artificial inflation in Overstock's common stock prices throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

102.   As a direct result of defendants' statements on September 16, 2019 and September 23, 2019, which indicated that the Company would be forced to make material changes to its crypto offering, and that its CFO had abandoned the Company after only 1 year of service, and that Overstock cold not achieve guidance sponsored and/or endorsed by defendants – including the $17.5 million of EBITDA necessary to support the launch of tZERO, Overstock's stock price traded to a low of $11.00 per share - -  a decline of over 60% compared to the $26.89 price of Overstock shares on September 13, 2019, the time before news of Overstock's true operational and financial condition, and its short squeeze scheme reached the market.  This dramatic share price decline, eliminated much of the artificial inflation from Overstock's share price, causing real economic loss to investors who purchased this stock during the Class Period.

103.   As evidence of the foregoing, as the truth about defendants' fraud and illegal course of conduct became known to investors, and as the artificial inflation in the price of Overstock shares was eliminated, Plaintiff and the other members of the Class were damaged, suffering an economic loss of as much as $15.00 per share.

104.    The decline in Overstock's stock price at the end of the Class Period was a direct result of the nature and extend of defendants' fraud being revealed to investors and to the market. The timing and magnitude of Overstock's stock price decline negates any inference that the losses suffered by Plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.  During the same period in which Overstock's share price fell over 60% as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

105.    The economic loss, *i.e.* damages suffered by Plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Overstock's common stock and the subsequent significant decline in the value of the Company's common stock when defendants' prior misstatements and other fraudulent conduct was revealed.

## ADDITIONAL SCIENTER ALLEGATIONS

106.    As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Overstock, their control over, and/or receipt and/or modification of Overstock's allegedly materially misleading misstatements and/or

their associations with the Company which made them privy to confidential proprietary information concerning Overstock, participated in the fraudulent scheme alleged herein.

107.   Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because it enabled defendant Byrne to sell **over $102 million** of his privately held Overstock shares while in possession of material adverse non-public information about the Company.  Defendant Byrne's insider stock sales which occurred within the Class Period are set forth below:

| Date | # Shares | Price | Total | Shares Remaining |
|------|----------|-------|-------|------------------|
| 5/13/19 | 250,000 | $13.33 | $3,332,500 | |
| 5/14/19 | 250,000 | $12.84 | $3.210,000 | |
| 5/15/19 | 407,055 | $10.29 | $4,188,595 | |
| 9/16/19 | 1,505,123 | $21.84 | 32,871,866 | |
| 9/16/19 | 87,000 | Gift Price Equivalent to $21.84 | 1,900,080 | |
| 9/17/19 | 2,141,646 | $18.66 | 39,963,114 | 0 Indirect |
| 9/18/19 | 1,056,690 | $16.32 | 17,245,180 | 0 Direct |
| | | **TOTAL Liquidation** | **$102,711,336** | |

**Applicability Of Presumption Of Reliance:**
**Fraud-On-The-Market Doctrine**

108.   At all relevant times, the market for Overstock's common stock was an efficient market for the following reasons, among others:

      (a)     Overstock's stock met the requirements for listing, and was listed and actively traded on the Nasdaq national market exchange, a highly efficient and automated market;

      (b)     As a regulated issuer, Overstock filed periodic public reports with the SEC and the Nasdaq;

      (c)     Overstock regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      (d)     Overstock was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

109.    As a result of the foregoing, the market for Overstock common stock promptly digested current information regarding Overstock from all publicly available sources and reflected such information in Overstock common stock prices. Under these circumstances, all purchasers of Overstock common stock during the Class Period suffered similar injury through their purchase of each of Overstock common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

110.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Overstock who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

111.   Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by Overstock, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

112.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

113.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceived the investing public regarding Overstock's business, operations, management and the intrinsic value of Overstock common stock; (ii) enabled defendants to artificially inflate the price of Overstock common stock; (iii) enabled defendant Byrne to sell over $100 million of his privately held Overstock shares while in possession of material adverse non-public information about the Company; and (iv) caused Plaintiff and other members of the Class to purchase Overstock common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually (and each of them) took the actions set forth herein.

114.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Overstock's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary

participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

115.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Overstock as specified herein.

116.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Overstock's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Overstock and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Overstock common stock during the Class Period.

117.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans,

projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or deliberately disregarded was materially false and misleading.

118.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts.   Such defendants' material misrepresentations and/or omissions were done knowingly or with deliberately for the purpose and effect of concealing Overstock's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.   As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were deliberate in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

119.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Overstock common stock was artificially inflated during the Class Period.   In ignorance of the fact that market prices of Overstock's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which

the shares trade, and/or on the absence of material adverse information that was known to or deliberately disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Overstock common stock during the Class Period at artificially high prices and were damaged thereby.

120.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Overstock was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Overstock common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

121.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

122.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**SECOND CLAIM**

**Violation Of Section 20(a) Of**
**The Exchange Act Against Defendant Byrne**

123.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124.    The Individual Defendants acted as controlling persons of Overstock within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

125.   In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

126.   As set forth above, Overstock and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 27, 2019

**ANDERSON & KARRENBERG, P.C.**

 */s/ Heather M. Sneddon*
Heather M. Sneddon (UT #9520)
Jared D. Scott (UT #15066)
Jason E. Greene (UT #13990)
50 West Broadway, Suite 700
Salt Lake City, UT 84101-2035
Telephone:  (801) 534-1700
Facsimile:   (801) 364-7697
hsneddon@aklawfirm.com
jscott@aklawfirm.com
jgreene@aklawfirm.com

LEWIS KAHN
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street – Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com

**Attorneys for Plaintiff**