## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **IN RE OVERSTOCK SECURITIES LITIGATION** | **MEMORANDUM DECISION AND ORDER** |
| **THE MANGROVE PARTNERS MASTER FUND, LTD.,** | **Case No. 2:19-CV-709-DAK-DAO** |
| Lead Plaintiff, | **Judge Dale A. Kimball** |
| v. | **Magistrate Judge Daphne A. Oberg** |
| **OVERSTOCK .COM, INC., PATRICK M. BYRNE, GREGORY J. IVERSON, and DAVID J. NIELSEN,** | |
| Defendants. | |

This securities fraud class action is before the court on Defendants Overstock.com, Inc., Gregory J. Iverson, and David J. Nielsen's ("Overstock Defendants") Motion to Dismiss Plaintiff's Consolidated Complaint [ECF No. 83], Defendant Patrick M. Byrne's Motion to Dismiss Plaintiff's Consolidated Complaint [ECF No. 84], and Defendants' requests for incorporation by reference and judicial notice of certain exhibits [ECF Nos. 86, 98]. On August 17, 2020, the court held a hearing on the motions by Zoom video conferencing because of the Covid-19 pandemic. Michael B. Eisenkraft,, Laura H. Posner, Daniel H. Silverman, Molly J. Bowen, Joshua Handelsman, and Keith M. Woodwell represented Plaintiff. John C. Dwyer, Jessica Valenzuela Santamaria, Jeffrey D. Lombard, and Erik A. Christiansen represented the Overstock Defendants. Robert N. Driscoll, Alfred D. Carry, Holly Stein Sollod, and Cory A. Talbot represented Defendant Patrick M. Byrne.

Having fully considered the parties' written submissions, oral arguments, and the law and facts related to the motion, the court enters the following Memorandum Decision and Order.

## BACKGROUND

This securities fraud class action was brought by Lead Plaintiff The Mangrove Partners Master Fund, Ltd. on behalf of persons who purchased Overstock common stock between May 9, 2019 and November 12, 2019. Plaintiffs allege that Defendants made false statements about Overstock's financial projections for 2019 and engineered a scheme to issue a digital dividend that purportedly caused an artificial short-squeeze.

Overstock is an online retailer of home goods. In 2014, Overstock began working on initiatives to develop blockchain technologies, which it now pursues through its wholly-owned subsidiary Medici Ventures, Inc. Medici conducts the majority of its business through a subsidiary, tZERO Group, Inc., which is focused on developing and supporting the issuance of digital securities. Through tZERO, Overstock sought to create an alternative trading platform where the investing public could purchase and trade digital securities. However, during the class period, Overstock's retail business generated nearly all of its revenues.

Dr. Patrick Byrne is the founder and former CEO and director of Overstock. He resigned from Overstock on August 22, 2019, during the middle of the class period. Gregory J. Iverson is Overstock's former CFO. He resigned from Overstock on September 17, 2019, during the class period. David J. Nielsen became Overstock's retail division President on May, 9, 2019, the beginning of the class period, and served in that role throughout the class period.

Lead Plaintiff The Mangrove Partners is an institutional investor that purchased Overstock common stock during the class period. Plaintiff is a well-known short seller, and Dr. Byrne publicly

2

denounced short sellers for artificially depressing Overstock's share price.  Short sellers borrow stock from a brokerage (and pay interest while the shares are outstanding), sell those borrowed shares at a time they believe the company's market price is high, purchase shares back when they believe the stock price is low, and return those newly purchased shares to the brokerage.  If their prediction is right, they make a profit.  If their prediction is wrong and the stock price rises, they incur a loss.  If a dividend is issued on stock a short seller has borrowed, the short seller has a contractual obligation to pay that dividend to the lender.  If the short seller cannot pay the dividend, the only way to avoid breaching its contractual obligations is to "close out" or "cover" its short position by purchasing the shorted stock on the open market.

Before the start of the class period at issue in this case, Plaintiff shorted more than 2.5 million Overstock shares.  Plaintiff continued shorting Overstock shares throughout the class period. In fact, Plaintiff's only purchases during the class period were pursuant to preexisting contractual obligations owed to lenders whose stock Plaintiff had previously borrowed to sell short.

During the period leading up to the class period, Overstock's retail division had been struggling to regain market share from its main competitor, Wayfair.  In early 2018, it cut prices and increased advertising spending, but its efforts to regain market share failed.  In the second half of 2018, Overstock reversed course and began focusing on value and running the company profitably by decreasing customer acquisition costs and increasing customer retention.

Two months before the start of the class period, on March 18, 2019, Overstock held its earnings call and disclosed, among other things, that the retail division ended the fourth quarter of 2018 with a $16.9 million "Adjusted EBITDA" loss.  Adjusted EBITDA is a non-GAAP financial measure that approximates cash flow.  However, Overstock also announced that it expected the retail division to be profitable in 2019 and provided full year 2019 guidance for Retail Adjusted

EBITDA of $10 million.

Overstock explained that the positive guidance was due to a number of factors: (1) retail contribution was $33 million in the fourth quarter of 2018 and was expected to increase to $37 million in the first quarter of 2019; (2) customer retention was up 36% year-over-year; (3) Overstock had already cut 25% of its general and administrative expenses; and (4) after 16 months of search optimization deterioration, Overstock posted six consecutive months of ranking improvements.  Plaintiff does not allege that any of these statements are false or misleading.

