Keith M. Woodwell (#7353)
Joseph D. Watkins (#16979)
CLYDE, SNOW & SESSIONS, P.C.
201 South Main Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: 801-322-2516
Facsimile: 801-521-6280
kmw@clydesnow.com
jdw@clydesnow.com

Michael B. Eisenkraft (*pro hac vice*)
Laura H. Posner (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: 212-838-7797
Facsimile: 212-838-7745
meisenkraft@cohenmilstein.com
lposner@cohenmilstein.com

Daniel H. Silverman (*pro hac vice*)
Molly J. Bowen (*pro hac vice*)
Joshua Handelsman (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Telephone: 202-408-4600
Facsimile: 202-408-4699
dsilverman@cohenmilstein.com
mbowen@cohenmilstein.com

*Attorneys for Lead Plaintiff The Mangrove Partners Master Fund, Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IN RE OVERSTOCK SECURITIES LITIGATION | |
| ─────────── | **CONSOLIDATED COMPLAINT** |
| THE MANGROVE PARTNERS MASTER FUND, LTD., | Case No. 2:19-cv-709- DAK-EJF |
| Lead Plaintiff, | Judge Dale A. Kimball |
| v. | |
| OVERSTOCK.COM, INC., PATRICK M. BYRNE, GREGORY J. IVERSON, and DAVID J. NIELSEN, | |
| Defendants. | |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 3

II.    JURISDICTION AND VENUE ........................................................................ 11

III.   PARTIES ........................................................................................................... 12

    A.   Lead Plaintiff.................................................................................................. 12

    B.   Defendants..................................................................................................... 12

IV.   FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS OF FRAUD .... 14

    A.   Overstock's Longstanding War with Short Sellers ...................................... 14

    B.   Overstock's Collapsing Business.................................................................. 18

    C.   Defendants Look for Outside Help – A Buyer for Retail and an Investor for Blockchain 23

    D.   Defendants Announce Fraudulently Inflated Retail Earnings and Guidance ............... 25

    E.   Byrne Takes Advantage of the Fraudulently Increased Price to Sell Stock for Proceeds of Over $10 Million ..................................................................................... 34

    F.   Overstock Fraudulently Raises Retail Guidance Again.................................. 35

    G.   Overstock Announces a Locked-Up Dividend and Creates a Manipulative Short Squeeze ....................................................................................................... 36

    H.   Defendants Learn That the Retail Division Revenue Will Fall Below the Forecast...... 43

    I.   Defendants Further Their Deception Regarding the Retail Division's Finances and Conceal a Company-Wide Insurance Crisis ................................................ 44

    J.   Byrne Flees and Launches a "Fire-and-Forget Missile" to Cash Out................................. 46

    K.   Overstock Reveals it *is* Trying to Sell the Retail Division ............................................. 49

    L.   Overstock's Stock Price Skyrockets as the Locked-Up Dividend's Record Date Nears 49

    M.   "Problem Solved": Byrne Takes Advantage of the Manipulated Market to Sell Off His Remaining Stock.......................................................................................... 52

    N.   Overstock's Stock Price Tumbles as Byrne Sells Off His Common Stock, the Public Learns that the Dividend Was a Manipulative Short Squeeze, and the Short Squeeze Abates 56

    O.   The Truth About Defendants' Retail Division and Insurance Crisis is Revealed.......... 61

    P.   Overstock Files for Registration of the Dividend ....................................... 63

    Q.   Overstock Belatedly Announces an SEC Investigation ................................. 64

    R.   Post-Class Period Revelations........................................................................ 64

V.    SUMMARIZED ALLEGATIONS REGARDING THE LOCKED-UP DIVIDEND ......... 66

    A.   The Purpose of Locking Up the Dividend Was to Target Short Sellers ........................ 66

B.      The Purpose of Locking Up the Dividend Was to Target Short Sellers and Create a Short Squeeze, Driving Up the Price of Overstock Stock ........................................ 67

C.      At the Time of the Locked-up Dividend's Announcement, Byrne Already Planned to Depart Overstock ........................................................................................................ 68

D.      On the Date That the Locked-up Dividend Was Announced, Byrne Already Planned to Sell Stock on the Artificial Stock Price Spike It Created ........................................ 69

E.      Thus, at the time the Locked-up Dividend was announced to investors, Byrne already planned to profit from it. ......................................................................................... 69

VI.     SUMMARIZED ALLEGATIONS OF DEFENDANTS' SCIENTER ........................... 69

A.      Byrne's Insider Sales During the Class Period ......................................................... 69

B.      Byrne's Admissions Regarding the Locked-Up Dividend Scheme ............................ 71

C.      Byrne, Iverson, and Nielsen Knew that Retail Guidance was Not Based in Realistic Revenue Estimates ..................................................................................................... 75

D.      Byrne's Admission that Retail Guidance was Only a "Guess" .................................. 76

E.      The Magnitude and Rapidity of Change in Retail Guidance Under New Leadership ... 76

F.      The SEC Investigation .............................................................................................. 77

G.      The Suspiciously Timed Departures of Iverson and Byrne ....................................... 78

H.      Byrne's Personal Animus Towards Short Sellers ..................................................... 79

I.      Retail's and tZERO's Fundamental Importance to Overstock ................................. 79

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS .... 80

A.      Defendants' False and Misleading Statements and Omissions Regarding Retail Guidance ................................................................................................................... 80

B.      Defendants' False and Misleading Statements and Omissions Regarding the Company's Director's and Officer's Insurance ........................................................................... 92

C.      Defendants' False and Misleading Statements and Omissions Regarding the Company's Manipulative Locked-Up Dividend Scheme ............................................................. 93

VIII.   THE PRESUMPTION OF RELIANCE ...................................................................... 96

A.      Rule 10b-5(a) and (c) Market Manipulation Claims .................................................. 96

B.      Rule 10b-5(b) Claims ................................................................................................ 98

IX.     LOSS CAUSATION AND ECONOMIC LOSS ........................................................... 99

X.      NO SAFE HARBOR .................................................................................................. 101

XI.     CLASS ACTION ALLEGATIONS ............................................................................. 102

XII.    CLAIMS FOR RELIEF .............................................................................................. 104

XIII.   JURY TRIAL DEMAND ............................................................................................ 109

XIV.    PRAYER FOR RELIEF .............................................................................................. 109

Lead Plaintiff, The Mangrove Partners Master Fund, Ltd.  ("Mangrove" or "Lead Plaintiff"), brings this action on behalf of itself and all other similarly situated purchasers of Overstock.com Inc. ("Overstock" or the "Company") common stock between May 9, 2019 and November 12, 2019, inclusive (the "Class Period"), against Overstock; its former Chief Executive Officer, Patrick M. Byrne ("Byrne"); its former Chief Financial Officer, Gregory J. Iverson ("Iverson"); and its current Retail President, David J. Nielsen (collectively, Byrne, Iverson, and Nielsen are the "Individual Defendants" and Overstock, Byrne, Iverson and Nielsen are "Defendants").1

Lead Plaintiff alleges the following based upon personal knowledge, information and belief, and the investigation of its counsel, which included, *inter alia*, review and analysis of (i) U.S. Securities and Exchange Commission ("SEC") filings by Overstock, (ii) regulatory filings and reports, (iii) press releases, (iv) news articles, (v) public statements and interviews, (vi) Byrne's Twitter posts and blog posts on www.deepcapture.com, (vii) securities and financial analysts' reports regarding Overstock, (viii) interviews with former employees of Overstock.com, (ix) consultation with experts, and (x) other readily obtainable information. Lead Plaintiff believes discovery will provide further additional evidentiary support for its allegations.

## I.    INTRODUCTION

1.       Overstock is an e-commerce retail company founded by Defendant Byrne. It went public pursuant to an initial public offering in 2002.  Just three years after it went public, however, Overstock began to struggle, and its stock price began to slide. Byrne blamed the Company's poor

---

1 Nielsen is a Defendant only for claims involving the false and misleading statements and omissions regarding Retail guidance.

performance on short sellers – individuals and entities engaged in a trading strategy premised on a belief that the Company's share price would decline. Short sellers became Byrne's obsession. Over the next 15 years, rather than focusing his attention on making Overstock a successful e-commerce retailer, Byrne's attention went to furthering his personal vendetta against short sellers. As he described it in an April 23, 2010 interview, "this CEO thing is just my day gig."

2.      By 2017, Overstock was in peril. Its core retail e-commerce business (the "Retail division") was wildly unprofitable and a major strategic shift in 2018 to regain market share from arch-competitor Wayfair had failed. Overstock looked for a buyer for the Retail division in order to shed that struggling business altogether, but that also failed.

3.      In the midst of the Retail division's struggles, Byrne shifted Overstock's attention to a new business – Medici Ventures, a subsidiary of Overstock with numerous blockchain technology businesses under its umbrella. tZERO is the flagship business within Medici Ventures, and is the home of an alternative trading system ("ATS") that grew out of and was driven by Byrne's personal animosity towards short sellers. Byrne's goal was to create a digital platform that would substitute for existing security lending markets and exclude short sellers.

4.      Overstock's attempts to generate cash from its supposedly world-changing blockchain technology arm, tZERO, fared no better than Overstock's Retail division. Overstock publicly announced a $404 million investment of outside capital in tZERO, but that potential deal never materialized, instead ultimately resulting in a meager $5 million investment nine months after it was first announced.

5.      Unable to right the ship legitimately, Defendants turned to fraud.  First, at the start of the Class Period, on May 9, 2019, Overstock suddenly – and falsely – told investors that the

tides had dramatically turned for the better, announcing an unexpected return to profitability on an EBITDA2 basis. Not only was the Company's Retail division purportedly EBITDA positive for the first time in years, but its profitability had grown so rapidly that Overstock increased year-end Retail Adjusted EBITDA guidance by *50%* - from $10 million to $15 million. Defendants explained that these increases were possible because of what Retail had ***already achieved***, including seven months of improved search engine rankings and the removal of 25% of cost from the Company's expense structure in the prior five months. After the price of the Company's shares predictably rose based on news of this miraculous financial turnaround, Byrne sold 19.5% of his Overstock holdings for a profit of $10 million.

6.     Two months later, on July 15, 2019, Defendants raised the Retail division's Adjusted EBITDA guidance even higher – from $15 million to $17.5 million, reflecting a *75%* increase over the Company's initial $10 million projection. They then reiterated this guidance again on August 8, 2019.

7.     Defendants, however, were not done defrauding investors or trying to harm short sellers – not by a long shot – or long short as the case turned out to be.  Defendants next hatched a plan to issue a dividend that would manipulate the market and generate a short squeeze. A short squeeze is a rapid stock price increase of a heavily shorted stock, which forces short sellers to close their positions by purchasing shares, adding to the upward pressure on the stock.  To orchestrate the short squeeze, on July 30, 2019, the Company announced that it would be issuing a dividend (the "Locked-up Dividend"). But instead of a typical cash dividend, the dividend would be in the

---

2 EBITDA reflects a company's Earnings Before Interest, Taxes, Depreciation, and Amortization. It is derived from information contained in GAAP financial statements and is a common way to assess a company's underlying profitability.

form of preferred shares issued as a blockchain-based digital "security token" available only through Overstock's own blockchain trading platform, operated by tZERO.   Defendants intentionally elected not to register the Locked-up Dividend as a security despite SEC rules to the contrary so that it could not be bought or sold for a six-month lockup period.  The exclusive goal of the Locked-Up Dividend was to harm short sellers.

8.      As Defendants knew at the time, Overstock was one of NASDAQ's most heavily shorted stocks. Short sellers borrow shares from a brokerage; if a dividend is issued for a stock a short seller has borrowed, the short seller is obligated to pay that dividend to the lender of the stock.  Because the Locked-Up Dividend would by choice and design not trade for six months, short sellers could not obtain the dividend to return to lenders.3  Accordingly, short sellers would be forced to "cover" their purchases by buying Overstock common stock on the open market, necessarily driving the price of the stock artificially high.

9.      Unbeknownst to investors, as Defendants announced the Locked-Up Dividend, Byrne ordered that 200,000 of his shares of Overstock common stock be sold in September, when entitlements to the Locked-Up Dividend were set to be issued and the stock price would inevitably spike.

10.     On August 22, 2019, the first cracks in Defendants' fraud appeared when Byrne suddenly resigned. At that time, he secretly increased his July stock sale instructions from 200,000 shares to *all* his remaining Overstock shares, instructing that his entire remaining stake be sold "into the volume" (and price) swell that would occur as the record date of the Locked-up Dividend

---

3 The very limited number of Overstock digital preferred shares already available were wholly insufficient to allow all shorts to cover their positions.

approached. Then, Byrne absconded to South America and later Indonesia – a country he noted had no extradition treaty with the United States. Byrne later publicly stated that the "proximate cause" of his departure was salacious news stories involving him which became public in July 2019[4], the result of which was that the Company could not obtain director's and officer's insurance for anyone at Overstock at any cost, a fact that also was concealed from the investors.

11.     Then, as Defendants intended, lenders began to recall their shares and short sellers frantically began to make "cover" purchases of Overstock common stock, dramatically driving up the price of Overstock stock as the record date for the Locked-Up Dividend approached.  From the start of the squeeze on September 3 through its peak trading during the day on September 13, Overstock's stock price shot up *97%*, from $15.07 to $29.75, and trading volume increased by *776%*, from 2,122,416 to 18,613,100 shares traded, causing investors to purchase Overstock common stock at wildly inflated prices, just as Defendants intended.

12.     Ultimately, the squeeze began to loosen after certain prime brokerages agreed to take a cash equivalent in lieu of the Locked-up Dividend – as a result, short sellers slowed their covering purchases of Overstock shares and Overstock's stock price began to descend to its true value absent Defendants' illegal market manipulation.  As Byrne learned that the squeeze was alleviating, he immediately ordered his accountant to implement his August orders to sell his entire

---

4 On July 26, 2019, Byrne stated that he has had a "non-standard arrangement" with the FBI for many years that included dating Russian agent Maria Butina, which he believed had morphed into a political espionage campaign. Alex Pappas, Leland Vittert, <u>Lawyer for accused Russian Agent Maria Butina alleges prosecutorial misconduct, reveals relationship with CEO</u>, Fox News, <u>https://www.foxnews.com/politics/lawyer-for-accused-russian-agent-maria-butina-alleges-prosecutorial-misconduct-reveals-relationship-with-ceo</u>; <u>Overstock, CEO Comments on Deep State, Withholds Further Comment, Overstock.com</u> (Aug. 12, 2019, 7:03 PM), https://investors.overstock.com/news-releases/news-release-details/overstockcom-ceo-comments-deep-state-withholds-further-comment.

remaining stake in Overstock common stock, so that he could take advantage of the artificially inflated share price before it returned to its true, uninflated state. Byrne richly profited from the inflated price, secretly selling over 4.7 million shares between September 16 to 18, yielding him over an additional ***$90 million*** worth of ill-gotten gains.

13.      As Byrne was quickly unloading his shares, the public began learning that Defendants deliberately schemed to structure the Locked-up Dividend exclusively to cause a short squeeze. On September 16, 2019, *Bloomberg* published an article entitled "How Patrick Byrne's Final Act at Overstock Crushed Short Sellers," explaining that the Locked-up Dividend caused massive purchasing by short sellers who were being forced to cover their positions. That day, Byrne published a blog post claiming, incorrectly, that "[t]he only market participants in harm's way would be the shorts," but cavalierly dismissing his illegal market manipulation by stating that "shorts are sophisticated investors." After the revelation in this *Bloomberg* article and as the frantic purchasing by short sellers covering began to abate, Overstock's stock price fell from $24.93 at close on September 13 to $19.75 at close on September 16, an enormous drop of 20.8%.

14.      The next day, on September 17, 2019, the *New York Post* published an article titled "Ex-Overstock CEO planned crypto dividend to thwart short sellers," explaining that "***[t]he crypto-dividend was devised by Byrne . . . to thwart Overstock's short sellers***" and stating that Byrne "***designed the dividend to create short covering***." On this revelation and with the further reduction in covering, the Company's share price continued falling, closing at $17.60, an additional $2.15 or 10.9% decline from the previous day.

15.      Having inflicted maximum pain, on September 18, the last possible day that short sellers could cover before the Locked-up Dividend record date (leaving time for the shares to

settle) – Defendants then announced that the Locked-Up Dividend would be postponed, officially ending the short squeeze. Overstock also announced that when it eventually issued the dividend it would be registered as a security and so would be immediately transferable – demonstrating definitively that the earlier, non-transferable approach was unnecessary to achieve Defendants' legitimate business goals or required by the SEC and rather was exclusively a mechanism to manipulate the price of Overstock shares by creating a short squeeze. On this revelation and with the further reduction in covering purchases, the Company's share price continued falling, closing at $16.19, an additional $1.41 or 8% decline from the previous day.

16.     After the market closed on September 18, 2019, Byrne finally revealed his sales to the public. A Form 4 was filed for Byrne revealing his total liquidation of his Overstock common stock between September 16 and 18, 2019 for over $90 million. On this news, Overstock's price dropped again, closing on September 19 at $15.57, an additional 3.8% decline. Byrne openly admitted that his insider sales were made in order to take advantage of the artificial inflation his manipulative short squeeze created, aptly writing on his blog, "I resigned the CEO position, the director position, and *after waiting until volume picked up, sold every last share of my stock. Problem solved*."

17.     Then, on September 23, 2019, Overstock's new leadership suddenly admitted that its Retail guidance was false, revealing that third-quarter 2019 Retail Adjusted EBITDA was only *break-even* – dramatically reversing the supposed progress towards profitability touted by the Company and revealing the falsity of the earlier claims that $17.5 million Retail Adjusted EBITDA number projected just six weeks earlier in the August 8, 2019 announcements was based on improvements that had already occurred.  Retail Adjusted EBITDA for the year was ultimately

*negative $2.2 million*, a far cry from the $15 million and $17.5 million guidance that Defendants provided during the Class Period, further demonstrating the falsity of those claims. The Company also revealed that its director's and officer's insurance premiums would significantly increase, and that Iverson had resigned a week earlier on September 17, effective immediately and with no notice.  These revelations caused Overstock's share price to fall *25%*, from $14.97 on September 20, 2019 to $11.19 at the close of trading on September 23, 2019 – Overstock stock's worst day in more than a decade and second worst single-day performance in the Company's history.

18.     The final fallout from Defendants' fraudulent activities came on November 12, 2019, when Overstock announced that it had received a subpoena from the SEC seeking documents relating to the Locked-up Dividend, the insider trading plans of Overstock's officers and directors, and communications with Patrick Byrne.  On this news, the Company's share price dropped more than 17%, from $9.42 at close on November 11, to $7.78 at close on November 12.

19.     Notably, Byrne has since admitted that he intentionally orchestrated the manipulative short squeeze scheme and that he did so in order to harm short sellers, stating that he "recognized" that the Locked-up Dividend "might" cause a short squeeze and that the stock price would increase as a result of the Locked-up Dividend, writing, "if the short positions in OSTK . . . had finally had to settle, the stock would have gone up just as surely as the water in the pot would have boiled over once the safe on its lid was removed." He boasted that he did "not just dream this [Locked-up Dividend] up on a whim. [He] designed it carefully," knowing full well that "*it put legitimate short sellers in a bind*," and that "*the OSTK shorts were asleep at the switch and got caught in a jam. We Overstock shareholders won this hand fair and square*." And Byrne knew

that his manipulative scheme was illegal, acknowledging that ***"[i]f there be any criminal liability associated with it, let me stipulate here that I am 100% responsible for this: come after me***."

20.     He also has since admitted that the Company's retail earnings projections were also fraudulent when made.  As he wrote on his blog, the Company's retail earning projections were just a "***best guess*** estimate" and that when he provided the earnings guidance to investors, he only "believed we had a 50% chance of meeting or exceeding" the number.

21.     By this action, Lead Plaintiff seeks to recover damages for the substantial losses suffered by the Class as a result of Defendants' materially false and misleading statements, omissions, and manipulative scheme.

## II.     JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and § 27 of the Exchange Act. The claims asserted herein arise under §§10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1) and Rule 10b-5 promulgated thereunder (17 C.F.R. §§ 240.10b-5).

