Erik A. Christiansen, USB #7372
Alan S. Mouritsen, USB #13558
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
EChristiansen@parsonsbehle.com
AMouritsen@parsonsbehle.com
ecf@parsonsbehle.com

John C. Dwyer (*Pro Hac Vice*)
Jessica Valenzuela Santamaria (*Pro Hac Vice*)
Jeffrey D. Lombard (*Pro Hac Vice*)
**COOLEY LLP**
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400
dwyerjc@cooley.com
jvs@cooley.com
jlombard@cooley.com

*ATTORNEYS FOR DEFENDANTS OVERSTOCK.COM, INC., GREGORY J. IVERSON, AND DAVID J. NIELSEN*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| IN RE OVERSTOCK SECURITIES LITIGATION<br><br>_____<br><br>THE MANGROVE PARTNERS MASTER FUND, LTD.,<br><br>          Lead Plaintiff,<br><br>v.<br><br>OVERSTOCK.COM, INC., PATRICK M. BYRNE, GREGORY J. IVERSON, AND DAVID J. NIELSEN,<br><br>          Defendants. | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED COMPLAINT**<br><br>Case No. 2:19-cv-709-DAK-EJF<br><br>Judge:  Hon. Dale A. Kimball<br>Magistrate Judge: Hon. Evelyn Furse |

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................ 1

II.     PLAINTIFF'S "MISSTATEMENTS" CLAIM (COUNT 1) SHOULD BE
        DISMISSED. .................................................................................................... 2

        A.      The Retail Guidance Is Protected by the PSLRA Safe Harbor............................ 2

                1.      The guidance is protected under the first prong of the safe harbor. .......... 3

                2.      The guidance is also protected under second prong of the safe
                        harbor. ................................................................................................ 3

                        a.      CW#0's allegations are unreliable and irrelevant. ........................ 4

                        b.      Byrne did not attribute increases in guidance to improved
                                SEO. ...................................................................................... 7

                        c.      That Overstock ultimately missed its guidance does not
                                demonstrate that any Defendant knew it was unattainable. ........... 9

        B.      None of the Remaining Statements Are Actionable. ........................................ 10

                1.      The AC fails to adequately plead falsity.................................................. 10

                2.      The AC Fails to adequately plead scienter. ............................................. 11

III.    PLAINTIFF'S SCHEME CLAIM (COUNT 2) SHOULD BE DISMISSED. ................. 13

        A.      The AC Fails to Adequately Plead the Required Element of Deception. ............. 13

        B.      Plaintiff Fails to Adequately Plead Scienter for Count 2.................................. 18

IV.     PLAINTIFF FAILS TO ADEQUATELY PLEAD RELIANCE FOR COUNTS 1
        AND 2.......................................................................................................... 19

V.      CONCLUSION.............................................................................................. 20

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................................16

*ATSI Communications, Inc. v. Shaar Fund, Ltd*,
   493 F.3d 87 (2d Cir. 2007)................................................................................................18

*Ayres v. Portfolio Recovery Associates, LLC*,
   2018 WL 6706021 (D. Utah Dec. 20, 2018).....................................................................13

*Board of Trustees of City of Ft. Lauderdale General Employees' Retirement*
   *System v. Mechel OAO*, 811 F. Supp. 2d 853 (S.D.N.Y. 2011), *aff'd sub nom.*
   *Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).............................................18

*In re Bristol–Myers Squibb Securities Litigation*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004)...............................................................................18

*Ellis v. Spectranetics Corp.*,
   2018 WL 1583837 (D. Colo., April 2, 2018).....................................................................18

*Employees' Retirement System of Rhode Island v. Williams Cos., Inc.*,
   889 F.3d 1153 (10th Cir. 2018) .........................................................................................16

*Exkae Ltd. v. Domo, Inc.*,
   2020 WL 7352735 (D. Utah Dec. 15, 2020)...............................................................5, 8, 9

*Fosbre v. Las Vegas Sands Corp.*,
   2013 WL 5970250 (D. Nev. Nov. 7, 2013) .........................................................................9

*In re FoxHollow Techs., Inc., Securities Litigation*,
   2008 WL 2220600 (N.D. Cal. May 27, 2008) .....................................................................5

*In re FX Energy, Inc. Securities Litigation*,
   2009 WL 1812828 (D. Utah June 25, 2009).......................................................................12

*GFL Advantage Fund, Ltd. v. Colkitt*,
   272 F.3d 189 (3d Cir. 2001)...............................................................................................13

*Glickenhaus & Co. v. Household International, Inc.*,
   787 F.3d 408 (7th Cir. 2015) ...............................................................................................4

*In re Gold Res. Corp. Securities Litigation*,
   957 F. Supp. 2d 1284 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir. 2015)....................2, 4

TABLE OF AUTHORITIES

Page(s)

*Harris v. IVAX Corp.*,
    998 F. Supp. 1449 (S.D. Fla. 1998), *aff'd,* 182 F.3d 799 (11th Cir. 1999)...............................3

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)...........................................................................................................4

*Joseph v. Wiles*,
    223 F.3d 1155 (10th Cir. 2000), *abrogated on other grounds by*
    *California Public Employees' Retirement System v. ANZ Securities, Inc.*,
    137 S. Ct. 2042 (2017)........................................................................................................20

*Kapur v. USANA Health Sciences, Inc.*,
    2008 WL 2901705 (D. Utah July 23, 2008) ........................................................................7

*Levie v. Sears, Roebuck & Co.*,
    496 F. Supp. 2d 944 (N.D. Ill. 2007) ................................................................................20

*MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
    761 F.3d 1109 (10th Cir. 2014) ..........................................................................................2

*In re Myriad Genetics, Inc. Securities Litigation*,
    2021 WL 977770 (D. Utah March 16, 2021).........................................................5, 6, 10, 14

*In re Ocular Therapeutix, Inc. Securities Litigation*,
    2019 WL 1950399 (D. Mass. Apr. 30, 2019),
    *aff'd* 955 F.3d 194 (1st Cir. 2020) ................................................................................13, 19

*Onel v. Top Ships, Inc.*,
    806 F. App'x 64 (2d Cir. 2020) ......................................................................................15, 16

*Ploss v. Kraft Foods Grp., Inc.*,
    197 F. Supp. 3d 1037 (N.D. Ill. 2016) ..............................................................................14

*Raab v. General Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) .........................................................................................10, 13

*In re SandRidge Energy, Inc. Securities Litigation*,
    2017 WL 3309758 (W.D. Okla. Aug. 1, 2017) .....................................................................3

*Schreiber v. Burlington Northern, Inc.*,
    472 U.S. 1 (1985).............................................................................................................13

*Southeastern Pennsylvania Transportation Authority v. Orrstown Financial*
    *Services, Inc.*,
    2016 WL 7117455 (M.D. Pa. Dec. 7, 2016).........................................................................5

