_____

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

_____

| | |
|---|---|
| **IN RE OVERSTOCK SECURITIES LITIGATION** | |
| _____ | **MEMORANDUM DECISION AND ORDER** |
| **THE MANGROVE PARTNERS MASTER FUND, LTD.,** | **Case No. 2:19-CV-709-DAK-DAO** |
| Lead Plaintiff, | **Judge Dale A. Kimball** |
| v. | **Magistrate Judge Daphne A. Oberg** |
| **OVERSTOCK .COM, INC., PATRICK M. BYRNE, GREGORY J. IVERSON, and DAVID J. NIELSEN,** | |
| Defendants. | |

_____

This matter is before the court on Defendants Overstock.com, Inc., Gregory J. Iverson, and David J. Nielsen's ("Overstock Defendants") Motion to Dismiss Plaintiff's Amended Consolidated Complaint [ECF No. 125], and Defendant Patrick M. Byrne's Motion to Dismiss Plaintiff's Amended Consolidated Complaint [ECF No. 124]. On June 18, 2021, the court held a hearing on the motions by Zoom video conferencing because of the Covid-19 pandemic. Michael B. Eisenkraft, Laura H. Posner, Daniel H. Silverman, Molly J. Bowen, Joseph D. Watkins, and Keith M. Woodwell represented Plaintiff. John C. Dwyer, Jessica Valenzuela Santamaria, Jeffrey D. Lombard, and Erik A. Christiansen represented the Overstock Defendants. Robert N. Driscoll, Alfred D. Carry, Holly Stein Sollod, and Cory A. Talbot represented Defendant Patrick M. Byrne. Having fully considered the parties' written submissions, oral arguments, and the law and facts

related to the motion, the court enters the following Memorandum Decision and Order.

## BACKGROUND

This is the second round of motions to dismiss in a securities fraud class action brought by Lead Plaintiff, The Mangrove Partners Master Fund, Ltd., on behalf of persons who purchased Overstock common stock between May 9, 2019, and November 12, 2019.  Plaintiff alleges that Defendants made false statements about Overstock's financial projections for 2019 and engineered a scheme to issue a digital dividend that purportedly caused an artificial squeeze on short sellers.  The court dismissed the claims in a previous decision, but allowed Plaintiff to amend its Consolidated Complaint based on new evidence.

### A.  Initial Allegations

As explained in the court's prior decision, Overstock is an online retailer of home goods.  In 2014, Overstock began working on initiatives to develop blockchain technologies, which it now pursues through its wholly-owned subsidiary Medici Ventures, Inc.  Medici conducts the majority of its business through a subsidiary, tZERO Group, Inc., which is focused on developing and supporting the issuance of digital securities.  Through tZERO, Overstock sought to create an alternative trading platform where the investing public could purchase and trade digital securities.  However, during the class period, Overstock's retail business generated nearly all of its revenues.

Dr. Patrick Byrne is the founder and former CEO and director of Overstock.  He resigned from Overstock on August 22, 2019, during the middle of the class period.  Gregory J. Iverson is Overstock's former CFO.  He resigned from Overstock on September 17, 2019, during the class period.  David J. Nielsen became Overstock's retail division President on May, 9, 2019, the beginning of the class period, and served in that role throughout the class period.

Lead Plaintiff, The Mangrove Partners, is an institutional investor that purchased Overstock common stock during the class period.  Plaintiff is a well-known short seller, and Dr. Byrne publicly denounced short sellers for artificially depressing Overstock's share price.  Short sellers borrow stock from a brokerage (and pay interest while the shares are outstanding), sell those borrowed shares at a time they believe the company's market price is high, purchase shares back when they believe the stock price is low, and return those newly purchased shares to the brokerage.  If their prediction is right, they make a profit.  If their prediction is wrong and the stock price rises, they incur a loss.  If a dividend is issued on stock a short seller has borrowed, the short seller has a contractual obligation to pay that dividend to the lender.  If the short seller cannot pay the dividend, the only way to avoid breaching its contractual obligations is to "close out" or "cover" its short position by purchasing the shorted stock on the open market.

Before the start of the class period at issue in this case, Plaintiff shorted more than 2.5 million Overstock shares.  Plaintiff continued shorting Overstock shares throughout the class period. In fact, Plaintiff's only purchases during the class period were pursuant to preexisting contractual obligations owed to lenders whose stock Plaintiff had previously borrowed to sell short.

During the period leading up to the class period, Overstock's retail division had been struggling to regain market share from its main competitor, Wayfair.  In early 2018, it cut prices and increased advertising spending, but its efforts to regain market share failed.  In the second half of 2018, Overstock reversed course and began focusing on value and running the company profitably by decreasing customer acquisition costs and increasing customer retention.

Two months before the start of the class period, on March 18, 2019, Overstock held its earnings call and disclosed, among other things, that the retail division ended the fourth quarter of 2018 with a $16.9 million "Adjusted EBITDA" loss.  Adjusted EBITDA is a non-GAAP financial

measure that approximates cash flow.  However, Overstock also announced that it expected the

retail division to be profitable in 2019 and provided full year 2019 guidance for Retail Adjusted

EBITDA of $10 million.

Overstock explained that the positive guidance was due to a number of factors: (1) retail

contribution was $33 million in the fourth quarter of 2018 and was expected to increase to $37

million in the first quarter of 2019; (2) customer retention was up 36% year-over-year; (3)

Overstock had already cut 25% of its general and administrative expenses; and (4) after 16 months

of search optimization deterioration, Overstock posted six consecutive months of ranking

improvements.  Plaintiff does not allege that any of these statements are false or misleading.

On May 9, 2009, the first day of the class period, Overstock reported results for the first

quarter of 2019.  The Retail Adjusted EBITDA improved $14.4 million from the prior quarter,

ending with a loss of  $2.5 million.  Overstock attributed the retail division's improved performance

to its continued focus on contribution, expense structure optimization, and improvements in search

engine rankings.  Based on that performance, and its estimate that contribution from the retail

division would increase from the original estimate of between $160-185 million, Overstock raised

its full-year Adjusted EBITDA retail guidance by the same amount, $5 million.  The revision of the

retail guidance is the first allegedly false statement identified in the Consolidated Complaint.

On July 15, 2019, in a Form 8-K filed with the SEC, Overstock disclosed that, based on

favorable second quarter results, it was raising retail guidance again by $2.5 million.

