FILED
United States Court of Appeals
Tenth Circuit

October 15, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

IN RE: OVERSTOCK SECURITIES LITIGATION.

--------------------------------

THE MANGROVE PARTNERS MASTER FUND, LTD.,

Plaintiff - Appellant,

v.

No. 21-4126

OVERSTOCK.COM, INC.; GREGORY J. IVERSON; PATRICK M. BYRNE; DAVID J. NIELSEN,

Defendants - Appellees.

------------------------------

NATIONAL CONFERENCE ON PUBLIC EMPLOYEE RETIREMENT SYSTEMS; OKLAHOMA FIREFIGHTERS PENSION & RETIREMENT SYSTEM; OKLAHOMA LAW ENFORCEMENT RETIREMENT SYSTEM; OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM; PUBLIC EMPLOYEES RETIREMENT ASSOCIATION OF NEW MEXICO; UTAH RETIREMENT SYSTEMS; FIRE AND POLICE PENSION ASSOCIATION OF COLORADO; JOHN C. COFFEE; JAMES D. COX; JESSE M. FRIED; EDWARD F. GREENE; ROBERT J. JACKSON, JR.; DONALD C. LANGEVOORT; JOSHUA MITTS; MINOR MYERS; FRANK

PARTNOY; JOEL SELIGMAN; MARC I. STEINBERG; DANIEL J. TAYLOR; RANDALL S. THOMAS; DAVID H. WEBBER; BETTER MARKETS, INC.; CONSUMER FEDERATION OF AMERICA; JAMES J. ANGEL,

Amici Curiae.

---

**Appeal from the United States District Court for the District of Utah (D.C. No. 2:19-CV-00709-DAK)**

---

Michael B. Eisenkraft, Cohen Milstein Sellers & Toll, PLLC, New York, New York (Laura H. Posner, Cohen Milstein Sellers & Toll, PLLC, New York, New York, and Daniel H. Silverman, Molly J. Bowen, and Joshua Handelsman, Cohen Milstein Sellers & Toll, PLLC, Washington, D.C., and Keith M. Woodwell, Katherine E. Pepin, Clyde Snow & Sessions, P.C., Salt Lake City, Utah, with him on the briefs), for Appellant.

John C. Dwyer, Cooley LLP, Palo Alto, California (Jessica Valenzuela Santamaria and Jeffrey D. Lombard, Cooley LLP, Palo Alto, California, and Erik A. Christiansen and Alan S. Mouritsen, Parsons, Behle & Latimer, Salt Lake City, Utah, with him on the brief), for Appellees Overstock.com, Inc., Gregory J. Iverson, and David J. Nielsen.

Robert N. Driscoll, McGlinchey Stafford PLLC, Washington, D.C. (Alfred D. Carry, McGlinchey Stafford PLLC, Washington, D.C, and Cory A. Talbot, Holland & Hart LLP, Salt Lake City, Utah, and Holly Stein Sollod, Holland & Hart LLP, Denver, Colorado, with him on the brief), for Appellee Patrick M. Byrne.

Andrew M. McNeela, Thomas W. Elrod, and Ira M. Press, Kirby McInerney LLP, New York, New York, for Amici Curiae National Conference on Public Employee Retirement Systems, Oklahoma Firefighters Pension & Retirement System; Oklahoma Police Pension and Retirement System; Public Employees Retirement Association of New Mexico; Utah Retirement Systems; and Fire and Police Pension Association of Colorado, in support of Appellant.

Jeremy A. Lieberman and Emma Gilmore, Pomerantz LLP, New York, New York, for Amici Curiae John C. Coffee; James D. Cox; Jessie M. Fried; Edward F. Greene; Robert J. Jackson, Jr.; Donald C. Langevoort; Joshua Mitts; Minor Myers; Frank Partnoy; Joel Seligman; Marc I. Steinberg; Daniel J. Taylor; Randall S. Thomas; and David H. Webber in support of Appellant.

Dylan H. Bruce, Esq., Consumer Federation of America, Washington, D.C., Stephen W. Hall, Esq., Better Markets, Inc., Washington, D.C., for Amici Curiae Better Markets, Inc.; and Consumer Federation of America, in support of Appellant.

Adam C. Trigg, Bergeson LLP, San Jose, California, for Amicus Curiae James J. Angel in support of Appellant.

---

Before **CARSON**, **LUCERO**, and **ROSSMAN**, Circuit Judges.

---

**CARSON**, Circuit Judge.

---

For as long as investors have traded securities, some have sought to manipulate the markets for their own gain. After the securities markets crashed in the 1930s, Congress enacted the Securities Act of 1933, 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. This case presents multiple issues of first impression arising under those Acts. Chief among them—whether a fully disclosed corporate transaction can be "manipulative" under the Exchange Act. The district court held that it cannot. We agree with the district court under the circumstances of this case. Exercising jurisdiction under 28 U.S.C. § 1291, we therefore affirm.[1]

[1] We consider whether the district court properly dismissed Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) on the ground that its allegations failed to satisfy the heavy pleading burden applicable to private parties alleging securities fraud. We express no opinion on whether any other remedy may be available to Plaintiff.

I.

Plaintiff, The Mangrove Partners Master Fund, Ltd., sued Overstock, Inc. and three high-ranking Overstock executives, alleging on behalf of itself and a putative class[2] that Defendants violated various securities laws.[3] Defendant Overstock is a publicly traded e-commerce company. The individual Defendants are Patrick M. Byrne, Overstock's former Chief Executive Officer, Gregory T. Iverson, Overstock's former Chief Financial Officer, and David J. Nielsen, President of Overstock's Retail Division.[4]

Plaintiff is an institutional investor that shorted millions of Overstock shares. "Shorting" or "short selling" refers to the legal trading strategy that investors use when they believe that a company's share price will decline. Legitimate short sellers—like Plaintiff—borrow stock from a brokerage, sell those borrowed shares at a time they believe the company's market price is high, purchase new shares back when they believe the stock price is low, and return those newly purchased shares to

---

[2] The putative class includes all purchasers of Overstock stock between May 9, 2019, and November 12, 2019.