On May 9, 2009, the first day of the class period, Overstock reported results for the first quarter of 2019.  The Retail Adjusted EBITDA improved $14.4 million from the prior quarter, ending with a loss of  $2.5 million.  Overstock attributed the retail division's improved performance to its continued focus on contribution, expense structure optimization, and improvements in search engine rankings.  Based on that performance, and its estimate that contribution from the retail division would increase from the original estimate of between $160-185 million, Overstock raised its full-year Adjusted EBITDA retail guidance by the same amount, $5 million.  The revision of the retail guidance is the first allegedly false statement identified in the Consolidated Complaint.

On July 15, 2019, in a Form 8-K filed with the SEC, Overstock disclosed that, based on favorable second quarter results, it was raising retail guidance again by $2.5 million.

On August 8, 2019, Overstock reported its second quarter results.  As projected the retail division returned to profitability, generating a positive $1.6 million in Adjusted EBITDA.  This was the first time since the second quarter of 2017 that the retail division had posted a positive Adjusted EBITDA.  Because the second quarter of the year is traditionally Overstock's softest quarter of the year, Overstock reconfirmed the retail guidance it provided in July.  Overstock also disclosed that its general and administrative expenses in the second quarter of 2019 were higher than the second

4

quarter of 2018, in part, due to a $722,000 increase in corporate insurance costs.

Plaintiff alleges that Overstock failed to announce that Overstock could not obtain insurance coverage going forward for Byrne or any of its other officers or directors due to Byrne's increasingly erratic behavior.  Plaintiff asserts that both Byrne and Iverson knew this.

On September 23, 2019, as its third quarter was nearing a close, Overstock issued a press release disclosing that the retail division's third quarter results were expected to approximately "break even."  Because the full year guidance previously "envisioned significant positive EBITDA for Q3," which did not materialize, Overstock stated that it would be updating the full-year guidance after the end of the third quarter.  Overstock identified five factors that would drive the company's revised retail guidance: increased tariffs, increased freight costs, increased D&O insurance premiums, waning consumer confidence, and slower conversion of search traffic.  Overstock also revealed that Defendant Iverson had resigned on September 17, 2020, with no notice and effective immediately.  Following the September 23 press release, Overstock's stock dropped by approximately 25%.

With respect to Plaintiff's other claim, on July 30, 2019, Overstock announced that it would issue a dividend of one share of Digital Voting Series A-1 Preferred Stock for every 10 shares of common or preferred stock outstanding.  The record date for the Dividend would be September 23, 2019, and the distribution date would be November 15, 2019.  Overstock explained that the Dividend would not be, and was not required to be, registered under the Securities Act of 1933. Consequently, the Dividend could not be traded until the shares became eligible for resale under Rule 14 of the Securities Act, approximately 6 months after issuance.

Once eligible for resale, the shares would be traded through a brokerage account established with Dinosaur Financial Group LLC ("Dino") on PRO Securities ATS, a SEC-registered alternative

trading system operated by PRO Securities, a tZERO subsidiary.  The estimated 40,000 Overstock

stockholders on the Dividend record date would be issued approximately 3.7 million Series A-1

Preferred shares to trade on the tZERO platform.

Although Overstock stated that the Dividend was important for adoption of the tZERO

platform and to bring broker-dealers into the broader tZERO ecosystem, Plaintiff claims that

Overstock's stated goal was pretextual.  Plaintiff contends that the dividend was announced shortly

after Dr. Byrne learned that his relationship with a Russian spy was about to be come public and he

might need to leave the company.  Plaintiff believes that the dividend's short squeeze was intended

to increase the price of Overstock shares at the time of Dr. Byrne's departure.

Within hours of its announcement, several market-focused publications recognized the

practical effect of the Dividend on short sellers.  RealMoney published an article that same day

stating, "Simply put: the digital shares are locked-up.  They can't be sold for a period of time to be

determined, but likely six months.  There's the rub.  If the digital shares can't be sold, how can they

be sold short?  Logic tells me they can't."  The article then described the Dividend as having the

potential to influence Overstock's stock price as "an artificial short-squeeze" because Overstock

was "essentially telling shorts they need to buy shares on the NASDAQ to either avoid paying out

the digital dividend or as a hedge after they've paid the digital dividend."  Two days later,

Bloomberg published an opinion article stating that the Dividend "punishes actual short sellers of

Overstock's regular stock right now . . . by adding technical difficulties to maintaining the short."

Similar commentary continued for months.

Plaintiff asserts that Overstock failed to prepare the necessary infrastructure for the

dividend's issuance.  Plaintiff claims that this failure indicates that Overstock never intended for the

dividend to be issued in the manner disclosed to investors.  A representative from Dinosaur

Financial stated that the dividend came out of left field without sufficient information or preparation.

On August 22, 2019, Byrne resigned from Overstock and left the country.  Less than three weeks later, the squeeze began to abate as some brokerages agreed to accept cash in place of the dividend and alleviated the short sellers' need to cover their positions.  Between September 16 and 18, 2019, Byrne sold his entire remaining common stock in Overstock, selling over 4.7 million shares for $90 million.  From abroad, Byrne admitted that he sold his remaining common stock after waiting for volume to pick up and stated that he invested the proceeds of his sales in precious metals and crypto-currencies to protect it from retaliation from the "Deep State.".

On September 18, 2019, Overstock officially ended the short squeeze by announcing in a Form 8-K filed that same day that the dividend's record date would be postponed and that restrictions would be loosened so that the dividend would be freely tradeable immediately.  This announcement alleviated short sellers' need to purchase to cover.  Plaintiff alleges that this shows that the lock-up feature of the dividend was a manipulative contrivance rather than a legitimate business maneuver.