23.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b) and (c) because one or more Defendants may be found or reside here or had agents in this district, transacted or is licensed to transact business in this district, and because a substantial portion of the affected trade and commerce described below has been carried out in this district.

24.     In connection with the acts and conduct alleged in this Consolidated Class Action Complaint ("Consolidated Complaint"), Defendants, directly or indirectly, used the means and

instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities markets.

### III.    PARTIES

#### A.  Lead Plaintiff

25.    Mangrove is an institutional investor that purchased Overstock common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. Dkt. 11 at 5-7 & 12-3. Mangrove was appointed as Lead Plaintiff for the Class on January 6, 2020. Dkt. 61.

#### B.  Defendants

26.    Defendant Overstock is a Delaware corporation with its principal place of business at 799 West Coliseum Way, Utah 84047. Overstock is an e-commerce retailer selling furniture and home goods that operates in the United States and internationally. Its majority-owned subsidiary, tZERO, develops and commercializes financial applications for blockchain technology. Overstock common stock trades on the NASDAQ under the ticker symbol OSTK. During the Class Period, Overstock made numerous materially false and misleading statements and omissions as alleged herein and engineered the market manipulation scheme.

27.    Defendant Byrne was the Chief Executive Officer ("CEO") of Overstock and a member of Overstock's Board of Directors during the Class Period until his abrupt departure from the Company (and the United States) in August 2019. During the Class Period, Byrne made numerous materially false and misleading statements and omissions as alleged herein and engineered the market manipulation scheme. Additionally, during the Class Period, Byrne sold his personally held Overstock shares for over $100 million in proceeds while in possession of material adverse information that was not disclosed to shareholders.

28.     Because of his senior position with the Company, Byrne possessed the power and authority to control the contents of press releases, investor and media presentations, and all filings Overstock made with the SEC during the Class Period. Byrne (i) signed the Company's letters filed with Forms 8-K on May 9, 2019; July 15, 2019; July 30, 2019; August 8, 2019, and August 22, 2019; (ii) certified the Company's Forms 10-Q filed on May 9, 2019 and August 8, 2019; and (iii) spoke at the May 9, 2019 and August 8, 2019 earnings calls.

29.     Defendant Iverson was the Chief Financial Officer ("CFO") and Principle Accounting Officer of the Company during the Class Period until his abrupt departure on September 17, 2019, which was concealed from the investing public until September 23, 2019. Iverson is a Certified Public Accountant. During the Class Period, Iverson made numerous materially false and misleading statements and omissions as alleged herein and engineered the market manipulation scheme.

30.     Because of his senior position with the Company, Iverson possessed the power and authority to control the contents of press releases, investor and media presentations, and all filings Overstock made with the SEC during the Class Period. Iverson (i) signed and certified the Company's Forms 10-Q filed on May 9, 2019 and August 8, 2019, and (ii) spoke on the August 8, 2019 earnings call.

31.     Defendant Nielsen became the President of Overstock's Retail division on May 9, 2019, the first day of the Class Period, and served in that role for the entirety of the Class Period. Nielsen previously served as Chief Sourcing and Operations Officer of Overstock.

32.     Because of his senior position with the Company, Nielsen possessed the power and authority to control the contents of press releases, investor and media presentations, and all filings

Overstock made with the SEC during the Class Period regarding the Company's Retail division. Nielsen spoke on the August 8, 2019 earnings call.

33.     Due to their positions with the Company, the Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that certain positive representations being made were therefore materially false and/or misleading.

### IV.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS OF FRAUD

#### A.  Overstock's Longstanding War with Short Sellers

34.     At Byrne's direction, Overstock has been at war with short sellers for years and has taken every opportunity to harm them that he can.

35.     Short selling is a legal trading strategy of investing in a company whose share price an investor believes will decline.  Short sellers borrow stock from a brokerage (and pay interest while the shares are outstanding), sell those borrowed shares at a time they believe the company's market price is high, purchase shares back when they believe the stock price is low, and return those newly purchased shares to the brokerage. If the short seller's predictions were correct, she will profit – earning the difference between the high price at which she first sold the borrowed shares and the low price at which she bought shares, minus fees and interest.  If the short seller's predictions were wrong, she will lose money.

36.     Short selling is important for the efficient functioning of capital markets. Short selling increases informational efficiency, fundamental value efficiency, and liquidity, and also helps identify fraud and misconduct at publicly traded companies. In addition, short selling ensures asset prices reflect the diverse views of the many participants in the public markets.

37.     The SEC has long recognized the benefits that short selling brings to retail investors and the marketplace. For example, in 2009, the SEC wrote: "Short selling often can play an important role in the market for a variety of reasons, including contributing to efficient price discovery, mitigating market bubbles, increasing market liquidity, promoting capital formation, facilitating hedging and other risk management activities, and importantly, limiting upward market manipulations." *Securities and Exchange Commission Release No. 2009-172* (July 27, 2009); *see also Statement of Securities and Exchange Commission Concerning Short Selling*, S.E.C. 08-235 (same).

38.     The SEC's view is supported by a wealth of economic literature. For example, a recent academic paper concluded that securities where short selling was difficult tend to remain mispriced or exhibit pricing anomalies for longer than securities where short selling is easier to do. Engelberg, Joseph and Reed, Adam V. and Ringgenberg, Matthew C., *Short-Selling Risk*, Journal of Finance (January 21, 2017). Research also has repeatedly demonstrated that short selling promotes more accurate pricing, including by anticipating the discovery and severity of financial misconduct and keeping share prices closer to their fundamental values when firms misrepresent their financial condition. Karpoff, Jonathan M. and Lou, Xiaoxia, *Short Sellers and Financial Misconduct*, Journal of Finance, Vol. 65, No. 5 (October 2010) (pp. 1879-1913); Boehmer, Ekkehart and Wu, Julie, Shortselling and the Informational Efficiency of Prices (2010).   Short

sellers enhance the informational efficiency of prices.  Pedro A. C. Saffi and Kari Sigurdsson, *Price Efficiency and Short Selling*, IESE Business School Working Paper No. 748 (Apr. 2008); Arturo Bris, William N. Goetzmann and Ning Zhu, Efficiency *and the Bear: Short Sales and* Markets *Around the World* (Yale School of Management, Jan. 2003).

39.     Since Overstock went public in 2002, it was well known as one of the most heavily shorted stocks on the market. Overstock is one of the top 10 most shorted stocks on the Nasdaq. Total short interest as of July 15, 2019 stood at approximately 17.8 million shares, more than half of the approximately 32 million shares outstanding at that time. Short selling of Overstock's common stock doubled from mid-2018 to July 2019.

40.     Byrne and Overstock executives regularly told investors that Overstock struggled because it was so heavily shorted. But the opposite is true – Overstock is heavily shorted because its management failed to responsibly steward the Company. Byrne's leadership was unpredictable – warning of an economy headed towards a zombie apocalypse and making disparaging and even lewd remarks about critical journalists5 – and he was frequently distracted from core operational concerns. The market reasonably responded with concern, and some market participants expressed that view by short-selling Overstock's securities. But instead of addressing these concerns by improving the Company's management and performance, Byrne targeted the short sellers themselves, seeking to harm them for lawfully selling shares short and scapegoat them for Overstock's problems.

---

5 *See* Bethany McLean, <u>Phantom Menace</u>, FORTUNE (Nov. 14, 2005), https://money.cnn.com/magazines/fortune/fortune_archive/2005/11/14/8360711/index.htm.

41.     The short selling of Overstock common stock became an obsession for Defendants, particularly Byrne. Byrne and other Overstock executives believed that naked short selling – an illegal practice that differs from traditional short selling (described above) because **_naked_** short sellers do not actually borrow shares from a broker – was solely responsible for Overstock's depressed share price.

42.     Byrne and Overstock regularly tracked short selling of Overstock (with no regard to distinctions between naked short selling and legitimate short selling). For example, when in January 2004, the SEC began publishing the Regulation SHO threshold list ("Reg SHO list") identifying companies with a high rate of failures-to-deliver stock, Byrne became hyper-focused on the list. After Reg SHO went into effect, Overstock appeared on the list for 998 straight trading days, a "historic" duration, in Byrne's words. Overstock was back on the Reg SHO list during the Class Period, a fact that Byrne noted regularly on his blog.

43.     When Overstock's stock price started falling in 2005, Byrne attributed the decline to naked short selling. Over the next few years, Byrne repeatedly expressed extreme anger towards short sellers (in general). In an August 12, 2005 conference call with investors, for example, Byrne ranted that he "believe[d] there's been a plan since we were in our teens to destroy our stock, drive it down to $6 - $10" and that this plan involved a conspiracy of hedge funds, journalists, and regulators (including the SEC) led by a faceless menace he dubbed the "Sith Lord."

44.     That year, Overstock brought the feud to the courtroom, suing short-selling hedge fund Rocker Partners and research firm Gradient Analytics, which had been critical of Overstock. Both defendants ultimately settled. Then, in 2007, Overstock filed a lawsuit against 11 of the biggest banks on Wall Street, including Goldman Sachs, Morgan Stanley and Credit Suisse,

accusing them of participating in a "massive, illegal stock market manipulation scheme" of distorting Overstock's stock price by facilitating naked short selling. The litigation dragged on for over a decade and resulted in a handful of settlements. Even after the litigation ended, however, Byrne's obsession with short sellers continued. He made repeated public comments about the evils of short selling. A 2008 blog post amended his claim that a "Sith Lord" was out to get his Company and wrote that Al Qaeda was the better analogy for the short sellers and others he believed were intent on Overstock's demise. In another interview, he described short selling as "a serial killer of small companies." In a 2008 *Forbes* opinion piece titled "Naked in Wonderland", Byrne described an apocalyptic vision of the markets, claiming that the SEC was "perform[ing] its best headless chicken imitation" but investors "must not be distracted from the fundamental problem: Our system is rife with unsettled trades that are deliberate, persistent and massive." Virtually every news article about the Company mentioned Byrne's crusade, regardless of what else was going on in the Company, stating, "Byrne for over a decade has publicly battled short sellers . . ."; Byrne "has long been at open war with short sellers and Wall Street at large"; and Byrne "led a campaign against Wall Street short sellers." Byrne even retained and paid for his own advisor-economist who tracked information "regarding the trading in OSTK, the volume, the negative rebate, and the average days outstanding of the short position."

B.  Overstock's Collapsing Business

45.     While Byrne focused on harming short sellers, Overstock's core e-commerce retail business suffered, and Overstock's stock price dropped. While revenue moved upward, hitting $830 million in 2008, $1.3 billion in 2013, and $1.8 billion in 2018, profitability was modest. Bottom-line earnings and cash flows were regularly negative.

46.     Former Overstock employees stated that "Byrne was distracted by his short-selling crusade and failed to take competitors seriously."6 Byrne has admitted as much; in an April 23, 2010 interview with The Young Turks he was asked why as the head of a public company he was spending so much time focused on naked short selling, and he responded that "this CEO thing is *just my day gig*." Two directors (Ray Groves and John A. Fisher) left Overstock's Board and penned public letters explaining that they resigned due to disagreements with the Company's pursuit of short-selling litigation against the prime brokers, bank divisions that provide security lending services. Byrne's own father temporarily stepped down from the Board because he believed Byrne's focus on his lawsuits against short sellers distracted him from Overstock's core business.

47.     But rather than heeding these concerns and focusing on improving Overstock's core Retail business, in 2014, Overstock made a dramatic change to its business model – the launch of a blockchain-based research and investment arm, Medici Ventures. The plan was to use blockchain technology to create an alternative trading platform where the investing public could purchase and trade blockchain-based securities as well as cryptocurrencies. That venture was called tZERO.

48.     But even the blockchain initiative was an extension of Byrne's crusade against and to harm short sellers. Byrne purpose in create a new trading platform was to exclude short sellers he blamed for Overstock's struggles. During a March 18, 2019 earnings call, a caller noted that Overstock had a high rate of short interest and Byrne responded, "***I'm saying a pox on the whole***

---

6 Lauren Debter, The Exclusive Inside Story of The Fall of Overstock's Mad King, Patrick Byrne, *The Wall Street Journal* (Aug. 22, 2019), https://www.forbes.com/sites/laurendebter/2019/08/22/the-exclusive-inside-story-of-the-fall-of-overstocks-mad-king-patrick-byrne/#2e3bb9c353a5.

**national market system, my only solution is, we've created an alternative**," by which he meant tZERO's alternative trading system (ATS).  Jonathan E. Johnson (Overstock Board member and President of blockchain subsidiary Medici Ventures) added, "any company that's worried about showing up on the Reg SHO threshold list, look at tZERO. **That's the exchange that can be a good solution to this**."

49.     The financial news recognized that Overstock's blockchain projects were inextricably intertwined with and directly the result of its short-selling crusade. *Forbes* described Byrne's foray into blockchain technology as "a personal vendetta" against what Byrne saw as "the evils of Wall Street – particularly the naked short-selling that he claims plagued his company for much of the last 15 years." *MarketWatch* reported that Byrne's motivation to focus on Overstock's "money-losing" blockchain efforts stemmed in part from Byrne's "obsession with revenge on Wall Street, for which he has no love, after a lengthy legal battle with some of the biggest firms on the street over allegations that they enabled naked short selling."

50.     The Company poured extraordinary resources into this quest, at a time that it had little to give – more than $200 million since 2014, over twice the profits Overstock ever delivered. Byrne spent "no fewer than 220 days on the road spreading his blockchain gospel, despite the fact that Overstock was hemorrhaging cash."

51.     Despite the infusion of time and energy, Overstock's focus on blockchain and cryptocurrency did not yield returns for the Company or its shareholders. While the Company's stock price momentarily rose sharply in 2017 as enthusiasm over cryptocurrencies based on blockchain technologies such as Bitcoin peaked, when the cryptocurrency market collapsed in 2018, Overstock's share price fell 70%.

52.    At the same time, the Retail division continued to struggle. Retail sales declined sharply in 2017. Byrne announced a new strategy in March 2018 to sacrifice profits by cutting prices and increasing advertising spending in an effort to bolster sales and regain market share from arch-competitor Wayfair.7 But that effort failed, and Overstock dropped it six months later. The net result was terrible for Overstock. Wayfair's business was not affected; to the contrary, Wayfair beat expectations and Wayfair's stock price soared above Overstock:



53.    And Wayfair's market capitalization continued to far exceed Overstock's:

---

7 Wayfair is Overstock's main competitor; like Overstock, it is an e-commerce retailer selling furniture, home goods, and consumer electronics. Wayfair has been highly successful and valued by investors due to its superior customer acquisition strategies including stronger search engine optimization, thinner margins, and better direct marketing.  Web Smith, No. 347: AN ANALYSIS OF WAYFAIR, 2pm,  https://2pml.com/2020/02/17/wayfair/.



54.     Byrne's strategy shift did not harm Wayfair, but it did harm Overstock. Overstock's

net income continued to plummet; the Company had not had a profitable quarter since the fourth

quarter of 2016 – 9 straight quarters of losses:



55.     Earnings per share plummeted in that same time period:

| Earnings per share | |
| --- | --- |
| **Q4 2016** | 0.12 |

| Q1 2017 | -0.23 |
|---------|-------|
| Q2 2017 | -0.29 |
| Q3 2017 | -0.03 |
| Q4 2017 | -3.8119 |
| Q1 2018 | -1.74 |
| Q2 2018 | -2.2458 |
| Q3 2018 | -1.5827 |
| Q4 2018 | -1.3181 |
| Q1 2019 | -1.2124 |

56.     As did revenue:



C.     Defendants Look for Outside Help – A Buyer for Retail and an
       Investor for Blockchain

57.     With the effort to compete with Wayfair by matching its strategy having failed,

Defendants next tried to salvage Overstock through outside aid, seeking a buyer for Retail and a

major investor for tZERO, the Company's blockchain subsidiary.  At first, both pieces appeared

to be falling into place.

58.     In June 2018, tZERO signed a letter of intent with private equity firm GSR Capital

for a $160 million investment. Then in August 2018, Overstock announced GSR Capital would

make an extraordinary $404 million investment in tZERO at a $1.5 billion valuation (three times Overstock's market capitalization at the time). Overstock's stock price leapt up 24% on this news. The companies signed a letter of intent to close the deal by the end of 2018.

59.     But December 2018 came and went with no tZERO investment. Instead, on December 17, 2018, Overstock announced that it had granted GSR Capital an extension until February 28, 2019 to close the deal.

60.     And although Byrne had announced in a *Wall Street Journal* interview that he expected to wrap up a deal to sell Retail by February 2019, that month came and went without a sale of the Retail division.

61.     Instead, March 2019 came with a string of bad news. On March 1, 2019, the Company shared in a letter filed with Form 8-K that the tZERO investment was still not complete. Instead of a deal, the Company merely had a memorandum of understanding with GSR Capital and a new partner, Makara, for only a $100 million investment in tZERO – a 75% reduction from the original announced investment of over $400 million.

62.     Then on March 18, 2019, Overstock announced in its Form 8-K and Form 10-K a net loss of more than $42 million for 2018 and layoffs of about 12% of its workforce. Overstock significantly missed analyst expectations with losses of $1.39 a share, compared to the expected loss of $0.84 a share.

63.     Finally, during the earnings call held on March 18, 2019, the Company revealed that it did not have a buyer for Retail. In response to a question about why the Retail sale had not yet closed, Byrne offered the vague response that it was "like a soufflé . . . The soufflé is ready when it's ready."

64.     On April 18, 2019, Byrne wrote a letter to shareholders announcing that the tZERO and GSR Capital deal was delayed again and would not meet the planned mid-April completion date, but reassured shareholders that Overstock had a binding agreement with GSR Capital to buy $30 million worth of tZERO tokens by May 6.

65.     By this point, a month before the beginning of the Class Period, Defendants knew that they had no viable buyer for the struggling Retail division and that the tZERO deal was falling apart. Seeing no legitimate path forward for the Company, Defendants lied to investors and manipulated the market for Overstock stock in order to inflate the stock price and let Byrne cash out, quit, flee the country, and convert the $100 million in proceeds from his Overstock stock sales to gold, silver, and cryptocurrency (which, as he noted on his blog, moved his "ammunition" "outside" of the reach of the government).   In the process, Defendants harmed investors who bought Overstock at inflated prices.

### D.  Defendants Announce Fraudulently Inflated Retail Earnings and Guidance

66.     On May 9, 2019, the first day of the Class Period, Defendants announced in a letter to shareholders that, due to the very positive *current and past performance* of the Retail division, Overstock was raising Retail Adjusted EBITDA guidance by 50% from $10 million to $15 million.

67.     Specifically, the shareholder letter claimed that the Retail business was "ahead of schedule" and a "source of positive cash flow." It also claimed that Overstock's search engine rankings had already seen seven months of sequential improvement and that the Retail division had removed 25% of its costs in the last five months. Byrne echoed these arguments on a shareholder call held the same day.

68.     Additionally, during the shareholder call Chief Strategy Officer Seth Moore stated that the Company was trending ahead on "repairing our rankings in natural search" and noted "7 consecutive months of sequential month over month growth." Moore referred to Slide 25, which included a chart labeled "SEO Improvement, Top 3 Keyword MoM Search Growth (Home and Garden)."

69.     Additionally, Slide 29 of the slides provided with the shareholder call was titled "Annual Retail Contribution" and included the "2019 Former Outlook" which reflected $160 million in base plan plus $20 million in upside for a $180 million outlook, and then a "2019 Current Outlook" which reflected $165 million in base plan plus $20 million in upside for a $185 million outlook, translated to an "Adjusted EBITDA Equivalent of $15M [million]."

70.     Along with this surprisingly positive news – that Retail had already achieved significant improvements, that Overstock was raising earnings guidance, and that the Retail division was cash-positive – Overstock's first quarter 2019 announcements also disclosed some very bad news.