TABLE OF AUTHORITIES

Page(s)

*SEC v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007)..................................................................14, 15

*Set Capital LLC v. Credit Suisse Group AG*
    2021 WL 1619620 (2d Cir. Apr. 27, 2021) .......................................................15, 16

*Sharette v. Credit Suisse*,
    127 F. Supp. 3d 60 (S.D.N.Y 2015)..........................................................................15

*Smallen v. The Western Union Co.*,
    950 F.3d 1297 (10th Cir. 2020) ...........................................................................12, 13

*Solow v. Citigroup, Inc.*,
    2012 WL 1813277 (S.D.N.Y. May 18, 2012) ...........................................................15

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008)....................................................................................................20

*Stransky v. Cummings Engine Corp. Inc.*,
    51 F.3d 1329 (7th Cir. 1995) ......................................................................................10

*Western Pennsylvania Electrical Employees Pension Fund v. Mentor Graphics
    Corp.*, 2018 WL 4524107 (D. Or. May 29, 2018), *report and recommendation
    adopted* 2018 WL 3618365 (D. Or. July 27, 2018), *aff'd* 788 F. App'x 421
    (9th Cir. 2019)..............................................................................................................4

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ..............................................................................2, 3

*In re Zagg, Inc. Securities Litigation*,
    797 F.3d 1194 (10th Cir. 2015) .................................................................................11

*Zucco Partners LLP v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..................................................................................4, 5

**Statutes**

15 U.S.C.
    § 77b(a)(3) .................................................................................................................17
    § 77d(a)(2) .................................................................................................................17
    § 78u–4(b)(1) .............................................................................................................11

TABLE OF AUTHORITIES

Page(s)

**Other Authorities**

17 C.F.R.
   § 230.144.................................................................................................17
   § 230.501.................................................................................................17
   § 230.701.................................................................................................17
   § 230.902.................................................................................................17
   § 240.16a-3(g)(1) ....................................................................................16

Practical Law Corporate & Securities, *Unregistered Offerings: Overview* (2021),
   http://us.practicallaw.com/9-382-8837 (last visited May 3, 2021) ...........17

Questions and Answers of General Applicability, Question 103.01, *available at*
   https://www.sec.gov/corpfin/securities-act-sections (last visited May 3, 2021) ...................17

Sec. & Exch. Comm'n Release Notice, Release No. 3728 (Dec. 17, 1956)..................................17

## I.   INTRODUCTION

It is clear from Plaintiff's Opposition brief that its misstatements claim related to Overstock's Retail guidance provided in May, July, and August 2019, and the manipulation claim related to the Company's digital Dividend, first announced on July 30, 2019, fail to cure any of the defects identified in the Court's September 2020 Order.

With regard to the guidance, the Amended Complaint ("AC") adds allegations from a new confidential witness ("CW#0") reflecting his apparent belief that the Retail guidance provided *before* the Class Period, though within a reasonable range, should have been at the lower end of that range. These allegations are inadequate. Financial guidance, like the Company's guidance at issue here, is "the quintessential example of a forward-looking statement protected by the PSLRA's safe harbor provisions." And here, the guidance is protected under two independent provisions of the safe harbor. Plaintiff does not dispute that the guidance was identified as forward-looking and accompanied by meaningful cautionary language, and "[t]here is no well-pled fact suggesting that the guidance did not reflect the company's good faith projection as to its future performance at the time it was given."

As to the manipulation claim relating to the Dividend, Plaintiff does not meaningfully dispute that the Dividend was part of a legitimate, long-term strategy to expand Overstock's focus solely from its low-margin retail business to novel blockchain technologies. Critically and fatally, the AC again fails to plead the requisite deception. It is undisputed that Overstock disclosed that the Dividend would not be registered, and the market knew the potential ramifications of that decision. Plaintiff claims there was deception by labeling Overstock's decision to not initially register the shares as "illegal." But the AC pleads nothing to support that inflammatory label.

For these and the other reasons set forth herein and in Defendants' Opening Brief, including that Plaintiff fails to plead scienter and reliance, Defendants respectfully request that the Court dismiss the AC with prejudice.

II.   **Plaintiff's "Misstatements" Claim (Count 1) Should Be Dismissed.**

Plaintiff's Opposition effectively concedes that the AC adds nothing that would alter the Court's prior conclusions that Plaintiff fails to plead falsity and scienter as to the statements regarding historical insurance costs (¶¶276-78), the potential sale of the Retail division (¶266), risk disclosures related to Dinosaur Financial (¶¶286, 288), and SOX certifications (¶¶253-55, 272).[1] (MTD at 14-16 & n.4; Dkt. 83 at 22 n.15, 23-24, 26 n.18; Dkt. 96 at 9, 14-16 & n.10.) Instead, the Opposition focuses on the Retail guidance, and statements addressing the Company's Q2 2019 results and SEO. (Opp. at 5-16.) Those efforts fail for multiple, independent reasons.[2]

A.   **The Retail Guidance Is Protected by the PSLRA Safe Harbor.**

Plaintiff's challenge to the Company's Retail guidance provided on May 9, July 15, and August 8, 2019 forms the core of Count 1. "Such guidance, however, is the quintessential example of a forward-looking statement protected by the PSLRA's safe harbor." (Dkt. 103 ("Order") at 11.) Although the AC contains new allegations from CW#0 purporting to describe the initial March 18, 2019 guidance process, none of these allegations impact whether the guidance provided in May, July, and August 2019 are protected by the PSLRA safe harbor. Every Circuit that has addressed the issue has concluded the PSLRA safe harbor is disjunctive. (*See* MTD at 18 n.6.) Thus, Overstock "will not be liable for a false or misleading statement if it is forward-looking and ***either*** is accompanied by cautionary language ***or*** is made without actual knowledge that it is false or misleading." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021); *see also In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1293-94 (D. Colo. 2013) (applying disjunctive analysis), *aff'd*, 776 F.3d 1103 (10th Cir. 2015); *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1112 n.1 (10th Cir. 2014). (*See also* Order at 11.)

---

[1]  "¶" refers to the AC. (Dkt. 120.)  "Ex." refers to the exhibits attached to the Declaration of Jeffery D. Lombard. (Dkt. 126.) Unless otherwise noted, emphasis is added.

[2]  Plaintiff also argues the Dividend statements were misleading based on the same "omissions" regarding the purpose of the Dividend that purportedly support its manipulation claim. (Opp. at 32-35.) These fail for the same reasons Plaintiff fails to plead deception. (Section III.A.)

The Retail guidance is protected by each independent prong of the safe harbor.