On August 8, 2019, Overstock reported its second quarter results.  As projected the retail

division returned to profitability, generating a positive $1.6 million in Adjusted EBITDA.  This was

the first time since the second quarter of 2017 that the retail division had posted a positive Adjusted

EBITDA.  Because the second quarter of the year is traditionally Overstock's softest quarter of the

year, Overstock reconfirmed the retail guidance it provided in July.  Overstock also disclosed that its general and administrative expenses in the second quarter of 2019 were higher than the second quarter of 2018, in part, due to a $722,000 increase in corporate insurance costs.

Plaintiff alleges that Overstock failed to announce that Overstock could not obtain insurance coverage going forward for Byrne or any of its other officers or directors due to Byrne's increasingly erratic behavior.  Plaintiff asserts that both Byrne and Iverson knew this.

On September 23, 2019, as its third quarter was nearing a close, Overstock issued a press release disclosing that the retail division's third quarter results were expected to approximately "break even."  Because the full year guidance previously "envisioned significant positive EBITDA for Q3," which did not materialize, Overstock stated that it would be updating the full-year guidance after the end of the third quarter.  Overstock identified five factors that would drive the company's revised retail guidance: increased tariffs, increased freight costs, increased D&O insurance premiums, waning consumer confidence, and slower conversion of search traffic.  Overstock also revealed that Defendant Iverson had resigned on September 17, 2020, with no notice and effective immediately.  Following the September 23 press release, Overstock's stock dropped by approximately 25%.

With respect to Plaintiff's other claim, on July 30, 2019, Overstock announced that it would issue a dividend of one share of Digital Voting Series A-1 Preferred Stock for every 10 shares of common or preferred stock outstanding.  The record date for the Dividend would be September 23, 2019, and the distribution date would be November 15, 2019.  Overstock explained that the Dividend would not be, and was not required to be, registered under the Securities Act of 1933.  Consequently, the Dividend could not be traded until the shares became eligible for resale under Rule 14 of the Securities Act, approximately 6 months after issuance.

Once eligible for resale, the shares would be traded through a brokerage account established with Dinosaur Financial Group LLC ("Dino") on PRO Securities ATS, a SEC-registered alternative trading system operated by PRO Securities, a tZERO subsidiary.  The estimated 40,000 Overstock stockholders on the Dividend record date would be issued approximately 3.7 million Series A-1 Preferred shares to trade on the tZERO platform.

Although Overstock stated that the Dividend was important for adoption of the tZERO platform and to bring broker-dealers into the broader tZERO ecosystem, Plaintiff claims that Overstock's stated goal was pretextual.  Plaintiff contends that the dividend was announced shortly after Dr. Byrne learned that his relationship with a Russian spy was about to become public and he might need to leave the company.  Plaintiff believes that the dividend's short squeeze was intended to increase the price of Overstock shares at the time of Dr. Byrne's departure.

Within hours of its announcement, several market-focused publications recognized the practical effect of the Dividend on short sellers.  RealMoney published an article that same day stating, "Simply put: the digital shares are locked-up.  They can't be sold for a period of time to be determined, but likely six months.  There's the rub.  If the digital shares can't be sold, how can they be sold short?  Logic tells me they can't."  The article then described the Dividend as having the potential to influence Overstock's stock price as "an artificial short-squeeze" because Overstock was "essentially telling shorts they need to buy shares on the NASDAQ to either avoid paying out the digital dividend or as a hedge after they've paid the digital dividend."  Two days later, Bloomberg published an opinion article stating that the Dividend "punishes actual short sellers of Overstock's regular stock right now . . . by adding technical difficulties to maintaining the short."  Similar commentary continued for months.

Plaintiff asserts that Overstock failed to prepare the necessary infrastructure for the

dividend's issuance.  Plaintiff claims that this failure indicates that Overstock never intended for the dividend to be issued in the manner disclosed to investors.  A representative from Dinosaur Financial stated that the dividend came out of left field without sufficient information or preparation.

On August 22, 2019, Byrne resigned from Overstock and left the country.  Less than three weeks later, the squeeze began to abate as some brokerages agreed to accept cash in place of the dividend and alleviated the short sellers' need to cover their positions.  Between September 16 and 18, 2019, Byrne sold his entire remaining common stock in Overstock, selling over 4.7 million shares for $90 million.  From abroad, Byrne admitted that he sold his remaining common stock after waiting for volume to pick up and stated that he invested the proceeds of his sales in precious metals and crypto-currencies to protect it from retaliation from the "Deep State.".

On September 18, 2019, Overstock officially ended the short squeeze by announcing in a Form 8-K filed that same day that the dividend's record date would be postponed and that restrictions would be loosened so that the dividend would be freely tradeable immediately.  This announcement alleviated short sellers' need to purchase to cover.  Plaintiff alleges that this shows that the lock-up feature of the dividend was a manipulative contrivance rather than a legitimate business maneuver.

The SEC launched an investigation into Overstock's and its officers' activities.  On October 7, 2019, the SEC subpoenaed documents relating to the dividend, potential insider trading by Overstock's officers, and communications with Byrne.  In December 2019, the SEC issued subpoenas relating to tZERO, insider trading policies, and employment and consulting agreements.

Lead Plaintiff's Amended Consolidated Complaint ("AC") continues to assert claims under Sections 10(b), 20(a), and 20A of the Exchange Act.  Count 1 alleges that all Defendants violated

Section 10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, by making false and misleading statements in May, July, and August 2019. Count 2 alleges a claim for market manipulation under Section 10(b) and Rules 10b-5(a) and (c) against Overstock, Byrne, and Iverson. Count 3 alleges that the Individual Defendants are "controlling persons" under Section 20(a) of the Exchange Act. Count 4 alleges an insider trading claim against Defendant Byrne under Section 20A of the Exchange Act.

Essentially, Plaintiff contends that Defendants engaged in a scheme to issue a locked-up dividend they knew would cause a short squeeze, artificially spike Overstock's stock price, and force short sellers of Overstock stock to cover their positions at inflated prices. According to Plaintiff, Defendants compounded this fraud by overstating Overstock's annual retail guidance–misleadingly bolstering investor confidence in its retail segment–and by concealing Overstock's inability to obtain D & O insurance. Moreover, Byrne allegedly took advantage of the artificially high stock price to sell his stake of Overstock common stock for $100 million in profits.