[3] Because this case reaches us from a successful motion to dismiss, we assume the truth of all well-pleaded facts in Plaintiff's complaint. Dias v. City of Denver, 567 F.3d 1169, 1174 (10th Cir. 2009) (citing Gann v. Cline, 519 F.3d 1090, 1091 (10th Cir. 2008)). We consider the complaint in its entirety, including "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007) (citing 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004 & Supp. 2007)).

[4] Defendants Iverson and Byrne both resigned during the class period.

the brokerage. If the short sellers' predictions are correct, they profit, earning the difference between the high price at which they sold the borrowed shares and the low price at which they bought new shares to return to their lenders, minus transaction fees and interest costs. If the short sellers' predictions are wrong, they lose money.

Defendant Byrne founded Defendant Overstock as an online retailer of furniture and other home goods to consumers. After an initial public offering ("IPO") in 2002, Overstock became a publicly traded company. But just three years after Overstock's IPO, its stock price began to slide. Byrne blamed short sellers.[5] In an August 12, 2005, conference call with investors, Byrne explained that he "believe[d] there's been a plan . . . to destroy our stock, drive it down to $6–$10," and believed that this plan involved a conspiracy of hedge funds, journalists, and regulators led by a faceless menace he dubbed the "Sith Lord." Byrne also retained his own advisor-economist to track Overstock's short interest, including Overstock's trading volume, the negative rebate, and the average days outstanding of each short position.

Then, in 2014, Overstock launched Medici Ventures, a blockchain-based research and investment company.[6] Through Medici, Overstock planned to create an alternative trading platform, called tZero, where the investing public could buy and

---

[5] Plaintiff alleges that investors heavily shorted Overstock because of management's irresponsible stewardship.

[6] A "blockchain" is a shared ledger of transactions between parties in a network, not controlled by a single central authority.

trade blockchain-based securities. As Plaintiff alleges, Overstock sought to create a new marketplace where Byrne could exclude the short sellers he blamed for Overstock's struggles. Overstock poured vast sums into tZero to achieve Byrne's vision. Despite Overstock's blockchain ventures, however, Overstock's core retail business continued to generate nearly all of Overstock's revenue.

But in the years just before the class period, Overstock's retail sales declined sharply. Overstock cut prices and increased advertising spending to regain market share from "arch-competitor" Wayfair.[7] But Overstock's financial performance continued to suffer. So Defendants turned to Bain & Company to help develop Overstock's 2019 financial plan. That plan projected the Retail Division's 2019 "Contribution"[8] to be between $160 and $180 million. This, in turn, translated into $10 million of "Adjusted EBITDA"[9] for the year. Overstock announced these metrics to shareholders on its March 2019 earnings call.

On May 9, 2019, the first day of the class period, Overstock reported promising Q1 results: Contribution was $39 million, more than double from Q1 2018, and EBITDA

[7] Like Overstock, Wayfair is an e-commerce retailer selling furniture, home goods, and consumer electronics.

[8] "Contribution" is a non-GAAP financial metric Overstock uses in its financial disclosures. Overstock calculates the Retail Division's Contribution as the Retail Division's gross profit minus sales and marketing expenses.

[9] "Adjusted EBITDA" is another non-GAAP financial metric Overstock uses in its financial disclosures. EBITDA measures a company's earnings before interest, taxes, depreciation, and amortization. Overstock defines Adjusted EBITDA as net income minus certain non-cash expenses, such as stock-based compensation and other "special items."

had improved substantially, ending with a loss of $2.5 million compared to a loss of $19 million the prior quarter. In a letter to shareholders, Byrne attributed the Retail Division's gains to improvements in search engine rankings, system changes, and aggressive expense management. Based on the Retail Division's promising Q1 performance, Overstock projected the Retail Division's full-year Contribution would increase from $160 million to $165 million. Overstock also raised its Adjusted EBITDA guidance from $10 million to $15 million accordingly. Two trading days after delivering this good news, Byrne sold 15% of his Overstock common stock for roughly $10 million. Then, in July 2019, Overstock again raised its EBITDA guidance from $15 million to $17.5 million. Byrne again attributed the increase to search engine optimization.[10]

Byrne learned that news of his romantic relationship with a Russian spy was about to go public and force him to leave Overstock. Defendants also knew then that Overstock had 17.8 million shares sold short, representing more than half of shares outstanding. So, Defendants concocted a scheme to squeeze Overstock's short sellers, artificially inflating Overstock's share price, making Byrne millions.[11]

Overstock announced it would issue Digital Voting Series A-1 Preferred Stock—a blockchain-based digital security token. Blockchain is the technology that

---

[10] According to Plaintiff's complaint, Defendants were not confident in these projections and overstated the search engine data.

[11] A "short squeeze" occurs when the price of a heavily shorted stock rapidly increases, which forces short sellers to close their positions by purchasing shares, adding to the upward pressure on the stock.

powers most cryptocurrencies. Overstock also announced that the record date for the dividend would be September 23, 2019. On that date, for each 10 shares of Overstock common stock, Series A-1, or Voting Series B Preferred Stock, a shareholder would receive the crypto equivalent of one share of Series A-1 Preferred Stock. But Defendants also announced that Overstock planned to issue the new dividend without registering it with the SEC.

Announcing an unregistered dividend spelled trouble for Overstock's short sellers. When a company pays dividends on a security that a shareholder is loaning to a short seller, that short seller is contractually obligated to transmit the dividend to the lender from whom it borrowed shares. Because companies that issue dividends in the form of stock typically issue freely tradeable securities, short sellers can pay cash or transmit the newly issued security to the brokerage from which they borrowed the shares to comply with their lending contracts. But *unregistered* securities cannot be bought or sold until six months after they issue. 17 C.F.R. § 230.144. Accordingly, Overstock's crypto dividend could not be traded or transferred until the "locked-up" period expired.

As a result, if a short seller's position remained open on the dividend's record date, that short seller would receive an untransferable security that it was contractually obligated to transfer. So Overstock's short sellers' only route to avoid necessarily breaching their lending contracts was to close their short positions by buying new Overstock shares and returning them to their lenders before the dividend's record date. This "forced buying" operated to artificially increase

Overstock's trading volume (and with it, Overstock's stock price) creating a "short squeeze" as the dividend's record date approached. Plaintiff alleges that Defendants' only reason for issuing an unregistered security was to cause a squeeze. Market analysts spotted these issues immediately, calling Overstock's dividend an "artificial short-squeeze of shorts"; "a digital squeeze"; "a large roadblock forcing [short sellers] to close positions—which is the whole point"; and a dividend that "punishes actual short sellers of Overstock's regular stock right now . . . by adding technical difficulties to maintain the short."