The SEC launched an investigation into Overstock's and its officers' activities.  On October 7, 2019, the SEC subpoenaed documents relating to the dividend, potential insider trading by Overstock's officers, and communications with Byrne.  In December 2019, the SEC issued subpoenas relating to tZERO, insider trading policies, and employment and consulting agreements.

Plaintiff's Consolidated Complaint asserts claims under Sections 10(b), 20(a), and 20A of the Exchange Act.  Count 1 alleges that all Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, by making false and misleading statements in May, July, and August 2019.  Count 2 alleges a claim for market manipulation under Section 10(b) and

Rules 10b-5(a) and © against Overstock, Byrne, and Iverson.  Count 3 alleges that the Individual

Defendants are "controlling persons" under Section 20(a) of the Exchange Act.  Count 4 alleges an

insider trading claim against Defendant Byrne under Section 20A of the Exchange Act.

Essentially, Plaintiff contends that Defendants engaged in a scheme to issue a locked-up

dividend they knew would cause a short squeeze, artificially spike Overstock's stock price, and

force short sellers of Overstock stock to cover their positions at inflated prices.  According to

Plaintiff, Defendants compounded this fraud by overstating Overstock's annual retail

guidance–misleadingly bolstering investor confidence in its retail segment–and by concealing

Overstock's inability to obtain D&O insurance.  Moreover, Byrne allegedly took advantage of the

artificially high stock price to sell his stake of Overstock common stock for $100 million in profits.

## DISCUSSION

### Overstock Defendants' Requests for Incorporation by Reference and Judicial Notice in Support of their Motion to Dismiss

Plaintiff does not oppose the Overstock Defendants' requests for incorporation by reference

and judicial notice of certain exhibits so long as they are not considered to resolve factual disputes

in Defendants' favor.  It is well established that when ruling on a Rule 12(b)(6) motion to dismiss, a

court may consider "documents incorporated into the complaint by reference and matters of which a

court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

(2007).  "Mere legal conclusions and factual allegations that contradict such a properly considered

document are not well-pleaded facts that the court must accept as true." *GFF Corp. v. Associated

Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997).  "In securities cases it is not unusual

to consider documents filed with the SEC, and documents the plaintiff relied upon in bringing the

suit." *Emps.' Ret. Sys. of R.I. v. Williams Cos., Inc.*, 889 F.3d 1153, 1158 (10th Cir. 2018).

Because Plaintiff's allegations are partly based on Overstock's SEC filings, investor call transcripts, press releases, and news articles regarding Overstock, these documents are incorporated by reference in the Consolidated Complaint and the court can consider them in full for purposes of determining Defendants' motion to dismiss. *Id.* Plaintiff has not disputed the authenticity of these exhibits. Moreover, the court concludes that these publicly available exhibits meet the criteria that would allow the court to take judicial notice of them.

Plaintiff asserts that the court cannot consider the exhibits to resolve factual disputes in Defendants' favor. In considering Defendants' motion to dismiss, the court views all inferences in the light most favorable to the nonmoving party. However, the court is not bound by Plaintiff's characterization of a document if that characterization is not supported by the document itself.

### Defendants' Motions to Dismiss Plaintiff's Consolidated Complaint

The Overstock Defendants argue that Counts 1 through 3 of Plaintiff's Consolidated Complaint should be dismissed, and Defendant Byrne argues that all four Counts should be dismissed. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim for fraud must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

In the securities fraud context, however, the pleading standard "is more strict than that of Rule 9(b)." *In re Qwest Communications, Int'l, Inc.*, 396 F. Supp.2d 1178, 1188 (D. Colo. 2004) (citing *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001)). A securities fraud case has the "most stringent pleading requirement in American civil law." *McCauley v. City of Chi*, 671 F.3d 611, 625 (7th Cir. 2011) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). Securities fraud claims are subject to the Private Securities Litigation

Reform Act of 1995 ("PSLRA"), which requires a plaintiff "to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." *Kessman v. Myriad Genetics, Inc.*, 2019 WL 1330363, at *3 (D. Utah March 25, 2019).  The PSLRA imposes a heightened pleading requirement for alleging the intent to defraud–or scienter– with particularized facts that give rise to an inference that is at least as cogent as any competing, nonculpable explanations for a defendant's conduct. *Tellabs*, 551 U.S. at 314.   The inference of scienter "must be more than reasonable or permissible–it must be cogent and compelling."  *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1236-37 (10th Cir. 2016).

### A.  Section 10(b) Claims

Counts 1 and 2 of Plaintiff's Consolidated Complaint allege violations of Section 10(b) of the Exchange Act.  To state claims under Section 10(b), Plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci-Atlanta*, 552 U.S. 148, 157 (208).  "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)." *Id.*

### 1.  Count 1 – Retail Fraud Claim

Under Count 1, Plaintiff contends that Defendants intentionally or recklessly misstated the financial condition of Overstock's retail division throughout the class period by repeatedly revising their retail earnings guidance upward, by failing to disclose Overstock's inability to obtain Director &Officer insurance, and by misrepresenting the purpose of the digital dividend.

#### a. Material Misrepresentation

Plaintiff must first "specify each fraudulent statement, explain why the statement was

misleading, and allege with particularity [its] basis for believing that the statement was false."
*Nakkhumpun v. Taylor*, 782 F.3d 1142, 1147 (10th Cir. 2015).   Defendants argue that each

challenged statement concerning the retail division is either (1) a forward-looking statement

protected by the PSLRA safe-harbor or (2) unsupported by particularized factual allegations

demonstrating falsity.