71.     The letter filed with the Form 8-K disclosed that, while Overstock had finally entered into an investment agreement with tZERO and GSR Capital, the terms were nothing like the original plan that Byrne had touted. Instead of the planned purchase of $30 million of tZERO tokens or the original investment of more than $400 million by February 2019, GSR Capital invested just $5 million dollars in exchange for tZERO equity – comprised of $1 million in cash; $1 million worth of Chinese Renminbi, and $3 million worth of certain securities. The final deal valued tZERO at $1 billion, far less than the initially agreed valuation of $1.5 billion. Overstock

and Byrne also announced that GSR Capital was released from all previous binding contracts – which would have included the prior announced obligation to buy $30 million in tZERO tokens.

72.     Additionally, that day Overstock filed its first quarter 2019 Form 10-Q. The Form 10-Q was signed by Iverson and certified by Byrne and Iverson as to the accuracy and completeness of Overstock's financial and operational reports, including that Overstock maintains disclosure controls and procedures to ensure reliable and timely financial reporting.

73.     The positive news regarding the Retail division's improvements and guidance outweighed the significant negative news disclosed that day, resulting in an increase in Overstock's stock price of 11%, from a closing price of $12.07 on 1,644,303 shares traded on May 8 to a close of $13.43 on 5,039,858 shares traded on May 9.

74.     Defendants' statements about the purported reasons for the increase in Retail guidance and the reliability of its internal controls were materially false and misleading. In truth, at that time, the 50% guidance increase was not a reasonable conclusion based on a diligent investigation of then-existing facts, applying accurate and reliable accounting principles. The fraudulent nature of this guidance increase is demonstrated by statements from former Overstock employees.

75.     Confidential Witness #0 was employed at Overstock as an executive and participated in the 2019 planning process. This individual was also familiar with the monthly Outlook process, which involved the monthly updating and reforecasting of financial numbers from the Plan based on recent performance and new information.  In this role, Confidential Witness #0 participated in the 2019 planning process with other members of leadership and executives, including members Defendant Nielsen, Defendant Iverson and Defendant Byrne.  Retail Guidance,

when provided, was in part, derived from these Plan and Outlook numbers.  The Retail Plan and Outlook numbers were comprised of two main components: the "Nectar Plan" (Nectar or contribution is similar to Gross Profit netting out items such as promotional and advertising spend) and "SG&A expenses" (selling, general, and administrative expenses).  In addition, a team of consultants from Bain & Company worked on the 2019 Plan. (The Bain team was originally contracted to focus on strategy and selected operational items, but the mandate was expanded to include planning). The 2019 Plan included a base Nectar Plan as well as a potential upside component largely based on the various 2019 initiatives or projects. The base Plan, at one point, was between $145M to $165M with the final Plan landing at a point estimate of $160M, which corresponded to a $10M Adjusted EBITDA Retail guidance. The Plan also had a finalized upside of $180M based on an assumed $20M Nectar impact related to various 2019 initiatives. The potential impact from the initiatives was revised from an early estimate of around $50M to around $20M (still a very rough guestimate) and then to between $5M to $10M, with the latter revision being rejected by Byrne in favor of the unrealistic $20M impact number. The $20M unrealistic number was presented to Byrne by the Bain consultants. This was done in spite of Iverson, the CFO, directing them to not mention such a rough, exaggerated number to Byrne. Iverson directed Bain to not present the number as he knew the number to be flat out wrong and misleading.

76.     Confidential Witness #0 described the $160M as misleading because it was not the lower, conservative end of a guidance range as presented, but was above the midpoint of the $145M to $165M range for the base Plan. By including an upside number of $180M ($160M plus $20M), the Retail Guidance gave a misleading impression that the lower, conservative number was $160M, when in fact it was more reasonably at $145M.

77.     The $21.1M miss in Retail guidance ($17.5M guidance minus -$3.6M FY 2019 actual results for Retail Adjusted EBITDA) is comprised of the $12.4M miss to the original guidance ($160M - $147.6M FY 2019 actual results for Retail contribution), the $7.5M increase in guidance ($17.5M guidance on August 8, 2019 minus $10M original Adjusted EBITDA guidance) and an apparent $1.2M miss on SG&A Expenses ($21.1M minus $12.4M minus $7.5M).

78.     About 2 weeks after Q2 2019 results were released on August 8, 2019, a revised Outlook was presented to Executive leadership. This revised Outlook made clear that the $17.5M Retail Adjusted EBITDA number would not be achieved. However, the revised Outlook from August was rejected by Nielsen and, therefore, was not considered an official Outlook.

79.     However, there was a disconnect between the $17.5M Adjusted EBITDA and the -$2.5M and $1.6M reported in Q1 2019 and Q2 2019, respectively. That would mean that $18.4M in Adjusted EBITDA would have to be achieved for Q3 and Q4 2019 combined. This point is also reinforced by the contribution that would be required in Q3 and Q4 2019. An average of $45M in contribution would need to be achieved for Q3 and Q4 each ($167.5M Q2 2019 contribution guidance minus $77.6M 1H 2019 contribution divided by the two remaining quarters). For comparison, the average contribution for Q3 and Q4 for both 2017 and 2018 was around $30M per quarter.

80.     This is compelling evidence that Overstock should have known that the $17.5M Adjusted EBITDA Retail guidance was incorrect prior to releasing Q2 2019 results on August 8, 2019.

81.     Iverson resigned September 17, 2019 after the August Outlook was rejected by Nielsen and prior to the "near break even" Retail Adjusted EBITDA guidance provided on September 23, 2019.

82.     Former Overstock employees also stated that Overstock's 2019 revenue guidance and increases throughout 2019 were based on inaccurate and misleading information.  Specifically, three former employees made clear that Byrne's statement that the Company could lift earnings guidance for the Retail division by 50% based, in part, on seeing seven months of sequential improvement in Overstock's search engine rankings, was false. To the contrary, Overstock's search engine optimization was performing poorly, Overstock never saw a big improvement, including no improvement during the first or second quarter of 2019, and any improvements in search engine rankings did not translate to a material increase in revenue.

83.     Confidential Witness #0 explained that the Company's presentation of search engine optimization improvements was largely disconnected from improvements in revenue and contribution (i.e. Nectar). Confidential Witness #0 described keyword rankings, as presented, as a "vanity metric" that did not meaningfully drive increased revenue and contribution. For example, the SEMrush numbers presented were based on a count of keywords where a search of a keyword in the identified set of important keywords would return an Overstock result in one of the top three unpaid search positions. However, Confidential Witness #0 stated that there was no weighting of the keywords by the magnitude of the associated volume of traffic nor by the conversion of that traffic nor by the average purchase price (i.e. revenue) of those conversions nor by the contribution margin of that revenue. Thus, niche keywords like "placemats" which would have little volume, low conversion, a low price point or low margin would count the same as keywords related to core

revenue and contribution drivers such area rugs and furniture. What mattered for revenue was that the site received a large volume of highly qualified traffic with good conversion (meaning that the people searching for a product actually purchased that product) at a relatively high average order size of around $200 to $400. Additionally, high keyword rankings only matter if they occur in Overstock's strongest areas where it had competitive pricing and inventory, such as area rugs and furniture, and was likely to lead to high conversion rates. Therefore, according to Confidential Witness #0, the increased keyword search rankings did not equate to meaningful improvements in revenue and contribution.  During CW's time at Overstock, Confidential Witness #0 was part of a conversation with Iverson about the drivers of SEO and that the keyword rankings, as presented, was not a meaningful metric. This conversation occurred because the three SEO keyword rank data points for September, October and November 2019 were used as justification to increase the base Nectar Plan for 2019.

84.     Confidential Witness #1 worked at Overstock from June 2004 to January 2019. During the Class Period, Confidential Witness #1 was a Production Design Lead in the Company's Co-op Advertising Operations Department.  In that role, Confidential Witness #1 would work with retail partners who purchased advertisement space from Overstock to design and build promotions. He would also ensure the accuracy of the promotions and oversee their execution.  Confidential Witness #1 similarly stated that Overstock's search engine optimization was performing poorly throughout his time at the Company, and that as a result, Overstock did not meet its revenue goals for the Retail division in the third and fourth quarters of 2018.  Google regularly changed its algorithm and Overstock did not keep up with those changes.  Confidential Witness #1 knew this information because it was shared by an executive during a "standup" – large meetings for multiple

business divisions that were held in a large conference room in Overstock's headquarters building. He also stated that "if your retail revenues tank in the fourth quarter of 2018, it's hard to show great revenue in the first quarter of 2019." He stated that Overstock did not understand the complexities, costs and timelines that came with a retail business.

85.     Confidential Witness #2 worked at Overstock from October 2015 through July 2019 as a Front-End Developer. As a Front-End Developer, Confidential Witness #2 was responsible for developing code for Overstock's retail homepage website and ensuring that content designed by Overstock's creative teams appeared correctly on the website. For example, Overstock's creative teams would design new sales and marketing material; Confidential Witness #2's job was to code the material so that it showed up properly on the website. Confidential Witness #2 was also responsible for implementing tags and analytics across the website that both measured and improved the website's search engine optimization. Confidential Witness #2 also confirmed that Overstock had significant problems related to its Search Engine Optimization ("SEO") throughout Confidential Witness #2's tenure at the Company, was continuously working on problems related to SEO, but there "was never a big improvement" in SEO, including no improvement during the first or second quarter of 2019. Confidential Witness #2 knows this because Confidential Witness #2's team of engineers did not make any major changes to the website in the fourth quarter of 2018 or first or second quarter of 2019 that would materially improve search engine optimization. Overstock did not make major changes to the website during the fourth quarter of 2018 because they did not want to risk crashing the website during the critical holiday-shopping season; accordingly, no new code was deployed in the fourth quarter of 2018 that would contribute to improved search engine optimization. Nor were there any significant

changes made in the first or second quarter of 2019. One of the necessary steps to improve search engine optimization is making changes to the website.  That requires a department-wide initiative to implement the new strategy across the website.   Confidential Witness #2's team and the other development teams would have been responsible for implementing those website changes. That did not happen in the fourth quarter of 2018 or the first or second quarters of 2019. Additionally, Confidential Witness #2 explained that in 2019 Confidential Witness #2 attended regular company "standups" – multi-department in-person gatherings where directors and executives would provide business updates – where performance data was discussed, and there was never in 2019 an announcement of a major improvement in search engine optimization.  Patrick Byrne typically attended the Company standups. Confidential Witness #2 also explained that while search engine rankings may improve for particular keywords, what really matters for revenue is conversion – are customers actually buying the product once they get to Overstock's website.

86.     Thus, the improvements in keyword search growth and natural search rankings touted at the May 9, 2019 earnings call were not actually meaningful for revenue generation and did not support the substantial increase in Retail guidance.

87.     Indeed, Byrne later conceded on his blog that the financial estimates to the public were fraudulent: a mere "best guess" that the Company had only a 50/50 shot of meeting at the time. Byrne's admission was borne out when just four and a half months later, upon Byrne's dramatic exit from the Company, Overstock's new leadership immediately "[u]pdated" Retail guidance, revealing that third-quarter 2019 Retail Adjusted EBITDA was just break-even, vividly illustrating the inaccurate and unreasonable nature of the May 9 earnings guidance increase. Byrne later explained the discrepancy not by pointing to any new information but rather explaining that

the new management would provide guidance that the Company had a 90% chance of meeting, rather than his 50/50 approach. Ultimately, on March 13, 2020, the Company announced that Retail Adjusted EBITDA for the year was negative $2.2 million, an extraordinary reduction from Defendants' $15 million announcement.

E.   Byrne Takes Advantage of the Fraudulently Increased Price to Sell
Stock for Proceeds of Over $10 Million

88.     Byrne promptly took advantage of the artificial boost to Overstock's stock price caused by his false Retail guidance. Beginning on May 13 – just two trading days after the first quarter 2019 results were announced – and continuing through May 15, Byrne sold over 900,000 of his personal shares of common stock, amounting to more than 15% of his stake in the Company's common stock at that time and yielding Byrne $10.731 million.

89.     Byrne sold 250,000 shares on May 13 at $13.33 per share and 250,000 shares on May 14 at $12.84 per share. He disclosed those sales on May 15 in a Form 4 filed with the SEC. When the market learned of Byrne's sales, Overstock's stock price plummeted 15%, falling from $12.89 at close on May 14, 2019 to $10.87 at close on May 15, 2019. Media coverage attributed the drop to Byrne's sales; a CNN Business article stated that "Overstock (OSTK) shares plunged almost 15% after SEC filings revealed the CEO sold half-a-million shares."

90.     On May 16, 2019, Byrne sold another 407,055 shares on May 16 at $10.288 per share. He disclosed that sale in a Form 4 on May 16 after the market closed.

91.     Byrne instantly received questions about these sales. Byrne's claimed justification for these sales in his May 17, 2019 letter to shareholders was his desire to "invest personally in blockchain projects" and "meet charitable pledges." But his real motivation was to sell his stake

in the Company while the share price was artificially inflated and before the market learned that the earnings guidance was false.

### F.   Overstock Fraudulently Raises Retail Guidance Again

92.     Two months later, on July 15, 2019, Overstock and Byrne issued a lengthy letter to shareholders with a Form 8-K.

93.     In this letter, Overstock and Byrne announced mixed news. The letter announced another increase in Retail Adjusted EBITDA guidance, this time from **$15 million to $17.5 million**, and that the Retail division's contribution (gross profit less sales and marketing expenses) was covering its expenses, with Byrne falsely telling investors that the "core earning power of our retail business has snapped back more quickly than I expected . . ." and that "Retail's recovery in 2019 has been exceeding expectations." Byrne also said that Retail "should generate enough cash to substantially cover Blockchain's operating cash burn" and trumpeted Retail's aggressive expense management.

94.     But the letter also disclosed that the Company was no longer actively looking to sell the Retail division.

95.     On the day of this announcement, Overstock's price initially fell, reflecting the market's concern about the sudden reversal in Overstock's plan to sell the Retail division. For example, an article titled "Overstock.com CEO Patrick Byrne Can't Keep His Story Straight" concluded that Overstock must have little interest from buyers, since it decided to hold onto the Retail business rather than sell it for what was expected to be hundreds of millions of dollars in cash.

96.     But, the next day, the market price recovered in response to analyst enthusiasm about the increase in retail guidance. On July 16, 2019, DA Davidson analyst Tom Forte reiterated his buy rating and Maxim Group resumed coverage of Overstock with a buy rating. Maxim stated that it expected the Retail division "to shift to adjusted EBITDA profitability in 2019, with improving results in 2020," and noting that "[e]ncouragingly," management raised Retail's adjusted EBITDA guidance to $15 million on the first quarter 2019 call and then to $17.5 million on July 15. On these positive reports, Overstock's price ticked back up 3.1% to $17.76.

G.      Overstock Announces a Locked-Up Dividend and Creates a
        Manipulative Short Squeeze

*1.      Defendants Launch the Locked-Up Dividend*

97.     In July 2019, Byrne learned that major personal news was about to go public – Byrne claimed to have had a "non-standard arrangement" with the FBI that included dating Russian spy Maria Butina; Byrne claimed that his work with the FBI had morphed into a political espionage campaign involving Hillary Clinton, Donald Trump, Marco Rubio, and Ted Cruz. Byrne explained on his blog that when he learned that this information would become public, he believed he would not be at the Company much longer and so he issued the July 15 shareholder letter, in which he raised Retail Adjusted EBITDA guidance by another $2.5 million.

98.     Byrne knew that his selling stock would have an adverse effect on Overstock share price; indeed, Overstock's public filings warned of this risk.  Thus, Byrne knew that his sale of a massive amount of shares would depress the stock price that he would receive for those sales – the act of his selling would result in him getting an even lower price.

99.     After Byrne realized that he would soon be gone from Overstock, on July 30, 2019, the Company abruptly announced that it would issue a dividend – which was, in reality, a new maneuver to artificially inflate Overstock's share price by engineering a short squeeze.

100.     Instead of a traditional cash payout or issuance of freely tradeable common stock, investors were forced to access the dividend in the form of a blockchain-based digital "security token" issued by Overstock, which it called the "Digital Voting Series A-1 Preferred Stock." The record date for the Locked-up Dividend would be September 23, 2019. On that date, for each 10 shares of Overstock common stock, Series A-1, or Voting Series B Preferred Stock, a shareholder would receive the crypto equivalent of one share of Series A-1 Preferred Stock.

101.     It was an economic inevitability that the Locked-up Dividend, as structured, would cause a short squeeze.

102.     At the time the Locked-up Dividend was announced, Defendants knew that Overstock was heavily shorted. As of July 15, 2019, Defendants were well aware that Overstock had 17.8 million shares sold short, representing more than half of shares outstanding. As discussed above, paragraphs 41-42, Defendants regularly monitored Overstock's short interest. Byrne even retained his own personal advisor to monitor Overstock's short interest.

103.     Knowing this, Defendants designed the Locked-up Dividend to be structurally incompatible with short selling. If a dividend is issued while a short seller has an open position – meaning, between the time she sells her borrowed shares and repurchases stock to return to the broker – that short seller must pay any dividend paid on the stock to the lender (usually via a broker). Typically, that is not a problem because traditional dividends are issued as cash or as a freely tradeable security, which is fungible, so short sellers can simply pay cash or the freely

tradeable security to the brokerage from which they borrowed the shares. But unlike a typical dividend that is either in cash or freely tradeable stock, the Overstock dividend was locked-up. Defendants chose not to register it as a security, which they claimed meant it could not be bought or sold for approximately six months. Short sellers would not receive the Locked-up Dividend themselves and, because it was locked-up, there was no way for short sellers to purchase it on any market. While Overstock had previously issued a small number of digital preferred shares that were trading, there were not nearly enough of these freely trading shares to allow all shorts to cover their positions by purchasing them. Further, due to the extraordinary nature of the Locked-Up Dividend, lending agents – those that lend shares to shorts – began to recall their shares.

104.   As a result, a short sellers' only choice to avoid breaching their contractual obligations to their lending broker was to close out – or "cover" – their Overstock positions before the Locked-up Dividend was issued and before the borrowed shares were recalled. This forced short sellers to purchase Overstock stock and to do it quickly. Because in September 2019 it took two days for transactions to settle, all covering had to be completed by September 18 (two trading days prior to the Locked-up Dividend's record date of September 23). The rapid purchasing of Overstock shares by short sellers attempting to cover would, necessarily, dramatically drive up Overstock's stock price and trading volume. It would also remove short sellers from the market for Overstock's stock.

105.   Thus, the Locked-up Dividend artificially altered the market for Overstock stock. Instead of the stock trading based on normal supply and demand, Overstock forced a huge group of investors to purchase Overstock stock to cover their positions in very short order who would not have otherwise done so, and that collective rush to cover artificially spiked the stock price.

106.    Defendants omitted this information from their July 30, 2019 announcement of the Locked-up Dividend, hiding from investors that it was intended to cause a short squeeze that would artificially spike Overstock's stock price.

107.    Defendants also concealed from investors that then-CEO Byrne – who was armed with all of this material non-public information regarding the short squeeze and his own imminent exit from the Company – secretly planned a sale of 200,000 shares of his stock to take advantage of "***the volume we expected to pick up in mid-September***" as the Locked-up Dividend's record date approached.

108.    On July 30, 2019, with the news of the Locked-up Dividend (omitting key information from the investing public), Overstock's stock price increased, from $22.08 at close on July 29, 2019 to $22.88 at close on July 30, 2019.

109.    Sophisticated analysts, however, quickly identified certain problems with the Locked-up Dividend.

110.    The same day the Locked-up Dividend was announced, July 30, 2019, Timothy Collins wrote an article in *RealMoney* titled, "Overstock Is Paying a Digital Dividend and That's Just Where the Intrigue Starts: How this one stays out of court, I have no idea." He noted Byrne's comment that the digital shares may be worth more than those listed on the NASDAQ and concluded the Company was creating an "artificial short-squeeze of shorts" and "a digital squeeze". He added:

> you are essentially telling shorts they need to buy shares on the Nasdaq to either avoid paying out the digital dividend or as a hedge after they've paid the digital dividend. . .  I have no idea how this one stays out of court. The two biggest issues I see are: trying to force a short on a traditional market to become short a security subject to Rule 144 and the conflict of interest in where the digital shares trade and how that exchange is controlled.