**1.      The guidance is protected under the first prong of the safe harbor.**

Plaintiff does not dispute that Overstock provided cautionary language outlining the same risks that the Company ultimately attributed to the guidance miss. (*Compare* MTD at 17-18 *with* Opp. at 17.) That is unsurprising as Overstock's cautionary statements "were detailed and specific." *Wochos*, 985 F.3d at 1193 n.3. (*See* Ex. A at 31-33; Order at 11 ("Plaintiff also claims that Overstock . . . did not give the required cautionary language, but Overstock directed investors to the risk disclosures in Overstock's 2018 Form 10-K.").) That should be the end of the inquiry.

Nevertheless, Plaintiff argues that such cautionary language does not "insulate these statements" as "Overstock missed its 'projections' because they were fraudulently inflated from the start, and the claimed reasons for the ultimate downward revision to guidance were pretextual." (Opp. at 17.) Putting aside the lack of any well-pled allegations supporting such a theory, "[t]he Court will not, looking in hindsight, hold the Defendants to the impossible burden of having to warn of every factor that ultimately causes the forward-looking statement not to come true. Such an approach was not the intent of Congress and would effectively eviscerate the safe harbor." *Harris v. IVAX Corp.*, 998 F. Supp. 1449, 1454 (S.D. Fla. 1998), *aff'd,* 182 F.3d 799 (11th Cir. 1999). Accordingly, the AC fails to overcome the first basis for protection under the safe harbor, and the Court's analysis could stop here. *See In re SandRidge Energy, Inc. Sec. Litig.*, 2017 WL 3309758, at *7 (W.D. Okla. Aug. 1, 2017) ("In those instances where there are 'meaningful cautionary statements,' liability is precluded despite a defendant's state of mind.").

**2.      The guidance is also protected under second prong of the safe harbor.**

To the extent the Court conducts an analysis under the separate actual knowledge prong of the safe harbor, the result is the same. Plaintiff argues that it pleads actual knowledge primarily based on allegations attributed to various confidential witnesses and the "dramatic reversal" of guidance in September 2019. (Opp. at 5-16.) None of those allegations come close to pleading that

any Defendant had actual "knowledge that it was *not possible*" to meet the guidance provided by Byrne and Nielsen on May 9, July 15, and August 8, 2019.[3] *W. Pa. Elec. Emps. Pension Fund v. Mentor Graphics Corp.*, 2018 WL 4524107, at *16 (D. Or. May 29, 2018), *report and recommendation adopted* 2018 WL 3618365 (D. Or. July 27, 2018), *aff'd* 788 F. App'x 421 (9th Cir. 2019).[4]  Accordingly, the Retail guidance should be dismissed on that basis as well.

### a.      CW#0's allegations are unreliable and irrelevant.

The Opposition relies most heavily on allegations attributed to CW#0 claiming that Byrne presented Retail guidance on March 18, 2019, two months before the start of the Class Period, that Iverson believed was "flat out wrong and misleading." (*See, e.g.*, Opp. at 2.) The AC, however, does not challenge the March 2019 guidance. Moreover, the allegations attributed to CW#0 lack the specificity and other indicia of reliability that the law requires.

In assessing the adequacy of a securities complaint in the context of a motion to dismiss, "confidential witness statements may only be relied upon where the confidential witnesses are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." (Order at 13 (quoting *Zucco Partners, LLP v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)).) "[C]onfidential witnesses are not reliable" where they "were not employed by [the defendant entity] during the time period in question." *Zucco*, 552 F.3d at 996. Here, the AC fails to plead even the most basic facts about

---

[3] Allegations that a defendant "*should have known* the projections were unattainable . . . do not pass muster under the stringent 'actual knowledge' test." *In re Gold*, 957 F. Supp. 2d at 1298.
[4] Plaintiff does not allege that Iverson made any of the guidance statements but argues that he and Nielsen are liable for statements made by Byrne because they purportedly knew such statements were false and failed to correct them. (Opp. at 5 n.3.) Plaintiff's authorities (*id.*) pre-date the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), holding that only the "maker" of a statement—"the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it"—can be primarily liable. The AC contains no well-pled facts that Iverson or Nielsen "*actually exercised* control" over any statements made by Byrne. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015). (*See also* Order at 25.) Because Iverson did not make any of the Retail guidance statements, Count 1 should be dismissed as to Iverson for this reason alone.

CW#0, including when CW#0 was employed by Overstock or even whether he was employed *during* the Class Period.[5] (¶75.) *See Exkae Ltd. v. Domo, Inc.*, 2020 WL 7352735, at *8-9 (D. Utah Dec. 15, 2020) (Kimball, J.) (rejecting allegations from CWs who left the company three months before the class period). The AC also fails to plead CW#0's job title or describe any of his job responsibilities. Instead, the AC identifies CW#0 only "as an executive [who] participated in the 2019 planning process." (¶75.) Critically absent, however, are any details about his specific role in that process, when he was involved, whether he attended meetings with the Defendants about guidance, what information he had about the underlying bases for the projections, or anything else that would explain how he knows the information purportedly attributed to him. *Cf. In re Myriad Genetics*, *Inc. Sec. Litig.,* 2021 WL 977770, at *18 (D. Utah Mar. 16, 2021) (CW allegations reliable where "Plaintiffs provided the witnesses' titles, the span of their employment with Myriad, and allegations of specific incidents in which they participated, including [dates and] names of various Myriad executives.").[6] Nor does Plaintiff allege any facts corroborating the allegations attributed to CW#0. *See In re FoxHollow Techs., Inc., Sec. Litig.*, 2008 WL 2220600, at *30 (N.D. Cal. May 27, 2008) (rejecting argument that CWs "should be considered reliable simply by virtue of the fact that they were 'executives,'" where "there are no corroborating details . . . that provide any indicia of reliability"). In short, the AC lacks the required details "to establish [CW#0's] reliability and personal knowledge" of the events attributed to him. *Zucco*, 552 F.3d at 995.

---

[5] The affidavit explaining CW#0's purported fear of retaliation is improper. (Opp. at 12 n.9; Dkt. 127-1.) *See, e.g.*, *Se. Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2016 WL 7117455, at *7 (M.D. Pa. Dec. 7, 2016). Moreover, Plaintiff's offer to provide more information if Defendants' motion is granted belies CW#0's purported fear. (*See* Opp. at 43 n.42.)

[6] The Opposition's heavy reliance on *Myriad* is misplaced. (Opp. at 7 n.5, 9-13, 18-21, 23 n.19, 24, 34, 38-40.) That case did not involve forward-looking statements or the application of the PSLRA safe harbor; it involved alleged misstatements of *historical information* regarding clinical trial data and improper revenue recognition practices which led to a restatement. *Myriad*, 2021 WL 977770, at *7-16. That complaint also included particularized allegations from the company's former scientists (identified by specific title and dates of employment), who identified specific meetings (dates, locations, and names of attendees) where they personally informed a defendant and other executives that there was "no data" to support the statements. *Id.* at *8-9, *17-18.