### B. New Allegations

Plaintiff's Amended Consolidated Complaint ("AC") includes allegations from a new confidential witness, CW#0, who is described as a senior-level executive who participated in the 2019 planning process with the individual Defendants. Plaintiff does not provide CW#0's job title, job description, or dates of employment though. CW#0 claims that Overstock's base 2019 Plan was misleading because it was not the lower, conservative end of the guidance range, which was set in consultation with a team of consultants from Bain & Company. That range was $145 to $165 million. Overstock's final plan was set at $160 million, which corresponded to a $10 million adjusted EBITDA Retail guidance. The final plan and retail guidance was set two months before the class period began. CW#0 claims that about two weeks after Overstock reaffirmed the adjusted

EBITDA Retail guidance on August 8, 2019, a revised outlook was presented to the executive leadership that purportedly made clear that the retail adjusted EBITDA would not be achieved.  A few weeks later, on September 23, 2019, Overstock issued its "corrective disclosure" regarding the expected disappointing third quarter results.  CW#0 also claims that Overstock's search engine optimization improvements were "largely disconnected from improvements in revenue and contribution."

In addition, Plaintiff's AC provides job descriptions for the two prior confidential witnesses that were not in the precious complaint.  CW#1 was a "production design lead," whose job responsibilities were to "work with retail partners who purchased advertisement space from Overstock to design and build promotions" and "ensure the accuracy of the promotions and oversee their execution."  The AC corrects CW#1's dates of employment with Overstock.  CW#1 left Overstock in January 2019, four months before the beginning of the class period.  The prior complaint had stated that CW#1 was employed at Overstock until 2020.

Plaintiff also adds allegations in the AC identifying CW#2 as a "front-end developer," who was responsible for developing code for Overstock's retail homepage website and ensuring that content designed by Overstock's creative teams appeared correctly on the website.  CW#2 worked on the team responsible for the technical side of Overstock's website and implemented measures to measure and improve the website's search engine optimization.  CW#2 stated that there was never a big improvement in SEO and Overstock's website was not updated.  CW#2 left Overstock in July 2019, in the middle of the Class Period.

Plaintiff's AC also includes additional allegations about Byrne's alleged vendetta against short sellers.  The AC also alleges, based on Byrne's statements and Overstock's actions after his departure, that the locked up feature of the digital dividend had no business purpose, was illegal,

and implemented for the sole, undisclosed purpose of creating a short squeeze that would harm

short sellers and allow Byrne to liquidate his Overstock common shares at artificially high prices.

## DISCUSSION

### Defendants' Motions to Dismiss Plaintiff's Amended Consolidated Complaint

The Overstock Defendants and Defendant Byrne move to dismiss Plaintiff's AC, asserting

that the AC fails to state plausible claims under the heightened standard applicable to securities

fraud claims.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).  A claim for fraud must "state with particularity the circumstances constituting

fraud or mistake."  Fed. R. Civ. P. 9(b).  In the securities fraud context, however, the pleading

standard "is more strict than that of Rule 9(b)."  *In re Qwest Communications, Int'l, Inc.*, 396 F.

Supp.2d 1178, 1188 (D. Colo. 2004) (citing *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245,

1258 (10th Cir. 2001)).  A securities fraud case has the "most stringent pleading requirement in

American civil law." *McCauley v. City of Chi*, 671 F.3d 611, 625 (7th Cir. 2011) (citing *Tellabs,

Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).

Securities fraud claims are subject to the Private Securities Litigation Reform Act of 1995

("PSLRA"), which requires a plaintiff "to state with particularity both the facts constituting the

alleged violation, and the facts evidencing scienter." *Kessman v. Myriad Genetics, Inc.*, 2019 WL

1330363, at *3 (D. Utah March 25, 2019).  The PSLRA imposes a heightened pleading requirement

for alleging the intent to defraud–or scienter– with particularized facts that give rise to an inference

that is at least as cogent as any competing, nonculpable explanations for a defendant's conduct.

*Tellabs*, 551 U.S. at 314.   The inference of scienter "must be more than reasonable or

permissible–it must be cogent and compelling." *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1236-37 (10th Cir. 2016).

## A. Section 10(b) Claims

Counts 1 and 2 of Plaintiff's Amended Consolidated Complaint allege violations of Section 10(b) of the Exchange Act.  To state claims under Section 10(b), Plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci-Atlanta*, 552 U.S. 148, 157 (208).  "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)." *Id.*

### 1.  Count 1

Defendants contend that Plaintiff fails to plead that any Defendant made a false or misleading statement about Overstock's historical insurance costs, the Dividend, or its Retail Guidance or SEO results.   The AC alleges nothing new regarding the insurance and dividend statements.  Because Plaintiff does not attempt to amend those allegations, and the court already found them to be inadequate, those claims are dismissed.

As to Retail Guidance and SEO, Plaintiff asserts that:

- In a May 9, 2019 shareholder letter, Byrne surprised investors by reporting good news about Retail adjusted EBITDA guidance.  He raised guidance from $10 million to $15 million based on reduced expenses and increased search engine rankings based on seven months of sequential improvements.  On a shareholder call that same day, Byrne stated that given "what's going on in retail, I've changed my expectations today . . . to expect this to go from $10 million to $15 million of operating – of

adjusted EBITDA."

- CW#0, who was involved in the Retail guidance planning process with the individual Defendants, and CW#2, who was responsible for implementing search engine improvements to the website, claim that the individual Defendants knew at that time that Overstock would not obtain $15 million in retail adjusted EBITDA and that the SEO improvement statements were illusory when made.  According to CW#0, Byrne intentionally ignored the realistic upside numbers that Iverson determined were accurate and instead forced Overstock to use a higher upside number to land on the $15 million retail adjusted EBITDA.  Iverson allegedly knew that this upside number and subsequent $15 million revenue guidance were "flat out wrong and misleading."  However, Iverson stood by silently as Byrne presented to investors guidance numbers premised on his higher projections.  Iverson and Byrne then signed Overstock's Form 10-Q that went out that day certifying that internal controls provided reasonable assurance regarding the reliability of financial reporting.  This falsely inflated guidance was not removed from subsequent guidance announcements during the Class Period.

- On July 15, 2019, Overstock and Byrne issued a letter to shareholders announcing another increase in retail adjusted EBITDA guidance, this time from $15 million to $17.5 million.  In the letter, Byrne also knowingly falsely claimed that the Retail division's contribution was covering its expenses, that the core earning power of the retail business had snapped back more quickly than expected, and that retail's recovery in 2019 had exceeded expectations.  Defendant Iverson knew that these statements were false because it started from an improper baseline guidance.