On August 8, 2019, Overstock reported its Q2 financial results. As projected, the Retail Division had returned to profitability, generating $1.6 million in Adjusted EBITDA. Defendant Nielsen, President of Overstock's Retail Division, noted that these results marked the first time "since Q2 of 2017" that the Retail Division delivered a positive quarter. Based on these results, Nielsen reconfirmed the EBITDA guidance Overstock provided in July.

Two weeks later, Byrne announced his resignation in a letter to Overstock's shareholders. But before he did so, Byrne instructed his staff to sell all his remaining Overstock common stock at the height of the short squeeze. He then left the United States for Indonesia.

As the dividend's record date approached, short sellers began purchasing Overstock shares to fulfill their contractual obligations. The looming crypto dividend and resulting stock purchases by the shorts covering caused Overstock's stock price to spike. From the beginning of the short squeeze on September 3, 2019, through its

peak during the trading day on September 13, Overstock's common stock nearly doubled (from $15.07 to a 52-week high of $29.75) and trading volume increased 776% (from 2,122,416 to 18,613,100 shares traded).

Byrne monitored the market from Indonesia, blogging:

- "[I]f there be any criminal liability associated with [the dividend], let me stipulate here that I am 100% responsible for this: come after me."
- I did "not just dream this up on a whim. [I] designed it carefully," knowing that "it put legitimate short sellers in a bind"
- "[T]he OSM shorts were asleep at the switch and got caught in a jam. We Overstock shareholders won this hand fair and square."
- The dividend was a "hand with four aces in it ready to play."
- "Mr. Shorty was sleepy and stepped on his weenie, and if the SEC objected after the fact, I would love to have met the SEC in court and put them on trial."
- "One thing I was certain of was that the volume had to expand in the week before the dividend record date."
- "[T]here are those who would claim that this was [a] deliberately created squeeze."

On September 13, certain prime brokerages agreed to take a cash equivalent from the short sellers in lieu of the untradable dividend, diminishing the effects of the squeeze. Two days later, Byrne learned that the SEC planned to intervene and force Overstock to postpone the dividend's record date. So Byrne ordered his accountant to immediately sell all his remaining shares of Overstock common stock. As the squeeze abated, Overstock's stock price dropped from a high of $29.75 on September 13 to $14.97 on September 18—the date Overstock announced that it was postponing the dividend. And between September 16 and 18, Byrne sold 4.7 million shares of Overstock stock—yielding him $90 million.

On September 23, Overstock's stock price took another dive. Overstock announced that Q3 Adjusted EBITDA—projected to be a significantly positive number—was about even.[12] To explain the difference, Overstock blamed increased tariffs, increased freight costs, increased director and officer insurance premiums, waning consumer confidence, and slower conversion of website search traffic. Overstock also announced that Defendant Iverson had resigned his position as Chief Financial Officer. On this news, the stock price tumbled another 25%, diving from $14.97 when the market closed on Friday, September 20 to $11.19 at the close of trading on Monday, September 23.[13]

The next day, Overstock filed a form S-3 to register the shares to be issued in connection with the dividend. Two months later, on November 12 (the last day of the class period), the SEC subpoenaed documents related to the dividend, the trading plans of Overstock's officers and directors, and communications with Byrne.

Plaintiff sued Overstock, Byrne, Nielsen, and Iverson in the United States District Court for the District of Utah, asserting four distinct securities law claims. First, Plaintiff alleged that all Defendants violated § 10(b) of the Exchange Act and

[12] Overstock's Form 8-K filed in March 2020, ultimately reported that the Retail Division's Adjusted EBITDA for 2019 was -$2.2 million—missing Overstock's projected figure of a positive $17.5m by over 100%.

[13] September 23, 2019, marked Overstock's worst trading day in more than a decade and second worst single-day performance in the company's history. It also concluded the worst seven-day stretch in Overstock history, with seven consecutive trading sessions totaling a 58.1% decline in share value.

SEC Rule 10b-5(b) by making false or misleading statements about the future and past performance of Overstock's Retail Division, internal risk controls, and dividend scheme.[14] Second, Plaintiff alleged that Defendants Overstock, Byrne, and Iverson illegally manipulated the market by inducing an artificial short squeeze in violation of § 10(b) of the Exchange Act, SEC Rule 10b-5(a), and SEC Rule 10b-5(c). Third, Plaintiff alleged that Defendants Byrne, Iverson, and Nielsen violated § 20(a) of the Exchange Act by causing Overstock to engage in wrongful conduct. Last, Plaintiff alleged that Defendant Byrne violated § 20A of the same by illegally trading on inside information.

Defendants moved to dismiss for failure to state a claim. The district court granted Defendants' motion. Plaintiff then successfully sought leave to amend and refiled its complaint. Defendants again moved to dismiss. The district court granted Defendants' second motion to dismiss and entered judgment in their favor. Plaintiff timely appeals.

II.

We review de novo a district court's grant of a motion to dismiss for failure to state a claim. Emps. Ret. Sys. v. Williams Cos., Inc., 889 F.3d 1153, 1161 (10th Cir. 2018) (citing Gee v. Pacheco, 627 F.3d 1178, 1183 (10th Cir. 2010)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

---

[14] Plaintiff also alleged that Defendants knowingly made false or misleading statements about Overstock's ability to insure its officers and directors. We omit those allegations because Plaintiff abandons that theory on appeal.

true, to state a claim for relief that is plausible on its face." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Federal Rule of Civil Procedure 9(b) requires all litigants alleging fraud or mistake to "state with particularity the circumstances constituting fraud," but allows plaintiffs to generally allege that the defendant acted with the requisite state of mind. United States ex rel. Polukoff v. St. Mark's Hosp., 895 F.3d 730, 745 (10th Cir. 2018) (quoting Fed. R. Civ. P. 9(b)).