To receive protection under the PSLRA's safe harbor, statements "must either (1) be

identified as forward-looking and be accompanied by meaningful cautionary language; (2) be

immaterial; or (3) not be made with actual knowledge that the statement was false or misleading."
*In re Sun Healthcare Grp., Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1288 (D.N.M. 2002).

Plaintiff challenges the retail division EBITDA guidance.  Such guidance, however, is the

quintessential example of a forward-looking statement protected by the PSLRA's safe harbor.
*Caprin v. Simon Transp. Servs.*, 112 F. Supp. 2d 1251, 1257-58 (D. Utah 2000).  The PSLRA safe

harbor defines a "forward-looking statement" as "a projection of financial items, a description of

management's plans and objectives for future operations or economic performance, or the stated

assumptions underlying these projections."  15 U.S.C. § 78u-5(I).  There is no well-pled fact

suggesting that the guidance did not reflect the company's good faith projection as to its future

performance at the time it was given.

Plaintiff also claims that Overstock press releases did not give the required cautionary

language, but Overstock directed investors to the risk disclosures in Overstock's 2018 Form 10-K.

"[C]autionary language contained in SEC disclosures will bring allegedly misleading press releases

under PSLRA safe harbor provision even if the cautionary language does not accompany the press

release."  *Kapur v. USANA Health Sciences, Inc.*, 2008 WL 2901705, at *13 (D. Utah July 23,

2008).

Plaintiff's heavy reliance on the fact that Overstock ultimately missed its guidance is a classic attempt to plead fraud by hindsight. "Predictions of future growth . . . will almost always prove to be wrong in hindsight. . . . Imposing liability [when growth proves smaller or greater] would put companies in a whipsaw, with a lawsuit almost a certainty." *Raab v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993). Byrne's statement that the guidance provided was a "best guess estimate" merely recognizes reality. It does not support a finding of deception. Byrne's statements regarding the future financial performance of Overstock are protected by the PSLRA safe harbor provisions which recognize that not every retrospectively inaccurate good-faith prediction of future performance supports a federal securities class action. Plaintiff has not pleaded particularized facts demonstrating falsity with respect to retail guidance.

Plaintiff also contends that the falsity of Overstock's guidance can be demonstrated by the change in guidance Overstock issued after Byrne left the company. Defendants acknowledge that different management teams may approach guidance differently. But the fact that one management team takes a different approach to guidance does not render another management team's projections false or misleading. Plaintiff must still demonstrate that the projections were false when they were given. Plaintiff has failed to do so.

While Plaintiff challenges various other statements regarding the underlying bases for increasing guidance and the positive outlook for retail operations (such as improvements to search engine optimization and cost-cutting measures), a statement about D&O insurance costs, and efforts to sell Overstock's retail division, the Consolidated Complaint contains no facts suggesting those statements were false or misleading at the time they were made.

Plaintiff relies on two confidential witnesses who allege that the improvements with respect to search engine optimization were false. However, it is not clear that the two confidential

witnesses are qualified to speak on search engine optimization.  Plaintiff provides their job titles but does not demonstrate how employees in those positions would know particulars about search engine optimization.  "[C]onfidential witness statements may only be relied upon where the confidential witnesses are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Zucco Partners LLP v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).  The Complaint also lacks any detail about how the witnesses learned the information and on what reports or data they are basing their testimony.  It is not obvious that a production design lead or front-end developer would have access to search engine optimization as part of their jobs.  "[G]eneralized claims about corporate knowledge are not sufficient."  *Id.* at 998.  Overstock presented charts containing search engine optimization data during the May 9 and August 8 earnings calls.  The Consolidated Complaint does not challenge the accuracy of those charts.  This specific data undercuts the more generalized allegations of the confidential witnesses.  Moreover, the former employees are not alleged to have interacted with Patrick Byrne or any other officer at any time.  Therefore, they have no basis for stating what Defendants knew.  The Consolidated Complaint does not contain a contemporaneous allegation suggesting that any Defendant knew of, or had access to, information inconsistent with any challenged statement.  Without such facts, Plaintiff fails to plead falsity with particularity as required by the PSLRA.

Plaintiff further argues that Defendants' decision to announce their increasing insurance costs on August 8, 2019, created a duty to reveal the whole truth–that they could not obtain D&O insurance with Byrne at the helm.  In reporting on the company's general and administrative expenses, Overstock stated: "we had a $1.0 million increase in staff-related expenses and a $722,000 increase in corporate insurance costs."  Plaintiff does not dispute that the past increase in

13

insurance costs was false.  Rather, Plaintiff claims that it was misleading for Defendants not to disclose that those increased costs would continue or worsen.  But Plaintiff cites to no authority that would require Overstock to disclose purported obstacles to securing future D&O insurance coverage simply because it had disclosed information about increased historical insurance costs.  "A duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement."  *Emps. Ret. Sys. of R.I. v. Williams Cos. Inc.*, 889 F.3d 1153, 1164 (10th Cir. 2018).  Plaintiff fails to provide a plausible explanation as to how the failure to disclose concerns about the potential renewal of D&O insurance in the future altered the meaning of disclosures regarding general and historical insurance costs.