111.     On July 31, 2019, Paulo Santos wrote an article on *Seeking Alpha* reaching similar

conclusions:

> What did Overstock just do? Well, it decided to create and award a dividend in
> something the short sellers don't have for delivery: A digital share dividend. The
> "Digital Voting Series A-1 Preferred Stock (the "Series A-1")."  . . .
>
> For institutionally-minded short sellers, the need to deliver on this digital asset
> could become a large roadblock forcing them to close positions – which is the
> whole point.
>
> ***This is a highly manipulative tactic***. It's to be expected that all kinds of other shady
> businesses with high short interest will replicate it. We'll see more of this, unless
> the SEC intervenes.
>
> Do note that many high short interest situations are shady and have owners trying
> to enrich themselves. If this technique is allowed, these persons could create a
> digital asset and then artificially create demand for it by forcing short sellers to buy
> it, thus enriching themselves.

112.     Then on August 1, 2019, Matt Levine of *Bloomberg* noted the same concerns,

stating that Overstock's "blockchain-stock dividend punishes *actual* short sellers of Overstock's

*regular* stock *right now*." This is because short sellers are required to pay back any dividends or

distributions on the stock. So, "[i]f Overstock pays a dividend of $1, you have to pay your share

lender $1. If Overstock pays a dividend of one share of Digital Voting Series A-1 Preferred Stock,

you have to give your lender one share of Digital Voting Series A-1 Preferred Stock, which means

you have to go and buy it," but because the new shares of Series A-1 were not registered and could

not be sold for six months, "the people who are getting [the Overstock blockchain stock] are not

allowed to sell it to you."

> 2.   *Defendants Lack of Preparation for the Locked-up Dividend*
> *Further Demonstrates That it Was a Farce*

113.    The Company's claimed business goal of using the Locked-up Dividend to draw users onto the tZERO platform was entirely pretextual – the Locked-Up Dividend was designed entirely to harm short sellers, not for any legitimate business purpose. They intentionally or recklessly failed to create the necessary infrastructure for the issuance and trading of the Locked-up Dividend and they knew that the SEC would never approve a dividend with a lock-up provision like this one.

114.    Defendants informed investors that they were required to open a brokerage account through Dinosaur Financial8 in order to receive and – eventually – trade the Locked-Up Dividend. However, they knew or recklessly disregarded that Dinosaur Financial was unequipped and unprepared to handle the Locked-Up Dividend.  Dinosaur Financials' website crashed, it did not have a process to open accounts for non-United States investors, it did not know whether the shares were restricted, and it took many weeks for investors to even be able to open an account. Indeed, according to Lead Plaintiff, the representative of Dinosaur Financial who was answering the phone number provided to investors by Overstock that the Locked-up Dividend came "out of left field" and had been dropped on Dinosaur Financial without sufficient information or preparation.

115.    Overstock was similarly unable to provide investors with any guidance on major legal and operational questions regarding the Locked-up Dividend.  For example, Mark Delcorps, Overstock's Senior Director of Public Relations, could not answer Lead Plaintiff's emailed questions regarding how the Locked-up Dividend would work if an investor's broker had lent out the shares. And the representative answering the Overstock phone number could not answer even

_____

8 Dinosaur Financial Group is a brokerage firm that teamed up with tZERO in February 2019 to provide brokerage accounts for tZERO's digital security tokens.

basic questions and told Lead Plaintiff that the Company was still working out responses to investors' questions. And when asked by Lead Plaintiff what impact the Locked-up Dividend would have on short sellers in particular, the Overstock representative responded that any issues raised were "the shorts' problem." Additionally, when asked how the Locked-up Dividend would work for unaccredited investors that owned Overstock shares, Overstock provided no answer. Delcorps directed Lead Plaintiff to raise that question with Dinosaur Financial; Dinosaur Financial never responded to the follow-up email. The lack of information and coordination further demonstrates that Defendants did not intend to ever issue the Locked-up Dividend.

116.    Because neither Overstock nor Dinosaur Financial could or would provide information regarding the Locked-Up Dividend to investors, numerous Overstock investors reached out to the Securities Industry and Financial Markets Association ("SIFMA"), a trade association for members of the securities industry, for assistance.  In response, SIFMA formed a working group, including members from major brokerage houses like Fidelity, to try to get answers to the securities industry's legal and operational questions from the Company.

117.    According to both Lead Plaintiff and Fidelity, the working group was also thwarted. Although the working group was initially hopeful that it could obtain guidance and a workable approach for investors that would not result in a short squeeze, Overstock refused to tell the SIFMA working group whether NASDAQ would declare an ex-dividend date,9 how the Locked-up

---

9 The ex-dividend date is the date on which the stock trades without the dividend. That date is set by The Nasdaq, the exchange on which Overstock stock trades (not by the Company). Nasdaq Listing Rule 520(e)(6) and SEC Rule 10b-17 require that "the issuer of any class of securities listed on The Nasdaq Stock Market must notify Nasdaq **no later than ten calendar days prior to the record date** of a cash or non-cash dividend distribution." Nasdaq never issued an ex-dividend date for the Locked-up Dividend.

Dividend would be delivered, how brokerages could obtain custody of it, and whether it was a digital asset or restricted stock – basic information necessary for the Locked-Up Dividend to be issued.

118.     Overstock's refusal to provide this basic information regarding the Locked-Up Dividend led the SIFMA working group to meet with the SEC, the Financial Industry Regulatory Authority (a self-regulatory organization that, under the supervision of the SEC, writes and enforces the rules governing registered brokers and broker-dealer firms in the United States), and other regulators to request their assistance in getting Overstock to issue guidance regarding how to work through the myriad of issues caused by the Locked-Up Dividend. However, as September 18 (the last day to cover) approached with no guidance or plan from Overstock, investors were forced to cover by purchasing Overstock shares.

## H.  Defendants Learn That the Retail Division Revenue Will Fall Below the Forecast

119.     Confidential Witness #0 stated that Overstock executives were definitively shown in August 2019 that the Company would not meet the Retail contribution guidance and thus the Retail Adjusted EBITDA guidance. The planning team prepared an Outlook for the remainder of 2019, which showed that the company would not meet the Retail contribution guidance and thus the Retail Adjusted EBITDA guidance. This Outlook was prepared based on information gathered from the business units. The planning team presented this Outlook to Nielsen. Nielsen was very upset. He described the information presented to him as a "worst-case scenario" even after instructing the planning team to "beat up the numbers" and find "wins".

120.     Shortly thereafter, Nielsen met with leaders of the OSP project, including Maquel Shaw (who was the VP over the OSP project), Jonathan Cramer (who reported to Maquel and was

the Director over Coop, which involved selling ad space to Overstock's partners), and the machine-learning engineer who built the OSP algorithm. OSP, at that time, was a meaningful source of contribution dollars and could be "squeezed" for more. At that meeting, Nielsen ranted that OSP needed to generate $7 million in Nectar in the next sixty days. Nielsen explicitly told those individuals to not speak with the planning team because he did not want their "negative" influence on whether the $7 million was achievable.

121.    After this meeting, emails were exchanged wherein Shaw informed Nielsen explicitly that she did not support including an additional $7 million in the Outlook related to OSP as that number was unrealistic.

I.    <u>Defendants Further Their Deception Regarding the Retail Division's<br>Finances and Conceal a Company-Wide Insurance Crisis</u>

122.    Directors' and officers' insurance covers legal defense for directors and officers when those costs exceed what is covered by a company's general liability insurance. If a company has agreed to pay legal costs – for example, in an employment contract with its CEO or other executives – directors and officer's insurance will protect the company in the event that current or former employee is embroiled in expensive legal disputes.

123.    As Byrne admitted in his September 25, 2019 blog post, the July 2019 revelations regarding Byrne, Butina, and the FBI created a major insurance problem for the Company (particularly in the context of many years of unstable leadership by Byrne and regular involvement by the SEC). The Company learned that with Byrne at the helm, Overstock could no longer obtain director's and officer's insurance for *anyone* at the Company.

124.    Nonetheless, in the Company's August 8, 2019 Form 8-K (signed by Byrne) and Form 10-Q (signed by Iverson), Overstock noted an increase in the Company's expenses,

attributable in part to a "$722,000 increase in insurance premiums," but omitted any mention of Overstock having difficulty accessing insurance coverage for Byrne or any of its other officers or directors.

125.    The letter also reaffirmed the falsely positive retail news from earlier in the summer, claiming that the "***retail business has returned to positive adjusted EBITDA*** for the first time since the second quarter of 2017 and shows no sign of stopping" and announced that the Retail adjusted EBITDA for the quarter was $1.6 million. On an earnings call the same day, Overstock continued to trumpet the Retail business and its positive earnings trajectory, with Nielsen stating that the Retail business was "delivering positive adjusted EBITDA" and reiterating the July 15 announcement increasing Retail adjusted EBITDA for the year to $17.5 million. Additionally, on that call there was extensive discussion of search engine optimization. Seth Moore stated that the Company "made another significant breakthrough in the recovery of our SEO rankings" and noted Slide 31, a bar chart labeled "SEO Top 3 Keywords (All Categories)" (but which failed to label the X-axis or explain what the chart actually depicted). Referencing that chart, Byrne added that the Company has seen "significant progress" in SEO and that "tells us we've been doing the right things, and focusing on the right things in our SEO efforts."

126.    Slide 39 for the investor all titled "Annual Retail Contribution" and had a "2019 Official Outlook"

127.    Additionally, on the same day, Overstock told investors that the record date for the Locked-up Dividend would be September 23, 2019, and the payment date would be November 15, 2019.  This announcement concealed that the Locked-up Dividend was intended to cause a short squeeze and that Byrne had a plan to personally profit from that squeeze.

J.   Byrne Flees and Launches a "Fire-and-Forget Missile" to Cash Out

128.    On August 17, 2019, just nine days after the oblique mention of rising insurance premiums, then-CFO Iverson confirmed to the Board (but not to investors) that Overstock could not obtain directors' and officers' insurance at all for any of its directors or officers. In an email sent on a Saturday to Overstock's Board, Iverson explained that because of Patrick Byrne's July 26 disclosure regarding his relationship with Maria Butina, it was "impossible" to get directors' and officers' insurance for Overstock with Byrne at the firm. That was confirmed on August 19 (the following Monday) by Overstock's insurance brokerage, Marsh LLC, which stated that it was impossible for Overstock to get insurance at any price. As Byrne later wrote, this was "[n]ot a question of price, [but] a question of coverage."

129.    The inability to obtain insurance forced Byrne to move up his plan to exit the Company. But before publicly announcing his departure, Byrne put in place a plan for selling his remaining common stock in order to fully maximize his personal profit from the short squeeze.

130.    As discussed above, paragraph 107, "[a]bout a month" earlier before the Locked-up Dividend was announced, Byrne created a plan to sell "~200,000 shares *into the volume we expected to pick up in mid-September*" with "volume" as a barely coded synonym for "price" (which would inevitably rise along with the trading volume due to short covering).

131.    When Byrne decided to imminently resign, he put that plan into overdrive. He first confirmed that everything was on track to maintain the artificially inflated share price. As Byrne later admitted, he "checked and got confirmation: guidance was stable, and the dividend was green-light." Having confirmed that (1) his inflated Retail guidance would stay inflated and that (2) the stock price would be further artificially inflated by the Locked-up Dividend causing a short

squeeze, Byrne changed his instructions from selling a mere 200,000 shares to "selling all my shares in mid-September."[10] Numerous Overstock executives knew of Byrne's plan. Byrne shared his plan to sell "100%" of his remaining stock with "8-10 executives . . . I asked them to review our guidance. [Defendant] Dave Nielsen (Retail President) came back said, The Retail executives met, reviewed it all, and we do not have to change guidance for this year. We think we can hit the $15-$17 million EBITDA for Retail which we have guided the Street", and Byrne submitted his resignation letter to Jonathan Johnson and General Counsel Glen Nickle.[11] Byrne then worked with his accountant/lawyer and bankers to "set the equivalent of *a fire-and-forget missile to launch in the week before the dividend*" and sell all of his remaining Overstock common stock shares at the height of the short squeeze.

132.    With that in place, a few days later, on August 22, 2019, Byrne announced in a letter to shareholders filed with a Form 8-K that he was leaving Overstock. He wrote that due to

---

10 Patrick Byrne, <u>Reflections on Overstock</u>, DeepCapture (Nov. 7, 2019) <u>https://www.deepcapture.com/2019/11/reflections-on-overstock/</u>; see also November 14, 2019 Patrick Byrne, <u>Reflections on Overstock Q3 Quarterly Earnings</u>, DeepCapture (Nov. 14, 2019) <u>https://www.deepcapture.com/2019/11/reflections-on-overstock-q3-quarterly-earnings/</u> (he "immediately" changed his plan to sell 200,000 shares and "decided to sell all [his] stock").

11 Charles Gasparino, Lydia Moynihan, <u>Fmr. Overstock CEO Patrick Byrne wants to explain controversial exit, stock sale and predicts more deep state revelations</u>, Fox Business, https://www.foxbusiness.com/business-leaders/fmr-overstock-ceo-patrick-byrne-exit-stock-sale-deep-state. Elsewhere, Byrne explained that "there are five witnesses within the company who can confirm that by August 19 I had let them know I would be selling all my shares in the week or two before the dividend, but as late as possible while still allowing me time to move out all my holdings." Patrick Byrne, <u>A Message to My Former Colleagues at Overstock</u>, DeepCapture (Sept. 18, 2019), https://www.deepcapture.com/2019/09/a-message-to-my-former-colleagues-at-overstock/. Similarly, Byrne tweeted, "decision made + instructions given Aug 19: 5 witnesses." Gary Weiss, Twitter.com, (Oct. 9, 2019, 7:11 PM), https://twitter.com/gary_weiss/status/1182071168242716672.

his "involvement in certain government matters . . . ***my presence may affect and complicate all manner of business relationships, from insurability*** to strategic decisions regarding our retail business" and so was in the "position of having to sever ties with Overstock, both as CEO and board member, effective Thursday August 22."12 Byrne also reiterated the "key points" of his July 15 shareholder letter, including falsely telling investors that the "***retail business has recovered to a state of positive adjusted EBITDA*** . . . ***I believe in the near future the cash generated by Retail going forward should be adequate for funding both Retail's ongoing innovation***" and the blockchain firms, especially tZERO.

133.    In a Fox news interview that day, Byrne claimed that "everything was in a perfect place, perfect time for me to resign" and explained that he "had an idea" that his departure "was coming since last July" and had "been preparing very carefully" by putting the blockchain technology in place.



134.    The market reacted very positively to the news of Byrne's departure (as well as the positive retail guidance) jumping from $19.50 at close and 3,707,888 shares traded on August 21, 2019 to $21.12 at close and an astounding 12,499,209 shares traded on August 22, 2019.

---

12 A month later, Byrne again reaffirmed that the insurance issues caused his departure, writing on his blog, "***[t]he proximate cause for my departure was, in fact, the impossibility of our getting corporate insurance with me still at the helm***" (emphasis added). Patrick Byrne, <u>A Message to My Former Colleagues at Overstock</u>, DeepCapture (Sept. 18, 2020), https://www.deepcapture.com/2019/09/a-message-to-my-former-colleagues-at-overstock/.

135.     Byrne then fled the country for South America and later continued on to Indonesia – a country that he noted does not have a criminal extradition treaty with the United States. As *MarketWatch* noted on August 23, 2019, Byrne's departure plans "sounds like the plans of a future fugitive from justice, not a chief executive."

### K.   Overstock Reveals it *is* Trying to Sell the Retail Division

136.     After Byrne's exit, Jonathan Johnson – the Director and Chairman of tZERO – was named Interim CEO. Under new leadership, the Company held an investor call a few days later, on August 26, 2019, to discuss the management change and business updates.

137.     Directly contradicting Byrne's statements on July 15 (and demonstrating the lack of bona fide progress in the Retail segment as Defendants were claiming), interim CEO Jonathan Johnson announced that Overstock's retail division was, in fact, looking for a buyer.

138.     On this news, Overstock's stock fell 15.8%, from a close of $19.89 on August 23, 2019 to a close of $16.75 on August 26, 2019.

### L.   Overstock's Stock Price Skyrockets as the Locked-Up Dividend's Record Date Nears

139.     As it became clear that the Locked-up Dividend was going forward, and as September 18 (the last day to complete covering in time for shares to settle before the September 23 record date) crept closer, short sellers rushed to cover their positions by purchasing Overstock

shares. And just as Defendants expected and intended, a short squeeze resulted, evidenced by the

dramatic increase in Overstock's stock price and trading volume:



140.    From the beginning of the short squeeze on September 3 through its peak during

the trading day on September 13, Overstock's common stock price rose **97%** (from $15.07 to a 52-

week high of $29.75) and trading volume increased by **776%** (from 2,122,416 to 18,613,100 shares

traded). The stock price was driven up by the massive increase in buying to cover (which also

drove up the trading volume).

141.    The day-to-day change in Overstock's stock price and trading volume caused by

Defendants' manipulative Locked-up Dividend was extraordinary; the artificial inflation in the

stock price skyrocketed as short sellers rushed to cover (as reflected in the rapidly growing trading volume caused by short sellers buying shares to cover):

| Date | Peak Share Price During Day | *Increase from Prior Day* | Closing Share Price | *Increase from Prior Day* | Volume of Shares Traded | *Increase from Prior Day* |
|---|---|---|---|---|---|---|
| 9/3/2019 | $16.18 | | $15.07 | | 2,122,416 | |
| 9/4/2019 | $15.87 | *-1.92%* | $15.35 | *1.86%* | 1,595,028 | -24.85% |
| 9/5/2019 | $16.24 | *2.33%* | $16.14 | *5.15%* | 1,980,592 | *24.17%* |
| 9/6/2019 | $17.14 | *5.54%* | $16.90 | *4.71%* | 2,379,426 | *20.14%* |
| 9/9/2019 | $19.97 | *16.34%* | $19.47 | *15.21%* | 4,128,299 | *73.50%* |
| 9/10/2019 | $21.50 | *7.66%* | $21.32 | *9.32%* | 5,755,673 | *39.42%* |
| 9/11/2019 | $23.94 | *11.35%* | $22.76 | *6.75%* | 9,234,612 | *60.44%* |
| 9/12/2019 | $27.38 | *14.37%* | $26.72 | *17.4%* | 11,448,303 | *23.97%* |
| 9/13/2019 | $29.75 | *8.66%* | $24.93 | -6.7% | 18,633,862 | *62.77%* |

142.    As short sellers rushed to cover their positions, the amount of short interest in the market declined:



143.    Short holdings declined by 11.32% during the squeeze, falling from 13,070,000 shares on September 3 at the start of the squeeze to 11,590,000 shares on September 12, as short sellers were forced to exit their positions at the extreme crest.

144.    Notably, according to data from S3 Partners, a financial analytics firm, 6% of the 13.2 million shares borrowed by short sellers were bought back on September 11, 12, and 13 (the three trading days prior to Sept. 16). As the managing director of S3 explained, the "serious acceleration of short covering" in the days before the Locked-up Dividend record date reflects that the market "is responding to an event that's *changing people's trading strategies*" – *i.e.*, the Locked-up Dividend.

145.    The Locked-up Dividend changed shareholder's behavior by forcing them to buy stock at inflated prices to close out positions when they otherwise would not have done so. And short sellers could not avoid the manipulation, even though they and some analysts recognized that it was happening. Short sellers were captive and forced to buy Overstock stock at an inflated price to avoid being in default of their legal obligations that result from them borrowing stock in order to sell short legally or having their positions recalled.