But, even if the Court were to credit CW#0's allegations, they fail to demonstrate that any Defendant knew the *challenged* guidance, provided on May 9, July 15, and August 8, was unattainable. That is because the allegations attributed to CW#0 relate almost exclusively to the guidance provided on March 18, 2019—*two months before the start of the Class Period*—which Plaintiff does not challenge. (¶75.) And critically, the AC does not allege that CW#0 had any involvement with the guidance that is actually challenged in the AC. (¶¶75-77.)

A closer look at the three core allegations attributed to CW#0 further belie their relevance. First, the AC alleges that the "base Plan" for 2019, established before the start of the Class Period, reflecting projected Retail Contribution of $160M, was "unrealistic" and "misleading" because it was not based on the "lower, conservative end" of the $145-165M range discussed internally. (¶¶75-76.) This allegation is absurd. Defendants are unaware of (and, unsurprisingly, Plaintiff has not identified) any authority suggesting that it is fraudulent for a company to set guidance at a particular point within a reasonable range of its own forecasts. (*See* MTD at 21.)

Second, the Opposition focuses almost exclusively on the "upside" component of the initial Contribution guidance that Byrne announced on March 18, 2019. (*See* Ex. K at 410 (providing Contribution guidance of $160M, but stating, "I actually think there's upside of $10 million to $20 million to that number").) This argument is irrelevant to whether any Defendant *knew* the guidance provided *during the Class Period* was unattainable. Byrne's statement pre-dates the Class Period and is not alleged to be false or misleading. Further, the AC concedes that the "upside" was *not* factored into the initial $10M Adjusted EBITDA guidance: "The base Plan . . . land[ed] at a point estimate of $160M, which corresponded to a $10M Adjusted EBITDA Retail guidance."[7] (¶75;

---

[7] Unlike in *Myriad*, where the Court determined there were no intervening events that would render the pre-class period allegations "stale," 2021 WL 977770, at *8, *17-18, the AC pleads that circumstances changed between the initial March guidance and the later challenged guidance. According to CW#0, the Company engaged in a "monthly Outlook process, which involved the *monthly updating and reforecasting of financial numbers from the Plan based on recent performance and new information*." (¶75; *cf.* Opp. at 7.)

*see also* ¶77 (calculating the "miss in Retail guidance" without factoring in the upside).)

Third, the Opposition insinuates that Iverson said the $10 to $20M upside was "flat out wrong and misleading." (*See* Opp. at 2, 6, 10, 18.) The AC, however, does not attribute this statement to Iverson or, for that matter, to CW#0; rather it appears to be Plaintiff's own characterization. (¶75.) In fact, the AC contains no allegations establishing *how* CW#0 would know anything about Iverson's purported opinion. It does not identify any meeting or conversation where Iverson expressed that opinion, much less that CW#0 was privy to any such communication. Nor does the AC allege whether Iverson shared his purported opinion with Byrne or Nielsen. Indeed, CW#0's allegations are so "lacking in specificity and reliability as to render the statement nothing more than a generic conclusion," which is not entitled to the presumption of truth. *Kapur v. USANA Health Scis., Inc.*, 2008 WL 2901705, at *3 (D. Utah July 23, 2008).

Finally, the Opposition contains a critical chronology error. Plaintiff argues that, on August 22, "two weeks after the August 8 earnings call," an internal projected "Outlook" was generated that made clear the Company's performance would likely fall short of the $17.5M Adjusted EBITDA guidance. (Opp at 8.) The Opposition then argues that, despite this information, the Company reiterated the same guidance "on an earnings call *that same day*." (Opp. at 9 (citing ¶¶269-71).) But Paragraphs 269 through 271 make clear that the reaffirmation of guidance was made on August 8, *before* the "revised Outlook" was allegedly presented, not on August 22. This is simply one more example of Plaintiff attempting to plead fraud by hindsight, though in this case by misrepresenting its own allegations.

### b.    Byrne did not attribute increases in guidance to improved SEO.

Plaintiff argues, based on allegations attributed to CW#0 and CW#2, that Overstock did not experience a "material" or "meaningful" improvement in SEO and, even if it did, SEO "bore no meaningful relationship to contribution or revenue" and thus "could not justify the Retail

guidance increases even if it had increased."[8] (Opp. at 14.) These arguments also fail.

First, the AC fails to allege *what* CW#0 or CW#2 believed to be the correct SEO numbers. Nor does the AC allege that either CW believed that the SEO metrics presented in the slides accompanying Overstock's earnings calls during the Class Period were inaccurate in any way. (¶¶68, 125; Ex. L at 431; Ex. M at 455.) Absent such a charge, "[t]his specific data undercuts the more generalized allegations of the confidential witnesses." (Order at 13.)

Second, Plaintiff's argument that CW#2's allegations are relevant and reliable solely because his or her job purportedly involved "implementing tags and analytics" on Overstock's website that "measured and improved the website's search engine optimization" is flawed. (Opp. at 12-13.) There are no details about whether CW#2 was responsible for reviewing, or was even aware of, the data that would show whether SEO was improving. And there is no allegation CW#2 and his or her team, *alone*, were responsible for implementing changes to improve SEO. (*Cf.* Ex. L at 421 (Overstock "had 10 teams across the company" working on SEO).) Indeed, CW#2's allegations are so vague as to be essentially meaningless. For example, CW#2 alleges there was no improvement in SEO during the first half of 2019 but provides no details about any specific information relied upon to reach that conclusion. (MTD at 23-24; Opp. at 13 n.11.) Nor can this be reconciled with CW#0's admission that keyword search rankings did improve. (*See* ¶83.) *See Exkae*, 2020 WL 7352735, at *8 (discounting "irreconcilable explanations" provided by CWs).

Third, regardless of whether SEO was improving, the Company did not increase its guidance based on improvements in SEO. Instead, as the AC alleges, Overstock raised both Contribution and Adjusted EBITDA guidance based on *undisputed* increases to Contribution in

---

[8] Plaintiff does not meaningfully address the fact that neither CW#0 nor CW#2 are alleged to have any forecasting or accounting expertise, such that they would have any basis to opine on the interplay between improvements in SEO and Contribution, or how that would impact where the Company chose to set its Adjusted EBITDA guidance. (*See* MTD at 24-25.)

prior periods, combined with *undisputed* reductions to expenses.[9] (¶¶249-50, 266; Ex. E at 330-32; Ex. H at 372-73; *see also* MTD at 5-7.) *See Exkae*, 2020 WL 7352735, at *6 (statement forecasting future growth not misleading where it was based on observed historical growth).