- On August 8, 2019, in a shareholder letter, Byrne reaffirmed the retail adjusted EBITDA at $17.5 million, stated that the retail business had returned to positive adjusted EBITDA for the first time since the second quarter of 2017, and claimed that the company had experienced significant progress in SEO.  During an earnings call that same day, attended by Byrne, Iverson, and Nielsen, these false statements were reiterated.  According to CW#2, who was with the company through July 2019, Defendants knew there was never a big improvement in SEO that could justify these increases.

- Approximately two weeks after the August 8 earnings call, CW#0 confirmed that a revised revenue Outlook was presented to executive leadership that made clear that the $17.5 million retail adjusted EBITDA would not be achieved.  Nielsen knew that even this report was overly optimistic.  Nielsen had previously instructed the team responsible for the report to "beat up the numbers" and find "wins."  Nielsen also tried to pressure a group within the company to add $7 million to their projections. Instead of disclosing the reality that the EBITDA projections could never be met, Nielsen did nothing.

- On August 22, 2019, in a letter filed with a Form 8-K and sent to investors, Byrne falsely told investors that the retail business had recovered to a state of positive adjusted EBITDA.  On an earnings call the same day, Nielsen went further and falsely reiterated that retail adjusted EBITDA was already positive and would hit $17.5 million for the year.  Byrne and Iverson participated in the earnings call.

Plaintiff alleges that these facts are sufficient to survive a motion to dismiss with respect to its claims relating to Overstock's Retail Guidance and SEO statements.

13

### a. Retail Guidance

Defendants argue that the new allegations in the AC regarding Retail Guidance are insufficient to plead a false or misleading statement under the heightened standards of the PSLRA. Plaintiff must "specify each fraudulent statement, explain why the statement was misleading, and allege with particularity [its] basis for believing that the statement was false." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1147 (10th Cir. 2015).

Plaintiff challenges the retail division EBITDA guidance Overstock provided on May 9, July 15, and August 8, 2019. Such guidance, however, is the quintessential example of a forward-looking statement protected by the PSLRA's safe harbor. *Caprin v. Simon Transp. Servs.*, 112 F. Supp. 2d 1251, 1257-58 (D. Utah 2000). To receive protection under the PSLRA's safe harbor, statements "must either (1) be identified as forward-looking and be accompanied by meaningful cautionary language; (2) be immaterial; or (3) not be made with actual knowledge that the statement was false or misleading." *In re Sun Healthcare Grp., Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1288 (D.N.M. 2002).

The PSLRA safe harbor defines a "forward-looking statement" as "a projection of financial items, a description of management's plans and objectives for future operations or economic performance, or the stated assumptions underlying these projections." 15 U.S.C. § 78u-5(I). In the AC, there are no new allegations to refute the fact that the Retail Guidance was identified as forward looking, was accompanied by meaningful cautionary language, and the cautionary language referred to the exact problems that ended up occurring. And in its briefing on this motion, Plaintiff does not dispute that the guidance was forward-looking and accompanied by meaningful cautionary language.

To claim that the Retail Guidance statements were misrepresentations, Plaintiff relies on

allegations attributed to confidential witnesses and Overstock's reversal of Retail Guidance in September 2019.  The "actual knowledge" standard for forward-looking statements is more exacting than the scienter inquiry required for statements of past or present fact.  *In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1297-98 (D. Colo. 2013).  Plaintiff cannot simply state that a defendant was reckless.  *Id.*

The AC adds allegations from a new confidential witness, CW#0, reflecting his belief that Overstock's retail guidance provided before the class period should have been at the lower end of the projected range instead of the higher end of the range.  CW#0 is described as "an executive [who] participated in the 2019 planning process."  The AC provides no title, no dates of employment, no job description, and nothing regarding the dates or manner in which CW#0 allegedly participated in the planning process.  CW#0 claims that Byrne presented retail guidance on March 18, 2019, two months before the class period, that Iverson believed was allegedly flat out wrong and misleading.  The AC, however, does not challenge the March 2019 guidance.

The new allegations attributed to CW#0 do not remove the retail guidance claim from the protection of the PSLRA's safe harbor provision.  Nothing attributed to CW#0 suggests that any Defendant gave guidance that he knew was impossible for Overstock to meet.  The allegations show a process to identify a range of future projections aided by external consultants from Bain & Company.  While there is no blanket immunization for reliance on outside consultants in determining future projections, the allegations demonstrate that Overstock engaged in a process that provided it with a potential range of projections.  There is no reason to believe that every executive at a company will agree with the range or where the company will fall within that range.  Those differences of opinion are inescapable when dealing with future projections.  The fact that a single unidentified "executive," such as CW#0, apparently disagrees with the decisions reached by

Defendants does not render Overstock's publicly-disclosed guidance false or misleading.  Moreover, given the lack of allegations regarding his expertise in determining retail guidance, the allegations attributed to CW#0 lack the specificity and other indicia of reliability that the law requires.

Even if the court were to credit CW#0's allegations, they fail to demonstrate that any Defendant knew that the challenged guidance was unattainable.  The allegations attributed to CW#0 are either irrelevant to the challenged guidance or merely another form of pleading fraud by hindsight.  The majority of the allegations attributed to CW#0 relate to the initial 2019 Retail Guidance provided in March 2019, which Plaintiff does not allege was false or misleading and which was provided two months before the class period.  CW#0's opinions appear to be based on the belief that Overstock considered a base plan between $145-$165 million, but did not select the lower or more conservative end of that range.  But, importantly, CW#0 does not dispute the range and the figures Overstock chose were within the range.  The AC alleges that the base plan for 2019, which was established before the class period began and reflected a projected retail contribution of $160 million, was unrealistic and misleading because it was not based at the lower, conservative end of the $145-165 million range.  Plaintiff has not cited any authority suggesting that it is fraudulent for a company to set guidance at a particular point within a reasonable range of its own forecasts. And the court is not aware of any requirement that a company must base its public guidance on the lowest point within a reasonable range of its own internal forecasts.  The fact that executives disagree as to the appropriate specific point within a determined range does not demonstrate fraud or an intent to defraud, only an internal disagreement.  These allegations do not meet the requirement of showing that any Defendant believed or had actual knowledge that it was impossible for Overstock to meet its guidance.

Plaintiff focuses almost exclusively on the "upside" component of the initial contribution

16

guidance that Byrne announced on March 18, 2019.  This argument is irrelevant to whether any Defendant knew the guidance provided during the class period was unattainable.  Byrne's statement pre-dates the class period and is not alleged to be false or misleading.  The AC concedes that the upside was not factored into the initial $10 million adjusted EBITDA guidance.