But private parties alleging securities fraud face a heavier pleading burden. See In re Level 3 Commc'ns, Inc. Sec. Litig., 667 F.3d 1331, 1333 (10th Cir. 2012). The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires plaintiffs alleging securities fraud to plead with particularity (1) the facts constituting the alleged violation and (2) the facts showing the defendant's intention "to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 314 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, 194 n.12 (1976)); accord 15 U.S.C. § 78u-4(b)(1)–(2). Accordingly, securities plaintiffs cannot allege generally that the defendant acted with scienter, as Fed. R. Civ. P. 9(b) allows. Securities plaintiffs must instead, "with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling." Tellabs, 551 U.S. at 314.

III.

Plaintiff alleges that Defendants committed multiple distinct securities law violations. We analyze each in turn.

A.

Plaintiff contends that Defendants made dozens of false or misleading statements to hide the Retail Division's true financial state from investors. In general, Plaintiff alleges that Byrne and Nielsen misrepresented the Retail Division's past performance and provided earnings projections to investors that they knew Overstock could never achieve. Plaintiff also alleges that Byrne made false statements about search engine optimization improvements that never occurred.[15]

Section 10(b) of the Exchange Act prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . for the protection of investors." See 15 U.S.C. § 78j(b).[16] Pertinent to this appeal, SEC Rule 10b-5 forbids "making any untrue

---

[15] Plaintiff also alleged in its complaint that Byrne and Iverson falsely certified that Overstock used reliable financial controls. Because Plaintiff has not advanced this theory on appeal, we do not consider it. See Sawyers v. Norton, 962 F.3d 1270, 1286 (10th Cir. 2020) (quoting Tran v. Trs. of State Colls. in Colo., 355 F.3d 1263, 1270 (10th Cir. 2004)) ("Issues not raised in the opening brief are deemed abandoned or waived.").

[16] The statute is inconsistent in its use of the conjunctive "and" in the title ("Manipulative and deceptive devices") and the disjunctive "or" in the text ("any manipulative or deceptive device"). But any potential ambiguity is cured by the phrase "in contravention of such rules and regulations as the Commission may prescribe," § 78j(b). As explained below, that phrase incorporates a fraud

statement of a material fact." See 17 C.F.R. § 240.10b-5(b). To state a claim for misstatement fraud under Rule 10b-5(b), Plaintiff must sufficiently allege that:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages because of [its] reliance.

In re Level 3 Commc'ns, Inc. Sec. Litig., 667 F.3d at 1333 (quoting Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1095 (10th Cir. 2003)). Plaintiff argues that it properly alleged all five elements and urges us to reverse the district court's dismissal.

We hold that Plaintiff failed to plausibly allege reliance. Investors can only recover damages in a private securities action if they establish that they relied on the defendant's misrepresentation in deciding to buy or sell a company's stock. Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 263 (2014) ("Halliburton II"). The "'traditional (and most direct) way' for a plaintiff to prove reliance is to show that he was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation." Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys., 594 U.S. 113, 118 (2021) (quoting Halliburton II, 573 U.S. at 267).

But securities plaintiffs can also prove reliance through the "fraud-on-the-market theory." Id. (citing Basic Inc. v. Levinson, 485 U.S. 224, 243 (1988)). To

requirement. In any event, Plaintiff does not develop a meaningful argument that deception is not a required element of a market manipulation claim.

invoke this theory, "a plaintiff must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed."[17] Goldman Sachs Grp., 594 U.S. at 118 (citing Halliburton II, 573 U.S. at 268). If a plaintiff demonstrates these elements, it is entitled to a rebuttable presumption of reliance—the Basic presumption. Id. (citing Basic, 485 U.S. at 248). But a defendant can rebut the Basic presumption by demonstrating that the plaintiff would have bought or sold the stock "even if he was aware that the stock's price was tainted by fraud," id. (citing Basic, 485 U.S. at 248–49); or by demonstrating that the plaintiff believed that the defendant's statements were false but sold his shares anyway because of "other unrelated concerns." Basic, 485 U.S. at 249; see also Id. at 248 ("Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance.").

[17] This theory is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." Basic, 485 U.S. at 241 (quoting Peil v. Speiser, 806 F.2d 1154, 1160–61 (3rd Cir. 1986)). And because the price of a stock traded in an efficient market reflects all public, material information, the price must also reflect any material misstatements. See Halliburton II, 573 U.S. at 263 (quoting Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 813 (2011)).

Neither party contests that Plaintiff's complaint entitles him to the Basic presumption of reliance.[18] But Defendants have rebutted the presumption with statements in Plaintiff's complaint. Plaintiff admitted that Overstock's looming crypto dividend—not the retail statements or the fairness of Overstock's market price—caused it to buy its Overstock stock. Indeed, this is an overarching theme in Plaintiff's complaint and appeal. In Plaintiff's own words, "Overstock forced a huge group of investors to purchase Overstock stock to cover their positions in very short order *who would not have otherwise done so*" (emphasis added). For this reason, the district court concluded that "Plaintiff appears to concede it would have purchased no matter the price." Plaintiff cannot have it both ways: if Plaintiff bought its shares to avoid breaching its lending contracts, it cannot also have bought its shares because of Defendant's alleged misstatements.[19]

A party "remains bound" by concessions in pleadings. Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 470 n.6 (2013). "Factual assertions in pleadings . . . unless amended, are considered judicial admissions conclusively binding on the party who made them." Am. Title Ins. Co. v. Lacelaw Corp., 861 F.2d

[18] We assume without deciding that a short seller may benefit from the Basic presumption.

[19] By this reasoning, Plaintiff also undermined any allegation of actual reliance: because Plaintiff pled that it bought its shares to avoid breaching its lending contracts, it failed to plead that it did so in reliance on Defendants' misleading statements under Rule 10b-5(b). In re Level 3, 667 F.3d at 1333 (quoting Adams, 340 F.3d at 1095).

224, 226 (9th Cir. 1988) (quoted in Amgen, 568 U.S. at 470 n.6). The concession in Plaintiff's complaint is analogous to the "other unrelated concerns" that could rebut the presumption referenced in Basic. See 485 U.S. at 249.