In addition, the Consolidated Complaint also fails to plead with particularity that any Defendant was aware, as of August 8th, that Overstock could not obtain insurance coverage going forward for Byrne.  The complaint does not allege when the existing policy would require renewal. According to the Consolidated Complaint, Byrne's disclosure on July 26th of his relationship with Russian spy Maria Butina created a major insurance problem for Overstock.  But it was not until August 17th, nine days after the challenged statements, that Iverson allegedly felt he had sufficient information on the issue to report to Overstock's board, and the insurance broker did not confirm that there was an issue until August 19th.  There are no well-pled factual allegations supporting an inference that the issue had arisen before the challenged statements on August 8th.

With respect to whether Overstock's SEC filings on July 30 and August 8, 2019, announcing the digital dividend were materially misleading, Plaintiff first alleges that the statements were misleading because they failed to describe the dividend as a "short squeeze."  But there is no evidence that Defendants concealed information as to the dividend that was material to investors. Overstock clearly disclosed the terms of the dividend.  Overstock did not have a duty to disclose the

impact on short sellers because it was readily apparent in Overstock's disclosures regarding the nature of the dividend.  Overstock disclosed that the digital dividend would not be registered and could not be resold for six months under SEC Rule 144, 17 C.F.R. § 230.144.  There is no duty to disclose something so obvious that the entire market immediately understands it.  The Consolidated Complaint alleges that market reporters immediately recognized the impact the dividend would have on short sellers.  As "[b]road as the concept of 'deception' may be, it irreducibly entails some act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).  In this case, there was no confusion or false impression in the marketplace with respect to the nature and impact of the digital dividend.

Byrne's very public disdain for short sellers is beside the point because there was a legitimate business purpose for issuing the dividend.  While Byrne, like any CEO of a public company that is heavily shorted, would want to reduce the downward pressure those shorts exerted on his company's stock price, there is no evidence that targeting short sellers was the purpose of the dividend.  Defendants state that Overstock was trying to transition from being a traditional online retailer to a blockchain technology business.  The dividend was a creative way to strengthen that transition.  Plaintiff has no evidence to overcome this legitimate business for issuing the dividend.

Plaintiff also argues that the statements about the dividend were misleading because they omitted the disclosure of the dividend's allegedly true purpose– to artificially spike the stock price and allow Byrne to personally profit when he sold his shares.  However, there is no evidence that Byrne knew he was leaving at the time Overstock announced the dividend.  Byrne left under very unusual circumstances and there is no evidence that anyone was aware of the timing of which such events would unfold.  Plaintiff's theory is based purely on speculation and could only be constructed in hindsight.  There is simply no evidence supporting Plaintiff's allegation that a potential cash out

15

was the true purpose of the dividend.

Moreover, Overstock generally gave express warnings that Byrne may sell stock and such sales could have an adverse effect on the market price of its common stock.  However, SEC regulations do not require officers of public companies to disclose their intended stock transactions. The regulations only require disclosure within two business days after the trade.  17 C.F.R. § 240.16a-3(g)(1).  There is no assertion that Defendants failed to comply with this requirement.

Byrne's statements demonstrate that Defendants designed the dividend to comply with the law and believed that it did.  Thus he was confident in publicly stating "come after me."  His statements cannot reasonably be construed to be an admission of concealment or illegal activity. Moreover, Byrne sold stock when every other participant in the market had the same information that he had.  The Consolidated Complaint does not plead with specificity any facts that overcome an inference that the dividend was designed with a legitimate business purpose–to promote the tZERO platform.  And there is no evidence that any material information was concealed from investors. Accordingly, Plaintiff has not demonstrated a material falsity with respect to Defendants' issuance of the digital dividend.

### b.  Scienter

Defendants contend that Plaintiff has failed to meet the PSLRA's heightened pleading requirement of alleging intent to defraud.  The PSLRA requires Plaitniff to plead particularized facts that give rise to an inference that is at least as cogent as any competing, nonculpable explanation for a Defendants' conduct.  *Tellabs*, 551 U.S. at 314.  The Tenth Circuit has required the inference of scienter to be "more than reasonable or permissible."  *Anderson*, 827 F.3d at 1236-37.

Plaintiff makes only bald conclusions that the senior officers "would have known" about material falsities.  But the Tenth Circuit has consistently rejected Plaintiff's theories that suggest

Defendants must have known a statement was false or misleading because something went wrong, as little more than pleading fraud by hindsight. *City of Philadelphia*, 264 F.3d at 1260.

The scienter allegations against Nielsen and Iverson appear to be an afterthought. The Consolidated Complaint contains no scienter allegations as to Defendant Nielsen, such as his motivations or state of mind, much less his contemporaneous knowledge.  His name does not appear in the summary of scienter allegations.  In addition, the allegations as to Iverson are boilerplate and inadequate under the PSLRA.  The timing of Iverson's departure is not sufficient to raise questions regarding scienter.  Plaintiff never addresses why Iverson resigned and its statement that his departure was suspicious is not based on any supporting facts.  These facts are not sufficient to plead scienter.

Most of Plaintiff's scienter allegations focus on Byrne.  Critically, however, none demonstrates that he knew of or recklessly disregarded the falsity of the challenged statements when they were made or that he intended to deceive investors.  In late September, after he resigned, Byrne stated that the guidance was "always his best guess estimate" that he believed Overstock "had a 50% chance of meeting or exceeding."  Plaintiff paints this as reckless but financial projections and guidance are just that "a best guess estimate."  There is no evidence that Byrne believed the guidance was unattainable.  The court, therefore, concludes that Plaintiff has not sufficiently pled scienter under the standards required in the PSLRA.