M.    "Problem Solved": Byrne Takes Advantage of the Manipulated
Market to Sell Off His Remaining Stock

146.    Byrne was tracking the short squeeze as it happened. Although he had left Overstock, he admitted that he nonetheless continued his retention of an advisor economist who

tracked Overstock's trading, volume, negative rebate, and average days outstanding of the short position.13

147.    However, Byrne did not have access to up-to-the-minute information about the short squeeze or Overstock's stock price. As he explained in his blog, in the last weeks of the short squeeze he on a boat sailing near West Papau, Indonesia and due to "rather serious civil unrest . . . authorities [were] turning the Internet off intermittently to prevent dissidents from using social media. Connectivity was determined for me those days by what island we were sailing by, if there was or was not a cell phone tower on it, how the civil unrest was running on-shore, the humidity, which way the wind was blowing, etc."14

148.    Just a few days before the Locked-up Dividend record date, Byrne learned that the short squeeze was starting to loosen. Byrne reported in multiple blog posts that as of September 12 or 13, 2019, the SEC planned to block Overstock's dividend. Byrne wrote "that the boys from the prime brokers were in Bobby Vans (a Wall Street watering hole) on Thursday and Friday, September 12 and 13, saying that the SEC had leaked to the prime brokers that they (the SEC) were going to put the kibosh on the dividend."15 In another blog, Byrne wrote that since September 13, 2019:

> major prime brokers on Wall Street (e.g., JP Morgan, Morgan, and Goldman) were telling clients that the SEC had let them know last Thursday night and Friday

---

13 Byrne was even receiving data from his adviser. Byrne later published a chart on his blog that was created by his privately retained economist-adviser showing Overstock's stock price dramatically increasing during the month of September to its peak and the short interest correspondingly dropping.

14 October 25, 2019, When the SEC Leaks, Is the Result Insider Trading

15 September 25, 2019, The Big O – A Closing Word

morning that they [sic] going to do something special to let short-sellers off the hook (and incidentally, I can easily trace back the names of the people at the primes saying that). They [sic] SEC informed the prime brokers that if Overstock went forward with the dividend, they (the SEC) would be sending them Wells Notices (essentially [sic] letters that say "We are going to come after you!"). These prime brokers were telling that to clients.[16]

149.    Additionally, around September 13, 2019, certain prime brokerages agreed to take a cash equivalent in lieu of the Locked-up Dividend shares. As short sellers learned this information, including that the SEC was going to halt the dividend, their frantic purchasing slowed.[17]

150.    Over the weekend of September 14 and 15, 2019, Byrne received "detailed messages" that major prime brokers on Wall Street like JP Morgan and Goldman Sachs had told clients that the Locked-up Dividend was not going forward. Byrne again claimed on his blog, including an entry titled "The Deep State Cries Bazoomba," that he was told the reason given was that the SEC was going to intervene to prevent the Locked-up Dividend.

151.    Then on Sunday, September 15, 2019, Byrne received an "alarm[ing]" text from John Tabacco, who he describes on his blog as a "friend[] within Wall Street (one of the Staten Island fellows who seems extraordinarily well-plugged-in)".[18] What Byrne did not share with his

---

[16] September 18, 2019, the SEC Cries "Bazoomba!"

[17] As the short squeeze alleviated, the short squeeze metrics resolved. The stock price dropped each day, from a high during the trading day of $29.75 on September 13, 2019 down to $11.19 on September 23.

[18] At times, Byrne has referred to Tabacco by the pseudonym "Huggy Bear," but states clearly on his blog that Huggy Bear is John Tabacco. In his October 19, 2019 blog "When the SEC Leaks, Is the Result Insider Trading?," Byrne makes the connection explicit, writing "Huggy Bear (a.k.a. John Tobacco) [sic]" and including a video clip of their television interview together. Patrick Byrne, When the SEC Leaks, Is the Result Insider Trading?, DeepCapture (Oct. 19, 2019), https://www.deepcapture.com/2019/10/when-the-sec-leaks-is-it-insider-trading/.

blog readers is that John Tabacco was barred from the securities industry after he was sanctioned for misconduct in the late 1990s. Despite that questionable background, Tabacco was a co-founder of tZERO and worked at tZERO for over two years. And, notably, his brother Derek was a Vice President at tZERO during the Class Period – and thus would have had access to insider information.

152.    According to Byrne, Tabacco warned him that Overstock management was "gonna get intense heat to postpone Record date" and that Tabacco was "hearing chatter from big brokers" that the Locked-up Dividend was not going to happen. Tabacco wrote that he knew Byrne "***still ha[d] a significant stake in ostk and tZERO***" and advised Byrne that "***if the new leadership caves to ANY postponement OSTK is $10*** and we never get another bite at this. ***If someone has a backbone and stands tall OSTK is $48 by Friday*** . . .", which would be the last trading day before the Locked-up Dividend record date. In other words, Tabacco told Byrne that (1) he heard the Locked-up Dividend was going to be called off and (2) if it was called off, Overstock's stock price would crash.

153.    Byrne then called Tabacco; in order to do that he claimed that he had to string an extension cord up to the roof of the boat and climb the mast to get better reception. Again, Byrne stated on his blog that Tabacco told him that on September 12, 2019, the SEC had told several prime brokerages that "the SEC was going to kill the tZERO dividend" and by September 13, 2019, the SEC had halted the dividend.[19]

---

[19] October 25, 2019, When the SEC Leaks, Is the Result Insider Trading

154.   After learning this, Byrne ordered his accountant to immediately sell his entire remaining stock in Overstock common stock. As Byrne wrote, he contacted his accountant "whose finger was poised over the button of the ejection seat, [and he] hit it . . ."

155.   As Byrne aptly summarized, "I resigned the CEO position, the director position, ***and after waiting until volume picked up, sold every last share of my stock. Problem solved***."

### N.   Overstock's Stock Price Tumbles as Byrne Sells Off His Common Stock, the Public Learns that the Dividend Was a Manipulative Short Squeeze, and the Short Squeeze Abates

156.   Over a dramatic three-day period in mid-September, Defendants' market manipulation scheme came to a head. Breaking down the events of each day:

#### 1.   *September 16, 2019*

157.   On September 16, 2019, Patrick Byrne sold 1,592,123 shares of Overstock stock at $21.83 a share, yielding $34.7 million dollars. That information was not revealed to the public, though, for another two days.

158.   Instead, that day, *Bloomberg* published an article entitled "How Patrick Byrne's Final Act at Overstock Crushed Short Sellers" explaining that "[s]hares of the online merchant are on a tear, up about 60% in two weeks . . . coincid[ing] with a flurry of short covering that comes a week before the record date for an exotic dividend the company unveiled to much fanfare and confusion last month." Recognizing Byrne's disdain for short sellers, *Bloomberg* noted that the harm befalling short sellers was "unlikely to bother Byrne."

159.   Citing data from financial analytics firm S3 Partners, *Bloomberg* reported that 6% of the 13.2 million shares borrowed by short sellers had been bought back in the past three business days, and noted that shares fell on Friday for the first time in eight days, but on volume three times the average. S3 managing director Ihor Dusaniwsky was quoted saying, "[t]here's been a serious

acceleration of short covering just recently . . . responding to an event that's changing people's trading strategies."

160.    The article further stated that the Locked-up Dividend was an explanation for the seeming rally in Overstock's stock price:

> Because the security could prove hard for others to lay hands on, the potential exists for it to snarl the process by which shorts maintain positions.

> The theory behind the squeeze is technical but comes down to the obligation a short seller faces to pass dividends back to whomever lent him shares. That may prove difficult in Overstock's case because the so-called "Digital Voting Series A-1 Preferred Stock" it promised in July is unregistered, will trade only on a blockchain exchange owned by a subsidiary, and may face restrictions on transfer.

161.    The article quoted TD Ameritrade chief market strategist JJ Kinahan as stating that short sellers "have no way of delivering" the Locked-up Dividend, and so "have to cover this stock." Similarly, Dusaniwsky said, "[y]ou can expect a lot of buy-to-covers before the record day." He noted that brokerages he had spoken to were "trying to figure out" how to handle the Locked-up Dividend and whether to accept something instead of the digital security.

162.    Byrne published a blog that same day admitting that he knew that the Locked-up Dividend would create a short squeeze, but that he did not care. He acknowledged that "some on Wall Street object that this is manipulative" but went on to claim, incorrectly and with no regard to the illegality of Defendants' conduct, that "[n]o retail investor would lose a penny from that dividend going forward. The only market participants in harm's way would be the shorts, but shorts are sophisticated investors." He then threatened the SEC, stating that if it intervened in the Locked-up Dividend, Byrne would consider that an "act of war".

163.    After the revelations in this *Bloomberg* article and on Byrne's blog, and as the frantic purchasing slowed, Overstock's stock price fell from $24.93 at close on September 13, 2019 to $19.75 on September 16, 2019 – an enormous drop of $5.18 or 20.8%.

### 2. *September 17, 2019*

164.    On September 17, 2019, Patrick Byrne sold another 2,141,646 shares of Overstock stock at $18.66 a share, yielding $39.9 million dollars. That information was not revealed to the public, though, for another day.

165.    Instead, that day the public learned more about the Defendants' intentional short squeeze.

166.    *The New York Post* published an article titled "Ex-Overstock CEO planned crypto dividend to thwart short sellers" explaining that "the crypto-dividend was devised by Byrne . . . to thwart Overstock's short sellers, with whom he has been tangling for decades. The plan worked – for a time anyway – and sent Overstock shares surging 60% over the last two weeks, to a 52-week high of $29.75 in midday trading on Friday [September 13]." The article reported based on an anonymous source that Byrne "designed the dividend to create short covering." The article further explained that the Locked-up Dividend forced short sellers "to unwind their short positions ahead of the dividend hitting, which drove the stock higher."

167.    *The New York Post* further reported that the "short squeeze has deflated in recent days" after brokerage firms JPMorgan and Morgan Stanley agreed to take cash of an equivalent value to the Locked-up Dividend to cover short positions. *The New York Post* reported that Overstock shares "buckled as word of the brokerage concession began to spread early Friday because it meant short sellers could maintain their short positions."

168.    On this revelation and with the further reduction in covering, the price continued falling, closing at $17.60, an additional $2.15 or 10.9% decline from the previous day.

*3.  September 18, 2019*

169.    Finally, on September 18, 2019, Patrick Byrne sold his remaining 1,056,690 shares of Overstock common stock at $16.32 a share, yielding $17.2 million.

170.    Having waited until the last day that short sellers could cover, and thus creating maximum uncertainty and having inflicted maximum pain on the shorts, Overstock officially ended the short squeeze by announcing in a Form 8-K filed that same day that the Locked-up Dividend's record date would be postponed and that restrictions would be loosened so the dividend would immediately be freely tradeable.

171.    This announcement alleviated short sellers' need to purchase to cover and revealed that the Company did not need to lock up the dividend to accomplish its stated goals of providing a benefit to investors and adding blockchain to the investor experience.

172.    On this revelation and with the further reduction in covering, the price continued falling, closing at $16.19, an additional $1.41, an 8% decline from the previous day.

173.    After the market closed, a Form 4 was filed for Byrne revealing his total liquidation of Overstock common stock between September 16 and 18, 2019, which yielded him over $90 million. From abroad, Byrne announced that he had invested the proceeds from his sales in gold, silver, and cryptocurrencies to hide his fortune from "retaliation from the Deep State."

*4.  The Market Recognizes that Defendants Manipulated the Market*

174.    With this new information regarding Byrne's stock sales, the financial news swiftly reported that the Locked-up Dividend was not only unusual, but was a market manipulation

scheme intentionally created by Overstock to harm short sellers and to allow Byrne to cash out his share holdings.

175.    As Matt Levine explained succinctly, "Byrne's decision to pay a dividend in magic beans on the blockchain has *both* led to a 60% rally in the stock *and* burned the short sellers he vocally hates." But because that rally was based on manipulation, it lasted long enough for Byrne to sell all of his shares, but not much longer.

176.    Additionally, *MarketWatch* published a report on September 22, 2019, titled "Overstock founder tried to squeeze short sellers, then sold out when the SEC cracked down," reporting on the recent events, including that the Locked-up Dividend was intended to cause an "operational impossibility" forcing short sellers to close their positions and driving up the stock price so Byrne could cash out:

> **In unexpected afterword to his bizarre final chapter at Overstock, Patrick Byrne sells his shares after his 'digital dividend' is changed and delayed**
>
> *One of Patrick Byrne's last acts at Overstock.com Inc. appears to have forced a short squeeze that warranted the attention of the Securities and Exchange Commission, and the sell-off of his entire stake over the last three days is now raising questions about whether he tried to manipulate the market.*
>
> Byrne, the controversial founding chief executive of Overstock OSTK, - 2.56% who has long been at open war with short sellers and Wall Street at large, left the company last month amid some of the strangest circumstances and stories from a tech executive since John McAfee fled Belize. *Before he left, though, he installed plans for a "digital dividend" for Overstock shareholders that appears designed to be a shot of pure poison for the people Byrne appears to hate only as much as "the Deep State," short sellers.*
> . . .
> What Byrne is saying is that the digital dividend is a way to force investors to open a digital wallet and help his blockchain-exchange experiment. *What he is not saying is that the scheme would also force investors to recall their shares that were loaned out to short sellers, forcing some to buy to cover their position.*
> None of this is going over well with investors, especially hedge funds who typically short stocks that they borrow, hoping to repay the borrows after a price decline and

make money on the difference. In the last two weeks, Overstock's shares have been on a roller-coaster ride, as investors started to realize that the digital dividend presented a problem for short sellers.

"*The entire dividend is a gimmick conceived by the company's board to engineer a short squeeze by designing an operational impossibility by short sellers to deliver the digital dividend,*" Willem de Vocht, founder of Netherlands hedge fund Mayflower Capital Partners, said in an email earlier this week. . . . "*If Byrne had intent to engineer a short squeeze then profited from selling into the price spike, that seems to be clear-cut market manipulation,*" Nathan Anderson, founder of Hindenberg Research, which published a scathing report on Bloom Energy BE, -9.61%  earlier this week, said Wednesday afternoon. "I've been both long and short Overstock in the past and frankly given these latest events I intend to be short tomorrow."

"*For years, Patrick Byrne has complained about short sellers and has insinuated that they are criminals or nearly so,*" said one hedge-fund manager who asked not to be named. "*Today we learned that he tried to engineer a short squeeze and when it appeared to be failing, he sold every share of stock he owned*."

> O.  The Truth About Defendants' Retail Division and Insurance Crisis is Revealed

177.    Just a few days later, on September 23, 2019, Overstock issued a press release along with a Form 8-K, revealing that Defendants' Class Period statements regarding the Retail division and insurance issues at Overstock were false and misleading.

178.    Overstock announced that it was "[u]pdat[ing] Retail guidance. It revealed that the prior $17.5 million Retail Adjusted EBITDA guidance provided just six weeks earlier presumed "significant positive EBITDA" for the third quarter, but in fact, the third quarter results were merely break-even – dramatically reversing the supposed progress towards profitability touted by the Company and revealing the falsity of the earlier claims that increased guidance (from $10 million to $17.5 million) were based on improvements that had already occurred. Overstock listed five supposed drivers of the Company's reduced earnings guidance, including recent tariffs, increased freight costs, increased insurance costs, decreased consumer confidence, and an unexpected lag in web search traffic producing new customers. These supposed justifications did

not make sense – in earnings calls throughout August 2019, Overstock dismissed recent tariffs as "non-material" to the retail business and repeatedly cited its management of freight costs as a driver of earnings *growth*. Even as late as August 26, 2019, Overstock was boasting of the key role its careful freight cost management played in Overstock's "sustainable and profitable future growth." In reality, the earnings guidance had to be slashed because the earlier projections were artificially and fraudulently inflated – as was clearly demonstrated by the ultimate announcement in Overstock's Form 8-K filed on March 13, 2020, announcing that Retail Adjusted EBITDA for fiscal year 2019 was negative $2.2 million. As explained by Confidential Witness #0, above, paragraph 77, the $21.1M miss in Retail guidance reflected the $12.4M miss to the original guidance, the $7.5M increase in guidance, and an apparent $1.2M miss on SG&A Expenses ($21.1M minus $12.4M minus $7.5M).

179.    Overstock also announced that Iverson had resigned his post as CFO on September 17, 2019, and notified the Company the same day.   There was no explanation for his departure or for the weeklong delay in announcing it.  As discussed above, paragraph 81, Confidential Witness #0 reported that Iverson's resignation came after the new official Outlook for the remainder of 2019 was presented to the new executive-level leadership, and showed that the Company would significantly miss the Retail guidance, which under Byrne and Iverson's watch was increased repeatedly during 2019 with no reasonable basis.

180.    Robert Hughes was appointed Acting Chief Financial Officer, and the Company stated it would search for a new CFO. Overstock additionally announced that its insurance costs "will significantly increase," finally disclosing that the insurance problems faced by Overstock were not general in nature but were caused specifically by Overstock-specific recent events such

as Byrne's management decisions. A month later, Byrne himself acknowledged that it was impossible for Overstock to get insurance while he was at the helm—and that Iverson and the Company's insurance brokers had said as much in writing.

181.    Finally, the Company confirmed that Byrne had sold all of his remaining common stock according to the Form 4 he filed on September 18, 2019.

182.    On this news, the stock price tumbled dramatically by **25%**, diving from $14.97 when the market closed on the previous trading day, September 20, 2019 to $ 11.19 at the close of trading on September 23, 2019.

183.    This was Overstock stock's worst day in more than a decade and second worst single-day performance in the Company's history. This also concluded the worst seven-day stretch in Overstock history, with seven consecutive trading sessions totaling a 58.1% decline in share value.

184.    Barron's, a financial news magazine, attributed the 25% dive in share value to the Company's stunning reversal in earnings guidance. The financial and markets news site *MicroSmallCap* likewise attributed the share price drop to the announcement of Iverson's unscheduled departure following the abrupt reduction in earnings guidance.

### P.   Overstock Files for Registration of the Dividend

185.    On September 24, 2019, Overstock filed a Form S-3 with the SEC to register a digital dividend. Regarding this dramatic change in course in the dividend's structure, Overstock CEO Jonathan Johnson stated that the Company "appreciate[s] the cooperation and guidance we are receiving from regulatory authorities."

186.    Byrne noted that if registration was granted, that "should obviate the concern about a squeeze", thus explicitly acknowledging that the locked-up structure had caused the squeeze.[20]

Q.  Overstock Belatedly Announces an SEC Investigation

187.    Further fall-out was revealed on November 12, 2019, when Overstock belatedly announced in its Form 10-Q filed that day that it had received a subpoena from the SEC for documents related to the Locked-up Dividend, the 10b-5-1 trading plans of Overstock's officers and directors, communications with Byrne, and documents related to the GSR Capital investment in tZERO.[21] Overstock also disclosed that the SEC's investigations "covers the departure of our former chief executive officer."

188.    On this news, Overstock's share price dropped more than 17%, from $9.42 when trading closed on November 11, 2019 to $7.78 when trading closed on November 12, 2019.

189.    A November 12, 2019 *Wall Street Journal* article titled "Overstock Shares Hit Seven-Year Low as SEC Expands Investigation," a November 16, 2019 *Salt Lake Tribune* article titled "Stock in Utah-based Overstock.com plummets as feds seek info on ex-CEO Patrick Byrne," and other reporters tied the stock drop that day to the announcement of the SEC investigation.

R.  Post-Class Period Revelations

1.  *February 13, 2020*

190.    On February 13, 2020, Overstock held a special shareholder meeting to allow shareholders to vote on whether Overstock should issue a digital dividend that would be freely tradeable.

---

[20] September 25, 2019, The Big O – A Closing Word

[21] Overstock received the subpoena on October 7, 2019. The Company offered no explanation for its decision to wait a month before sharing that information with its shareholders.

191.    Shareholders approved the proposal to issue a Series A-1 Preferred Stock dividend that would be registered with the SEC and would trade on the tZERO platform. Unlike the original Locked-up Dividend, the dividend issued under this modified proposal would be freely tradeable and thus comply with SEC rules.

192.    Shockingly, despite having claimed that he had disassociated from Overstock (writing on his blog "I sold all my stock", "[I] sold every last share of my stock", and that he was "100% disassociated from Overstock"), Byrne nonetheless participated in this shareholder vote. This is clear from the vote results. Byrne owned 63,775 shares of Overstock's Series A-1 preferred stock and there were 124,546 outstanding shares of that series eligible to vote.  Thus, only 60,771 shares are owned by someone *other than* Byrne. 86,257 Series A shares were voted at the meeting (86,249 in favor of the proposals and 8 against with zero abstentions). Necessarily, then, Byrne voted at least 25,486 of his shares.