### c.   That Overstock ultimately missed its guidance does not demonstrate that any Defendant knew it was unattainable.

Plaintiff also argues that the "dramatic reversal" of guidance on September 23, 2019, "is evidence that Defendants knew their revenue guidance was false when made." (Opp. at 15; *see also id.* at 20.) This is more fraud by hindsight, which is impermissible under the PSLRA. "Congress designed the safe harbor to allow companies to safely share future expectations by minimizing the risk of frivolous 'fraud by hindsight' lawsuits. Congress' apparent understanding was that the investing public obtains a net benefit from the increased information, even if there is some risk of forward-looking statements being inaccurate." *Fosbre v. Las Vegas Sands Corp.*, 2013 WL 5970250, at *11 (D. Nev. Nov. 7, 2013). (*See also* Order at 12 ("the PSLRA safe harbor provisions [ ] recognize that not every retrospectively inaccurate good-faith prediction of future performance supports a federal securities class action.").) Indeed, as the Court recognized, "[p]redictions of future growth . . . will almost always prove to be wrong in hindsight. . . . Imposing liability [when growth proves smaller or greater] would put companies in a whipsaw."[10] (Order at

---

[9] There is no allegation that Byrne ever attributed increases in *revenue* to improvements in SEO; in May 2019, he stated that *Contribution* increased in part due to improvements in SEO. (¶249.) In any event, improvements in SEO can increase both Contribution and Adjusted EBITDA without increasing revenue. That is because both metrics are calculated as the difference between revenue and certain expenses. Contribution is calculated by subtracting "certain promotional and advertising expenses" from revenue. (Opp. at 14 n.13.) Adjusted EBITDA, in turn, is calculated by deducting certain additional expenses from Contribution. (MTD at 5.) Thus, improvements in SEO that allow the Company to decrease its other advertising-related expenses, would lead to improvements in both Contribution and Adjusted EBITDA, without necessarily increasing revenue. As the Company made clear well before the Class Period, that was its strategy for the Retail division, to shift its focus from gaining market share and revenues to improving profitability by decreasing customer acquisition costs through a "combination of improved organic [search] traffic and more efficient [paid] marketing." (Ex. K at 408-09.)

[10] Nor is there any merit to Plaintiff's argument that Defendants had a duty to correct their previous guidance. (Opp. at 8 n.6, 9.) A duty to correct "applies when a company makes a historical statement that, at the time made, the company believed to be true, but as revealed by subsequently

12 (quoting *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993)).)

Because Plaintiff has not pled that any Defendant had actual knowledge that the challenged guidance was unattainable, Byrne's and Nielsen's statements regarding that guidance are fully protected by the second prong of the PSLRA safe harbor.

> **B.     None of the Remaining Statements Are Actionable.**

>> **1.     The AC fails to adequately plead falsity.**

Aside from Retail guidance, the Opposition continues to challenge the Company's disclosures regarding its actual second quarter Retail results and SEO performance. (Opp. at 16-17.) There are, however, no well-pled facts to support either claim.

With regard to the Company's second quarter results, Plaintiff argues that "Defendants' August 8, 2019 and August 22, 2019 statements that the Retail division had already returned to positive adjusted EBITDA are false statements of historical fact." (*Id.* at 16 (citing ¶¶268, 274).) There is not a single allegation to support that charge. The AC does not state what the actual results were or identify any facts suggesting the reported results were inaccurate. *See Myriad Genetics*, 2021 WL 977770, at *13 (rejecting arguments premised on plaintiffs' contention that a statement was "flatly untrue," where plaintiffs failed to "explain how it was 'flatly untrue'").

As for the improvements in the Company's SEO results, Plaintiff argues that statements made by Seth Moore (a non-defendant) and Byrne on May 9 and July 15 were false. (Opp. at 16-17 (citing ¶¶68, 125, 266); *see also id.* at 12-14.) But the AC does not challenge the statements made by Moore (¶¶68, 125), or allege any "reasons" why those statements were false or

---

discovered information actually was not." *Stransky v. Cummings Engine Corp. Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995). The Retail guidance is not a "historical statement," and the "revised Outlook" was not prepared until weeks or months *after* the guidance was provided. Plaintiff also argues that the revised Outlook triggered a duty to update. (*See* Opp. at 9 n.7.) The Tenth Circuit has never recognized such a duty. Regardless, the AC alleges that the revised Outlook indicating that the Company might not meet its guidance was first generated on or about August 22, and one month later, on September 23, the Company provided an appropriate "update," publicly disclosing that it projected Adjusted EBITDA for 2019 to be "break even." (¶¶78, 178.)

misleading. *See* 15 U.S.C. § 78u–4(b)(1). And, as discussed above, the AC contains no facts that are inconsistent with Byrne's statement that "in June our SEO rankings on Google took another big step in recovery." (¶266.)

### 2.    The AC **Fails to adequately plead scienter.**

Count 1 should also be dismissed on the independent ground that the AC fails to adequately allege that any Defendant acted with the requisite strong inference of scienter. This requires Plaintiff to plead "facts evidencing the defendant's intent to deceive or defraud, or [] facts establishing the defendant acted recklessly," *i.e.*, a state of mind approaching "something closer to . . . actual intent." *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1201, 1206 (10th Cir. 2015). Though slightly repackaged, the scienter allegations in the AC are essentially the same allegations the Court previously rejected as inadequate in the prior complaint. (Order at 16-17.) Whether viewed individually or collectively, they fail for the same reasons.

For example, Plaintiff previously attempted to connect Iverson's departure with the Dividend, but Plaintiff now argues Iverson's departure was suspicious because it occurred between the "revised Outlook" and the downward revision to guidance. (Opp. at 18-19; ¶81.) But Plaintiff does not explain *how* this timing is suspicious. Iverson is not alleged to have made any of the challenged guidance statements, and the AC fails to plead that he participated in the meeting where the "revised Outlook" was allegedly presented. (*See* MTD at 30 (citing ¶¶78, 119).) Thus, nothing in the AC undercuts the Court's holding that "[t]he timing of Iverson's departure is not sufficient to raise questions regarding scienter" as Plaintiff's "statement that his departure was suspicious is not based on any supporting facts." (Order at 17.)