Plaintiff also appears to claim that Iverson said that the $10 to $20 million upside was "flat out wrong and misleading," but the AC does not attribute this statement to Iverson or CW#0.  It appears to be Plaintiff's own characterization.  The AC contains no allegations establishing how CW#0 would know anything about Iverson's purported opinion.  It does not identify any meeting or conversation where Iverson expressed an opinion.  It also fails to state how CW#0 was privy to any such communication or if any such communication was shared with Byrne or Nielsen.

CW#0 also asserts that many months after this initial guidance, in late August 2019, a "revised Outlook" was presented to executive leadership that supposedly made clear that the $17.5 retail adjusted EBITDA number would not be achieved.  But this is after all challenged guidance statements were made and just a few weeks before Overstock disclosed disappointing third quarter results.  Plaintiff argues that on August 22, two weeks after the August 8 earnings call, an internal projected outlook was generated that made clear the company's performance would likely fall short of the $17.5 million adjusted EBITDA guidance.  Plaintiff argues that, despite this information, the company reiterated the same guidance on an earnings call that same day.  But paragraphs 269 and 271 of the AC make clear that the reaffirmation of guidance was made on August 8, before the revised Outlook was allegedly presented.   These allegations add nothing to Plaintiff's fraud claims and appear to be another attempt at pleading fraud by hindsight.  None of these allegations plead that any Defendant had actual knowledge that it was not possible to meet the Retail Guidance provided at the time that the guidance was provided.

The court concludes that Plaintiff's new allegations fail to provide any basis for changing the court's prior analysis that the Retail Guidance is protected by the PSLRA safe harbor for forward-looking statements.  The AC, therefore, fails to demonstrate that any of the Defendants made a knowingly false claim regarding retail guidance.  Retail guidance within a range estimated by the company and an outside consultant is not evidence of fraud or an attempt to mislead investors.  Picking the high end of the range rather than the low end of the range does not make the guidance fraudulent or misleading.  And, Overstock provided cautionary language outlining the same risks that the company ultimately attributed to the guidance miss.  Such conduct does not remove this case from the PSLRA's safe harbor provisions for forward-looking statements.  The fact that Overstock ultimately missed its guidance does not demonstrate that any Defendant knew it was unattainable.  And claiming that Overstock's failure to meet the guidance is evidence of fraud is a classic example of fraud-by-hindsight pleading.  Congress designed the safe harbor provisions of the PSLRA to protect companies from these types of challenges.  The AC also fails to adequately allege that any Defendant had adequate knowledge of any falsity.  Accordingly, the court dismisses Plaintiff's retail guidance claim.

**b. SEO**

Defendants argue that the AC also fails to adequately allege that the statements regarding SEO (search engine optimization) were false or misleading when made.  Plaintiff challenges two statements by Byrne about SEO performance.  On May 9, 2019, Byrne stated that search engine rankings had seen seven months of sequential improvements.  And, on July 15, 2019, Byrne stated that in June, the SEO rankings on Google took another big step in recovery.  Plaintiff claims that these statements were false or misleading because SEO purportedly was not improving.

Plaintiff's allegations with respect to SEO rely heavily on information from confidential

witnesses.  But the AC fails to allege what CW#0 and CW#2 believed to be the correct SEO

numbers and whether either CW believed that the SEO metrics presented in the slides

accompanying Overstock's earnings calls during the class period were inaccurate in any way.

Absent such a charge, this specific data undercuts the more generalized allegations of the

confidential witnesses.

Plaintiff's argument that CW#2's allegations are relevant and reliable because his or her job

purportedly involved "implementing tags and analytics" on Overstock's website is a stretch.  There

are no details about whether CW#2 was responsible for reviewing, or even aware of, the data that

would show whether SEO was improving.  CW#2 alleges that there were no SEO improvements

during the first half of 2019 but provides no details about any specific information relied upon to

reach that conclusion.  Nor can this be reconciled with CW#0's admission that keyword search

rankings did improve.  Thus CW#2's allegations are so vague as to be essentially meaningless as a

basis for a fraud claim.  Nothing attributed to either witness actually contradicts the two challenged

statements.  Plaintiff still does not challenge the accuracy of the underlying SEO data disclosed on

the May 9 and August 8 earnings calls.  This specific data undercuts the more generalized

allegations of the CWs.  And, regardless of whether SEO was improving, Overstock did not increase

its retail guidance based on improvements in SEO.  Instead, as the AC alleges, Overstock raised

both contribution and adjusted EBITDA guidance based on undisputed increases to contribution in

prior periods, combined with undisputed reductions to expenses.

Plaintiff asserts a new theory as to SEO in the AC.  CW#2 claims that while search engine

rankings may have improved for particular keywords, this is irrelevant because what really matters

for revenue is conversion.  Defendants, however, point out that this misses the mark because Byrne

did not claim that improved SEO resulted in increased revenue.  Rather, he stated it helped increase

contribution.  The AC does not allege that improved SEO cannot lead to increased contribution by reducing sales and marketing expenses, which Plaintiff cannot dispute happened.  As such, the AC fails to allege that Byrne's statements were inconsistent with the actual facts the company was facing at the time.  *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1148 (10th Cir. 2015).

According to CW#0–who is not alleged to have experience with, or expertise regarding, SEO or accounting–the improvements in SEO were not a meaningful metric because they were largely disconnected from, did not equate to meaningful improvement in, and did not meaningfully drive increased revenue and contribution.  But the AC fails to provide any specifics on what CW#0 considers meaningful.  CW#0's allegations suggest that there was some increase and improvement in revenue and contribution.  That contradicts the allegations of CW#2, who claims that there was no improvement.  These contradictory claims do not support an allegation of fraud.  Therefore, the court concludes that Plaintiff still fails to plead that Byrne's statements about SEO were false or misleading.  The AC contains no well-pled facts that are inconsistent with Byrne's statements regarding SEO.  Accordingly, the court dismisses Plaintiff's SEO misrepresentation claims.

### 2.  Count 2

In Count 2, Plaintiff alleges that Defendants' digital dividend manipulated the market in violation of Rules 10b-5(a) and (c).  Defendants, however, argue that Plaintiff fails to plead a manipulative scheme claim because there are no well-pled facts demonstrating that the market was deceived by Defendants' digital dividend.