Still, Plaintiff contends we should treat its Basic presumption as unrebutted because Basic creates a relaxed pleading standard that Defendants can never rebut before discovery. But Plaintiff identifies no authority requiring us to allow a facially deficient allegation to proceed past a motion to dismiss.[20] Accordingly, we hold Plaintiff failed to plead reliance and affirm the district court's dismissal of Plaintiff's Rule 10b-5 claims.[21]

B.

[20] Plaintiff cites the Supreme Court's language in Amgen Inc., 568 U.S. at 482, and Goldman Sachs Grp., 594 U.S. at 124–25, arguing that whether Defendant has rebutted the Basic presumption should be a matter for trial or summary judgment. But both cases concerned class certification—not dismissal—and neither holds that a defendant cannot rebut the Basic presumption with the plaintiff's own allegations. Plaintiff also relies heavily on In re UBS Auction Rate Sec. Litig., No. 08-CV-2967(LMM), 2010 WL 2541166, at *25 (S.D.N.Y. June 10, 2010), for the proposition that "[i]t is well-established that whether the fraud on the market theory applies is not a pure question of law" so "it is rarely appropriate to decide the issue on a motion to dismiss." That statement is taken out of context. UBS cited In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 377 (S.D.N.Y. 2003), for that proposition. The court there stated that whether the fraud on the market theory applies "turns on whether the relevant market has the traits of an 'efficient market' as described in Basic" so "whether securities were traded in an efficient market should not be decided on a motion to dismiss." Id. That question is not specifically in play here.

[21] We do not adopt a blanket rule barring short sellers from relying on Basic's presumption as the Pension Funds fear. See Brief for Pension Funds as Amici Curiae 13–21. We merely hold that *this* short seller has rebutted the Basic presumption because *this* short seller affirmatively disclaims any reliance on market efficiency.

We turn to Plaintiff's market manipulation claim. Plaintiff alleges that Defendants manipulated the market by issuing an unregistered dividend to force Overstock's short sellers to cover their positions, drive Overstock's stock price to artificially high levels, and allow Byrne to sell his shares for a massive profit. Defendants respond that these allegations fail to allege a "deceptive or manipulative act," because Overstock fully disclosed the dividend's terms five weeks before the short squeeze began, and sufficiently in advance of the dividend's record date.

Section 10(b) bars the use of any "manipulative or deceptive device or contrivance" in violation of regulations enacted by the SEC to protect investors. See 15 U.S.C. § 78j(b). Rule 10b-5(a) and (c), in turn, prevent any person from "employ[ing] any device, scheme, or artifice to defraud," and any "act, practice, or course of business which operates or would operate as a fraud or deceit." 17 C.F.R. § 240.10b-5. Together, these provisions prohibit manipulative acts as well as material misstatements. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (citing Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994)).

To state a claim for market manipulation under § 10(b), a plaintiff must allege: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." Plumber & Steamfitters Loc. Pension Fund v. Danske Bank A/S, 11 F.4th 90, 105 (2d Cir. 2021) (quoting In re Mindbody, Inc. Sec. Litig., 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020)). The deceptive or manipulative "activity must have occurred in connection

with the purchase or sale of a security." Id. (quoting 17 C.F.R. § 240.10b-5). Because market manipulation claims require a showing of fraud and scienter, plaintiffs must allege each element under the heightened pleading standards we outlined above. See Section II, supra; see also Plumber & Steamfitters Loc. Pension Fund, 11 F.4th at 105; Set Cap. LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 75–76 (2d Cir. 2021).

We begin with the threshold question of whether Plaintiff alleged a manipulative act.[22] The Supreme Court has interpreted "manipulation" to be "virtually a term of art when used in connection with securities markets." Santa Fe Indus. v. Green, 430 U.S. 462, 476–77 (1977) (quoting Ernst & Ernst, 425 U.S. at 199). The term generally refers "to practices, such as wash sales, matched orders, or rigged prices, that are intended to *mislead* investors by artificially affecting market activity," and "connotes intentional or willful conduct designed to *deceive or defraud* investors by controlling or artificially affecting the price of securities." Set Cap., 996 F.3d at 76 (first quoting Santa Fe Indus., 430 U.S. at 476; and then quoting Ernst & Ernst, 425 U.S. at 199) (emphasis added). Whether an open-market transaction may qualify as a manipulative act is an issue of first impression for this court. Consistent with the Second Circuit's approach, we hold that an open-market transaction may

[22] We reach this question only as it relates to Plaintiff's manipulation claim against Defendants Overstock and Byrne. Plaintiff alleges nothing about Iverson's purported involvement in the dividend scheme, let alone "facts giving rise to a strong inference that [Iverson] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). We affirm the dismissal of Plaintiff's claims against him accordingly.

qualify as manipulative conduct, but only if accompanied by plausibly alleged deception. See id. at 76–77 (citing ATSI Commc'ns, Inc., 493 F.3d at 100–02; Wilson v. Merrill Lynch & Co., 671 F.3d 120, 130 (2d Cir. 2011)).

1.

First, Plaintiff contends that Defendants' act of issuing an unregistered dividend alone constitutes manipulative conduct because Defendants acted with the intent to create an artificial price. But acting in a manner that results in an artificial price, on its own, is not enough to constitute manipulative conduct. In describing how the Exchange Act "substitute[d] a philosophy of full disclosure for the philosophy of caveat emptor," the Supreme Court made clear that § 10(b) prohibits practices that are manipulative in the "technical sense of artificially affecting market activity *in order to mislead investors*." Santa Fe Indus., 430 U.S. at 477 (emphasis added) (internal quotation marks omitted).