### c. Reliance

The parties dispute whether Plaintiff, as a short seller, is entitled to a presumption of reliance under both *Affiliated Ute* and the fraud-on-the-market theory.  Because the court has concluded that Plaintiff failed to sufficiently plead a material misrepresentation or scienter as to Count 1, the court need not address reliance as an additional basis for dismissal.  Accordingly, the court grants

Defendants' motions to dismiss Count 1 of Plaintiff's Consolidated Complaint.

### 2. Count 2 – Market Manipulation Claim Relating to Dividend

In Count 2, Plaintiff alleges a market manipulation claim with respect to Defendants' issuance of the digital dividend that would be paid to Overstock shareholders in tZERO shares. According to Plaintiff, because short sellers with borrowed shares would have to purchase Overstock common stock to repay the lender the digital dividend in advance of the dividend date, Defendants caused an artificial short squeeze "manipulating" an increase in share price.

#### a. Material Misrepresentation

The statute prohibits "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). A wide range of conduct can be manipulative. *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019). Conduct is manipulative when it artificially alters the market for a security: "manipulative . . . connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976). "Sufficient proof of manipulation [exists] if the manipulator caused either actual or apparent activity or caused a rise in the market price." *SEC v. Martino*, 255 F. Supp. 2d 268, 286 (S.D.N.Y. 2003). "[T]he purpose of securities law [is] to 'prevent practices that impair the function of stock markets in enabling people to buy and sell securities at prices that reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of the securities traded.'" *SEC v. Masri*, 523 F. Supp. 2d 361, 371 (S.D.N.Y. 2007). But a market manipulation claim requires some form of deception that "differentiate[s] legitimate trading activities that permissibly may influence prices" from unlawful "ingenious devices that might be used to manipulate securities prices." *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001). Plaintiff must plead "false statements" or "illegitimate,

deceptive trading techniques that mislead investors about the price or demand for a stock." *Id.* at 204.

There is no allegation that Overstock injected inaccurate information into the market regarding the digital dividend.  Defendants could not  "manipulate" a market via truthful statements.  Overstock announced its planned blockchain dividend publicly and detailed its regulatory and logistical risks.  Overstock disclosed that the dividend would not be registered and, thus, could not be resold for approximately six months under SEC regulations.  17 C.F.R. § 230.144.  The collateral consequences of the blockchain dividend, including the possibility of a short squeeze for short sellers with preexisting contractual obligations, were immediately apparent and written about in the market.  The Consolidated Complaint concedes that on the day that Overstock announced the dividend, market observers recognized and publicized that the digital dividend would place short sellers in a pickle by forcing them to cover their short positions to avoid breaching preexisting contractual obligations.  The broad media coverage belies Plaintiff's contention that Defendants' conduct or statements deceived anyone.

Plaintiff relies on a New York Post article reporting that an anonymous source stated that Byrne designed the dividend to create short covering.  But Plaintiff pleads no facts demonstrating that this anonymous source had any interaction with Byrne or that this result was concealed or meant to mislead investors.  The Consolidated Complaint also has many allegations regarding Byrne's purported animosity towards short sellers and "admissions" that he intended to create a short squeeze.  But there is no allegation that Byrne misrepresented the nature of the dividend, that the dividend itself was unlawful, or that the actual purpose of the dividend was to hurt short sellers.

As stated above, Defendants explained that the true purpose of the dividend was to bolster Overstock's transition away from being only an online retail business.  The dividend had a

legitimate business purpose.  A company cannot be penalized for taking measures to benefit shareholders who are hoping for the company to succeed.  By the same token, a short seller like Plaintiff who is hoping that the company will fail has taken those risks on itself.  Plaintiff seems to be asking for special treatment as a short seller, but short sellers were treated the same as all shareholders.  The needs of short sellers are not entitled to special consideration.  Overstock put all shareholders in the same position.  There is no evidence that the dividend was detrimental to an average shareholder.  Plaintiff brought the risks it faced on itself.

The gravamen of Plaintiff's claim is that the digital dividend was locked-up and thus improper per se, as the non-transferability of the dividend for six months manipulated the market by causing the logistical short squeeze.  But Plaintiff fails to recognize that the locked-up dividend was a product of Overstock's compliance with SEC regulations.  Overstock announced its intent to issue the dividend and disclosed all the related risks, including the SEC regulatory risk and execution risk that the issuance might not happen as scheduled or intended, and disclosed to shareholders or potential recipients of the dividend the legal restrictions on transferability prior to registration, pursuant to SEC Rule 144, 17 C.F.R. § 230.144(d).  Complying with SEC rules does not demonstrate deception or manipulation.

Plaintiff also claims that deception is not an element of a market manipulation case.  Plaintiff argues that it need not plead deception because of the disjunctive "or" in Section 10(b)'s prohibition on "any manipulative or deceptive device or contrivance."  The Supreme Court rejected this very argument in *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1 (1985).  Plaintiff's own authority cites *Schreiber*, and confirms that "despite the disjunctive phrasing 'manipulative or deceptive,' it is well-established that conduct cannot run afoul of Section 10(b) unless it involves deception."  *FERC v. Coaltrain*, 2018 WL 7892222, at *11 (S.D. Ohio Mar. 30, 2018).   "[T]he

essential element of a market manipulation claim is the injection of inaccurate information into the market." *GFL*, 272 F.3d at 204.  Accordingly, under settled law, a manipulative act requires deception.  In this case, Plaintiff acknowledges that the market understood the impacts that the digital dividend would have on short sellers.