193.    Byrne's self-interested vote and retention of his Series A shares wholly undermines Byrne's claims that his $90 million worth of stock sales were an innocent attempt to disentangle himself from the Company, not the culmination of an illegal scheme to profit from his market manipulation.

## 2.   *March 13, 2020*

194.    On March 13, 2020, the Company announced fourth quarter 2019 and fiscal year 2019 earnings and related results in a Form 8-K and Form 10-K.

195.    The Form 8-K revealed that Retail Adjusted EBITDA for fiscal year 2019 was ***negative $2.2 million*** – a significant reduction from the $15 million and $17.5 million numbers announced by Defendants during the Class Period.

196.     The Form 10-K also revealed that the SEC had expanded its investigation into the key issues during the Class Period. In addition to the October 7, 2019 subpoena, Overstock revealed that on December 9, 2019, the Company received a subpoena requesting documents relating to the alternative trading system run by tZERO ATS, LLC (on which the Locked-up Dividend was supposed to trade) and into the tZERO investment by GSR Capital. Then on December 19, 2019, Overstock received yet another subpoena, this time for insider trading policies and certain employment and consulting agreements. Overstock revealed that the Company had previously received requests from the SEC regarding GSR and communications with Byrne, as well as the matters referenced in the December 2019 subpoenas; the Company did not provide the date or any information regarding the nature of those requests.

### 3.  *August 6, 2020*

197.     On August 6, 2020, the Company announced second quarter 2020 earnings and related results in a Form 10-Q.

198.     The Form 10-Q stated that the SEC investigation continued, with ongoing attention to tZERO, reporting that "[o]n May 27, 2020, we received a subpoena from the SEC requesting further information regarding the alternative trading system run by tZERO's ATS, LLC."

## V.     SUMMARIZED ALLEGATIONS REGARDING THE LOCKED-UP DIVIDEND

### A.  The Entire Purpose of Locking Up the Dividend Was to Target Short Sellers

199.     In determining the purpose or motivation behind Defendants' conduct, any broader goals for the dividend must be analyzed distinct from the decision to lock-up the dividend. Defendants have never claimed that, for example, they locked-up the dividend because they

believed it would make it (and thus tZERO) more attractive. Nor is there any logical economic argument to support such a position. Overstock's ultimate decision to issue the dividend without locking it up shows that it was not necessary to serve legitimate business goals.

200.    The only purpose for choosing to issue the lock-up the dividend was a manipulative and self-serving one: to target short sellers and increase the stock price so Byrne could cash out at an inflated price.

201.    Defendants announced that they were halting the Locked-up Dividend on September 18, 2019. Just six days later, on September 24, 2019, Overstock filed with the SEC to register the dividend – eliminating the lock-up feature altogether – and revealing that that structural feature of locking-up the dividend had no legitimate business purpose.

### B.    The Purpose of Locking Up the Dividend Was to Target Short Sellers and Create a Short Squeeze, Driving Up the Price of Overstock Stock

202.    The sole purpose of the locked-up aspect of the dividend was to harm short-sellers. As noted above, it had no legitimate business purpose.

203.    Byrne's own statements demonstrate that the purpose was to target short sellers and create a short squeeze, including statements that:

- When he was designing the Locked-up Dividend, he "recognized" that it "might" cause a short squeeze.
- The situation prior to the Locked-up Dividend was akin to, "struggling to keep the lid on the pot of boiling water… However, if one must hoist a bank safe to rest on a lid over a pot of boiling water to create enough weight to keep that lid in place, then taking that bank safe off would lead (as the reader may imagine) to the water boiling over in a tremendous way. Maybe blasting a hole through the ceiling. Similarly, if the short positions in OSTK (including the 18 million "legitimate" shorts + the Reg SHO shorts + the ex-clearing shorts

+ daisy-chaining) had finally had to settle, the stock would have gone up just as surely as the water in the pot would have boiled over once the safe on its lid was removed."

- The Locked-up Dividend would have cost short sellers "more than $400 million. It might have cost $1 billion, but who knows? It could have been $2 billion. Maybe $4 billion.
- "[T]here are those who would claim that this was deliberately created squeeze."
- The Locked-up Dividend was a "hand with four aces in it (the dividend) ready to play."
- He did "not just dream this [Locked-up Dividend] up on a whim. [He] *designed it carefully*," knowing full well that "*it put legitimate short sellers in a bind.*" He further gloated about how "*the OSTK shorts were asleep at the switch and got caught in a jam. We Overstock shareholders won this hand fair and square*."
- The Locked-up Dividend was revenge for his long campaign against short sellers, explaining that "after 15 years of being scofflaws, *the shorts are now crying because they are getting sucked into a black hole that they created themselves*."
- The "Powers That Be on Wall Street . . . pointed out that [the Locked-up Dividend] put legitimate short sellers in a bind, to which my reply was, '*As CEO of Overstock my responsibility is to shareholders, and not to anyone who might have shorted our stock, legitimately or otherwise.*'"
- "*Mr. Shorty was sleepy and stepped on his weenie*, and if the SEC objected after the fact, I would love to have met the SEC in court and put *them* on trial."
- He had anticipated that trading volume and share price would increase as the Locked-up Dividend record date approached; "one thing I was certain of was that the *volume* had to expand in the week before the dividend record date."
- If registration was granted, that "should obviate the concern about a squeeze".

204.   As these statements from Byrne clearly demonstrate, the Locked-up Dividend's exclusive purpose was to target short sellers and create a short squeeze, driving up the price of Overstock stock.

### C.   At the Time of the Locked-up Dividend's Announcement, Byrne Already Planned to Depart Overstock

205.   Prior to July 15, 2019, Byrne learned that his "non-standard arrangement" with the FBI was about to become public. He stated on his blog that when he learned that revelation was coming, he believed he would not be at the Company much longer and so he issued the July 15 shareholder letter.

206.   The Locked-up Dividend was not announced for another two weeks, on July 30, 2019.

207.     Thus, at the time the Locked-up Dividend was announced, Byrne already planned to depart Overstock.

D.  On the Date That the Locked-up Dividend Was Announced, Byrne Already Planned to Sell Stock on the Artificial Stock Price Spike It Created

208.     About a month before the Locked-up Dividend was publicly announced, Byrne developed a plan to sell 200,000 shares "into the volume we expected to pick up in mid-September" at the peak of the short squeeze.

209.     Thus, at the time the Locked-up Dividend was announced to investors, Byrne already planned to profit from it.

VI.     SUMMARIZED ALLEGATIONS OF DEFENDANTS' SCIENTER

A.  Byrne's Insider Sales During the Class Period

210.     Patrick Byrne was able to cash in on Overstock's artificially inflated stock price by selling more than 5.6 million shares of Overstock common stock for more than $100 million during the Class Period – his entire stake in Overstock common stock.

211.     A chart of Byrne's sales, including for each sale the number of shares sold, the price per share, the number of shares held after the transaction, the percentage of total holdings sold, and the total proceeds, follows:

| Date of Transaction | Number of Shares | Price per Share | Total Sale | Total Shares Held Before Transaction | Change in Shares Held as a Percentage of Total Shares Held[22] |
|---|---|---|---|---|---|
| 5/13/2019 | 250,000 | $13.33 | $3,332,900.00 | 4,640,824 | -5% |
| 5/14/2019 | 250,000 | $12.84 | $3,211,175.00 | 4,390,824 | -6% |
| 5/16/2019 | 407,055 | $10.29 | $4,187,863.25 | 4,140,824 | -10% |
| 9/16/2019 | 1,505,123 | $21.83 | $32,864,812.20 | 3,733,769 | -40% |
| 9/17/2019 | 2,141,646 | $18.66 | $39,966,969.30 | 2,141,646 | -100% of shares held indirectly |
| 9/18/2019 | 1,056,690 | $16.32 | $17,243,384.40 | 1,056,690 | -100% |
| **TOTAL:** | **5,610,514** | | **$100,807,104.15** | | |

212.    Byrne's Class Period sales were highly unusual and unprecedented in terms of their timing, size, and frequency when compared to his pre-Class Period selling history.

213.    A review of Form 4s filed with the SEC in the twenty years prior to the start of the Class Period reveals that these sales were highly irregular compared to Byrne's sales prior to the Class Period. But for one sale on July 15, 2016, and a larger sale over a three-day period of September 6, 7, and 10 in 2018, Byrne did not make any sales for nearly a six-year period prior to the start of the Class Period.  Those sales that he did make in the six years prior to the Class Period

---

[22] Byrne owned shares of Overstock common stock directly and indirectly, through High Plains Investment LLC. This chart reflects shares owned directly, except where otherwise indicated.

totaled only 16% of his holdings, in stark contrast to his sale of his entire common stock holdings during the Class Period.

214.     The magnitude and timing of Byrne's sales are highly probative of scienter as well. On the heels of the major increase in the stock price following Defendants' May 9, 2019 announcement of a 50% increase in Retail guidance, Byrne reaped over $10 million by selling Overstock common stock at artificially inflated prices.

215.     And Byrne openly admits having laid a careful plan to sell the remainder of his common stock into the volume and price swell right before the Locked-up Dividend record date, a plan that he executed on September 16, 17, and 18, reaping over $90 million.

216.     Byrne knew that his sale of massive amounts of Overstock common stock would depress the Company's stock price.  The short squeeze created artificial upward that preserved the stock price against the impact of Byrne's sales.

217.     Thus, Byrne had a powerful personal motive to inflate Overstock's stock price and maintain those inflated prices so that he could gain over $100 million in profit from his sales of Overstock stock. These sales came at a time when Overstock's stock price was artificially inflated by materially inflated Retail guidance, the short squeeze caused by the Locked-up Dividend, and the concealed Company-wide insurance crisis.

B.   Byrne's Admissions Regarding the Locked-Up Dividend Scheme

218.     In the days and weeks that followed the alleviation of the squeeze, Byrne openly and repeatedly admitted his and the Company's true intent to use the Locked-up Dividend to create a short squeeze so that Byrne could personally profit. These admissions establish a strong inference of scienter.

219.    Byrne admitted that he intended the Locked-up Dividend to create a short squeeze

that would inflate Overstock's share price. He wrote:

> In that regard, it is interesting to mention[] something studied by an advisor-economist I keep on retainer. He was tracking information regarding the trading in OSTK, the volume, the negative rebate, and the average days outstanding of the short positions. The average duration of the short positions was important because, by counting backwards, one could use it to determine the date at which the average short position had been put in place.  Short positions on margin can move 50% against their holder before triggering a margin call. Thus, if at any point the OSTK share price reached a price that it was 50% higher than the price at which the average short position had been put on (which one determined by counting backwards a number of days equal to the average duration), it would trigger margin calls, at which point the price would have become a question of what price really cleared the market for the 37 million shares we had issued (rather than what price cleared the market for the 55 million – 60 million – 70 million – 100 million shares that had been issued by the firm plus the various shares created by the National Market System's stock settlement system).
>
> ***If that happened, then as the stock price moved up, the cost to the shorts would have gone up with it. It would have thus cost more than $400 million. It might have cost $1 billion, but who knows? It could have been $2 billion. Maybe $4 billion***. No idea. It would have been up to the marketplace to decide how high the stock moved to shake out enough shares from the longs holding OSTK.
>
> . . .
>
> ***I estimate the right answer is, "Such an event would have cost the shorts $1 billion – $2 billion". Some would claim that it would have been much more. But the mathematical least it would have cost $400 million (as explained above), and my sense is that it would have cost the shorts $1-$2 billion***.

220.    Although feigning uncertainty, Byrne revealed that he knew exactly what the

Locked-up Dividend would do. On Twitter, Byrne admitted that when he was designing the

Locked-up Dividend, he "recognized" that it "might" cause a short squeeze. More candidly, in a

blog post responding to the September 17, 2019 *New York Post* article stating that Byrne designed

the Locked-up Dividend to create short covering, Byrne then went on to admit as much himself

publicly: Byrne intended the Locked-up Dividend to catalyze something he called "The Great

Reveal" by which he means that forcing short sellers to close out their short positions will lead the share price to increase. Comparing the Locked-up Dividend to taking a bank safe off the lid of a pot of boiling water, Byrne described short sellers as "struggling to keep the lid on the pot of boiling water… However, if one must hoist a bank safe to rest on a lid over a pot of boiling water to create enough weight to keep that lid in place, then taking that bank safe off would lead (as the reader may imagine) to the water boiling over in a tremendous way. Maybe blasting a hole through the ceiling. Similarly, if the short positions in OSTK (including the 18 million "legitimate" shorts + the Reg SHO shorts + the ex-clearing shorts + daisy-chaining) had finally had to settle, the stock would have gone up just as surely as the water in the pot would have boiled over once the safe on its lid was removed."   After the Company announced it would re-structure the dividend, he acknowledged that if registration was granted, that "should obviate the concern about a squeeze", thus explicitly acknowledging that the locked-up structure had caused the squeeze.

221.    Byrne went on to "note that if that had been permitted to happen, *while there are those who would claim that this was deliberately created squeeze*, Overstock would then have had a stock price trading at a multiple of sales merely *half* of what essentially all its eCommerce competitors have always had."

222.    Byrne also gloated that the Locked-up Dividend was a tool to harm short sellers, stating that "we also had a hand with four aces in it (the dividend) ready to play."

223.    His September 18, 2019 blog post was similarly full of admissions of the criminal nature of the Locked-up Dividend and Byrne's delight at the harm it caused short sellers. Byrne admitted that he did "not just dream this [Locked-up Dividend] up on a whim. [He] **designed it carefully**," knowing full well that "**it put legitimate short sellers in a bind.**" He further gloated

about how "***the OSTK shorts were asleep at the switch and got caught in a jam. We Overstock***

***shareholders won this hand fair and square***." He also admitted that this was revenge for his long

campaign against short sellers, explaining that "after 15 years of being scofflaws, ***the shorts are***

***now crying because they are getting sucked into a black hole that they created themselves***." He

stated that "the Powers That Be on Wall Street . . . pointed out that [the Locked-up Dividend] put

legitimate short sellers in a bind, to which my reply was, '***As CEO of Overstock my responsibility***

***is to shareholders, and not to anyone who might have shorted our stock, legitimately or***

***otherwise***.'" Finally, Byrne threatened the SEC that if they intervened to "Bazoomba!" the

Locked-up Dividend (by which he means allow short sellers to pay cash in lieu of the dividend

rather than being forced to purchase Overstock shares to close out their short position), he would

"use this website to ***vaporize*** you with information I give the public."  Byrne framed the digital

dividend as a challenge to the SEC, stating "I saw this as the ultimate litmus test for the SEC: were

they in the business of protecting American retail investors, or are they still protecting Wall Street

cronies . . ."

224.    A week later, on September 25, 2019, Byrne further gloated about how the Locked-

up Dividend was designed to create a short squeeze, writing, "I would not have backed down to

the SEC, because ***I am spoiling for another fight with them*** (as the discerning reader may note).

Everything was announced in late July, *Mr. Shorty was sleepy and stepped on his weenie*, and if

the SEC objected after the fact, I would love to have met the SEC in court and put *them* on trial."

Byrne's repeated claim that the SEC might "interfere with" or "Bazoomba" the Locked-up

Dividend indicates that he understood it was manipulative. Indeed, he wrote: "***[i]f there be any***

***criminal liability associated with it, let me stipulate here that I am 100% responsible for this: come after me***."

225.   Using barely coded language, Byrne acknowledged that he had anticipated that trading volume and share price would increase as the Locked-up Dividend record date approached. Byrne wrote on his blog that "one thing I was certain of was that the *volume* had to expand in the week before the dividend record date." But because Byrne knew that short covering would mean that volume would be driven by investors seeking to buy rather than sell, he understood that such increased volume would mean rising prices. There is no reason that the volume of Overstock stock would "swell" in the weeks immediately before the Locked-up Dividend record date other than the frantic purchases by short sellers which Byrne *admitted* would cause the price to go up. Overstock issued cash dividends for its preferred stock in 2017, 2018, and 2019, and in none of those years was there a swell in trading volume in the period between the dividend announcement date and the record date.

226.   And as discussed above, Byrne admitted that he intended to sell his shares during the increased volume (and price) caused by the short squeeze – demonstrating that his intent all along was that the Locked-up Dividend would cause a short squeeze.

### C.   Byrne, Iverson, and Nielsen Knew that Retail Guidance was Not Based in Realistic Revenue Estimates

227.   Byrne, Iverson, and Nielsen all knew that the 2019 Retail guidance was not based in realistic revenue estimates and nonetheless allowed the Company to issue false and misleading Retail guidance, and failed to correct or update that guidance.

228.   In the process of planning for 2019 guidance, Byrne was presented with a $20 million upside number based on the impact of various new initiatives and projects. That number

was determined to be unrealistic and so internally was revised downward to $5 million to $10 million, but Byrne rejected that downward revision in favor of the unrealistic $20 million number.

229.    Iverson knew that the $20 million was unrealistic and even warned the Bain consultants to not present it to Byrne, but nonetheless allowed it to be used for 2019 guidance. Iverson also knew that that search engine keyword rankings were not a meaningful metric to predict revenue, and nonetheless Overstock increased Retail guidance based on supposed improved search engine optimization.

230.    Nielsen knew that Overstock was not going to meet Retail guidance and was going to have a material miss, but rejected a realistic revised Outlook presented to him showing this negative result so it was not considered an official Outlook and pressured subordinates to come up with something so the Company could meet the guidance, despite that being wholly unrealistic.

D.    Byrne's Admission that Retail Guidance was Only a "Guess"

231.    Byrne directly admitted after the end of the Class Period to the recklessness of the Defendants' Class Period statements regarding the Retail division's financial outlook, stating that his prior Class Period announcements regarding the Company's earnings projections were just a "***best guess*** estimate" that he "believed we had a ***50% chance*** of meeting or exceeding," as compared to new management, which aimed for 90% certainty.

232.    This clear statement establishes Defendants' fraudulent intent and the recklessness of their announcements increasing Retail guidance.

E.    The Magnitude and Rapidity of Change in Retail Guidance Under New Leadership

233.    The magnitude and rapidity of the change in Retail guidance under Overstock's new leadership further supports an inference of scienter. On May 9, 2019, Defendants bloated the

Retail Adjusted EBITDA guidance from $10 million to $15 million. That number increased to $17.5 million on July 15, 2019, and then again was reconfirmed on August 8, 2019. Then just six weeks later – after Byrne quit, the short squeeze ended, and new leadership was installed – Overstock cut Retail guidance.

234. The dramatic change in the financial outlook in such an extremely short time period, and the fact that it coincided with new leadership, is strong evidence that Defendants' Retail guidance statements were both false and misleading and made with scienter.

### F.   The SEC Investigation

235. On October 7, 2019, the SEC requested documents from Overstock pertaining to the key events at issue in this case: the Locked-up Dividend, trading plans for officers and directors (including Byrne, who sold stock at prices inflated first by false Retail guidance and second by the short squeeze and related misstatements and omissions), and communications with Patrick Byrne (reflecting that he is a target of the investigation).[23] The Company admitted that the investigation covered Byrne's departure from Overstock. This request came just nineteen days after the short squeeze ended and the truth about its purpose was revealed, and just fourteen days after Retail guidance was slashed.

236. On March 13, 2020, in a Form 10-K, the Company revealed that the SEC had expanded its investigation into the key issues during the Class Period, including issuing a December 9, 2019 subpoena requesting documents relating to the alternative trading system run by tZERO ATS, LLC (on which the Locked-up Dividend was supposed to trade) and a December 19, 2019 subpoena for insider trading policies and certain employment and consulting agreements.

---

23 The SEC also requested documents pertaining to the transaction with GSR Capital.

237.    On August 6, 2020, in a Form 10-Q, the Company stated that the SEC investigation continued, with ongoing attention to tZERO, reporting that "[o]n May 27, 2020, we received a subpoena from the SEC requesting further information regarding the alternative trading system run by tZERO's ATS, LLC."

238.    The fact of the SEC's investigation, the fact that it occurred so quickly after these key revelations, and its ongoing rapid expansion strongly supports an inference of scienter.