Similarly, Plaintiff argues that the Company's disclosure on September 23, 2019, that it expected Adjusted EBITDA to be "break even" in 2019[11] "adds to the inference of scienter"

---

[11] Plaintiff argues that the "large disjunction between the true Retail EBITDA of negative $2.2M and the projected $17.5M—and that the change occurred within just four-and-a-half weeks—was so significant that it adds to the inference of scienter." (Opp. at 20.) However, this is just another

because "just four-and-a-half weeks" earlier it reaffirmed the guidance. (Opp. at 20; *see also id.* at 15.) This is just another attempt by Plaintiff to plead fraud by hindsight. *See Smallen v. The W. Union Co.*, 950 F.3d 1297, 1309-10 (10th Cir. 2020). Moreover, Plaintiff's argument that Overstock missed its guidance by "more than 100%" grossly inflates the magnitude of the Company's shortfall by focusing only on Adjusted EBITDA. (Opp. at 3, 15.) Adjusted EBITDA is derived from Contribution; meaning, the two generally move together. The Company's initial guidance of $10M Adjusted EBITDA provided in March 2019, corresponded to Contribution of $160M. (¶75.) Similarly, the May 8 Adjusted EBITDA guidance of $15M corresponded to Contribution of $165M. (¶¶69, 252.) And, the July 15 and August 8 Adjusted EBITDA guidance of $17.5M corresponded to Contribution of $167M. (Ex. F at 355-56; Ex. M at 444-45; ¶271.) Thus, on September 23, when the Company disclosed that Adjusted EBITDA would be approximately "break even," it suggested a similar decrease in projected Contribution, somewhere in the range of $150M. While that decrease was clearly disappointing, it reflected a much smaller percentage miss for Contribution (approximately 10%). By focusing on the smaller Adjusted EBITDA numbers, Plaintiff unfairly and unconvincingly exaggerates the shortfall.

Plaintiff also again argues that Byrne's May 2019 stock sales support an inference of scienter. (Opp. at 19.) However, neither the amount nor the timing of Byrne's sales was "dramatically out of line with prior trading practices." *In re FX Energy, Inc. Sec. Litig.*, 2009 WL 1812828, at *10 (D. Utah June 25, 2009). Byrne's proceeds from his pre-Class Period sales in September 2018 were nearly *double* that of his May 2019 stock sales. (Dkt. 83 at 33.) And the May sales occurred in the days immediately following the Company's announcement of Q1 2019 results (¶88)—precisely when Byrne would be expected to sell because new material non-public

---

attempt to inflate the magnitude of the miss by misstating Plaintiff's own allegations. As pled, on September 23, 2019, the Company reported that it expected Adjusted EBITDA to break even. (¶178.) It was not until five months later, on March 13, 2020, that Overstock reported Adjusted EBITDA for 2019 was negative $2.2M. (*Id.*)

information had just been disclosed.

Finally, Plaintiff cites Overstock's announcement that in January 2021—a year and half *after* the challenged statements—it received a subpoena from the SEC requesting information regarding the Company's 2019 Retail guidance. (Opp. at 21.) This is not alleged in the AC, and thus, improper for consideration. *See Ayres v. Portfolio Recovery Assocs., LLC*, 2018 WL 6706021, at *1 (D. Utah Dec. 20, 2018). Regardless, "[t]he lone fact of an SEC investigation *after* the challenged statements proves nothing about scienter at the time of the statements." *In re Ocular Therapeutix, Inc. Sec. Litig.*, 2019 WL 1950399, at *9 (D. Mass. Apr. 30, 2019), *aff'd* 955 F.3d 194 (1st Cir. 2020); *see also Smallen*, 950 F.3d at 1308.

Looking at the allegations holistically, the most cogent and compelling inference is that Overstock was justifiably optimistic about Retail's future performance, but ultimately underperformed. This is not evidence of fraud. It reflects only the well-known fact that predictions are "simply the company's best guess as to how the future will play out" and "will almost always prove to be wrong in hindsight." *Raab*, 4 F.3d at 290 (4th Cir. 1993).

## III.   PLAINTIFF'S SCHEME CLAIM (COUNT 2) SHOULD BE DISMISSED.

### A.   The AC Fails to Adequately Plead the Required Element of Deception.

As the Court previously held, "under settled law, a manipulative act requires deception." (Order at 21.) Thus, "Plaintiff must plead 'false statements' *or* 'illegitimate, deceptive trading techniques that mislead investors about the price or demand for a stock.'" (*Id.* at 18-19 (quoting *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 204 (3d Cir. 2001)).) Plaintiff has failed to do so, and, accordingly, Count 2 should be dismissed.[12]

Here, no reasonable investor could have been misled or deceived by the Company's

---

[12] The Opposition reiterates Plaintiff's position that "deception is not an element of a market manipulation claim under Rule 10b-5(a) or (c)" only to preserve the issue for appeal. (Opp. at 23 n.19.) The Supreme Court rejected this argument in *Schreiber v. Burlington N., Inc.*, 472 U.S. 1 (1985), explaining that "Congress used the phrase 'manipulative or deceptive' in § 10(b) as well, and we have interpreted 'manipulative' in that context to require misrepresentation." *Id.* at 7-8.

Dividend announcement. The Opposition attempts to shift the focus from the Dividend itself to a specific feature of the Dividend—the fact the Dividend shares were initially intended to be unregistered—what Plaintiff dubs the "Locked-up Feature." However, that does not change the analysis. The Company clearly disclosed that the shares to be issued in connection with the Dividend "have not been, and are not required to be, registered under the Securities Act of 1933 or applicable state securities laws. Consequently, no secondary resales of such shares will occur until they become eligible for resales . . . [i]n general . . . six months from the payment date for non-affiliate investors." (Ex. G at 364; Order at 14-15, 19.) "The collateral consequences of the blockchain dividend, including the possibility of a short squeeze for short sellers with preexisting contractual obligations, were immediately apparent and written about in the market." (Order at 19; *see also* ¶¶109, 145.) Indeed, the *same day* the Dividend was announced, *RealMoney* reported that "[s]imply put: the digital shares are locked-up. They can't be sold for a period of time to be determined, but likely six months." (Order at 6; *see also* ¶110.) Similar articles were published each of the next two days. (¶¶111-12; Ex. P at 476.) As a result, even if Plaintiff's focus is now on the "Locked-up Feature," nothing changes the Court's holding that Plaintiff fails to plead deception because "[t]here is no allegation that Overstock injected inaccurate information into the market." (Order at 19-20.)

Nevertheless, Plaintiff continues to argue, in essence, that it need not allege actual deception but only a manipulative intent, arguing such intent can be inferred from the "true purpose" of the Dividend (to harm short sellers and to allow Byrne to sell shares at an inflated price). (Opp. at 24, 26, 34.) "Even if Plaintiff need only plead an intent to manipulate," which is not the law, "Plaintiff cannot do so where the 'transaction would have been conducted for

---

The authorities cited by Plaintiff do not support its contrary position. *See SEC v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007) (acknowledging that "[t]he gravamen of manipulation is *deception of investors.*"); *Myriad*, 2021 WL 977770 (did not involve claims under Rule 10b-5(a) or (c)); *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037 (N.D. Ill. 2016) (same).

investment purposes or other economic reasons.'" (Order at 21 (quoting *Masri*, 523 F. Supp. 2d at 373).) The Opposition does not even attempt to argue that Overstock did not have a legitimate purpose for issuing the Dividend. Indeed, it is undisputed that the Dividend was designed to play a major role in Overstock's well-publicized transition to the development of blockchain technologies. (*See* MTD at 7-8.) As Overstock transitioned from its traditional retail focus, it sought to create "'an alternative trading platform where the investing public could purchase and trade' digital securities." (*Id.* at 3-4 (citing ¶47).) The Company would issue digital shares that would trade on the platform operated by tZERO, an Overstock subsidiary. (*Id.* at 8 (citing Ex. G. at 364).) This was "very important for the adoption of [the tZERO] platform" and, relatedly, Overstock's transition away from being only an online retail business. (*Id.* (citing Ex. M at 437, Ex. B at 140).) Put simply, "[t]he dividend had a legitimate business purpose." (Order at 19-20.)