As the court previously recognized, a wide range of conduct can be manipulative.  *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019).  Conduct is manipulative when it artificially alters the market for a security: "manipulative . . . connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."  *Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185, 199 (1976).  "[T]he purpose of securities law [is] to 'prevent practices

that impair the function of stock markets in enabling people to buy and sell securities at prices that

reflect undistorted (though not necessarily accurate) estimates of the underlying economic value of

the securities traded.'" *SEC v. Masri*, 523 F. Supp. 2d 361, 371 (S.D.N.Y. 2007).  But a market

manipulation claim requires some form of deception that "differentiate[s] legitimate trading

activities that permissibly may influence prices" from unlawful "ingenious devices that might be

used to manipulate securities prices."  *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d

Cir. 2001).  Plaintiff must plead "false statements" or "illegitimate, deceptive trading techniques

that mislead investors about the price or demand for a stock."  *Id.* at 204.  "[T]he essential element

of a market manipulation claim is the injection of inaccurate information into the market."  *Id.*

Because market manipulation cases often "involve facts solely within the defendant's

knowledge . . . the plaintiff need not plead manipulation to the same degree of specificity as a plain

misrepresentation claim."  *ATSI Communications, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 102 (2d

Cir. 2007).  The plaintiff needs only "lay out the nature, purpose, and effect of the fraudulent

conduct and the roles of the defendant without requiring specific instances of the conduct."

*Nanopierce Techs., Inc. v. Southridge Cap. Mgmt., LLC*, No. 02-CV-0767-LBS, 2002 WL

31819207, at *5 (S.D.N.Y. Oct. 10, 2002).

The court previously dismissed Plaintiff's market manipulation claim because it did not

adequately allege deception.  The AC fails to add any new allegations suggesting that the digital

dividend or the disclosures regarding the digital dividend were deceptive.  Plaintiff simply adds an

array of conclusory adverbs to the prior allegations relating to the dividend, claiming it was

designed "exclusively" or "entirely" to harm short sellers by causing a short squeeze.  These

conclusory adverbs are not supported by facts and the court need not accept them as true.  And, also

importantly, these new adverbs do not demonstrate that Overstock issued the digital dividend to deceive anyone.

Plaintiff's AC also adds a paragraph with eleven sub-bullets containing references to various statements that it alleges are related to the dividend–ten of which were included in the prior complaints. Plaintiff merely reshuffles these allegations, but they do nothing to demonstrate that there was confusion or a false impression in the marketplace with respect to the nature and impact of the digital dividend. The only new statement–Byrne's statement that registration of the dividend should obviate the concern about a short squeeze– simply states the obvious. There is nothing deceptive about that comment.

As with the prior consolidated Complaint, the AC fails to allege well-pled factual allegations that Overstock injected inaccurate information into the market regarding the digital dividend. Specifically, the AC does not plead any new facts concerning the description, nature, or terms of the dividend. The absence of such allegations is again fatal to Plaintiff's manipulative scheme claim. Defendants could not manipulate the market via truthful statements or via a dividend that everyone immediately knew would impact short sellers. It is undisputed that Overstock disclosed that the dividend would not be registered. The market knew the potential ramifications of that decision. Plaintiff claims there was deception by labeling Overstock's initial decision not to register the shares as illegal. But the AC pleads nothing to support a finding that the dividend was illegal.

Nothing alleged in the AC demonstrates that Overstock's plan to issue the dividend without first registering it with the SEC was somehow illegal. Despite arguing that it would have been illegal to issue the dividend shares as unregistered securities, Plaintiff identifies no law, statute, court decision, rule, regulation, regulatory guidance, or other authority from any source that such an act would purportedly violate. Nor does Plaintiff allege a contemporaneous fact that the SEC or

anyone else told Overstock that not registering the dividend was illegal or a violation of SEC rules. Because the dividend did not involve a sale under Section 2(a)(3) of the Securities Act, the shares issued in connection with it were not required to be registered. 15 U.S.C. § 77b(a)(3). The Securities Act provides a comprehensive framework that provides for a number of circumstances where unregistered securities may be issued. Plaintiff fails to allege that none of these exemptions applied to the digital dividend. A company may issue unregistered securities for any number of legitimate business purposes and to avoid the time, expense, and burdens of the registration process. There is nothing inherently deceptive about issuing an unregistered security.

It is also entirely understandable that there might be disagreement with the SEC when dealing with a security that is new and unprecedented like the one here–a digital security intended to be traded on Overstock's alternative trading platform that was completely untested within the structures of the federal securities laws. Plaintiff claims that when Overstock filed a Form S-3 to register the dividend on September 24, 2019, "Overstock cited the guidance it had received from regulators making clear that the locked-up feature of the Dividend was not acceptable." The AC, however, alleges that Overstock merely stated that it "appreciate[s] the cooperation and guidance we are receiving from regulatory authorities." This statement does not support the claim that the "locked-up" feature of the dividend was unacceptable. Absent clear case law precedent or some other way to have foreseen the regulators' actions, the court cannot infer illegal conduct simply from the fact that Overstock initially decided not to register the dividend shares and then ultimately decided to register the dividend shares.

Plaintiff also continues to argue that it need only plead a manipulative intent and that such an intent can be inferred from the true purpose of the Dividend, which was allegedly not to promote Overstock's move to blockchain technologies but to increase share prices for when Byrne cashed

23

out his shares.  But, even if Plaintiff need only plead an intent to manipulate, the securities laws did not require Defendants to characterize the dividend as a short-squeeze when its impact on short sellers was immediately apparent to the market.  And, Plaintiff's argument that Defendants allegedly failed to disclose Byrne's intent to sell stock at some point in the future also fails to render the dividend deceptive.  The law only requires executives to disclose stock sales two business days after they happen.  17 CFR § 240.16a-3(g)(1).  Absent a duty to disclose these matters, Defendants' alleged silence, which allegedly demonstrates an alleged intent to manipulate the market, cannot serve as the basis for liability under Rule 10b-5.

Therefore, the court concludes that Count 2 fails because there is still no allegation that Defendants misrepresented the nature of the dividend, that the dividend was unlawful, or that Defendants needed to disclose that the actual purpose of the dividend was allegedly to hurt short sellers and increase the price per share for a potential Byrne stock sale.  Plaintiff's market manipulation claim regarding the digital dividend is based on an alleged grand scheme that requires layers of speculation to be plausible, when such a claim must rest on well-pled facts to be viable.  Accordingly, the court dismisses Plaintiff's market manipulation claim under Count 2.