Although we have not determined what market activity misleads investors by "artificially" affecting the price of securities, several of our sister circuits have. The Second Circuit queries whether "the transaction or series of transactions 'sends a false pricing signal to the market' or otherwise distorts estimates of the 'underlying economic value' of the securities traded." Set Cap., 996 F.3d at 75–76 (quoting ATSI Commc'ns, Inc., 493 F.3d at 99). The Third Circuit requires plaintiffs to establish that the alleged manipulator injected "inaccurate information" into the market or otherwise created a false impression of market activity. GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 205 (3d Cir. 2001). The Fifth Circuit considers

whether the plaintiffs have engaged in deceptive conduct which has "the effect of either creating the false impression that certain market activity is occurring when in fact such activity is unrelated to actual supply and demand or tampering with the price itself." Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc., 482 F.3d 372, 390–91 (5th Cir. 2007) (citing Hundahl v. United Benefit Life Ins. Co., 465 F. Supp. 1349, 1360 (N.D. Tex. 1979)). And the Eighth Circuit, while declining to expressly adopt either the Second or the Third Circuit's tests, relied on them both to uphold a jury finding that a manipulator's conduct was fraudulent and manipulative. United States v. Gilbertson, 970 F.3d 939, 949–50 (8th Cir. 2020).

From these cases we draw a principle: for market activity to "artificially" affect the price of securities, the manipulative conduct must be "aimed at deceiving investors as to how other market participants have valued a security." Wilson, 671 F.3d at 130; accord Regents of the Univ of Cal., 482 F.3d at 391 (citing Hundahl, 465 F. Supp. at 1359, 1362) (holding that manipulation is only "conduct that . . . constitutes deception"). Here, Defendants' truthful disclosure of the terms of the upcoming dividend transaction did not deceive investors as to how the market valued Overstock.

Overstock disclosed the digital dividend's terms almost eight weeks before the dividend's record date. On July 30, 2019, Overstock revealed the nature of the security it planned to issue (shares of its Digital Series A-1 Preferred Stock), the conversion rate (one dividend share for every ten shares outstanding), the record date of September 23, and the distribution date of November 15. Overstock also

announced that the dividend shares would be tradeable only on Overstock's blockchain-based ATS. And importantly, Overstock disclosed that the dividend shares would not be registered under the Exchange Act—thus not available for resale for a period after distribution.[23]

On these disclosures, we conclude that the market received notice that short sellers might buy Overstock stock to cover their positions before the dividend's record date, evinced by market analysts' descriptions of the dividend's potential impact. Because buyers and sellers possessed sufficient information to form judgments about how Overstock's dividend would impact Overstock's share price, Plaintiff fails to allege that Overstock "deceiv[ed] investors as to how other market participants have valued a security." See Wilson, 671 F.3d at 130 (quoting ATSI Commc'ns, Inc., 493 F.3d at 100).

Plaintiff argues that, although certain open-market transactions are not inherently manipulative, we should consider them manipulative when accompanied by manipulative intent. We agree in principle. For example, in Koch v. S.E.C., 793 F.3d 147, 153–54 (D.C. Cir. 2015), the SEC successfully prosecuted a market

[23] Overstock also cautioned investors that "[w]e could encounter a variety of challenges in connection with the issuance of our Series A-1 Preferred Shares as a dividend." The company advised investors that accounts investors needed to receive for the digital dividend may not be "opened in a timely manner" because of the high volume of recipients. And Overstock again warned investors that the issuance of the digital dividend may "cause unforeseen issues." As the company explained, "since we have not previously issued Series A-1 Preferred Shares on such a wide scale, we could encounter challenges related to . . . complying with . . . unforeseen legal and compliance issues."

manipulation claim against a defendant who engaged in a flurry of trades intended to "mark the close" and thereby influence a security's price. Similarly, in Markowski v. S.E.C., 274 F.3d 525, 529 (D.C. Cir. 2001), the SEC successfully prosecuted a manipulation claim against a defendant for maintaining high bid prices and absorbing unwanted securities to prevent sales from depressing market prices. And in Set Capital, 996 F.3d at 75–76, a plaintiff stated a plausible manipulation claim against Credit Suisse for flooding the market with millions of notes and then executing large hedging trades against those notes to destroy their value. Each time, the manipulator's intent caused otherwise legal transactions to be "manipulative" under the Exchange Act. See Koch, 793 F.3d at 152; Markowski, 274 F.3d at 529; Set Cap., 996 F.3d at 77.

These cases finding a violation of securities laws based on manipulative intent share an element that is absent here: secrecy. Whereas Overstock's plan was announced to the public, the defendants in Koch, Markowski, and Set Capital committed deceptive conduct and made secret trades to affect the market price. The investment adviser in Koch told his trader to conduct a burst of trading on a certain stock "right before 3pm up to as near $25 as possible *without appearing manipulative*." 793 F.3d at 152 (internal quotation marks omitted). The securities firm in Markowski acted behind the scenes to support securities it had underwritten. And the corporation and corporate officers in Set Capital issued millions of notes in an undisclosed scheme, "knowing or recklessly disregarding the virtual certainty that their own hedging activity would trigger a liquidity squeeze in . . . futures contracts,

destroy the value of [the notes], and allow [the corporation] to accelerate and redeem the notes at a substantial loss to investors while locking in a profit for its own account." 996 F.3d at 76.

Had the planned market activity in these cases been fully and truthfully disclosed, the deceptive conduct would have been compromised or thwarted. The Koch defendant would never have been able to influence prices by "marking the close" had it publicly announced that it would be purchasing the stock before doing so. No reasonable investor would have purchased the Markowski securities had the defendant disclosed that it was maintaining artificial bids and absorbing excess supply to keep prices high. Nor would the investors in Set Capital have suffered their losses had the defendants announced hedging trades several weeks before executing the trades. In each case, nondisclosure of market activity was a central feature of the manipulation. See Santa Fe Indus., 430 U.S. at 478 ("[O]nce full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute."). Indeed, each scheme remains unlawful under the test we adopt today: all three defendants deceived investors by sending false pricing signals to the market as to how other market participants have valued a security. Amici Professors agree that a defendant's full disclosure defeats a plaintiff's market manipulation claim but contend that Overstock's disclosures came too late. See Brief for Professors as Amici Curiae 17–21. They argue that a defendant's § 10(b) liability turns on whether the defendant's activity "sent a false signal to the market at times relevant to the plaintiff's purchase." Wilson, 671 F.3d at 134 n.7 (cleaned up). So,

they assert, when reviewing Defendants' disclosures, we "must look to what was known by the market as of the time of the alleged manipulative acts." Id. That is, because Plaintiff did not open or maintain a short position in Overstock shares knowing that Overstock would issue an unregistered digital dividend, they contend that Defendants' disclosures cannot preclude liability.