Plaintiff argues that to determine whether conduct is manipulative, the court need only look at Defendants' intent.  But to do so would improperly conflate conduct with the separate issue of scienter.  *See SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 19980).  Even if Plaintiff need only plead an intent to manipulate, Plaintiff cannot do so where the "transaction would have been conducted for investment purposes or other economic reasons." *SEC v. Masri*, 523 F. Supp. 2d 361, 373 (S.D.N.Y. 2007).  While *Masri* focused on intent, the court recognized that "[t]he gravamen of manipulation is deception of investors." *Id.* at 367.  When courts look to manipulative intent to support a finding of deception, they "err on the side of caution," and will not find liability where the defendant may have had both manipulative and non-manipulative purposes. *Id.* at 373.

Here, the dividend was to play a major role in Overstock's well-publicized transition to the development of blockchain technologies.  The dividend was important to the development of the tZERO platform and Overstock's transition from retail.  The Consolidated Complaint contains no non-conclusory allegations suggesting that this was not, in fact, the intended purpose of the dividend.  Byrne was dedicated to the development and success of the tZERO platform.  Plaintiff does not claim that this was not in fact a purpose of the dividend.  Plaintiff argues that Overstock did not need to include the lock-up feature in the dividend to successfully launch the tZERO platform, but the lock-up feature was required under federal securities laws because Overstock did not intend to register the dividend with the SEC.

Plaintiff further claims that although the scheme was quickly uncovered as a short squeeze,

21

the real purpose of the scheme was to spike the share price so Byrne could make millions of dollars in artificial prices when he left the company.  As stated above, however, Plaintiff's theory as to the real purpose of the dividend is based on pure speculation and appears to have been constructed in hindsight.  There is no evidence that when Defendants announced the dividend, Defendants knew that Byrne would be leaving Overstock or that Byrne intended to sell all of his common stock.  The unusual circumstances surrounding Byrne's exit would suggest that the timing was fluid and uncertain.  There is no evidence to support a conclusion that Defendants knew the timing of Byrne's potential exit or stock sales.  In fact, there is evidence to the contrary.  In October 2019, Byrne posted that there was a company-approved Rule 10b5-1 trading plan with dates for sales that Byrne never actually did.[1]

Plaintiff's claim relies on an underlying presumption that Defendants knew the dividend would cause an increase in the share price.  But there is no evidence that Defendants knew at the time of announcing the dividend what affect the dividend would have on the company's share price. Byrne stated that he was certain that the volume would expand the week before the dividend record date, but that he had given up trying to predict what the price of the stock would do.  Moreover, Byrne did not sell during the volume increase in the week before the dividend record date.  The court finds no evidence, but speculation and fraud-by-hindsight, supporting Plaintiff's claim that the "real" purpose of the dividend was to increase the share price for Byrne to cash out on his common stock.

Plaintiff further asserts that Byrne never intended the blockchain dividend to be paid at all

---

[1]     In addition, Plaintiff identifies no duty to disclose Byrne's future intent to sell stock.  Arguing that the intent to sell stock is itself material information that must be disclosed to avoid insider trading is circular and unsupported by any cited authority.  Plaintiff ignores that the law only requires executives to disclose stock sales two business days after they happen.

and that it was a farce.  According to Plaintiff, Defendants failure to prepare the necessary infrastructure for the dividend demonstrates that the true intent of the dividend was market manipulation.  Yet this assertion has no factual basis or support, is thus purely speculation, and makes little sense.  There were actual reasons behind Overstock's interest in doing the dividend that make more sense than Plaintiff's speculation.  *See Nakkhumpun v. Taylor*, 782 F.3d 1142, 1149 (10th Cir. 2015).

Accordingly, the court concludes that the Consolidated Complaint fails to plead with particularity facts giving rise to a strong inference that Defendants deceived or intended to deceive investors by artificially affecting the market price of securities through issuance of the digital dividend.

### b.  Scienter

Defendants also dispute whether Plaintiff has sufficiently met the PSLRA's heightened pleading standard with respect to Defendants' alleged intent to defraud under its market manipulation claim in Count 2.  The Consolidated Complaint does not contain any allegations regarding Defendants Nielsen and Iverson's involvement or intent to defraud with respect to the digital dividend.  By pleading that Byrne was responsible for the dividend, Plaintiff has conceded that neither Nielsen nor Iverson acted with scienter.  Therefore, Plaintiff's allegations with respect to Nielsen and Iverson are insufficient under th PSLRA's heightened pleading requirements.

The Consolidated Complaint makes several allegations that Byrne intended to create a short squeeze with the issuance of the dividend because of his animosity toward short sellers. But Defendants readily disclosed the short squeeze.  Defendants disclosed the nature of the dividend and the market immediately understood the dividend's impact on short sellers.  As such, Plaintiff has not pled any intent to deceive short sellers or the market as a whole with respect to the impact the

dividend would have on short sellers.

Although Plaintiff relies on Byrne's stock sales to demonstrate scienter, "stock sale allegations have no independent significance" as they illustrate nothing "more than motive and opportunity which is insufficient under the [PSLRA]." *Caprin v. Simon Transport. Servs.*, 112 F. Supp. 2d 1251, 1259 (D. Utah 2000). Plaintiff does not explain how Byrne's stock sale in May 2019 was related to the dividend or an intent to defraud. And, Byrne's stock sale when he exited the company appears to have more to do with his exit than the dividend. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) ("It is not unusual for individuals leaving a company . . . to sell shares.").