### G.   The Suspiciously Timed Departures of Iverson and Byrne

239.    The suspicious timing of both Byrne and Iverson's departures strongly supports an inference of scienter.

240.    Both Byrne and Iverson left the Company without notice and in the midst of the key events in this case. Byrne resigned in mid-August 2019, right after launching the short squeeze to inflate the stock price and allowing the company to misrepresent the state of its insurance coverage. He then fled for a foreign country that he boasted had no extradition treaty with the United States, and he hid his assets in gold, silver, and cryptocurrency outside of the reach of government authorities, specifically, his "ammunition" was "moved outside acts of retaliation from the Deep State."[24]

241.    Iverson resigned on September 17, 2019 with no notice, after the official outlook for the remainder of 2019 was presented to new executive-level leadership, showing that the Company would dramatically miss forecasted revenue, and just a day before the Company ended the short squeeze by unlocking the dividend. The Company did not announce his departure for another six days. Iverson has made no public comments or been heard from in the past six months.

---

[24] September 18, 2019, A Message to My Former Colleagues at Overstock.

### H.  Byrne's Personal Animus Towards Short Sellers

242.    As discussed above, Section IV(A), Byrne came into the Class Period with a strong personal motivation to harm short sellers. Byrne did not distinguish between illegal naked short selling and legitimate traditional short selling. He lumped all short sellers together as a nemesis that he claimed had harmed his Company – and in order to deflect attention from his failed leadership, he needed the public to believe that short sellers were, in fact, harming the Company.

243.    This personal animosity to harm and discredit short sellers provided a strong motivation that supports an inference of scienter.

### I.  Retail's and tZERO's Fundamental Importance to Overstock

244.    The fact that the fraud occurred in Overstocks' essential business lines further supports an inference of scienter.

245.    Overstock is not a diversified company with numerous business lines, or where certain small segments of the Company receive little attention from top executives. Overstock has two business lines – Retail and tZERO. Overstock stated as much in the first line of its Form 10-K filed on March 18, 2019 for fiscal year 2018 ("2018 10-K"), explaining "[w]e are an online retailer and advancer of blockchain technology."

246.    Retail was of critical importance to Overstock's finances during the Class Period. As the Company stated in the 2018 10-K, the "retail business generates nearly all of our net revenues." And tZERO was critical to Overstock's future. The Company had poured enormous resources into the blockchain businesses and hoped to sell off Retail and focus exclusively on blockchain. The Company reported in its 2018 Form 10-K that as of December 31, 2018, it had spent approximately $206.9 million in its blockchain businesses, with the majority of that spent on tZERO.

247.    Given the centrality of Retail and tZERO to the Company's current and future success, Defendants knew or recklessly disregarded the false and misleading nature of their statements regarding Retail guidance and the Locked-up Dividend, and of the manipulative nature of the Locked-up Dividend.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    Defendants' False and Misleading Statements and Omissions Regarding Retail Guidance

#### 1.    *May 9, 2019*

248.    On May 9, 2019, in a letter to shareholders filed along with a Form 8-K signed by Byrne, Overstock raised Retail Adjusted EBITDA guidance by 50% from $10 million to $15 million, falsely discussing the past and current positive performance of its Retail division.

249.    The letter provided significant detail on Retail's performance in the first quarter and explained that the guidance increase was possible because the Company had ***already achieved*** significant milestones in the Retail business. Specifically, Byrne and Overstock wrote that "[b]oth the Retail and Medici (blockchain) sides of our business ***are progressing*** ahead of schedule, and ***below I raise guidance for Retail by 50%***." They added that "[r]etail is returning to be a source of positive cash flow rather than a consumer of it" due to the increased contribution and reduced expenses. They disclosed that contribution grew 111% in the first quarter because "***[o]ur search engine rankings have seen seven consecutive months of sequential improvements.***"; "***[a] new ad tech system that will allow us to better monetize our site traffic went into alpha release this week***"; and because "***[w]e have made a significant change in the architecture of our logistics.***" Given these factors, Byrne raised 2019 contribution guidance from $160 million to $165 million.

250.   With respect to expenses, Byrne announced that Overstock's "expense management has been aggressive. ***We have taken a tremendous (>25%) amount of cost out of our expense structure in the last 5 months***." Finally, "***[t]aking the previous two points together, I am raising my Retail Adjusted EBITDA guidance for 2019 from $10 million to $15 million.***"

251.   On the same day, Overstock met with shareholders and held an earnings call where Byrne elaborated on the achievements in the Retail divisions that supported the guidance increase. During the shareholder meeting, Byrne stated, "***given what's going on in retail, I've changed my expectations today to*** – I've let the public know that – ***to expect this to go from $10 million to $15 million of operating – of adjusted EBITDA or operating income or whatever*** . . . I remember somebody asked a couple quarters ago, did they think that we, even in two years, could get back to this point. And I had to laugh because ***I actually knew that we were getting back there in February or March***. But anyway, ***we have recovered. We have readjusted our expense structure and we have our contribution soaring again*** . . . This puts us in the point of ***actually raising our guidance***."

252.   On the earnings call, Byrne explained that the $5 million increase in contribution "***means that we're raising our guidance for adjusted EBITDA for the year up 50%. We're taking it from $10 million to $15 million with a bullet, as they would say, in the top 40 because I think that you will see that number quite possibly slide up over the course of the year. But all that said, we're taking our guidance up to $15 million for the year.***" Finally, he added that "***this year, and next year, we'll be back in the place where [Retail is] spitting out lots of cash and the whole blockchain side of the business will be structured so that next year, just the cash that retail spits out supports the blockchain side of the business***."

253.     Also, on May 9, 2019, Overstock reported its first quarter 2019 financial results via Form 10-Q. The Form 10-Q was signed by Iverson and certified by Byrne and Iverson as to the accuracy and completeness of Overstock's financial and operational reports, including:

ITEM 4. CONTROLS AND PROCEDURES

We maintain disclosure controls and procedures, as such term is defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The term disclosure controls and procedures means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms.

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

254.     The Form 10-Q also stated:

We carried out an evaluation required by the Exchange Act under the supervision and with the participation of our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) of the Exchange Act, as of the end of the period covered by this report. Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and to provide reasonable assurance that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

* * *

[T]here has not occurred any change in our internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

255.     Both Byrne and Iverson certified the following:

1. I have reviewed this Quarterly Report on Form 10-Q of Overstock.com, Inc.;

2. Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

3. *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d15(f)) for the registrant and have:

   a. *designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision*, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. *designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

   c. *evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. *disclosed in this report any change in the registrant's internal control over financial reporting* that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the

registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. ***all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

b. ***any fraud, whether or not material, that involves management or other employees*** who have a significant role in the registrant's internal control over financial reporting.

256.    Defendants' statements in the foregoing paragraphs—including the statements that Retail guidance could be increased by 50% due to numerous milestones that had already been achieved and the statements that Overstock had reliable internal controls—were false and misleading. In particular, at the time these statements were made, Overstock's Retail division was actually rapidly deteriorating. Revenue was rapidly declining, and the Company had just suffered its two worst revenue decline quarters in history. Byrne later admitted on his blog that when he "gave estimates to the public on any subject, I always gave my *best guess* estimate: that is, I choose estimates that I believed we had a 50% chance of meeting or exceeding, a 50% chance of missing . . . [batting] .500 was my goal." He doubled-down on this position on Twitter, writing, "I always communicate best guesses. 50-50."

257.    The 2019 plan was based on unrealistic numbers for both the base plan and the upside, and were presented in a manner that misled investors as to the likely range for guidance.

258.    Additionally, multiple former employees disputed Byrne's statement that the Company could lift earnings guidance for the Retail division by 50% based, in part, on seeing seven months of sequential improvement in Overstock's search engine rankings – to the contrary, these former employees saw no improvement in Overstock's search engine optimization ("SEO")

and stated that the keyword search ranking metrics that Overstock was emphasizing had no meaningful relationship to revenue generation.

259.   The fact that a mere four-and-a-half months later, after Byrne's tumultuous departure from Overstock, new leadership immediately cut Retail guidance illustrates the misleading nature of the Company's prior statements about earnings, which were made to suit Byrne's goal of inflating Overstock's share price so he could personally profit by selling his shares.

260.   The false and misleading nature of this number is further demonstrated by the fact that Defendants' ultimate explanations for reducing Retail guidance were factors that were known during the Class Period, while the guidance was inflated. Defendants' September 23, 2019 press release listed five purported drivers of the company's dramatic reduction in earnings guidance:

- increased costs from tariffs on goods manufactured in China;

- significantly increased director's and officer's insurance costs;

- waning consumer confidence;

- increased freight costs due to the bankruptcy of an in-home delivery vendor and the delayed integration of a new freight carrier; and

- a delay in increased web search traffic translating into purchasing customers.

261.   Many of these supposed newly discovered facts were known during the Class Period. For example, on an earnings call (on August 8, 2019, the same day that Overstock reiterated the $17.5 million adjusted EBITDA), Byrne asked David Nielsen, the President of Overstock Retail, to address "the latest round [of tariffs] that was announced" and Nielsen described the recent tariffs as "non-material" to the retail business. Additionally, Nielsen explained that Overstock had already reduced its earnings outlook because of an earlier round of tariffs that more directly affected home furnishings.

262.     Nor did the Company have dramatic new freight costs. On the same August 8 call, Seth Moore, Overstock's Chief Strategy Officer, touted "freight savings from rebalancing carrier lanes." Moore explained: "We expect these trends to continue and have initiatives around continuing to drive these costs out of our ecosystem." Nielsen echoed this optimism with respect to reducing freight costs, noting that Overstock had "completed all of our freight contracts . . . and rebalanced our freight lanes, which in turn is providing improved margins." Nielsen concluded: "[W]e'll continue to see improvement on our gross margins as we build out our freight and logistics carriers[.]" Again on August 26, 2019, Nielsen kicked off another earnings call by highlighting "improved freight rates and margins" as a critical aspect of Overstock's "sustainable and profitable future growth."

263.     It is also implausible that "waning consumer confidence" could be a principal driving force behind an earnings guidance reduction of the sheer magnitude of the one that Overstock issued. Overstock's principal competitor, Wayfair, did not mention a sudden decline in consumer confidence even as a headwind against earnings in any of its public statements or regulatory filings during this same time period. If a decline in consumer confidence was truly a first-order cause of Overstock's acute earnings guidance issues, its chief competitor would be reckoning with the same decline, or at least mentioning it as an issue relevant to their business.

264.     Thus, Overstock's attribution of its reduced earnings guidance to factors like tariffs, freight costs, and waning consumer confidence, is not credible, further demonstrating that the Class Period guidance was falsely inflated and that the ultimate revision of that guidance reflected a restoration to its true value all along and not a consequence of material business changes.

265.    Finally, the false and misleading nature of these claims is demonstrated by Overstock's ultimate announcement in Form 8-K filed on March 13, 2020 that Retail Adjusted EBITDA for fiscal year 2019 was ***negative \$2.2 million*** – an extraordinary reduction from Defendants' Class Period claims of \$15 million and then \$17.5 million based on events the Retail division had already achieved.

### 2.  *July 15, 2019*

266.    On July 15, 2019, Overstock and Byrne filed a Form 8-K with an accompanying letter to shareholders. In the letter, Overstock and Byrne increased Retail Adjusted EBITDA guidance from \$15 million to \$17.5 million, asserted that the Retail division was revenue neutral, and stated that Overstock was not actively looking to sell the Retail division. Overstock and Byrne said:

> a. ***The core earning power of our retail business has snapped back more quickly than I expected***.
>
> . . .
>
> d. **How we corrected**: *At the start of 2019 I told you that Retail EBITDA for 2019 would be ≈ \$115 million improvement from 2018, through a combination of a \$33 million reduction in expenses and an \$82 million improvement in Contribution. It looks to me now as though that our improvement will be ≈ \$120 million.*
>
> i. ***In the first half of 2019 we took an axe to expenses, trimming payroll in Utah by about 30%.*** The reduction in force was heavily skewed *away from* technologists and scientists and *towards* business staff, so that we are approaching a 50-50 split. Though any such reduction is painful, everything seems to be running smoothly.
>
> ii. ***In the first half of 2019 our contribution soared, so that I now move my estimated projection for its improvement this year from \$82 million to >\$90 million. As a result of our belt-tightening and return to optimization of Contribution, we have already reached the point that our monthly Contribution covers our Retail cash expense structure***:



e. **Where we go from here** -

i. Retail's recovery in 2019 has been exceeding expectations. ***I have raised our 2019 Retail Adjusted EBITDA estimate from $10 million to $15 million to (now) $17.5 million to reflect this growing strength***.

ii. ***Additionally, in June our SEO rankings on Google took another big step in recovery***, and some of this improvement was taken out of the hide of Wayfair (which means the point where their two lines will cross just got moved farther out).
. . .

for 2020, Retail should generate enough cash to substantially cover Blockchain's operating cash burn. Thus, an important strategic consideration to note is that we are not in a place that we have to sell" and that Overstock would sell Retail if it received a good offer, but "[o]therwise we will operate the retail business as though we are going to hold it forever" and to "fund our world-changing blockchain innovations."

267.    The foregoing statements were false and misleading for the same reasons as the

May 9 statements (paragraphs 256-265). Additionally, the Retail division was not earnings neutral

in mid-July 2019, and Overstock was actively searching for a buyer at that time.

3. *August 8, 2019*

268.     On August 8, 2019, Overstock and Byrne reported second quarter earnings. In a letter attached to an accompanying Form 8-K and signed by Byrne, Overstock falsely claimed the "*retail business has returned to positive adjusted EBITDA* for the first time since the second quarter of 2017 and shows no signs of stopping."

269.     The Company had an earnings call that day in which Byrne, Nielsen, and Iverson participated. Nielsen reiterated this misleading message, stating "*our retail business has snapped back quicker than anticipated, delivering positive adjusted EBITDA*. As Patrick [Byrne] has mentioned on our previous earnings calls, many expected this turnaround to take years to return to profitability. We first began speaking of turning this ship three quarters ago, and as you can see from Slide 22, *we've beat our estimate and delivered positive adjusted EBITDA of $2 million within three quarters.* This is the first positive adjusted EBITDA quarter since Q2 of 2017." Later in the call, Nielsen again said, "*we're thrilled to deliver our first positive adjusted EBITDA quarter since Q2 of 2017.*"

270.    Slide 22, referenced above, can be viewed below:



271.    Finally, he announced:

[O]ur second quarter retail contribution was equal to our first quarter coming in at $39 million, a $42 million improvement over second quarter of 2018. Typically, our second quarter is our softest quarter of the year which speaks to the continued recovery and positive trajectory. And finally, as we turn to Slide 39, you'll see that our current outlook is to finish the year at $167 million [of annual retail contribution] (added by company after the call). ***This equates to an adjusted EBITDA of $17.5 million for the year, and it is an increase of $2.5 million in adjusted EBITDA from our previous Q1 estimate of $15 million***. We're very bullish about our retail business. We like the trajectory we're on.

272.    Also, on August 8, 2019, Overstock reported its second quarter 2019 financial results via Form 10-Q. The Form 10-Q was signed by Iverson and certified by Byrne and Iverson and included the same statements and certifications as to the accuracy and completeness of Overstock's financial and operational reports as in the May 9, 2019 Form 10-Q.

273.    The foregoing statements regarding Retail guidance and the Company's financial controls were false and misleading for the same reasons as the May 9 statements (paragraphs 256-265). Additionally, the foregoing statements were false and misleading because the retail business had not returned to positive adjusted EBITDA, as evidenced by Overstock's slashing of earnings guidance less than six weeks after these statements were made and immediately after Byrne's exit. Byrne also admitted that earnings projections at Overstock during his tenure were merely a "best guess."

### 4.  *August 22, 2019*

274.    On August 22, 2019 in a letter filed with Form 8-K, Byrne announced his resignation to shareholders and repeated several of the key points of his July 15 shareholder letter, including falsely telling investors that the "retail business has recovered to a state of positive adjusted EBITDA. . . I believe in the near future the cash generated by Retail going forward should be adequate for funding both Retail's ongoing innovation" and the blockchain firms, especially tZERO.

275.    The foregoing statements were false and misleading for the same reasons as the May 9 statements (paragraphs 256-265).  Additionally, the foregoing statement was false and misleading because a revised Outlook had been presented to Executive leadership showing that the $17.5M Retail Adjusted EBITDA number would not be achieved. However, the revised Outlook from August was rejected by Nielsen and therefore was not considered an official Outlook, and Byrne nonetheless reaffirmed the Retail business's recovery.  Additionally, the foregoing statement was false and misleading because the retail division was not in a state of positive adjusted EBITDA, nor was it poised to generate cash to fund Overstock's blockchain

activities, as was made clear by Overstock's cutting guidance just one month later. Byrne also acknowledge that earnings projections at Overstock during his tenure were merely a best guess.

      B.   Defendants' False and Misleading Statements and Omissions
            Regarding the Company's Director's and Officer's Insurance

      276.    On August 8, 2019, Overstock reported its second quarter earnings, including changed insurance costs.

      277.    In the Form 10-Q, issued by Overstock and signed by Iverson, the Company noted a "$722,000 increase in corporate insurance costs."

      278.    Similarly, in a letter attached to the accompanying Form 8-K, issued by Overstock and signed by Byrne, Overstock acknowledged a "$722,000 increase in corporate insurance costs."

      279.    However, in July, following the disclosure of Patrick Byrne's relationship with Russian agent Maria Butina, Defendants had learned that Overstock could not obtain directors' and officers' insurance for anyone at the Company or for the Company at large, regardless of the price.

      280.    On August 17, 2019, then-CFO Iverson confirmed in an email to the Board what the Company had known since July: Overstock could not obtain directors' and officers' insurance at all for any of its directors or officers with Byrne at the helm. Shortly thereafter, on August 19, 2019, Overstock's insurance brokerage also confirmed that Overstock could not obtain directors' and officers' insurance.

      281.    Thus, the foregoing statement was false because Defendants Overstock, Byrne and Iverson knew at the time that Overstock could not get director's and officer's insurance at the stated price. It also omitted that Overstock could not get director's and officer's insurance at any

price. Finally, it omitted that the cause of the increased insurance costs and inability to obtain insurance was Company- and Byrne-specific.

C. <u>Defendants' False and Misleading Statements and Omissions</u>
<u>Regarding the Company's Manipulative Locked-Up Dividend Scheme</u>

282.    Defendants Overstock, Byrne and Iverson's manipulative scheme regarding the Locked-up Dividend violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c). While Lead Plaintiff need not allege false statements or omissions for a Rule 10b-5(a) or 10b-5(c) claim, as set forth below, Defendants did make material misstatements and omit material information pertaining to the Locked-Up Dividend from investors in violation of Rule 10b-5(b).

*1.    July 30, 2019*

283.    On July 30, 2019, Overstock announced that it would issue a dividend in the form of a blockchain-based digital security token.

284.    In the letter filed with Form 8-K that day, which was issued by Overstock, Defendants falsely and misleadingly stated the following:

> Overstock.com, Inc. (NASDAQ:OSTK) announces that its Board of Directors has declared a dividend (the "Dividend") payable in shares of its Digital Voting Series A-1 Preferred Stock (the "Series A-1"). The record date for the Dividend will be September 23, 2019, and the distribution date for the Dividend will be November 15, 2019. The Dividend will be payable at a ratio of 1:10, meaning that one share of Series A-1 will be issued for every ten shares of common stock, Series A-1 or Voting Series B Preferred Stock held by all holders of such shares as of the record date.

> . . .

> "***Five years ago, we set out to create a parallel universe: a legal, blockchain-based capital market. We've succeeded***," said Overstock.com founder and CEO Patrick M. Byrne.

285.    In the Form 10-Q filed that day, which was issued by Overstock, signed by Iverson, and certified by both Byrne and Iverson, Defendants falsely and misleadingly stated the following:

On July 30, 2019, we announced that our Board of Directors declared a dividend (the "Dividend") payable in shares of our Series A-1 Preferred Stock. The record date for the Dividend will be September 23, 2019, and the payment date for the Dividend will be November 15, 2019. The Dividend will be payable at a ratio of 1:10, meaning that one share of Series A-1 will be issued for every ten shares of common stock, Series A-1 or Voting Series B Preferred Stock held by all holders of such shares as of the record date. Existing Series A-1 shares can currently be traded on the PRO Securities ATS operated by PRO Securities, LLC, a subsidiary of Overstock.com. The Series A-1 shares to be issued in the dividend are anticipated to be subject to restrictions on resales under federal and state securities laws.