In any event, the securities laws did not require Defendants to engage in self-flagellation by characterizing the Dividend as a "short squeeze" or "manipulative." *Solow v. Citigroup, Inc.*, 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012). Indeed, Plaintiff's own authority, *Sharette v. Credit Suisse International*, 127 F. Supp. 3d 60 (S.D.N.Y 2015), shows that it was *not* deceptive to omit the characterizations Plaintiff has attached to the Dividend. (Opp. at 24.) There, the defendant "was alleged to have misrepresented not just its true motive in entering the transaction at issue, *but the very nature of the transaction itself*." *Onel v. Top Ships, Inc.*, 806 F. App'x 64, 68 n.3 (2d Cir. 2020) (describing *Sharette*). The same is true in *Set Capital LLC v. Credit Suisse Group AG. See* 2021 WL 1619620 (2d Cir. Apr. 27, 2021).[13]  In that case, Credit Suisse's offering documents stated that "we and our affiliates have no reason to believe that our . . . hedging activities will have a material impact" on the value of the exchange-traded notes ("ETNs"). *Id.* at

---

[13] Although the Second Circuit found manipulative *intent* on the facts pled in *Set Capital*, it made clear that "[d]eception is the gravamen of a claim for market manipulation, and the market is not misled when a transaction's terms are fully disclosed." *Set Capital*, 2021 WL 1619620, at *7. Plaintiff's Notice of Supplemental Authority (Dkt. 130) ignores this aspect of the decision as it cannot argue that Overstock did not fully disclose the terms of the Dividend.

*4, *9. The complaint, however, alleged that, "following three prior volatility spikes, [the defendants] knew with virtual certainty that, upon the next volatility spike, their hedging activity would significantly depress the value of [the ETNs]." *Id.* at *14. The offering documents "misrepresented Credit Suisse's knowledge and intent when they warned that Credit Suisse's hedging activity 'could' or 'may' impact prices of [the ETNs] but affirmed that Credit Suisse had 'no reason to believe' that it would." *Id.* There are no similar facts alleged here. Plaintiff has never alleged (nor could it) that Defendants misrepresented any aspect of the Dividend, including that Overstock initially intended to issue unregistered shares. The AC fails "to allege a manipulative act *because [] the complained-of transaction[] was fully disclosed to the market*." *Onel*, 806 F. App'x at 66.

Plaintiff's argument regarding Defendants' alleged failure to disclose Byrne's intent to sell stock at some point in the future also fails to render the Dividend deceptive. (*See* Opp. at 26-28.) The Court previously rejected this argument, finding that "*Plaintiff identifies no duty to disclose Byrne's future intent to sell stock*. Arguing that the intent to sell stock is itself material information that must be disclosed to avoid insider trading is circular and unsupported by any cited authority." (Order at 22 n.1.) Indeed, "the law only requires executives to disclose stock sales two business days after they happen." (*Id.*) *See also* 17 CFR § 240.16a-3(g)(1). Moreover, "[s]ilence, absent a duty to disclose[,] cannot serve as the basis for liability under Rule 10b-5." *Emps.' Ret. Sys. of R.I. v. Williams Cos.*, 889 F.3d 1153, 1164 (10th Cir. 2018). And the AC does not identify *any* statement that was purportedly rendered false or misleading by the omission of such intent. (*See* ¶¶284-86, 291, 293.) Accordingly, Plaintiff's arguments about the *timing* of Byrne's departure or his purported "plan" to sell stock are irrelevant. (*See* Opp. at 26-28.)

Finally, Plaintiff argues that Overstock's plan to issue the Dividend without first registering it with the SEC was somehow "illegal." (Opp. at 24; *see also id.* at 22, 26.) The AC alleges nothing to support this conclusion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("the tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). Tellingly, despite arguing it would have been "illegal" to issue the Dividend shares as unregistered securities, Plaintiff identifies no law, statute, published court decision, rule, regulation, regulatory guidance, or other authority *from any source* that such an act purportedly violated. Nor does Plaintiff allege a single contemporaneous fact that the SEC (or anyone else) told Overstock that not registering the Dividend was "illegal" or a "violation of SEC rules." (¶7.)

Because the Dividend did not involve a "sale" under Section 2(a)(3) of the Securities Act, the shares issued in connection therewith were not required to be registered. *See* 15 U.S.C. § 77b(a)(3); *see also* Questions and Answers of General Applicability, Question 103.01, *available at* https://www.sec.gov/corpfin/securities-act-sections (last visited May 3, 2021); Sec. & Exch. Comm'n Release Notice, Release No. 3728 (Dec. 17, 1956). Moreover, in the Securities Act, Congress instituted a comprehensive framework (accompanied by a robust set of rules developed by the SEC) that provides a number of circumstances where unregistered securities may be issued. *See, e.g.*, Regulation D (17 C.F.R. § 230.501); Rule 701 (17 C.F.R. § 230.701); Rule 144 (17 C.F.R. § 230.144); Regulation S (17 C.F.R. § 230.902); Section 4(a)(2) (15 U.S.C. § 77d(a)(2)). Plaintiff does not allege that none of these exemptions applied to the Dividend. One of the primary benefits of issuing unregistered securities is the issuer avoids the time, expense, and burdens of the registration process, including potential delay to the transaction. Practical Law Corporate & Securities, *Unregistered Offerings: Overview* (2021), http://us.practicallaw.com/9-382-8837 (last visited May 3, 2021).

It is also entirely understandable that there might be disagreement with the SEC when dealing with a security that is new and unprecedented—here, a digital security intended to be traded on Overstock's alternative trading platform that was completely untested within the structures of the federal securities laws. Absent "clear case law precedent or some other way to have foreseen the regulators' actions," the Court cannot infer "illegal" conduct simply from the

fact that Overstock ultimately decided to register the Dividend shares.[14] *See Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 874 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012); *see also In re Bristol–Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 567 (S.D.N.Y. 2004) (no scienter where the accounting treatment at issue was not "the subject of prior accounting rules or literature" and "involve[d] evaluation of a variety of factors and a number of complex judgments.").

Because the AC fails to adequately allege deception *or* manipulative intent, the AC fails to plead that Defendants committed a manipulative act, and Count 2 must again fail.