### 3.  Scienter Under Counts 1 & 2

Defendants argue that Plaintiff has not met the heightened scienter requirement under the PSLRA.  Under the PSLRA, scienter must be pled with particularized facts that give rise to an inference that is at least as cogent as any competing, nonculpable explanations for a defendant's conduct.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).   The Tenth Circuit has recognized that the inference of scienter "must be more than reasonable or permissible–it must be cogent and compelling."  *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1236-37 (10th Cir. 2016).  Scienter must be found as to each defendant and with respect to each of the

alleged violations of the statute.  The scienter allegations in the AC are slightly repackaged but are essentially the same allegations the court previously rejected as inadequate.

### a.  Nielsen

Plaintiff alleges that Nielsen is liable only for statements regarding the retail results and guidance made on August 8, 2019.  But the only facts that even purport to touch on his state of mind relate to information he allegedly learned about two weeks after the statements were made.  Those allegations fail to plead scienter.

### b.  Iverson

Plaintiff alleges Iverson is liable for both the alleged misrepresentations and scheme.   Under Count 1, the only challenged statement Iverson allegedly made concerns the D&O insurance and the dividend.  None of the new allegations regarding Iverson's purported scienter relate in any way to these challenged statements.  Instead they concern only the retail guidance and SEO, alleging that CW#0 was part of a conversation with Iverson about SEO and keyword rankings not being a meaningful metric and that Iverson supposedly knew the $20 million upside component of the initial guidance was unrealistic.  But Iverson is not alleged to have made any statements about retail guidance or SEO.  Thus, these allegations are irrelevant to whether he made false or misleading statements with scienter.

As to Count 2, the AC still pleads nothing about Iverson's purported involvement in the digital dividend.  In fact, as the court previously observed, by pleading that Byrne was responsible for the dividend, Plaintiff has conceded that neither Nielsen nor Iverson acted with scienter.  Plaintiff attempts to link Iverson's departure on September 17, 2012, to a presentation purportedly made to an unidentified group of executives about revised retail outlook.  But the AC alleges no facts plausibly connecting these events.  The presentation occurred a month prior to Iverson's

departure and after the challenged statements were made.  There is no allegation that Iverson even participated in the meeting.  Plaintiff previously attempted to connect Iverson's departure with the dividend, but now argues that it was suspicious because it occurred between the revised outlook and the downward revision to guidance.  But Plaintiff never actually states why the departure is suspicious.  As before, Plaintiff's statement that Iverson's departure was suspicious is not based on any supporting facts.  The court, therefore, concludes that Plaintiff's scienter allegations as to Iverson remain boilerplate and inadequate under the PSLRA.

### c.  Byrne

As was the case previously, the majority of Plaintiff's scienter allegations focus on Byrne. As to Count 1, the only new allegations to address Byrne's mental state relate to retail guidance. But those allegations do not demonstrate that Byrne believed the guidance was unattainable when it was provided.  Allegations that other executives disagreed with Byrne's position does not demonstrate what Byrne believed.  In fact, it supports a finding that Byrne believed in his position enough for the other executive to know his position on it and that Byrne held that position in private as well as in public.  There is no allegation or suggestion that Byrne believed one thing privately and said another thing publicly.  The AC contains no well-pled facts suggesting that Byrne knew of or disregarded information contradicting the challenged statements at the time he spoke.  Also, with respect to the SEO claim under Count 1, the AC has contradictory information from the confidential witnesses as to whether SEO was improving.  These contradictory accounts do not demonstrate that Byrne was misleading the public when he spoke about SEO.  The AC fails to allege well-pled facts that would support an inference that Byrne knew, or had access to, information showing that SEO was not improving.

As to Count 2, the AC alleges that Byrne was the driving force behind the digital dividend.

26

Although the AC repeatedly claims that Byrne proposed the digital dividend to increase share price so he could sell his common stock when he left Overstock, the AC fails to plead with particularity facts giving rise to a strong inference that Byrne intended to deceive investors by artificially affecting the market price of the securities through issuance of the digital dividend.

The AC is full of allegations regarding Byrne's animosity toward short sellers and purported admissions that he intended to create a short squeeze. But these allegations are beside the point. Plaintiff does not allege that Byrne misrepresented the nature of the dividend or attempted to conceal that it would not be registered and immediately available for resale. The AC alleges nothing that would warrant the court changing its conclusion that Plaintiff has not pled any intent to deceive short sellers or the market as a whole with respect to the impact the dividend would have on short sellers.

Plaintiff again relies on Byrne's stock sales for scienter. But neither the timing nor amount of his sales was dramatically out of line with past trading practices. And stock sale allegations have no independent significance as they illustrate nothing more than motive and opportunity, which is insufficient under the PSLRA. The AC, like the prior complaint, does not explain how Byrne's stock sale in May 2019 was related to the dividend or an intent to defraud. The May sales occurred in the days immediately following the company's announcement of Q1 2019 results–precisely when Byrne would be expected to sell because new material non-public information had just been disclosed.

Plaintiff claims it has alleged scienter based on Byrne's departure and subsequent stock sale, his purported flight to another country, and the SEC's investigation. Plaintiff's allegations are based on Byrne's vague after-the-fact statements that he expected to leave the company at some unidentified time. The AC does not allege that Byrne's September 2019 stock sales, after he

resigned, were based on inside information.  Short sellers and analysts recognized the practical

effect of the dividend and the market had the same information as Byrne.  Plaintiff ignores its own

allegation that Byrne did not have inside information after he left his employment.  Therefore, the

timing of Byrne's stock sales do not support an inference of scienter.

Byrne's alleged flight proves nothing about his state of mind with respect to the digital

dividend.  Byrne had a number of unrelated matters going on in his life at the time of his alleged

flight that could have caused him to leave the country.  It is pure speculation that he may have left

the country because he believed he had engaged in securities fraud.  Byrne's statements at the time

actually indicate that he did not believe that he had done anything wrong.  And Byrne is here

defending the action, still holding to the position that he did not do anything wrong.  Plaintiff's

speculation does not support an allegation of scienter.  Moreover, the fact that the SEC later

initiated an investigation proves nothing about scienter at the time of the statements.

The court agrees with Defendants that it defies common sense that Defendants would

attempt to issue an "illegal" dividend or attempt to mislead investors by fully disclosing their plan

not to register the dividend.  Viewed holistically, Plaintiff's scienter allegations do not create the

strong inference required by the PSLRA.