We disagree. Though the Professors begin with the right rule, their application misses the mark considering the particulars of this case. When evaluating the sufficiency of a defendant's disclosures, we indeed ask whether that defendant's activity sends a false signal to the market at times relevant to Plaintiff's purchase. Id. But here, the relevant time is not when Plaintiff opened or maintained its short position—but when Plaintiff *closed* it. Gurary v. Winehouse, 190 F.3d 37 (2d Cir. 1999), lends support for our conclusion. In analyzing a Rule 10b-5 claim based on manipulation, the Second Circuit made clear that the transaction under consideration must have occurred *after* the allegedly manipulative act took place due to the reliance requirement. See id. at 45 ("In order to make out a 10b-5 claim, . . . the plaintiff must allege and prove, among other elements, reliance. . . . In consequence, a private plaintiff in such a case must establish that he or she engaged in a securities trade in ignorance of the fact that the price was affected by the alleged manipulation.").

Like most investments, short sales involve two transactions: a purchase and a sale. See Anschutz Co. v. Comm'r, 664 F.3d 313, 316 n.2 (10th Cir. 2011) (quoting Whistler Inv., Inc. v. Depository Tr. & Clearing Corp., 539 F.3d 1159, 1162 (9th Cir. 2008)). The only difference with short selling is that the sale comes first.

Defendants have not identified a persuasive reason to treat the short sales at issue differently than traditional investments. In either instance, we ask whether the defendant's activity sent a "false pricing signal to the market" at the time of the complained-of trade, whether that trade be a purchase or a sale.

Our decision to examine the market's knowledge when Plaintiff purchased shares harmonizes with Wilson's second instruction—to examine "what the market knew as of the time of the allegedly manipulative acts." Wilson, 671 F.3d at 134 n.7. The alleged manipulative act here is Overstock issuing a fully-disclosed, unregistered dividend, and Overstock's share price did not begin to rise until five weeks later. Had Plaintiff chosen to cover during the five-week period right before September 3, rather than wait until September 6, Plaintiff would have avoided any loss it attributes to the short squeeze. Likewise, any investors reading Seeking Alpha, MarketWatch, or Bloomberg were free to make their own informed judgments as to how Overstock's dividend issuance might affect the price of Overstock shares. Thus, whether we look to what the market knew when Defendants committed their allegedly manipulative act or when Plaintiff bought its shares, our conclusion is the same: Defendants' disclosures prevented any false signal that would deceive investors from entering the market.

2.

Plaintiff also argues that Defendants' dividend was manipulative because they omitted material information from the dividend's disclosures. Plaintiff alleges that these omissions violated Rule 10b-5's prohibition of misleading statements.

a.

First, Plaintiff argues Defendants failed to disclose that Defendants were bluffing about issuing an unregistered dividend and that they intended to register the dividend with the SEC all along. Plaintiff points to these allegations to support its claim: Defendants never obtained an ex-dividend date from Nasdaq, "a critical legal step" necessary to issue the dividend; Dinosaur Financial, the broker tasked with administering the dividend, could not answer basic questions or perform ordinary ministerial tasks because the dividend came out of "left field"; Overstock could not provide investors with guidance on major legal and operational questions about the dividend; and rather than issue the unregistered dividend on September 23, Overstock reversed course on September 24 and filed a Form S-3 to register the dividend.

But neither these allegations, nor their reasonable inference, reveal that Defendants were lying about issuing an unregistered dividend. These allegations also fit with an intent to file a belated Form S-3 when Overstock disclosed the dividend.[24] We fail to see how Nasdaq's decision to delay in declaring an ex-dividend date relates to Defendants' intent to register the dividend at the time they disclosed it.

Plaintiff's allegation that Overstock failed to create the infrastructure necessary to issue the dividend is similarly unavailing. Plaintiff fails to explain how the dividend's registration status alters the infrastructure necessary for its issuance.

[24] Nasdaq Listing Rule 5250(e)(6) required Defendant to provide Nasdaq with various information related to the dividend ten days before the dividend's record date.

Instead, Plaintiff points to a phone call that occurred on an unknown date between Plaintiff and an unnamed Dinosaur Financial representative to establish that Overstock dropped the dividend on Dinosaur Financial without sufficient information or preparation. But we fail to see how the opinion of a third party's employee can help Plaintiff prove Defendants' intent to register Overstock's dividend. Plaintiff also points to undated conversations between Plaintiff and an Overstock representative who was allegedly unable to answer questions on, among other things, how the dividend would work if an investor's broker had lent out the shares. But again, that representative's ability to answer questions about how the dividend's registration status might affect Plaintiff's lending contracts is irrelevant to whether Defendants intended to register the dividend when they announced it.

Lastly, Plaintiff makes much of Defendants' decision to ultimately file for the registration of the digital dividend. Plaintiff contends that because Defendants filed the Form S-3 on September 24, Defendants must have intended to do so as of July 30 and August 8. In doing so, Plaintiff ignores the "obvious alternative explanation" for Defendants' actions: post-announcement discussions with the SEC resulted in Defendants filing for registration. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 567 (2007). And circumstantial evidence does not support an inference of wrongdoing if the evidence is as consistent with an obvious alternative explanation. Llacua v. W. Range Ass'n, 930 F.3d 1161, 1180 (citing Twombly, 550 U.S. at 554). Here, the alternative explanation is all the more likely given Plaintiff's own allegation that replacement-CEO Jonathan Johnson commented on September 24 that

"[Overstock] appreciate[s] the cooperation and guidance we are receiving from regulatory authorities."

In sum, Plaintiff's factual allegations, together with reasonable inferences from the allegations, cannot establish that Overstock did not intend, as of July 30 and August 8, to issue the dividend shares as unregistered securities. So Plaintiff fails to plausibly allege that Defendants planned to register the dividend all along.

b.