The court has already stated that there is no evidence that Byrne or any Defendant knew at the time the dividend was announced when Byrne would be leaving Overstock. And, given the unusual circumstances surrounding his exit, there is no evidence that Byrne had a grand plan in place to deceptively manipulate the market through the issuance of the dividend in order to capitalize on it for his own benefit. Byrne admitted that he thought the dividend would increase volume, but that he could not predict what the share price would do. Moreover, Byrne did not sell his stock during the increase in volume the week before the dividend record date. Byrne sold his shares after he left the company when he had the same information as everyone in the market. Therefore, even if the dividend could be considered a market manipulation, there is no evidence that Byrne intended to deceive investors with respect to the dividend. Defendants have demonstrated that they issued the dividend to promote and create demand for the tZERO platform that Byrne was eager to see succeed. Because Plaintiff's allegations regarding the intent and purpose of the dividend is based on speculation and hindsight, it's explanations for Defendants' conduct is not as cogent or compelling. The court, therefore, concludes that Plaintiff has not sufficiently pled scienter

under the PSLRA's heightened pleading standard.

### c. Reliance

The parties dispute whether Plaintiff, as a short seller forced to buy stock to avoid breaching contractual obligations,  can rely on certain presumptions in order to allege reliance.  As with Count 1, the court concludes that this analysis is unnecessary because Plaintiff has not plausibly alleged a material misrepresentation or scienter as to its market manipulation claim in Count 2.  Based on Plaintiff's failure to sufficiently plead a material misrepresentation and scienter under Count 2, the court grants Defendants' motions to dismiss Count 2 of Plaintiff's Consolidated Complaint.

### B.  Section 20(a) Claim – Count 3

Defendants seek dismissal of Count 3 because the Consolidated Complaint does not state a primary violation of Section 10(b) or Rule 10b-5 against Defendants and, thus, Plaintiff's "control person" claim under Section 20(a) against the individually named Defendants necessarily fails as well.   "[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."  *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1270-71 (10th Cir. 2001); *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1327 (D. Colo. 1997).  By failing to state a primary violation of the securities laws, Plaintiff has failed to satisfy the first element of a prima facie case under Section 20(a).  Moreover, even if there was an underlying violation of the securities laws, Plaintiff has not pled supporting facts demonstrating that Nielsen or Iverson had control over the primary violators or that Byrne would be anything other than a primary violator.  Accordingly, the court dismisses Plaintiff's Section 20(a) cause of action against the individual Defendants and grants Defendants' motions to dismiss Count 3 of the Consolidated Complaint.

### C.  Section 20A Insider Trading Claim Against Byrne – Count 4

Under Count 4, Plaintiff claims that Byrne violated Section 20A by using material nonpublic information to profit from the sales of his Overstock shares.  During the class period, Byrne sold over five million shares of Overstock common shares.  Plaintiff alleges that Byrne made such sales at prices inflated by Defendants' allegedly fraudulently actions.  Byrne seeks dismissal of Count 4, arguing that Plaintiff fails to plead a claim for insider trading liability under Section 20A because there is no predicate violation of the securities laws and Plaintiff is not a contemporaneous trader.

Under Section 20A, "Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased ... or sold . . . securities of the same class."  15 U.S.C. § 78t-1(a).

The Tenth Circuit has recognized that "[c]ourts have interpreted § 20A as requiring the plaintiff to plead a predicate violation of the 1934 Act or its rules and regulations." *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1194 n.5 (10th Cir. 1998).  While the Tenth Circuit has never expressly adopted a per se rule with respect to requiring a primary violation, the language of the statute is clear and courts appear to be in agreement that a predicate violation of the securities laws and regulations is required for a Section 20A claim to survive a motion to dismiss. *In re Crocs Sec. Litig.*, 774 F. Supp. 2d 1122, 1155-56 (D. Colo. 2011) (collecting cases requiring plaintiff to plead a predicate violation of securities laws).  Based on the plain language of Section 20A, the court agrees with the reasoning of these courts.

The court concluded above that Plaintiff's predicate Section 10(b) claims fail because Plaintiff did not state a claim under the PSLRA for either material misrepresentation under Count 1

26

or market manipulation under Count 2.  Accordingly, Plaintiff cannot satisfy the requirements of a Section 20A claim against Byrne.

In addition, even if the Tenth Circuit did not require a primary violation of the securities laws in this context, Plaintiff has not established that it traded contemporaneously with Byrne. Byrne's stock sales occurred three to five calendar days after Plaintiff purchased Overstock shares and after the alleged short squeeze was over.  While Plaintiff relies on *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599-600 (S.D. Tex. 2003), to assert that trades within less than a week of each other are contemporaneous, the court also stated that a "plaintiff's trades must have taken place after the challenged insider trading transaction."  In this case, Plaintiff traded before Byrne, the purported insider, which negates a Section 20A claim.

The court concludes that Plaintiff has failed to state a Section 20A claim against Byrne because it has not stated a predicate securities law violation against Defendants and it did not trade contemporaneously with Byrne.  Accordingly, the court grants Byrne's motion to dismiss Count 4 of the Consolidated Complaint.

## CONCLUSION

Based on the above reasoning, the court grants the Overstock Defendants' Motion to Dismiss Plaintiff's Consolidated Complaint [ECF No. 83], Defendant Patrick M. Byrne's Motion to Dismiss Plaintiff's Consolidated Complaint [ECF No. 84], and Defendants' requests for incorporation by reference and judicial notice of certain exhibits [ECF Nos. 86, 98].

DATED this 28th day of September, 2020.

BY THE COURT:

Dale A. Kimball,
United States District Judge

27