286.    The Form 10-Q also included a purported "risk disclosure" regarding the Locked-up Dividend:

***We could encounter a variety of challenges in connection with the issuance of our Series A-1 Preferred Shares as a dividend.***

We recently announced that our Board of Directors has declared a dividend (the "Dividend"), payable on November 15, 2019, in shares of our Series A-1 Preferred Shares. The Dividend will be payable at a ratio of 1:10, meaning that one share of Series A-1 will be issued for every ten shares of common stock, Series A-1 or Voting Series B Preferred Stock held by all holders of such shares as of September 23, 2019, the record date for the Dividend. The Series A-1 Shares received pursuant to the Dividend will initially be subject to trading restrictions. Subject to compliance with applicable securities laws, recipients of the Series A-1 shares received in the Dividend are expected to be able to trade those securities on the PRO Securities ATS operated by our subsidiary PRO Securities, LLC, through a brokerage account established with Dinosaur Financial Group, LLC ("Dino") or any other broker dealer that serves as an introducing broker on that platform. Currently, Dino is the only broker dealer that operates on the PRO Securities ATS. Unless we designate one or more other such broker dealers, Dino will be required to open tens of thousands of new accounts in a short period of time. Dino may be unable to get all such accounts opened in a timely manner. Further, the issuance of the Series A-1 Shares pursuant to the Dividend will significantly increase the number of outstanding Series A-1 Preferred Shares from approximately 125,000 to approximately 3.8 million. This could result in a substantial increase in trading volume on the PRO Securities ATS once the Dividend Series A-1 Preferred Shares become eligible for trading in accordance with applicable securities laws. This increased volume could cause unforeseen issues with PRO Securities ATS, which has not yet handled such volume levels. Furthermore, since we have not previously issued Series A-1 Preferred Shares on such a wide scale, we could encounter challenges related to dealing with shares held in retirement plans or individual retirement accounts, complying with any applicable foreign law legal requirements or other unforeseen legal and compliance issues.

287.    These announcements omitted that the Locked-up Dividend was specifically intended to cause a short squeeze that would artificially inflate Overstock's stock price.

288.    The announcement's purported risk disclosure that Overstock "could encounter a variety of challenges" omitted that Defendants Overstock, Byrne and Iverson knew that these "challenges" were certain to follow the issuance of the Locked-up Dividend because they carefully designed it to be structurally incompatible with short selling and to manipulate the price of Overstock common stock. Moreover, the announcement omitted that Defendants knew that Dinosaur Financial, the company through which investors were required to receive and trade the Locked-Up Dividend, was unable to broker the transfer of the Locked-Up Dividend.

289.    The announcements further omitted that Defendant Byrne was concurrently putting into effect a plan to enrich himself by unloading his personal stock as the short squeeze caused an "increase [in] volume" of trading and the price of Overstock's common stock to surge.

290.    Further, the announcement failed to accurately inform investors of dividend notification issues. NASDAQ Listing Rule 5250(e)(6) and SEC Rule 10b-17 requires that "the issuer of any class of securities listed on The Nasdaq Stock Market must notify Nasdaq no later than ten calendar days prior to the record date of a cash or non-cash dividend distribution." That notification allows NASDAQ to determine an ex-dividend date for the distribution, at which point the security trades without the right to receive the dividend. NASDAQ *never* issued an ex-dividend date for the Locked-up Dividend. Consequently, either Defendants omitted that they had declined to notify NASDAQ of the dividend record date in violation of the listing rules and securities laws, or Defendants did notify NASDAQ but failed to update investors that NASDAQ had declined to

issue an ex-dividend date or had concerns regarding the Locked-up Dividend that were causing them to withhold issuing the ex-dividend date.

### 2. *August 8, 2019*

291.    On August 8, 2019, in a Form 10-Q issued by Overstock and signed by Iverson and certified by Byrne, Defendants stated:

> On July 30, 2019, we announced that our Board of Directors declared a dividend (the "Dividend") payable in shares of our Series A-1 Preferred Stock. The record date for the Dividend will be September 23, 2019, and the payment date for the Dividend will be November 15, 2019. The Dividend will be payable at a ratio of 1:10, meaning that one share of Series A-1 will be issued for every ten shares of common stock, Series A-1 or Voting Series B Preferred Stock held by all holders of such shares as of the record date. Existing Series A-1 shares can currently be traded on the PRO Securities ATS operated by PRO Securities, LLC, a subsidiary of Overstock.com. The Series A-1 shares to be issued in the dividend are anticipated to be subject to restrictions on resales under federal and state securities laws.

292.    This statement omitted that Defendants had contrived a short squeeze through the issuance of the Locked-up Dividend. Likewise, it omitted to mention that Byrne planned to enrich himself by selling his personal stock once his short squeeze caused the Overstock share price to spike.

### 3. *August 22, 2019*

293.    On August 22, 2019, Defendant Byrne announced in a letter to shareholders that he was leaving Overstock but omitted to mention that he had contrived a short squeeze through the issuance of the Locked-up Dividend. Likewise, Byrne omitted to mention that he planned to enrich himself by selling his personal stock once his short squeeze caused Overstock's share price to spike.

### VIII.    THE PRESUMPTION OF RELIANCE

#### A.    Rule 10b-5(a) and (c) Market Manipulation Claims

294.    To the extent the element of reliance must be established for Lead Plaintiff's Rule 10b-5(a) and (c) market manipulation claims, Lead Plaintiff is entitled to a presumption of reliance.

295.    Lead Plaintiff's market manipulation claims are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) ("*Affiliated Ute*"), because Lead Plaintiff's market manipulation claims exclusively involve omissions to the market.

296.    Lead Plaintiff's market manipulation claims are also entitled to a presumption of reliance pursuant to the fraud-on-the-market doctrine under *Basic v. Levinson*, 485 U.S. 224 (1988) because, during the Class Period, the market for Overstock common stock was an efficient market for the following reasons, among others:

a.   Overstock common stock is actively traded on the NASDAQ, a highly efficient, electronic stock market;

b.   As a regulated issuer, Overstock filed periodic public reports with the SEC;

c.   Overstock's common stock traded at high weekly trading volumes;

d.   Overstock was eligible to file registration statements with the SEC on Form S-3;

e.   The market reacted promptly to public information disseminated by Overstock;

f.   Overstock regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

g.   Overstock was regularly covered throughout the Class Period by financial analysts, including D.A. Davidson and GARP Research, and each of these reports was publicly available and entered the public marketplace;

h.   Overstock was regularly covered throughout the Class Period by the financial news;

i.   The material misrepresentations and omitted material facts alleged herein would tend to induce a reasonable investor to misjudge the value of Overstock securities; and

j.   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired Overstock

securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

297.    Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Overstock common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

### B.   Rule 10b-5(b) Claims

298.    Lead Plaintiff's Rule 10b-5(b) retail guidance, insurance coverage and Locked-up Dividend claims are entitled to a presumption of reliance under *Affiliated Ute,* since those claims are similarly predicated upon material omissions of fact that Defendants had a duty to disclose.

299.    These claims are also entitled to a presumption of reliance pursuant to the fraud-on-the-market doctrine under *Basic v. Levinson*, 485 U.S. 224 (1988) because, during the Class Period, the market for Overstock common stock was an efficient market for the following reasons, among others:

a.   Overstock common stock is actively traded on the NASDAQ, a highly efficient, electronic stock market;

b.   As a regulated issuer, Overstock filed periodic public reports with the SEC;

c.   Overstock's common stock traded at high weekly trading volumes;

d.   Overstock was eligible to file registration statements with the SEC on Form S-3;

e.   The market reacted promptly to public information disseminated by Overstock;

f.   Overstock regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

g.   Overstock was regularly covered throughout the Class Period by financial analysts, including D.A. Davidson and GARP Research, and each of these reports was publicly available and entered the public marketplace;

h.   Overstock was regularly covered throughout the Class Period by the financial news;

i.   The material misrepresentations and omitted material facts alleged herein would tend to induce a reasonable investor to misjudge the value of Overstock securities; and

j.   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired Overstock securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

300.   Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Overstock common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## IX.   LOSS CAUSATION AND ECONOMIC LOSS

301.   As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and maintained the price of Overstock common stock and operated as a fraud on investors in Overstock common stock during the Class Period. This scheme was accomplished both by: (1) manipulating the market for Overstock common stock through the Locked-up Dividend; and (2) failing to disclose and misrepresenting the Company's earnings guidance, insurance coverage, and manipulative Locked-up Dividend scheme.

302.   As discussed above in Section IV(K), the Locked-up Dividend scheme caused Overstock common stock to artificially inflate in price from $15.07, when the short squeeze began, to a high of $29.75, and forced investors who held short positions prior to the initiation of the short squeeze to purchase Overstock stock at these artificially inflated prices in order to "cover" their short positions when they otherwise would not have, causing real economic loss.  Any investor

that purchased during this time period suffered significant damages as a result of having to purchase shares who price was artificially inflated by the short squeeze created by Defendants' market manipulation.

303.   Defendants' false and misleading statements and omissions regarding the Company's earnings guidance, insurance coverage and manipulative Locked-up Dividend scheme also artificially inflated Overstock's common stock price.  As the truth was disclosed through a series of partial corrective disclosures, Overstock's common stock statistically significantly declined, causing real economic loss to those who purchased Overstock common stock during the Class Period at artificially inflated prices.

304.   Additionally, when Overstock's market manipulation scheme through the Locked-up Dividend ended, the price of Overstock common stock declined significantly as the prior artificial inflation caused by the short squeeze came out of the price of Overstock common stock, causing real economic loss to those who purchased Overstock common stock during the Class Period at artificially inflated prices.

305.   As a direct result of their purchases of Overstock securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.* damages, under the federal securities laws. Lead Plaintiff and the Class would not have purchased at the prices they paid, or at all, but for Defendants' manipulative conduct and the resulting artificial inflation in the price of Overstock securities. The economic loss, *i.e.* damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to manipulate the market and/or to artificially inflate and/or maintain the price of Overstock securities causing a subsequent

decline in the value of the securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed and when the short squeeze was alleviated.

### X.   NO SAFE HARBOR

306.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this Consolidated Complaint.

307.   The statements complained herein were not forward-looking statements; they were statements of historical fact or projections based on facts and conditions purportedly known at the time the statements were made. For example, Defendants claimed that the Retail guidance was increased because the Company's "search engine rankings *have seen* seven consecutive months of sequential improvements" and that "[w]e *have taken* a tremendous (>25%) amount of cost out of our expense structure in the last 5 months."

308.   To the extent there were any forward-looking statements, Overstock's "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

309.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

310.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking

statement was false or misleading, and the forward-looking statement was authorized and/or approved by an executive officer of Overstock who knew that the forward-looking statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XI.    CLASS ACTION ALLEGATIONS

311.    Lead Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on its own behalf and on behalf of:

> All persons and entities, their agents, successors in interest, assigns, heirs, executors, and administrators who purchased Overstock common stock during the period between May 9, 2019 through and including November 12, 2019, and who were damaged thereby. Excluded from the Exchange Act Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

312.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Overstock or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

313.     Lead Plaintiff's claims are typical of the claims of the Class in that all members of the Class were damaged by the same wrongful conduct of Defendants as alleged herein, and the relief sought is common to the Class.

314.     Numerous questions of law or fact arise from Defendants' conduct that is common to the Class, including but not limited to:

a.   whether the federal securities laws were violated by Defendants' acts during the Class Period, as alleged herein;

b.   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Overstock;

c.   whether the price of Overstock common stock was artificially inflated and/or maintained during the Class Period;

d.   whether Defendants manipulated the price of Overstock common stock during the Class Period; and

e.   to what extent the members of the Class have sustained damages and the proper measure of damages.

315.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

316.     Lead Plaintiff will fairly and adequately represent the interests of the Class in that it has no conflict with any other members of the Class. Furthermore, Lead Plaintiff has retained competent counsel experienced in class action and other complex litigation.

317.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

318.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**XII.    CLAIMS FOR RELIEF**

**COUNT ONE**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder**
**(Against Defendants Overstock, Byrne, Iverson, and Nielsen)**

319.    Lead Plaintiff repeats and re-allege the above paragraphs as though fully set forth herein.

320.    During the Class Period, Defendants Overstock, Byrne, Iverson, and Nielsen made, had authority over, or controlled the materially false and misleading statements and omissions specified above in Section VI(A), regarding the Company's Retail Guidance and financial controls.  Each of these Defendants knew or deliberately disregarded that the Company's Retail Guidance and financial control statements were misleading, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements not misleading, in light of the circumstances under which they were made.

321.    During the Class Period, Defendants Overstock, Byrne, and Iverson made, had authority over, or controlled the materially false and misleading statements and omissions specified above regarding the Company's directors' and officers' insurance (Section VI(B)) and the Locked-Up Dividend (Section VI(C)).  Each of these Defendants knew or deliberately

disregarded that the Company's statements regarding the Company's directors' and officers' insurance, risk controls, and Locked-Up Dividend were misleading, in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements not misleading, in light of the circumstances under which they were made.

322.    Specifically, Defendants Overstock, Byrne, and Iverson knew or were reckless in not knowing that their statements regarding the Company's directors' and officers' insurance were materially misleading or omitted to disclose material facts because at the time the statements were made, Defendants Overstock, Byrne, and Iverson knew that neither the Company nor any of its officers could obtain directors' and officers' insurance due to the disclosure of Byrne's relationship with Maria Butina.

323.    Similarly, Defendants Overstock, Byrne, and Iverson knew or were reckless in not knowing that their statements regarding the Company's risk controls were materially misleading or omitted to disclose material facts because Byrne later conceded that this Class Period financial projections were mere guesses that the Company had only a 50/50 chance of meeting and because the Retail division and tZERO were Overstock's primary business lines and so were of critical importance to the Company's current and future financial success.

324.    Defendants Overstock, Byrne, and Iverson also knew or were reckless in not knowing that their statements regarding the Locked-Up Dividend were materially misleading or omitted to disclose material facts because the Company never prepared the operational or legal infrastructure to actually issue the Locked-up Dividend in an orderly way; Byrne later admitted that he recognized the Locked-up Dividend would cause a short squeeze and that he planned to (and did) personally profit from the squeeze by selling $90 million of Overstock common stock

before fleeing the country; and Overstock waited until the last day that short sellers could possibly

cover before postponing the Locked-up Dividend and later deciding to issue it as a freely tradeable

dividend.

325.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the

integrity of the market, they paid artificially inflated prices for Overstock stock. Lead Plaintiff and

the Class would not have purchased Overstock stock at the prices they paid, or at all, if they had

been aware that the market prices had been artificially and falsely inflated by the Defendants'

misleading statements and omissions.

326.    As a direct and proximate result of the Defendants' wrongful conduct, Lead

Plaintiff and the other members of the Class suffered damages in connection with their purchases

of Overstock stock during the Class Period.

## COUNT TWO
### Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)
### Promulgated Thereunder
### (Against Defendants Overstock, Byrne, and Iverson)

327.    Lead Plaintiff repeats and re-alleges the above paragraphs as though fully set forth

herein.

328.    Defendants Overstock, Byrne, and Iverson manipulated the market for Overstock

stock through the Locked-up Dividend, which was intended to and did cause a short squeeze that

artificially affected the price of Overstock stock. Specifically, as discussed above in Sections

IV(G) and (K-M), Defendants issued a digital dividend that was not freely tradeable and thus could

not be purchased by Overstock's many short sellers. After Overstock rebuffed efforts to understand

and bring order to the process, short sellers were forced to cover their positions, causing

Overstock's common stock price to artificially and dramatically spike upward.  This conduct

constituted devices, schemes, and artifices to defraud, and/or acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Overstock stock during the Class Period.

329.   To the extent reliance is required, Lead Plaintiff relied on the integrity of the market and the market not being manipulated.

330.   Lead Plaintiff and the Class have suffered damages from Defendants Overstock, Byrne, and Iverson's manipulative acts in that because of the manipulative conduct they were forced to purchase Overstock stock at artificially inflated prices. Lead Plaintiff and the Class would not have purchased Overstock stock at the prices they paid, or at all, but for Defendants Overstock, Byrne, and Iverson's manipulative conduct which artificially affected the prices of Overstock stock.

331.   As a direct and proximate result of Defendants Overstock, Byrne, and Iverson's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Overstock stocks during the Class Period.

## COUNT THREE
### Violation of Section 20(a) of the Exchange Act
### (Against Defendants Byrne, Iverson, and Nielsen)

332.   Lead Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

333.   Defendants Byrne, Iverson, and Nielsen acted as controlling persons of Overstock within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers of Overstock, as alleged above, Defendants Byrne, Iverson, and Nielsen had the power and authority to cause Overstock to engage in the wrongful conduct complained of

herein. By reason of such conduct, Defendants Byrne, Iverson, and Nielsen are liable pursuant to Section 20(a) of the Exchange Act.

### COUNT FOUR
### Violation of Section 20A of the Exchange Act
### (Against Defendant Byrne)

334.    Lead Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

335.    This Claim is brought against Defendant Byrne under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1.

336.    While Overstock's securities traded at artificially inflated and distorted prices, Defendant Byrne profited by selling more than 5,610,514 shares of Overstock common stock while in possession of adverse, material nonpublic information about Overstock, reaping $100,799,127.09 in illegal insider trading proceedings, as detailed herein.

337.    Lead Plaintiff purchased Overstock common stock contemporaneously with several of Defendant Byrne's sales, as reflected in the following chart:

| Defendant Byrne's Open Market Sales | | | Lead Plaintiff's Contemporaneous Purchase | | |
|---|---|---|---|---|---|
| Sale Date | Shares Sold | Price per Share | Purchase Date | Number of Shares | Price per Share |
| 9/16/2019 | 1,505,123 | $21.83 | 9/13/2019 | 138,535 | $27.57 |
| 9/17/2019 | 2,141,646 | $18.66 | | | |
| 9/18/2019 | 1,056,690 | $16.32 | | | |

338.    Lead Plaintiff and all other members of the Class who purchased Overstock common stock contemporaneously with Defendant Byrne's sales of Overstock common stock have suffered damages because:

a.   They paid artificially inflated prices as a result of the violations of Sections 10(b), 20(a), and 20A of the Exchange Act as alleged herein and in reliance on the integrity of the market; and

a.   They would not have purchased the Overstock common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements and omissions alleged herein.

339.    Thus, Defendant Byrne violated Section 20A of the Exchange Act and is liable to Lead Plaintiff and the other members of the Class for the substantial damages suffered in connection with their purchase of Overstock common stock during the Class Period.

## XIII.    JURY TRIAL DEMAND

340.    Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiff demands a trial by jury of all the claims asserted in this Consolidated Complaint so triable.

## XIV.    PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

a.   This action may proceed as a class action, with Lead Plaintiff as the designated Class representative and Lead Plaintiff's counsel designated as Class Counsel;

b.   Lead Plaintiff and the members of the Class recover damages sustained by them, as provided by law, and that a judgment in favor of Lead Plaintiff and the Class be entered against the Defendants, jointly and severally, in an amount permitted pursuant to such law;

c.  Lead Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

d.  Lead Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

e.  Lead Plaintiff further seeks permission to replead, should the Court deem this pleading in any way insufficient; and

f.  Lead Plaintiff and members of the Class receive such other and further relief as may be just and proper.

DATED this 23rd day of October 2020.

/s/ Keith M. Woodwell
Keith M. Woodwell
Joseph D. Watkins
Michael B. Eisenkraft
Laura H. Posner
Daniel H. Silverman
Molly J. Bowen
Joshua Handelsman
*Attorneys for The Mangrove Partners Master Fund, Ltd.*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 23, 2020, I electronically filed the foregoing

Consolidated Complaint with the Clerk of Court using the CM/ECF system which sent

notification of such filing to all parties of record.


<u>/s/ Keith Woodwell</u>