### B.   Plaintiff Fails to Adequately Plead Scienter for Count 2.

Count 2 fails for a second reason: Plaintiff's failure to adequately allege scienter. Plaintiff does not, and cannot, plead that Defendants misrepresented the nature of the Dividend, or attempted to conceal that it would not be registered. Plaintiff also does not credibly dispute that the market immediately understood the practical impact of the Company's disclosures. Thus, if there was any danger that someone might be misled, it certainly was not "so obvious" that Byrne would be "legally bound as knowing." *Ellis v. Spectranetics Corp.*, 2018 WL 1583837, at *5 (D. Colo., Apr. 2, 2018). Instead, Plaintiff claims it has alleged scienter based on Byrne's departure and subsequent stock sales, his purported flight, and the SEC's investigation.[15] (Opp. at 36-40.) These allegations do not establish "a strong inference that the defendants *intended to deceive investors*" through the Dividend. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).

---

[14] The Opposition blatantly mischaracterizes the AC claiming that, when Overstock filed a Form S-3 to register the Dividend on September 24, 2019, "Overstock cited the guidance it had received from regulators making clear that the Locked-up Feature of the Dividend was not acceptable." (Opp. at 25.) The AC, however, alleges that the Company merely stated that it "appreciate[s] the cooperation and guidance we are receiving from regulatory authorities." (¶185.)

[15] The Opposition's scienter arguments do not mention Iverson or Nielsen. Thus, Plaintiff appears to concede that the AC "does not contain any allegations regarding Defendants Nielsen and Iverson's involvement or intent to defraud with respect to the" Dividend. (Order at 23.)

With regard to Byrne's stock sales, Plaintiff's allegations are based on Byrne's vague, *after-the-fact* statements that he expected to leave at some unidentified time. (*See* Opp. at 27-28 (citing ¶¶97, 133).) Plaintiff also ignores *its own allegation* that Byrne did not have inside information after he left his employment. (¶147; Opp. at 37 n.33.) "Byrne's stock sale when he exited the company appears to have more to do with his exit than the dividend." (Order at 24.)

With regard to Byrne's alleged flight, one cannot ignore the fact that Byrne is here defending these claims. That alone distinguishes the two cases relied upon by Plaintiff, which involved criminal defendants fleeing *after* warrants or indictments for criminal charges had been issued or filed. (Opp. at 40.)

Finally, Plaintiff relies on the purported "intense regulatory scrutiny" surrounding the Dividend. (*Id.*) There is, however, no support for Plaintiff's assertion that "[t]he SEC instructed Overstock" that non-registration "was illegal and that it needed to be registered before it was offered." (*Compare id. with* ¶¶7, 113, 148-50, 153, 176.) Additionally, the fact that the SEC later initiated an investigation "proves nothing about scienter at the time of the statements." *Ocular*, 2019 WL 1950399, at *9.

Taken individually or holistically, the most cogent and compelling inference is that Defendants acted in good faith. The Dividend was designed for the legitimate purpose of furthering Overstock's transition from an online retail business. It defies common sense that Defendants would attempt to do something illegal or mislead investors by fully disclosing their plan to not register the Dividend. Instead, the most plausible inference is that Overstock and the SEC may have disagreed regarding whether registration was required at the outset, which is unremarkable given that Overstock was navigating unchartered territory with the Dividend.

## IV.   PLAINTIFF FAILS TO ADEQUATELY PLEAD RELIANCE FOR COUNTS 1 AND 2.

The Opposition also makes clear that Plaintiff fails to adequately plead reliance. (*See* Opp. at 41-43.) First, Plaintiff continues to baselessly argue that "[r]eliance is not an element of a market

manipulation case in the Tenth Circuit." (*Id.* at 41.) But the Supreme Court has made clear it is. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). Second, Plaintiff cannot rely on the *Affiliated Ute* presumption to plead reliance in Count 1 because the new allegations only address the Retail statements (guidance, SEO, and Q2 Adjusted EBITDA), which are alleged affirmative misrepresentations. (MTD at 34-35.) And it is worth remembering that Plaintiff is a short seller that did not actually rely on the guidance. Plaintiff also continues to mischaracterize its manipulation claim arguing that it "is based . . . exclusively[] on omissions" in an effort to shoehorn Count 2 within *Affiliated Ute*. (Opp. 41.) But Plaintiff's own allegations make clear that it is challenging affirmative conduct: "Defendants issued a digital dividend that was not freely tradeable and thus could not be purchased by Overstock's many short sellers . . . *This conduct* constituted devices, schemes, and artifices to defraud." (¶328; *see also* ¶¶7, 13, 19, 101, 103.) Simply claiming that the manipulative scheme is "exclusively" the failure to disclose the alleged scheme, does not allow invocation of *Affiliated Ute*. Indeed, to permit such an interpretation of the *Affiliated Ute* presumption would "swallow the reliance requirement almost completely." *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000), *abrogated on other grounds by California Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017). Finally, Plaintiff does not dispute that (1) its only purchases during the Class Period were pursuant to, and made to avoid breaching, pre-existing contractual obligations, and (2) it was *these* facts that caused it to purchase. (*Compare* MTD at 35 *with* Opp. 42-43.) Plaintiff appears to concede it would have purchased no matter the price. The *Basic* presumption is inapplicable where, as here, "price [played] *no* part whatsoever in [Plaintiff's] decision marking." *Levie v. Sears Roebuck & Co.*, 496 F. Supp. 2d 944, 949 (N.D. Ill. 2007).

## V.   CONCLUSION

Defendants respectfully request that the AC be dismissed with prejudice.

Submitted By:                                    /s/ John C. Dwyer

                                                 John C. Dwyer (*Pro Hac Vice*)
                                                 Jessica Valenzuela Santamaria (*Pro Hac Vice*)
                                                 Jeffrey D. Lombard (*Pro Hac Vice*)
                                                 **COOLEY LLP**
                                                 3175 Hanover Street
                                                 Palo Alto, CA  94304
                                                 Telephone: (650) 843-5941
                                                 Facsimile: (650) 849-7400
                                                 dwyerjc@cooley.com
                                                 jvs@cooley.com
                                                 jlombard@cooley.com

                                                 Erik A. Christiansen, USB #7372
                                                 Alan S. Mouritsen, USB #13558
                                                 **PARSONS BEHLE & LATIMER**
                                                 201 South Main Street, Suite 1800 Salt Lake
                                                 City, Utah 84111
                                                 Telephone: (801) 532-1234
                                                 EChristiansen@parsonsbehle.com
                                                 AMouritsen@parsonsbehle.com
                                                 ecf@parsonsbehle.com

                                                 *Attorneys for Defendants Overstock.com, Inc.,*
                                                 *Gregory J. Iverson, and David J. Nielsen*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May, 2021, I electronically filed the foregoing **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED COMPLAINT** with the Clerk of Court using the CM/ECF system which sent notification of such filing to all parties of record.

*/s/ John C. Dwyer*