### 4.  Reliance Under Counts 1 & 2

Defendants argue that Plaintiff's claims under Counts 1 & 2 also fail because the AC does

not allege that Plaintiff relied on any challenged statement or actions in purchasing Overstock

shares.  The court did not previously rule on this argument.  However, the United States Supreme

Court has made clear that "[r]eliance by the plaintiff upon the defendant's deceptive acts is an

essential element of the § 10(b) private cause of action."  *Stoneridge Inv. Partners, LLC v. Sci.-

Atlanta, Inc.*, 552 U.S. 148, 159 (2008).

28

Plaintiff seeks to invoke the legal presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153 (1972). *Affiliated Ute* allows a court to presume reliance where a fraud theory rests primarily on the omission of material information. Under Count 1, Plaintiff's new allegations only address the retail guidance and SEO statements, which are alleged affirmative misrepresentations. Therefore, the *Affiliated Ute* presumption does not apply to Count 1. Under Count 2, Plaintiff claims that the market manipulation of the digital dividend was based on Defendants' alleged failure to tell investors the true reason for issuing the digital dividend and the locked-up mechanism used to harm short sellers. While a failure to divulge their intent behind the dividend appears to allege omissions, Plaintiff's allegations make clear that it is challenging affirmative conduct–the issuance of "a digital dividend that was not freely tradeable and thus could not be purchased by short sellers . . . This conduct constituted devises, schemes, and artifices to defraud." Am. Compl. ¶ 328. Thus, Plaintiff's dividend claim primarily focuses on the locked-up feature of the dividend and is challenging affirmative conduct. Simply claiming that the manipulative scheme is the failure to disclose the alleged scheme behind the affirmative conduct does not allow invocation of *Affiliated Ute* presumption. To permit such an interpretation of the presumption would "swallow the reliance requirement [under *Affiliated Ute*] almost completely." *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000).

Plaintiff also relies on the *Basic* fraud-on-the-market presumption, which is "based on the idea that individuals relied on the integrity of the market price." *In re PolyMedica Corp. Sec. Litig.*, 224 F.R.D. 27, 44 (D. Mass. 2004), *vacated and remanded on other grounds*, 432 F.3d 1 (1st Cir. 2005). "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). Because

29

Plaintiff is a short seller of Overstock securities, it does not dispute that its only purchases during the class period were pursuant to pre-existing contractual obligations it entered into before the alleged fraud began and it made those purchases to avoid breaching its pre-existing contractual obligations. These obligations, not the fair market price, caused Plaintiff to purchase shares during the class period. Plaintiff appears to concede it would have purchased no matter the price. The *Basic* presumption is inapplicable where "price [played] no part whatsoever in [Plaintiff's] decision making." *Levie v. Sears Roebuck & co.*, 496 F. Supp. 2d 944, 949 (N.D. Ill. 2007). Therefore, the court concludes that Plaintiff has not demonstrated reliance under Counts 1 or 2.

## B.  Count 3 – Section 20(a) Control Person Liability

Because the court has found that the AC does not state a primary violation of Section 10(b) or Rule 10b-5 against Defendants, Plaintiff cannot state a Section 20(a) control person claim under Count 3 against the individual Defendants. *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1270-71 (10th Cir. 2001). And, as the court previously ruled, even if there is a primary violation of Section 10(b) or Rule 10b-5, Plaintiff's control person claim under Section 20(a) also fails against because Plaintiff has not pled sufficient facts demonstrating that Nielsen or Iverson had control over the primary violators or that Byrne would be anything other than a primary violator. Accordingly, the court dismisses Plaintiff's Section 20(a) cause of action against the individual Defendants and grants Defendants' motions to dismiss Count 3 of the AC.

## C.  Count 4 – Section 20A Insider Trading Claim Against Byrne

Under Count 4, Plaintiff claims that Byrne violated Section 20A by using material nonpublic information to sell his Overstock common shares at inflated prices. The court previously dismissed Count 4 against Byrne because Plaintiff failed to plead a predicate violation of the securities laws and because Plaintiff was not a contemporaneous trader.

The court has again determined that there is no predicate violation of the securities laws. The Tenth Circuit has recognized that "[c]ourts have interpreted § 20A as requiring the plaintiff to plead a predicate violation of the 1934 Act or its rules and regulations." *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1194 n.5 (10th Cir. 1998); *In re Crocs Sec. Litig.*, 774 F. Supp. 2d 1122, 1155-56 (D. Colo. 2011) (collecting cases requiring plaintiff to plead a predicate violation of securities laws).

And, with respect to whether Plaintiff was a contemporaneous trader, the legal analysis has not materially changed.  Plaintiff alleges that Byrne's stock sales occurred after Plaintiff purchased Overstock shares.  Because Plaintiff traded before Byrne, the purported insider, Plaintiff's Section 20A claim fails.  *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 599-600 (S.D. Tex. 2003).

Therefore, the court concludes that Plaintiff has failed to state a Section 20A claim against Byrne because it has not stated a predicate securities law violation and it was not a contemporaneous trader with Byrne.  Accordingly, the court grants Byrne's motion to dismiss Count 4 of the AC.

**D.  Request to Amend**

Plaintiff requests leave to amend should either motion to dismiss be granted.  Plaintiff states that if given leave, it will include new facts including Overstock's February 26, 2021 disclosure that it received a new subpoena from the SEC regarding retail guidance and additional detail regarding CW#0's title and responsibilities.  However, an amendment on these grounds would appear to be futile.  The SEC's initiation of an investigation is largely irrelevant to the issues before the court.  In addition, the court did not discount CW#0's allegations based on the lack of detail regarding his title and responsibilities.  Rather, his allegations were vague and many were based on opinions with respect to future projections, not facts that could be right or wrong.  Moreover, Plaintiff's request to

31

plead additional facts as to Byrne's general credibility and honesty does not explain how such general matters would be relevant to the specific issues before the court.  The court is unaware of any case law allowing a fraud claim to proceed because a defendant is generally untrustworthy.  As discussed above, such cases have heightened pleading requirements that require specific allegations.  The court believes it has given Plaintiff an adequate opportunity to plead its case and repeated amendments would be futile.  Therefore, the court denies Plaintiff's request for leave to amend.

**CONCLUSION**

Based on the above reasoning, the court GRANTS the Overstock Defendants' Motion to Dismiss Plaintiff's Amended Consolidated Complaint [ECF No. 125], and  Defendant Patrick M. Byrne's Motion to Dismiss Plaintiff's Amended Consolidated Complaint [ECF No. 124].

DATED this 20th day of September, 2021.

BY THE COURT:

Dale A. Kimball,
United States District Judge