Second, Plaintiff argues Defendants failed to disclose that it was illegal for Overstock to issue the digital dividend without registering it with the SEC. But neither Plaintiff's briefing nor complaint establish that Defendant's unregistered dividend would have violated the law. Federal securities law provides for unregistered securities. See, e.g., 1 Thomas Lee Hazen, Treatise on the Law of Securities Regulation § 4:106 (2021) (discussing exemptions under SEC Rule 144a); 17 C.F.R. § 230.500–508 (SEC Regulation D—Rules Governing the Limited Offer and Sale of Securities without Registration). Yet Plaintiff does not identify a statute, rule, or regulation making Overstock's announced dividend unlawful. Nor does Plaintiff allege that any regulatory authority commanded Overstock to register its dividend. Accordingly, Plaintiff's allegations cannot establish a claim for securities fraud.

c.

Plaintiff argues Defendants failed to disclose Overstock's true reason behind not registering the dividend: to create an artificial price at which Byrne could sell his

shares. But Plaintiff points only to Byrne's stock sales and post-hoc statements. These allegations, taken as true, certainly support Plaintiff's insider trading claim; but they fail to allege with particularity that Overstock decided not to register the dividend to enable Byrne to profit personally. Because Plaintiff fails to adequately allege that Defendants omitted material information from its dividend disclosures, we affirm the dismissal of Plaintiff's related market manipulation and misstatement fraud claims.[25]

C.

Plaintiff next alleges that Defendants Byrne and Nielsen violated § 20(a) of the Exchange Act because, as high-ranking executives, they exercised control over Overstock's illegal conduct. Control-person claims under § 20(a) requires an

[25] Plaintiff and its amici argue that we create a slippery slope by affirming the district court, undermining capital market integrity and inducing charlatans to devise schemes to exploit investors. But this argument presumes that short sellers must always cover if a company with a high rate of short interest elects to issue an unregistered dividend. This premise is faulty: securities lenders can contract around unregistered distributions made on borrowed shares. In fact, some already do. For example, § 8.2 of the Securities Industry and Financial Markets Association's model lending agreement provides that distributions made on borrowed shares will automatically be added to the balance of the loan. Securities Industry and Financial Markets Association, Master Securities Loan Agreement, https://www.sifma.org/wp-content/uploads/2017/06/MSLA_Master-Securities-Loan-Agreement-2017-Version.pdf (last visited Apr. 10, 2024). Similarly, J.P. Morgan's model lending agreement provides that non-cash distributions need not be delivered to the lender until the relevant loan is terminated. JPMorgan Chase Bank, N.A., Securities Lending Agreement, https://www.sec.gov/archives/edgar/data/1303608/000119312505211076/dex99h4.htm (last visited Apr. 10, 2024). Plaintiff's argument also disregards the fact that schemes are still unlawful if they mislead investors as to how other market participants have valued a security.

underlying primary violation of the securities laws. Smallen v. W. Union Co., 950 F.3d 1297, 1315 (10th Cir. 2020) (citing Adams, 340 F.3d 1083). The district court dismissed Plaintiff's control-person claims after concluding that Plaintiff failed to adequately plead that Overstock violated § 10(b). Because we affirm the district court's dismissal of Plaintiff's predicate claims, Plaintiff's control-person claims also fail. See id. (holding that without a predicate violation of the securities laws, § 20(a) claims necessarily fail).

D.

Plaintiff lastly alleges that Defendant Byrne's September stock sales violated § 20A of the Exchange Act. Section 20A provides that insiders who trade stock "while in possession of material, nonpublic information" are liable to any person who traded contemporaneously with the insider. 15 U.S.C. § 78t-1(a). And while we have not yet decided the pleading parameters of a § 20A claim, several of our sister circuits interpret § 20A to require insider trading plaintiffs to plead a predicate violation of the Exchange Act or its rules and regulations. See, e.g., City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 175 (3d Cir. 2014) (quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999)); Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d Cir. 1994); In re VeriFone Sec. Litig., 11 F.3d 865, 872 (9th Cir. 1993).

The district court agreed with our sister circuits and similarly concluded that Plaintiff's § 20A claim, like its § 20(a) claims, must be based on an underlying violation of the Exchange Act or its regulations. The district court also determined

that, even if Plaintiff plausibly alleged the required predicate violation, Plaintiff's insider trading claim still fails because Plaintiff did not trade at the same time as Byrne. Plaintiff's opening brief, however, addressed only the district court's second conclusion—that Plaintiff and Byrne did not trade contemporaneously. And though Byrne urged us to affirm the district court's dismissal on both grounds, Plaintiff again declined to brief whether a § 20A claim must be based on a predicate Exchange Act violation in its reply.

Plaintiff's omission is fatal. "When an appellant does not challenge a district court's alternate ground for its ruling, we may affirm the ruling." Starkey ex rel. A.B. v. Boulder Cty. Soc. Servs., 569 F.3d 1244, 1252 (10th Cir. 2009) (citing Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 877 (10th Cir.2004)). Because Plaintiff fails to challenge both of the district court's grounds for dismissing its § 20A claim, Plaintiff fails to demonstrate reversible error. See, e.g., Nixon v. City & Cnty. of Denver, 784 F.3d 1364, 1369–70 (10th Cir. 2015) (the failure to adequately brief an issue results in waiver). We accordingly affirm the district court's dismissal.

AFFIRMED.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

October 15, 2024

Molly Judith Bowen
Daniel H. Silverman
Joshua Handelsman
Cohen Milstein Sellers & Toll
1100 New York Avenue, NW, East Tower, Suite 500
Washington, DC 20005

Michael B. Eisenkraft
Laura H. Posner
Cohen Milstein Sellers & Toll
88 Pine Street, 14th Floor
New York, NY 10005

Katherine Pepin
Keith M. Woodwell
Clyde Snow & Sessions
201 South Main Street, Suite 2200
Salt Lake City, UT 84111

**RE: 21-4126, In re: Overstock Securities, et al**
Dist/Ag docket: 2:19-CV-00709-DAK

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,



Christopher M. Wolpert
Clerk of Court

cc: Dylan Bruce
Alfred Dumetz Carry
Erik Anthony Christiansen
Robert Neil Driscoll
John Dwyer
Thomas Elrod
Emma Gilmore
Stephen Wright Hall
Jeremy A. Liberman
Andrew Martin McNeela
Alan S. Mouritsen
Ira M. Press
Holly Stein Sollod
Cory Alan Talbot
Adam Trigg

CMW/mlb